**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| W&G, LLC and GEORGE STRIPP, ) | |
| ) | |
| Petitioners, ) | Case No. |
| ) | |
| vs. ) | Judge |
| ) | |
| PAINTERS DISTRICT COUNCIL NO. 14 AND ) | |
| ITS AFFILIATE, GLAZIERS ARCHITECTURAL ) | |
| METAL AND GLASSWORKERS ) | |
| LOCAL 27 ) | |
| ) | |
| Respondent. ) | |

FILED: JULY 22, 2008
08CV4166
JUDGE GUZMAN
MAGISTRATE JUDGE SCHENKIER

TC

**MEMORANDUM OF LAW OF W&G LLC AND GEORGE STRIPP IN
<u>SUPPORT OF THEIR PETITION TO VACATE ARBITRATION AWARD</u>**

**I.  INTRODUCTION**

    **A.  The Parties and Jurisdiction**

        Petitioners, W&G, LLC ("W&G") and George Stripp ("Stripp") have timely petitioned this Court for the entry of an order vacating an April 23, 2008 Arbitration Award (the "Award") which the Joint Arbitration Committee (the "Committee") of the Association of Glazing Contractors (the "Association") and Painters District Council No. 14 and its Affiliate, Glaziers Architectural Metal and Glassworkers Local 27 (the "Union") entered against them and Huron Valley Glass Company LLC ("HVG") (W&G, Stripp, HVG, and the Union are sometimes collectively referred to as the "Parties").

        Alternatively, W&G and Stripp request that this Court modify the award or remand the Award back to the Committee to clarify its ruling or to conduct a full rehearing on the merits. This Court has subject matter jurisdiction in accordance with 28 U.S.C. § 1337 over W&G's and Stripp's Petition in accordance with the provisions of Taft Hartley Labor Management Relations Act, 29 U.S.C. § 185 the Federal Arbitration Act, 9 U.S.C. § 1.

    **B.  Summary of Argument**

        The Committee award against W&G, Inc., W&G, LLC and George Stripp is improper and must be vacated because, among other things:

1.  W&G, Inc. did not exist at the time the award was entered;

2.  W&G, LLC and Stripp were not parties to the 2005 Collective Bargaining Agreement;

3.  The Union failed to bring any grievance that it had against W&G, LLC and Stripp before a Board of Business Agents as a prerequisite to initiating arbitration in accordance with Article 18 of the 2005 Collective Bargaining Agreement;

4.  The Union failed to notify W&G, LLC and Stripp that it was seeking to arbitrate its claims against those entities thereby precluding it from participating in the hearing; and

5.  The Union failed to establish any basis upon which to impose liability against them.

For the reasons that petitioner, Huron Valley Glass, LLC, asserted in its Petition to Vacate and Supporting Memorandum incorporated herein and attached hereto as Exhibit A, and because the Committee exceeded its powers in entering an award against W&G, Inc.—a non-existent entity—as well as W&G, LLC, the Court should vacate the award entered against them

## C. <u>Procedural History</u>

In or about April, 2007, the Union sent letters to HVG's Dennis Ahearn requesting HVG to appear at meetings of the Union's Board of Business Agents in accordance with Article 18 of the 2005 Collective Bargaining Agreement between the Union and HVG. Neither W&G nor Stripp were invited to attend that meeting. Subsequently, on January 30, 2008, the Glaziers Architectural Metal and Glassworkers Local 27 ("the Union") sent out an Amended Notice of Joint Committee Hearing to Dennis Ahearn, President of Huron Valley Glass LLC. A true and correct copy of the Amended Notice is attached to HVG's Supporting Memorandum as Exhibit 4. The Amended Notice contained a service list, which shows the Notice was also sent to various members of the Joint Arbitration Committee, and counsel for Huron Valley Glass. See Exhibit 4. The names W&G Inc., W&G LLC, and George Stripp are not noted in the caption of the Notice nor anywhere else in the body of the document sent by the Union. See Exhibit 4. Further, the Service List attached to the Notice does not indicate that any of these parties were given Notice of the arbitration, either directly or through counsel. See Exhibit 4.

The Amended Notice requested the Joint Committee be convened to hear a dispute over present and future work performance between Huron Valley Glass Company LLC and the Union

concerning certain provisions of the June 1, 2006 through May 31, 2009 Collective Bargaining Agreement ("2006 CBA") and predecessor agreements between Huron Valley Glass Company LLC and Glaziers Local No. 27 ("2005 CBA").  (Ex. 1.)  A true and correct copy of the July 22, 2005 CBA between Huron Valley Glass Company LLC and the Glaziers Union Local No. 27 is attached to the HVG memorandum as Exhibit 6.  A true and correct copy of the June 1, 2006 through May 31, 2009 CBA between the Association of Glazing Contractors and the Glaziers Union Local No. 27 is attached to the HVG memorandum as Exhibit 7.

A Joint Committee comprised of three Association of Glazing Contractors and three Union Officials convened a hearing pursuant to the notice on March 20, 2008.  W&G, Inc., George Stripp, and W&G LLC were not present nor were they represented by counsel at the hearing.  The Committee issued its Decision and Award on April 23, 2008.  A true and correct copy of the transcript of the hearing is attached to the HVG memorandum as Exhibit 8.  A true and correct copy of the Decision and Award is attached to the HVG memorandum as Exhibit 13.

## II.    Facts Adduced During the Hearing

Petitioner, W&G Inc. is a dissolved corporation based in Michigan.  See Exhibit A. Petitioner W&G LLC, its successor corporation, is a corporation organized under the laws of the State of Michigan.  W&G LLC is a payroll company that administers payroll and benefits for a few companies, including Huron Valley Glass. George Stripp is an agent of W&G LLC.  HVG works as a glass subcontractor in a few regional States, including Illinois. (Ex. A.)  Respondent, Glaziers Architectural Metal and Glassworkers Local 27, is a Union that represents Glaziers in the Chicagoland area.  (Ex. A.)  W&G LLC administers the payroll and benefits for the Union members who work with or for Huron Valley Glass in the Chicago area.  (Ex. A.)  In 2005, HVG and the Union negotiated the 2005 CBA.  (Ex. A.)  George Stripp signed the 2005 CBA.  (Ex. A.)

The 2005 CBA governed the relationship between HVG and the Union.  (Ex. A.)  The 2005 CBA contained provisions regarding such things as wages, hours and subcontracting, to name a few.  (Ex. A.)

Sometime during the year 2007, a dispute arose between the Union and HVG based upon the 2005 CBA, and in 2008, the Union issued its Amended Notice of Hearing Before Joint Committee.  (Ex. A.)  George Stripp was never given Notice of the hearing, nor did he have notice of the nature of the dispute.  (Ex. A.)  The W&G Entities were never given Notice of the

hearing, nor did either of them or their representatives have notice of the nature of the dispute. (Ex. A.)

The Union presented a grievance to the Committee alleging HVG, George Stripp, and the W&G Entities violated the subcontracting clause of the 2005 CBA by subcontracting with J&D Erectors, a non-Glazier shop, and that each of them should be held jointly and severally liable for the alleged breach. (Ex. A.) The Union did not issue a revised Notice such that George Stripp would have known that he was targeted individually by the Union in its grievance. (Ex. A.). Mr. Stripp would have requested a continuance from the Joint Committee had he received Notice. (Ex. A.) This continuance would have allowed Mr. Stripp time to retain counsel, educate himself on the facts and nature of the grievance proceeding, and present a defense at the time of hearing. (Ex. A.) Mr. Stripp was not given such an opportunity. (Ex. A.)

Just as the Union did not issue a revised Notice notifying Mr. Stripp of its intent to pursue him, the Union did not issue a revised Notice such that the W&G Entities would have known that they were targeted by the Union in its grievance. (Ex. A.) The W&G Entities would have requested a continuance from the Joint Committee had either or both of them received Notice. (Ex. A.) This continuance would have allowed the W&G Entities time to retain counsel, educate themselves on the facts and nature of the grievance proceeding, and present a defense at the time of hearing. (Ex. A.) Neither of the W&G Entities was given such an opportunity. (Ex. A.)

The matter was heard by a joint Committee of the Union and Association of Glazing Contractors on March 20, 2008 in the absence of George Stripp and the W&G Entities. (Ex. A.) The Committee engaged in a pattern of misbehavior which exceeded the authority of the Committee and prejudiced the rights of each Petitioner. (Ex. A.) The following is a prime example:

- Early in the proceeding, the Committee disregarded rules of procedure and due process by allowing the Union to lodge and advance claims against certain Petitioners, who had not received notice of the arbitration proceeding. The claims against Petitioners were spontaneously added by counsel for the Union upon the start of his opening statement. HVG objected to this procedural flaw several times throughout the hearing, informing the Committee that counsel for HVG did not represent the Petitioners or their interests in this proceeding. Exhibit 5. Each time, HVG's objection was denied. (Ex. A.)

The Committee issued its Decision and Award on April 23, 2008 ("the Decision").  (Ex. A.)  In the Decision, the Committee made twenty-four findings and issued a three point Award which contained an explanation of the computation of damages.

The Decision indicates clear and evident partiality by the Committee in favor of the Union.  (Ex.  A.)  For example, the Committee made the following findings:

1.  It has jurisdiction over the parties and the subject matter and is authorized under the contract to grant an appropriate remedy.  Jurisdiction over all parties was discussed (Ex.);

2.  HVG, George Stripp, individually, W&G Inc., and W&G LLC are all bound to the terms of the CBA (Ex. A.);

3.  The conduct of Huron and W&G LLC indicates that the companies remain bound to a successor bargaining agreement (the "2006 CBA").  (Ex. A.);

The Award ordered, among other things: 1) "The grievance is sustained.  The remedy for the breach of the subcontracting clause is an amount of damages that would make the Union whole."  (Ex. A.); 2) *"Huron, [W&G] LLc (sic) [George] Stripp and [W&G] Inc. jointly and severally are directed to comply with the subcontracting provisions, Article 9, of the agreement."* (Ex. 6.); and 3) "The Committee's opinion is that a monetary award is warranted." (Ex. A.)

## III.  Argument

### A.  Standard of Review

In addition to the standard of review as articulated in HVG's Supporting Memorandum, it is important to note that "an arbitrator need only provide the parties with a fundamentally fair hearing."  *Hayne, Miller & Farni, Inc. v. Flume*, 888 F. Supp. 949, 952 (E.D.Wis. 1995) (citing to *Bowles Financial Group, Inc. v. Stifel, Nicolaus & Co., Inc.,* 22 F.3d 1010, 1012 (10th Cir. 1994). "A fundamentally fair [arbitration] hearing 'requires only notice, an opportunity to be heard and to present relevant and material evidence and argument before the decision makers, and that the decision makers are not infected with bias.  *Hayne,* 888 F.Supp.  at 952); (quoting *Bowles,* 22 F.3d at 1013).

Most of the Circuits appear to agree that a fundamentally fair arbitration hearing requires only notice, an opportunity to be heard and to present relevant and material evidence and argument before the decision makers, and that the decision makers are not infected with bias.

See; e.g. *Employers Ins. of Wausau v. National Union Fire Ins. Co.*, 933 F.2d 1481, 1491 (9th Cir. 1991).  (fair hearing is based on notice, opportunity to be heard and to present evidence, and lack of biased decision making); *Sunshine Mining Co. v. United Steelworkers of Am.*, 823 F.2d 1289, 1295 (9th Cir. 1987) (hearing is fundamentally fair if it meets the 'minimum requirements of fairness'--adequate notice, a hearing on the evidence, and an impartial decision) (quoting *Ficek v. Southern Pacific Co.*, 338 F.2d 655, 657 (9th Cir. 1964), cert. denied, 380 U.S. 988, 14 L. Ed. 2d 280, 85 S. Ct. 1362 (1965));  *Hoteles Condado Beach v. Union de Tronquistas Local 901*, 763 F.2d 34, 39 (1st Cir. 1985) (arbitrator must give each party an adequate opportunity to present evidence and arguments).

"An arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not dispense his own brand of industrial justice.  He may of course look to guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement.  When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." *Tootsie Roll Indus., Inc. v. Local Union #1,* 832 F.2d 81, 83, (7th Cir. 1987) (quoting *United States Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct, 1358 (1960)).  See also *Anheuser Busch Inc. v. Beer Drivers, Local Union No. 744, Affiliated with the International Brotherhood of Teamsters*, 280 F.3d 1133, 1137, 169 L.R.R.M. 2513,   (7th Cir. 2001)(holding that an arbitration award was invalid when the arbitrator exceeded his authority by modifying the collective bargaining agreement and the contract was clear, unambiguous and required no interpretation).

Under section 301 of the Taft-Hartley Act, 29 U.S.C. § 185, a federal judicial remedy is available if a collective bargaining agreement is breached.  The Federal Arbitration Act, 9 U.S.C. § 1, created federal judicial remedies for disputes arising out of collective bargaining agreements to arbitrate.  *See Smart v. IBEW*, 315 F.3d 721, 724 (7th Cir. 2002).  "When there is no conflict" between these statutes, "and the FAA provides a procedure or remedy not found in section 301…then…we apply the Federal Arbitration Act." *Smart*, 315 F.3d at 724-25.

Section 10 of the Federal Arbitration Act provides guidelines for situations where a court may vacate an arbitration award. Specifically, §§ 10(a)-(b) and 11(a) - (c) state:

§ 10(a)-(b)

(a) In any of the following cases, the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration.

*** 

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of …any other misbehavior by which the rights of any party have been prejudiced;

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made.

(b) If an award is vacated and the time within which the agreement required the award to be made has not expired, the court may, in its discretion, direct a rehearing by the arbitrators.

§11(a)-(c)  In either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration --

(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.

(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.

(c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties.

**B.  W&G and Stripp Were Not Parties to the 2005 Collective Bargaining Agreement**

Arbitration is contractual by nature -- a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Zurich American Ins. Co. v. Watts Industries, Inc.,* 417 F.3d 682, 687 (7th Cir. 2005) (internal punctuation and citations omitted).  W&G and Stripp were not such parties.  Indeed, all of the evidence adduced at the hearing showed that the Union relied upon HVG as being the party and all communications were with it as opposed to Stripp and W&G.  For that reason, alone, this Court should vacate the Award.

**C.  The Union's Failure to Include W&G and Stripp in the Grievance Process Precludes the Initiation of Arbitration Against Them**

Even assuming that W&G and Stripp could arguably be viewed as parties to the 2005 Collective Bargaining Agreement, the Committee had no authority to enter any relief against them in the Arbitration because the Union failed to bring any grievance that it had against W&G, LLC and Stripp before a Board of Business Agents as a prerequisite to initiating arbitration in accordance with Article 18 of the 2005 Collective Bargaining Agreement.  As such, the Committee had no authority over them.

**D.  The Union Failed to Notify Stripp or W&G That It Was Seeking Relief Against Them**

As stated *supra*, the Federal Arbitration Act provides that an arbitration award should be vacated where the arbitrators were guilty of misbehavior by which the rights of any party have been prejudiced.  9 U.S.C. § 10.

The Committee in this case did not provide the Petitioners "a fundamentally fair hearing." *Hayne, Miller & Farni, Inc. v. Flume*, 888 F.Supp. 949, 952 (E.D.Wis. 1995) (citing to *Bowles Financial Group, Inc. v. Stifel, Nicolaus & Co., Inc.,* 22 F.3d 1010, 1012 (10th Cir. 1994); (Ex. A.)  "A fundamentally fair [arbitration] hearing in this case  would have required notice to Petitioners, an opportunity to be heard and to present relevant and material evidence and argument before the Committee during the arbitration hearing, and that the Committee were not infected with bias. *Hayne,* 888 F.Supp. at 952; (quoting *Bowles,* 22 F.3d at 1013).  None of the criteria of a fundamentally fair hearing are present in this case.  (Ex. A.)

Most of the Circuits appear to agree that a fundamentally fair arbitration hearing requires only notice, an opportunity to be heard and to present relevant and material evidence and argument before the decision makers, and that the decision makers are not infected with bias. See; e.g. Employers Ins. of Wausau v. National Union Fire Ins. Co., 933 F.2d 1481, 1491 (9th

Cir. 1991). (fair hearing is based on notice, opportunity to be heard and to present evidence, and lack of biased decision making); *Sunshine Mining Co. v. United Steelworkers of Am.,* 823 F.2d 1289, 1295 (9th Cir. 1987) (hearing is fundamentally fair if it meets the 'minimum requirements of fairness'--adequate notice, a hearing on the evidence, and an impartial decision) (quoting *Ficek v. Southern Pacific Co.*, 338 F.2d 655, 657 (9th Cir. 1964), cert. denied, 380 U.S. 988, 14 L. Ed. 2d 280, 85 S. Ct. 1362 (1965)); *Hoteles Condado Beach v. Union de Tronquistas Local 901*, 763 F.2d 34, 39 (1st Cir. 1985) (arbitrator must give each party an adequate opportunity to present evidence and arguments). While this is persuasive authority, other district courts in the Seventh Circuit have applied this standard of "fundamental fairness." *Hayne,* 888 F.Supp. at 952.

     **E.  The Committee Engaged in Misbehavior Thereby Prejudicing the Rights of Stripp and the W&G Entities By Denying Them a Fundamentally Fair Hearing Where the Hearing Was Held Without Notice**

     First, it must be noted that the Amended Notice of Hearing did not contain the name(s) of any Petitioner, nor was the name(s) of any Petitioner included on the Service list. (Ex. A.); See e.g. *Hayne,* 888 F.Supp. at 952.

     Even if Petitioners Stripp and the W&G had been provided with a copy of the Amended Notice of Hearing, receipt would not have been sufficient to place Petitioners on notice of the Union's intent to hold each of them to the CBA and grieve against each of them because of an alleged breach. (Ex. A.) At best, receipt of the Amended Notice would have placed Petitioners on notice that the Union intended to grieve against Huron Valley Glass. (Ex. 1.) If Petitioners would have received a copy of the Amended Notice, none of them would have been made award by the contents of the Notice that they were subject to personal liability.

     During the arbitration hearing, counsel referred to a letter dated February 28, 2008 in support of his contention that Petitioners had received adequate Notice. (Ex. A.) The letter was directed to counsel for Huron Valley Glass. (Ex. A.) The record is devoid of a notice of grievance issued against George Stripp and the W&G Entities. In light of this fact, an arbitration hearing that proceeded against their interests in this case could never satisfy the fundamental fairness test. See e.g. *Hayne,* 888 F.Supp. at 952.

**F.  The Committee Engaged in Misbehavior That Prejudiced Petitioners by Allowing Argument of Petitioners' Liability Without Providing Petitioners With an Opportunity to Be Heard**

The Committee did not afford the Petitioners with a fair hearing when the Committee allowed the Union to argue the Petitioners' joint and several liability with Huron Valley Glass without providing Petitioners with an opportunity to be heard." *Hayne, Miller & Farni, Inc. v. Flume*, 888 F.Supp. 949, 952 (E.D.Wis. 1995) (citing to *Bowles Financial Group, Inc. v. Stifel, Nicolaus & Co., Inc.,* 22 F.3d 1010, 1012 (10th Cir. 1994). Petitioners, Stripp and the W&G Entities would have presented relevant and material evidence and argument in defense of the Union's grievance had the Committee afforded them such an opportunity. *Hayne,* 888 F.Supp. at 952); (quoting *Bowles,* 22 F.3d at 1013). Since Petitioners were not provided with an opportunity to present relevant evidence and argument to mount a defense to the grievance because the Committee engaged in such misbehavior, the arbitration award should be vacated under section 10(a)(3). (Ex. A.); 9 U.S.C. § 1; *Hayne,* 888 F.Supp. at 952); (quoting *Bowles,* 22 F.3d at 1013).

**G.  The Committee Engaged in Misbehavior That Prejudiced Petitioner Thereby Denying Them a Fundamentally Fair Proceeding Where the Committee Panel was Infected With Bias**

The hearing was infected with bias and fundamentally unfair where the Union lodged arguments and presented evidence against Petitioners where they were not present to respond. (Ex. A.) This hearing biased the Committee against Petitioners which is evident in the Decision and Award issued by the Committee finding liquidated damages and joint and several liability against them. (Ex. A.) *Hayne,* 888 F.Supp. at 952); (quoting *Bowles,* 22 F.3d at 1013). The hearing was tainted with bias and deprived the Petitioners of their right to a fundamentally fair hearing and decision. (Ex. A.) *Hayne,* 888 F.Supp. at 952); (quoting *Bowles,* 22 F.3d at 1013). As such, the award against Petitioners should be vacated.

**H.  The Award Should be Modified to Remove Petitioners as the Arbitrators Awarded Upon a Matter Not Submitted to Them**

The Amended Notice of hearing did not give the arbitrators authority to resolve a dispute between the Union and Petitioners. (Ex. A.) As the arbitrators gain their authority from the Notice, the Committee's decision to award damages against Petitioners was beyond the matter

submitted to them.  (Ex.  A.)  As such, this Court should modify the award to remove Petitioners in accordance with 9 U.S.C. § 1.

## III.     CONCLUSION

For the foregoing reasons, Petitioners George Stripp, W&G Inc., and W&G LLC, seek judicial intervention and review of the Committee's Decision and Award and respectfully request this Court enter an order vacating the arbitration award of April 23, 2008, modifying the arbitration award of April 23, 2008, or, alternatively, remanding this matter back to the arbitrators for clarification of the basis of their ruling and/or for a full rehearing on the merits.

Respectfully Submitted,

**W&G, LLC**, and **GEORGE STRIPP,** Petitioners

By:  /s Scott Ruksaktiati
One of Their Attorneys

Dated:  July 22, 2008

Scott Ruksakiati, Esq.
VANEK, VICKERS & MASINI, PC
Attorneys for Defendant W & G, LLC
225 West Washington Street
18th Floor
Chicago, Illinois 60606

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| HURON VALLEY GLASS COMPANY, LLC | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | ) Case No. 08CV4166 |
| | ) |
| | ) Judge JUDGE GUZMAN |
| PAINTERS DISTRICT COUNCIL NO. 14 AND | ) MAGISTRATE JUDGE SCHENKIER |
| ITS AFFILIATE, GLAZIERS ARCHITECTURAL | ) |
| METAL AND GLASSWORKERS | ) TC |
| LOCAL 27 | ) |
| | ) |
| Respondent. | ) |

## PETITION TO VACATE ARBITRATION AWARD

Petitioner, Huron Valley Glass, LLC, by its attorneys, moves pursuant to the Federal

Arbitration Act ("FAA"), 9 U.S.C. §1, *et seq.* for an Order vacating an arbitration award for

monetary relief entered on April 23, 2008 by the Joint Arbitration Committee and in support

thereof submits its attached Memorandum In Support of Its Petition to Vacate Arbitration Award

(the "HVG Memorandum") and states:

### PARTIES AND JURISDICTION

1.      Petitioner, Huron Valley Glass LLC, ("HVG") is a Michigan corporation with its

principal place of business in Ypsilanti, Michigan.

2.      Respondents, Painters District Council No. 14 and its Affiliate, Glaziers

Architectural Metal and Glassworkers Local 27 (collectively referred to as the "Union") have

their principal places of business in Chicago, Illinois.

3.      The matter in controversy exceeds $75,000.00 exclusive of interest and costs. This Court may exercise jurisdiction pursuant to 28 U.S.C. § 1391(a) because the Union has its principal place of business in this District.

4.      This Court has subject matter jurisdiction in accordance with 28 U.S.C. § 1337 over HVG's Petition in accordance with the provisions of Taft Hartley Labor Management Relations Act, 29 U.S.C. § 185 the Federal Arbitration Act,  9 U.S.C. § 1.

## BACKGROUND

5.      On July 22, 2005, Petitioner and Respondent entered into a collective bargaining agreement governing labor and employment relations between the two parties.  A copy of this agreement is attached to the Memorandum.

6.      Prior to May 2007, HVG contemplated installing windows that it manufactured at a project located at 1401 S. State Street in Chicago (the "1401 Project").  In accordance with the 2005 CBA, HVG representatives communicated with Union representatives about securing Union members to work on the project.  However, the Union Business Agents did not suggest any particular labor contractor where HVG could find any such Union members who were not already engaged in other work.  Nonetheless, at the Union's urging, HVG solicited bids from labor subcontractors it believed employed Union Glaziers.  True and accurate copies of this correspondence are attached to the Memorandum.

7.      None of those potential subcontractors responded to the HVG's requests for bids and HVG notified the Union of this fact.  True and accurate copies of this correspondence are attached to the Memorandum.

8.     In response, the Union offered no members available for work and no companies having Union member employees with which HVG could contract for labor.  Instead, it merely threatened to file a payment-in-lieu action.  True and accurate copies  of this correspondence are attached to the Memorandum.

9.     The Union presented a grievance to the Committee alleging HVG violated the subcontracting clause of the 2005 CBA by subcontracting with J&D Erectors, a non-Glazier shop.  True and accurate copies of the notice of hearing, hearing transcript and related documents are attached to the Memorandum.

10.     On March 20, 2008, a Joint Arbitration Committee of the Association of Glazing Contractors and Painters District Council No. 14 and its Affiliate, Glaziers Architectural Metal and Glassworkers Local 27 presided over an arbitration hearing.   The Joint Committee was comprised of representatives of the Union, and representatives of the Association of Glazing Contractors.  HVG is not a member of the Association of Glazing Contractors.

11.     On April 23, 2008, the Committee issued its Decision and Award, a true and correct copy of which is attached to the Memorandum.

12.     HVG is appealing from that decision pursuant to §10(a) of the FAA for the reasons more fully specified in the Memorandum.

13.     This Petition to Vacate the award is brought within ninety (90) days of the time the award was issued.

     **WHEREFORE** Petitioner, Huron Valley Glass LLC respectfully requests that the Court:

(a)      enter an Order vacating the Committee's Decision and Award;


(b)      Alternatively, Petitioner requests that this Court modify the award or remand the Award back to the Committee to clarify its ruling or to conduct a full rehearing on the merits;

(c)      Grant such further relief as the Court deems just and proper.




Respectfully Submitted,


**HURON VALLEY GLASS LLC**, Petitioner


By: _____/s/  Richard H. Chapman_____
                   One of Its Attorneys

Edward L. Filer Esq.,
Richard H. Chapman Esq.,
Jessica M. Scheller Esq.,
Clark Hill PLC
150 North Michigan Avenue
Suite 2400
Chicago, Illinois
Telephone No.: (312) 985-5900
Facsimile No.: (312) 985-5999

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | | |
|---|---|---|---|
| HURON VALLEY GLASS COMPANY, LLC | ) | | |
| | ) | | |
| Petitioner, | ) | | |
| | ) | Case No. | 08CV4166 |
| | ) | | JUDGE GUZMAN |
| vs. | ) | | |
| | ) | Judge | MAGISTRATE JUDGE SCHENKIER |
| PAINTERS DISTRICT COUNCIL NO. 14 AND | ) | | |
| ITS AFFILIATE, GLAZIERS ARCHITECTURAL | ) | | TC |
| METAL AND GLASSWORKERS | ) | | |
| LOCAL 27 | ) | | |
| | ) | | |
| Respondent. | ) | | |

**MEMORANDUM OF LAW OF HURON VALLEY GLASS COMPANY LLC IN
SUPPORT OF ITS PETITION TO VACATE ARBITRATION AWARD**

## I.  INTRODUCTION

### A.  The Parties and Jurisdiction

Petitioner, Huron Valley Glass LLC ("HVG") has timely petitioned this Court for the entry of an order vacating an April 23, 2008 Arbitration Award (the "Award") which the Joint Arbitration Committee (the "Committee") of the Association of Glazing Contractors (the "Association") and Painters District Council No. 14 and its Affiliate, Glaziers Architectural Metal and Glassworkers Local 27 (the "Union") entered against HVG (HVG and the Union are sometimes collectively referred to as the "Parties").  Alternatively, HVG requests that this Court modify the award or remand the Award back to the Committee to clarify its ruling or to conduct a full rehearing on the merits.  This Court has subject matter jurisdiction in accordance with 28 U.S.C. § 1337 over HVG's Petition in accordance with the provisions of Taft Hartley Labor Management Relations Act, 29 U.S.C. § 185 the Federal Arbitration Act,  9 U.S.C. § 1.

### B.  Summary of Argument

In the Arbitration underlying the Award, the Union claimed that HVG violated the sub-contracting clause of one or more collective bargaining agreements to which HVG was allegedly subject.  The collective bargaining agreements did not specify a particular remedy for the claimed breach.  At the hearing, the Union did not proffer a single Union member to testify that he or she was unable to work on the HVG job because a member of the Iron Workers' union had

taken that job.   Nor, did the Union proffer any specific amount of damages that would compensate any specific members for any injuries that they purportedly suffered.  Indeed, such proof of both injury and damage would have been difficult to obtain because HVG showed that there were few, if any, Union members who were not already working on other unrelated jobs while the HVG job was pending.

Nonetheless, the Arbitration and the Award were irrevocably tainted by the Chairman of the Committee's improper and unsolicited testimony on material matters, as well as his incessant questioning of HVG witnesses.   Aided by the Chairman's thoroughly improper conduct, the Committee awarded damages to the Union, as a whole, based upon the total hours the Iron Workers' members spent on the job, not to any specific Union members who arguably suffered any injuries or damages as a result of the claimed subcontracting.  Such a remedy exceeded the authority of the Committee, by among other things, failing to adhere to the legal principles underlying the collective bargaining agreements.  Absent this misconduct and baseless nature of the Award, the Committee would not have awarded any damages to the Union. As such, the award should be vacated or, in the alternative, modified or be subject to the Committee rehearing the Union's grievance on the merits.

## II.  Facts Adduced During the Hearing

### A.  The Parties and the Alleged Collective Bargaining Agreements

Petitioner, HVG is a corporation based in Michigan and works as a glass subcontractor in a few regional States, including Illinois.  (Ex.8, Pp. 128, 287.).  HVG manufactures windows to be installed in as part of new construction projects.  From time to time, HVG provides its own labor for the installation of those windows. Respondent, Glaziers Architectural Metal and Glassworkers Local 27, is a Union that represents Glaziers in the Chicagoland area.  (Ex. 8, Pp. 150.)

### B.  The 2005 and 2006 CBA's

On July 22, 2005, HVG entered into a collective bargaining agreement ("CBA") with the Union (the "2005 CBA").  The 2005 CBA required HVG to give first consideration to qualified Union members of HVG's choosing found with the Union's assistance to install those windows[1]

---

[1]Section 6 of the 2005 CBA provides: "When hiring new Employees, the Employer shall give first consideration to qualified Glaziers and Apprentice Glaziers who have prior experience with Employers covered by the Agreement and performing work within the area covered by this Agreement.  It

or to subcontract the labor for installation only to contractors employing Union members. (Ex. 6.)[2]  The 2005 CBA does not require an employer to take any further action if it is not able to locate an available subcontractor

The 2005 CBA does not prescribe a damage remedy in the event that HVG were to breach the "subcontracting" clause.  It does not specifically provide the Union with a right to damages, nor does it specify any right to any individual member to recover damages.

This 2005 CBA was separate and distinct from any agreement that the Union might have had with the Association of Glazing Contractors Association [sic], of which HVG is not a member.  (Ex. 6);(Ex. 7.)  The fact that there are two separate and distinct CBAs at issue in this case is critical, as the CBA maintained with the Glazing Contractors Association is longer in duration, awards higher wages, and contains other contractual provisions that are significant in light of this dispute.  (Ex. 7);(Ex. 6.) For all purposes here,  the CBA between HVG and the Union shall be referred to as the 2005 CBA, and the CBA between the Union and the Association shall be referred to as the 2006 CBA.  (Ex. 6);(Ex. 7.)

### C. HVG As A Joint Signatory to Glaziers' and Iron Workers' CBAs

In relation to the work to be performed by the Union, HVG signed CBAs with two distinct unions, each of which claimed jurisdiction over the same work (referred to in the industry as being a "dual signatory").  (Ex. 8, Pp. 189.)  In this case, those unions were the Glaziers and the Architectural and Ornamental Ironworkers Union Local No. 1.  (Ex. 8, Pp. 189.)  For a period of several years, the Glaziers operated under an agreement with HVG regarding its dual signatory status.  (Ex. 8, pp. 192.)  According to the testimony of Michael Mabus the Union's Business Representative, HVG was allowed to staff its projects with members of whichever union was outperforming the other irrespective of the 2005 CBA with the Glaziers Union.  (Ex. 8, Pp. 194.)  Thus, despite the provisions of the CBA, the Union admittedly agreed

---

is recognized, however, that the Employer has the final right to select the Employees to be hired.  It shall be the responsibility of the Union to assist the Employer in obtaining competent Glaziers."

[2]Section 9 of the 2005 CBA "[I]f an Employer is unable to obtain sufficient employees in any classification through the Glaziers Local 27 referral procedure within 48 hours excluding Saturday, Sunday and holidays from the time the request is made it [employer] may subcontract the work for that job to a Union contractor without regard to any other provision of this Agreement."

to be staffed at a level of 50% or less in accordance with what is oft described as the "Cold War" agreement[3] between these two unions.  (Ex. 8, Pp. 192.)

   **D.  Availability of Union Labor and Subcontractors for the 1401 Project**

   Prior to May 2007, HVG contemplated installing windows that it manufactured at a project located at 1401 S. State Street in Chicago (the "1401 Project").  In accordance with the 2005 CBA, HVG representatives communicated with Union representatives about securing Union members to work on the project.  However, the Union Business Agents did not suggest any particular labor contractor where HVG could find any such Union members who were not already engaged in other work.  Nonetheless, at the Union's urging, HVG solicited bids from labor subcontractors it believed employed Union Glaziers, including .  See, April 9, 2007 Letters from Dan Lindsey to Prime Architectural, Service Glass, and Desiree, Inc. (Ex. 1.)   None of those potential subcontractors responded to the HVG's requests for bids and HVG notified the Union of this fact.  See, April 21, 2007 Letter from Kevin Anderson to Michael O'Donnell (Ex, 2.)  In response, the Union offered no members available for work and no companies having Union member employees with which HVG could contract for labor.  Instead, it merely threatened to file a payment-in-lieu action.  See May 2, 2007 Letter from Michael Mabus to Kevin Anderson (Ex. 3.).  With no Glaziers to hire and while still using Glaziers as part of its composite crews at another ongoing HVG project with the Union's blessing, HVG was left with little choice but to sign the J&D Contract which it did on April 23, 2007. (Ex. 8, Pp. 110.)

   J&D Ironworkers worked at the 1401 Project for a total of 10,770.20 hours between May 2007 through February 2008.  During that same period, the Union's records showed the Union did not have any members who were not already working substantial hours. See Exhibit 9 detailing Glaziers' Members' availability during the May 2007 through February 2008 period.

   **E.  The Union's Grievance**

   The Union presented a grievance to the Committee alleging HVG violated the subcontracting clause of the 2005 CBA by subcontracting with J&D Erectors, a non-Glazier shop.  (Ex. 4.);(Ex. 8.)  HVG denied that it violated the subcontracting clause, and asserts that the Union violated the 2005 CBA when it failed to procure the necessary labor for the 1401

---

[3]The "Cold War" agreement was reached after the Glaziers and the Ironworkers contested jurisdiction over certain jobs.  In accordance with the agreement, a dual signatory may maintain a composite crew of approximately 50% Glaziers and 50% Ironworkers on jobs with concurrent jurisdiction, and no damages would be sought under any CBA.

Project.  (Ex. 8, Pp. 110.)   On January 30, 2008, the Glaziers Architectural Metal and Glassworkers Local 27 ("the Union") sent out an Amended Notice of Joint Committee Hearing. A true and correct copy of the Amended Notice is attached hereto as Exhibit 4.  The Amended Notice requested the Joint Committee be convened to hear a dispute over present and future work performance between Huron Valley Glass Company LLC and the Union concerning certain provisions of the June 1, 2006 through May 31, 2009 Collective Bargaining Agreement ("2006 CBA") and predecessor agreements between Huron Valley Glass Company LLC and Glaziers Local No. 27 ("2005 CBA").  (Ex. 4.)

In response to the Notice, Huron Valley Glass Company LLC sent a letter of objection to the Glaziers Union and the Joint Committee.  A true and correct copy of that letter is attached hereto and incorporated by reference as Exhbit 5.  The letter stated, among other things, that Huron Valley Glass is not a member of the Association of Glazing Contractors, and as such, the Glaziers Articles of Agreement with the Association would not apply, and that it would like a complete copy of the July 22, 2005 Articles of Agreement entered into by the Glaziers and Huron Valley Glass.  (*Id.*)   A true and correct copy of the July 22, 2005 CBA between Huron Valley Glass Company LLC and the Glaziers Union Local No. 27 is attached hereto as Exhibit 6. A true and correct copy of the June 1, 2006 through May 31, 2009 CBA between the Association of Glazing Contractors and the Glaziers Union Local No. 27 is attached hereto as Exhibit 7.

A Joint Committee comprised of three Association of Glazing Contractors and three Union Officials convened a hearing pursuant to the notice on March 20, 2008.  The Committee issued its Decision and Award on April 23, 2008.  A true and correct copy of the transcript of the hearing is attached hereto as Exhibit 8.

During the arbitration proceeding, the Committee accepted into evidence a chart of the damages per Union member prepared by HVG.  A true and correct copy of that chart is attached hereto as Exhibit 9.

Both HVG and the Union submitted post-hearing briefs.  A true and correct copy of the post-hearing brief filed by HVG is attached hereto as Exhibit 10.  A true and correct copy of the post-hearing brief filed by the Union is attached hereto as Exhibit 11.  A true and correct copy of the Union's brief is attached hereto as Exhibit 12.  In addition, the Union filed a proposed Decision and Award.  A true and correct copy of the Union's proposed Decision and Award is

attached hereto as Exhibit 12. A true and correct copy of the Decision and Award issued by the arbitrators is attached hereto as Exhibit 13.

## III. ARGUMENT

### A. The Standard of Review

#### 1. Application of the Federal Arbitration Act

Under section 301 of the Taft-Hartley Act, 29 U.S.C. § 185, a federal judicial remedy is available if a collective bargaining agreement is breached. The Federal Arbitration Act, 9 U.S.C. § 1 ("FAA"), created federal judicial remedies for disputes arising out of collective bargaining agreements to arbitrate. *See Smart v. IBEW*, 315 F.3d 721, 724 (7th Cir. 2002). As is the case here, where there is no conflict between the Taft Hartley Act and the FAA, and where the FAA provides a procedure or remedy not found in section 301, the Court should apply the FAA. *Smart*, 315 F.3d at 724-25.

#### 2. Key FAA Provisions

Accordingly, Section 10(a) of the FAA provides guidelines for situations where a court may vacate an arbitration award:

> (a) In any of the following cases, the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration…
>
> > (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> >
> > (3) where the arbitrators were guilty of …any other misbehavior by which the rights of any party have been prejudiced;
> >
> > (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made.

Applying Section 10(a)(4), the Seventh Circuit has also noted that an arbitration award may be vacated within the purview of Section 10(a)(4) if the arbitrators "manifestly disregarded" the law by directing the parties to violate the law or by failing to adhere to the legal principles

specified by the contract. *Cameel A. Halim v. Great Gatsby's Auction Gallery, Inc.,* 516 F.3d 557, 563 (7th Cir. 2008).

Arbitrators are confined to interpretation and application of the collective bargaining agreement; they do not dispense their own brand of industrial justice. A panel exceeds its authority when it attempts to dress up its policy desires in contract interpretation clothing. *Anheuser-Busch*, 280 F.3d at 1142 ("As we have pointed out, an arbitrator cannot '*dress his policy desires up in contract interpretation clothing; a wolf in sheep's clothing, is still nothing other than a wolf.*")[emphasis in original]quoting *NIPSCO v. United Steel Workers of America*, 243 F.3d 345, 347 (7th Cir. 2001).

Arbitrators may, of course, look to guidance from many sources, yet their award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrators words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." *Tootsie Roll Indus., Inc. v. Local Union #1,* 832 F.2d 81, 83, (7th Cir. 1987) (quoting *United States Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct, 1358 (1960). See also *Anheuser Busch Inc. v. Beer Drivers, Local Union No. 744, Affiliated with the International Brotherhood of Teamsters*, 280 F.3d 1133, 1137, 169 L.R.R.M. 2513 (7th Cir. 2001) (holding that an arbitration award was invalid when the arbitrator exceeded his authority by modifying the collective bargaining agreement and the contract was clear, unambiguous and required no interpretation).

## B. The Panel Was Guilty of Misbehavior and Evident Partiality Prejudicing HVG's Rights

The record contains at least one instance of direct, definite and demonstrated bias in the conduct by the Committee members in favor of the Union when the Committee's chairman chose to testify on a key issue concerning the availability of Union labor. The Chairman's testimony came in the midst of HVG's counsel's cross-examination of Michael Mabus, the Union's Business Representative, about his testimony that he "bent over backwards for Huron Valley Glass to satisfy their manpower needs." In connection with the Mabus testimony, Committee Chair Shapiro chose to testify in support of the Union's position while still purporting to be an independent arbitrator:

> Q (MR. CHAPMAN TO MR. MABUS):    Okay.  So when you say you would give HVG first consideration over contractors that have been established with our Local, what does that mean?  Like so, for example, if

Mr. Shapiro was seeking people – his company seems like one that has been established for quite a while here, and the other gentlemen here as well – what would you have done better for Huron Valley than you would have done for them?

COMMITTEE CHAIR SHAPIRO:  **Could I respond?**

MR. CHAPMAN:        Why don't we just finish it up.

MR. SCHWARTZ:      **You probably shouldn't.**

COMMITTEE CHAIR SHAPIRO:  It is the practice when we need people to call up a month, two months, three months, to say we are doing a large job, we need people, and Mike consistently over many years when he has the opportunity to have notice will put together people that suit that job.  They have done it for me.  They have done it for everybody.  This is something that they do.  So if you need people and you say you are putting up a curtain wall or you're welding or you're – whatever you're doing, you'll say, I need six people or eight people, it's going to go four months or five months from now.  Is the job going to start always exactly at that date?  It may, it may not.  But I have a crew to do the jobs I want to do when I don't have people today to do it because I don't need them today.  **This is the way we do things.**  You call up and you say, I need people, and they get people.  I have also had them take people from me when they need somebody.  The have called up and said Al, we need people for three of four days, we have a contract, or wee need to do something, and they have taken the people.  I mean – and I'm sure it's happened to people in this room.

(Exhibit 8, Pp 207-09) (emphasis added).

Attempting to characterize the Chairman's wholly improper "testimony" merely serves to dilute its patent impropriety and bias.  In any tribunal, be it in a judicial proceeding, arbitration, or otherwise, it would be wholly improper for a judge, jury member, or an attorney to testify as to his own personal experience with a party to support that party's position.  The Chairman's action thoroughly and completely tainted the Committee Hearing rendering it a sham which should not be given this Court's imprimatur.  Given that Mr. Shapiro was acting as the Chair of the Committee when this "testimony" was given, it demonstrates the Committee was biased in favor of the Union at every turn, including testifying on the Union's behalf when HVG ask the tough questions.

In particular, the Chairman's quote of "This is the way we do things" suggests that in addition to influencing the testimony before the remainder of the panel, Chairman Shapiro

-8-

intended to base his decision on some other policy or body of thought that was outside of either the 2005 or 2006 CBA. *Anheuser-Busch*, 280 F.3d at 1142  This quote indicates Arbitrator Shapiro's intent to dispense his own brand of industrial justice and because of this, the award should be vacated. *Anheuser-Busch*, 280 F.3d at 1142

Chairman Shapiro's improper conduct did not stop with his own testimony. (Ex. 8.) Throughout the hearing, Chairman Shapiro cross-examined witnesses that were brought before the tribunal on behalf of HVG. (Ex. 8., see e.g. 133.) During the testimony of Dennis Ahearn, Arbitrator Shapiro asked no fewer than sixty-seven (67) questions of the witness. (Ex. 8, 133-147.)

In accordance with the Seventh Circuit's holding in *Health Services Management Corp, v. Charles Hughes*, 975 F.2d 1253, 1264 (7th Cir. 1992), and for this reason, alone, this Court should vacate the award.

### C. The Arbitrators Exceeded Their Powers By Awarding Damages to the Union Without Any Basis in the CBA To Do So

One of the main issues contested between the parties before the Committee was the appropriate remedy to be applied in the event of a breach of the 2005 CBA. (Ex. 8);(Ex. 10);(Ex. 11);(Ex. 12.) The 2005 CBA was silent as to the damages available in the event of a breach of the subcontracting clause. (Ex. 6.) HVG asserted that even if it violated the 2005 CBA by using Ironworkers instead of Glaziers (which, of course, it disputed), nearly all of the Glaziers qualified to do work on the 1401 Project were otherwise employed, and, therefore the Union members, actually damaged by the alleged breach were few, if any. (Ex. 8, 21.)

The Union responded to HVG's defense by stating it need not prove damage to any individual member. (Ex. 8, 12-13.) Indeed, when asked, the witness who prepared the audit for the Union, Richard J. Wolf, testified that he did not know of any individual Union member who was damaged, and did not know how the damages would be disbursed if awarded. (Ex. 8, pp. 62-63.) Instead, the Union argued that the Union itself suffered damage, and was therefore entitled to grieve the entire amount of wages paid to J&D Erectors. (Ex. 8, 12-13.) The Union so-argued even though it could not and did not prove the alleged breach harmed any specific individual, or group of individuals, in the Glaziers Union. (Ex. 8.) The Union thus asserted that it had legal standing to receive damages for its own benefit under the 2005 CBA. (Ex. 8);(Ex. 10);(Ex. 11);(Ex. 12.)

The Committee exceeded its authority and engrafted a legal principle on to the Agreement that never existed in finding:

1.    The Union has been damaged in it's standing which argues in favor a (sic) full compensation for loss of work due to the violation of the subcontracting clause of the CBA." (Ex. 13, Par. W.); and

2.    "We do not accept the company's argument that individualized damages are the only proper remedy. The grievance was brought by the Union on behalf of the entire bargaining unit…Nor do we find it proper to deduct unemployment or interim earnings earned by employees on the out of work list from an award to the Union as a whole." (Ex. 13, Par. X)

The Award ordered, among other things: 1) "The grievance is sustained. The remedy for the breach of the subcontracting clause is an *amount of damages that would make the Union whole*."[emphasis added](Ex. 13, Par. 1.); 2) "Huron, [W&G] LLc (sic) [George] Stripp and [W&G] Inc. jointly and severally are directed to comply with the subcontracting provisions, Article 9, of the agreement," where the Award did not specify whether those persons were to comply with the 2005 CBA or the 2006 CBA. (Ex. 13, Par. 2.); and 3) "The Committee's opinion is that a monetary award is warranted." (Ex. 13, Par. 3.)

The Committee further exceeded its authority by finding that full compensation and damages to the Union itself were warranted though the record contains no indication that any individual members of the Union had been damaged by HVG. (Ex. 13, Par W);(Ex. 8.)

The Committee adopted the damage theory proffered by the Union by multiplying the total number of hours J & D Erectors worked on the 1401 Project by the prevailing wage rate for a Glazier, $35.00 per hour. (Ex. 13.)(Ex. 8);(Ex. 10);(Ex. 11);(Ex. 12.) This resulted in a total award to the Union of $396,936.50. This calculation was the result of the Committee exceeding its authority in two ways: 1) the 2005 CBA Article 5, which governs wages between HVG and the Union, does not support a wage of $35.00 under any set of circumstances; and 2) the award was not supported by any evidence that individual Glaziers could have and would have taken the job but for the alleged breach. (Ex. 13);(Ex. 6);(Ex. 8.) In fact, the evidence showed quite the opposite – that individual Glaziers were all otherwise employed and unable to take the job anyway. Thus, the award amounts to a windfall for the Union which itself never established that it suffered any damages.

-10-

Nothing in the 2005 CBA purports to provide damages to the Union itself – as opposed to its damaged members – in the event the subcontracting clause is breached. (Ex. 6.). Quite to the contrary, the CBA is silent as to remedies for breach. (Ex. 6.)

In addition, the CBA entered into between HVG and the Union did not allow a wage as high as $35.00 per hour. (Ex. 6.). Despite this, the Committee awarded an hourly rate of $35.00. (Ex. 13.) The decision to ignore the CBA was a clear error and evidence of manifest disregard.

Further, the law on this issue is clear: the injured Union members are entitled to *actual damages*, and nothing more. The objective in compliance proceedings like arbitration is to restore to the extent feasible the status quo by restructuring the circumstances that would have existed had there been no improper conduct. *See, Consolidated Delivery & Logistics and Teamsters Local No. 481,* 2007 NLRB Lexis 374 (NLRB 2007). Back pay is meant to be remedial, and not punitive. *Id.,* citing *Republic Steel Corporation v. NLRB,* 311 U.S. 7, 12, (1940).

Here, the Union failed to provide proof that a single one of its members was damaged. Indeed, the record evidence showed just the opposite – HVG was unable to contract the Union specifically because its members were unavailable and already working. The record is in fact void of *any* proof by the Union that *any* qualified member was available for the entire period over which back pay is claimed. (Ex. 8); (Ex. 6.)

Nevertheless, the Committee awarded damages in an amount that would only have been appropriate had the Union proved that it had a whole team of workers sitting on the sideline that could have and should have been working in place of J&D Erectors. (Ex. 13.) This award thus unjustly enriched the Union by placing it—without regard to any individual members—in a better position than it otherwise would have been without the alleged breach by HVG. *Id.,* at 13. (Ex. 13.)

Moreover, the Union badly failed to meet its burden of proof, but the Committee nonetheless entered the award sought by the Union. (Ex. 8);(Ex. 13.) Rather than consider the evidence, the Committee simply and blindly relied solely the Union's presentation of damages and audit numbers, without tailoring damages on an individualized basis. *See, Consolidated Delivery & Logistics and Teamsters Local No. 481, supra.* (Ex. 8) and (Ex. 13.) The law requires much more.

The law requires the Committee to hold the Union to certain burdens of proof. Specifically, the Union must establish the amount of back pay due to each Union member who was not hired as a result of the alleged 2005 CBA violation by HVG. *See, NLRB v. Ferguson Electric,* 242 F.3d 426 (2nd Cir. 2001). To that end, for each Union member whom the Union seeks back pay, the Union must prove that the individual gross back pay calculation is reasonable to compensate that member. *Contractor Services, Inc. v. IBEW Local 347,* 2007 NLRB Lexis 393 (2007). Similarly, before the Union can recover back pay for an individual Union member under the law, the Union must first prove that the Union member harmed sought out interim employment, and that the Union member's earnings from the interim employment do not exceed the amount of back pay that is sought on his or her behalf. *Id. See, Cheney Construction , Inc. and United Brotherhood of Carpenters and Joiners of America,* 2007 NLRB Lexis 105 (NLRB 2007). If the proofs demonstrated that the Union member's earnings during interim employment exceeded the back pay sought, the worker would be entitled to no damages under the law. *Id.* Moreover, in order to conform with existing labor law, any Award by the Committee which included back pay must have been sufficiently tailored to remedy only the actual consequences of an unfair labor practice by HVG, and should not have addressed purely speculative damage on behalf of the Union. *Id.,* at 431. The record is devoid of any such proofs by the Union and the Committee made no attempt to tailor the award as required by law.

The law also is clear that if the Award of a committee includes damages payable to Union members, and those damages place the members of a Union in a better position than they would have been had the breach never occurred, those damages are punitive in nature and improper. *Aguinaga, et al. v. United Food & Commercial Workers Int'l Union,* 854 F.Supp. 757, 761 (D. Kan. 1994). As described above, that is exactly what happened here. (Ex. 13.) The Committee's Award and Damages calculation improperly included hours for Union members who simply were not damaged because they were working – and being paid – elsewhere. (Ex. 13.) At the very least, the interim earnings of Union members during a grievance period are to be offset against a back pay award so that the back pay award compensates only actual damages to the members of the Union and to avoid making a Union member who has found other work more than whole. *Heinrich Motors Inc. and Int'l Union, United Auto, Aerospace and Agricultural Implement Workers of America,* 166 NLRB 783, 7 (NLRB 1967). Here, there was

no offset – instead the Committee simply entered an excessive award that resulted in a windfall to the Union by awarding damages where no damage had been done.  (Ex. 13.)

The heavy handed damage award handed down by the Committee can only be understood as a misguided attempt by the Committee to punish HVG or deter others.  (Ex. 13.) Unsurprisingly, that is exactly what the Union was seeking.  (Ex. 8);(Ex. 11);(Ex. 12.)  During the hearing and in its papers the Union oft suggested that the Committee should "deter" HVG and other employers in the area from engaging in any behavior that might run afoul a CBA, and also for "damaging its Standing."  (Ex. 8);;(Ex. 11);(Ex. 12.) .  In support of this position, the Union cited the musings of a hornbook, not either of the CBAs it argues apply to this dispute, nor any applicable law in this jurisdiction.  (Ex. 8);(Ex. 11);(Ex. 12.).  However, as described above, damage awards in contract arbitrations are to be remedial, not punitive.  *Republic Steel Corporation v. NLRB,* 311 U.S. 7, 12, (1940).

The Committee's damages award exceeded the Committee's authority rendered without regard to the CBA's provision.  For these reasons, as well, it should be vacated.

### D.  The Committee Exceeded Its Authority By Subjecting HVG to Liability Under a Contract It Did Not Sign.

What is perhaps most amazing about the Committee's Decision is that it purports to subject HVG to liability under the 2006 CBA—a *contract to which HVG was not even a signatory or party*.  (Ex. 13, Par L.);(Ex. 7.)

The Committee specifically found that HVG adopted the 2006 CBA.   (Ex. 13, Par. L.) The 2006 CBA was the successor agreement to the 2005 CBA.  (Ex. 7);(Ex. 6.)  The arbitration was brought, over objection by HVG under the 2006 CBA and to which HVG was never a signatory.  (Ex. 4);(Ex. 5);(Ex 4.).  HVG was, however, a signatory to the 2005 agreement.  (Ex. 6.)

In addition to being legally unsupportable, the Committee's finding regarding the application of the 2006 CBA also makes for completely unintelligible Decision, as the Decision repeatedly refers singularly to "the CBA," never once distinguishing which CBA it is interpreting at the moment.  (Ex. 13.)  Subjecting HVG to liability in such an ad hoc fashion cannot stand. (Ex. 13.)

It cannot be questioned that finding HVG bound to a successor agreement to which it was neither a party nor a signatory was wildly beyond the scope of the panel's authority, beyond the scope of the notice of the hearing, and demonstrative of an intent by the Committee to dress up

-13-

its policy desires regarding HVG in contract interpretation clothing. This act, in and of itself, is sufficient evidence that the Committee was not "even arguably construing or applying the contract and acting within the scope of [its] authority" such that judicial review of the award in this circumstance is not inappropriate. *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (S. Ct. 2001); (cited by *International Union of Operating Engineers, Local 139, AFL-CIO v. J.H. Findorff & Son, Inc.*, 393 F.3d 742, 745 (7th Cir. 2004)(where the Court held that a judge may not overturn an award where the judge found the "plain" meaning of the CBA to be at odds with the award when the record reflected the arbitrator interpreted the CBA at issue).

Moreover, the confusion created by the Committee's flip-flopping between CBAs leaves the reader – and HVG, a party subject to a damages award – unsure as to which contract is even at issue. (Ex. 13);(Ex. 6);(Ex. 7). In such a situation, it is clear that judicial intervention is appropriate. According to the Seventh Circuit, when asking the question of whether judicial intervention is appropriate, the proper question to be asked by the district court is not "…whether [the Committee] grossly erred in interpreting the contract; it is whether [the Committee] interpreted the contract." *Findorff & Son, Inc.*, 393 F.3d at 745; (citing to *Hill v. Norfolk & Western Ry.,* 814 F.2d 1192-1194-95 (7th Cir. 1987). The *Findorff* case is especially applicable here, as it is impossible to decipher whether the Committee was interpreting the 2006 CBA submitted by the Union's Notice, the 2005 CBA by which HVG agrees it was bound, or whether it was interpreting any contract language at all. *Id.* at 745; (Ex. 13);(Ex. 4);(Ex. 6);(Ex. 7.) This determination is critical, as the wages awarded by the Committee cite to a wage that is not supported by HVG's 2005 CBA with the Union. (Ex. 13);(Ex. 6.)

In the present case, it is clear that the answer to the question of whether the Committee interpreted the CBA must be "no," as the Decision makes a finding that HVG adopted a new and wholly separate CBA. (Ex. 13);(Ex. 7.) According to *Findorff & Sons*, "[t]here is a big difference – a clear difference, a plain difference – between misunderstanding and ignoring contractual language." *Id. at 745.*

By ignoring the relevant contractual language and instead subjecting HVG to liability under a contract it did not even sign, the Committee engaged in manifest disregard for the law. (Ex. 13);(Ex. 7.) According to the United States Supreme Court, though an error of law is not a ground listed in the FAA for vacating or modifying an award, an arbitrator's "manifest

-14-

disregard" of legal rules can justify intervention by the judiciary. *Wilko v. Swan* 346 U.S. 427, 436-37 (1953), overruled on other grounds by *Rodriguez de Quijas v. Shearson American Express, Inc.*, 490 U.S. 477 (1989); *See also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995)(same). Based on the language from *Wilko*, the Seventh Circuit has confirmed that an arbitration award may be vacated when an arbitrator "disregards" the law. *See e.g. National Wrecking co. v. Teamsters*, 990 F.2d 957 (7th Cir. 1993); *Health Services Management Corp. v. Hughes*, 975 F.2d 1253 (7th Cir, 1992); (discussed in *George Watts & Son, Inc. v. Tiffany and Company*, 248 F.3d 577, 579-80 (7th Cir. 2001). *See also Koveleskie v. SBC Capital Markets, Inc.*, 167 F.3d 361, 366 (7th Cir. 1999) (noting that the statutory list cited by the FAA does not provide the exclusive means of modifying or vacating an arbitration award, and that "manifest disregard of the law" is one of the means by which a court may set aside the award).

Here, by holding HVG to the 2006 CBA, a contract to which it was never a party, the Committee committed a manifest disregard of the law. (Ex. 13.) As such, the award should be vacated.

### E. The Committee Exceeded Its Authority By Awarding Liquidated Damages Under Article 18 Section 1 where the 2005 CBA Did Not Authorize the Committee to Award Liquidated Damages.

The Committee did not stop at awarding damages where no damage was inflicted. (Ex. 13.) They went on to announce in Paragraph 3(d) that, pursuant to Article 18 Section 1 of the 2005 CBA, "the violation of the contract was willful and that a 25% liquidated damage award rendered hereunder to be paid to the grieving party." Paragraph 3(e) states: HVG, W&G Inc., W&G LLC and George Stripp, "Individually, jointly, severally, individually (sic) and personally are ordered to pay within seven days of receipt of the Award plus this Award, 25% which equals $99,234 (sic) as liquidated damages for a total award against them of $496,170.50." (Ex. 13.)

While the 2005 CBA does allow for the award of liquidated damages under certain circumstances, it is not a remedy that is available to the Committee under Article 18. (Ex. 6.) The Committee exceeded its authority in granting this extraordinary remedy. (Ex. 13.)

The 2005 CBA clearly articulates that liquidated damages can only be award by a third party Arbitrator selected by the Committee, *and not the Committee itself*. The relevant portions of Article 18 Section 1 of the 2005 CBA provides the following:

> **Step 2.** Any grievance, dispute, misunderstanding or difference arising during the life of this Agreement, interpretation of the same

-15-

shall be decided by a Committee composed of three (3) representatives appointed by the Employers and three (3) by the Union whose majority decision shall be final and binding upon all parties to the dispute.  Representatives will be appointed only for the length of the contract.  ***In the event of the Committee's inability to decide an issue or a deadlock by the Committee, a third party shall be selected by them to act as an Arbitrator***…

***

…If an ***Arbitrator*** determines that the violation of the Agreement is willful, he/she shall have the authority to attach to any monetary award rendered hereunder a liquidated damage of Twenty Five Percent (25%) of such award to be paid to the grieving party. [emphasis added].

The 2005 CBA makes clear when and by whom a finding of liquidated damages is authorized.  (Ex. 6.)  Only a third party arbitrator had the discretion to award liquidated damages. The Committee's Award of liquidated damages clearly exceeds the authority granted to it by the CBA, and should therefore be vacated.  *Id.*

## IV. CONCLUSION

For the foregoing reasons, HVG seeks judicial intervention and review of the Committee's Decision and Award.  Wherefore the Petitioner, Huron Valley Glass LLC respectfully requests this Court enter an order vacating the arbitration award of April 23, 2008, modifying the arbitration award of April 23, 2008, or, alternatively, remanding this matter back to the arbitrators for clarification of the basis of their ruling and/or for a full rehearing on the merits.

Respectfully Submitted,

**HURON VALLEY GLASS LLC**, Petitioner

By:   /s/ Richard H. Chapman
            One of Its Attorneys

Edward L. Filer Esq.,
Richard H. Chapman Esq.,
Jessica M. Scheller Esq.,
Clark Hill PLC
150 North Michigan Avenue, Suite 2400
Chicago, Illinois
Telephone No.: (312) 985-5900
Facsimile No.: (312) 985-5999



**HURON VALLEY GLASS COMPANY, LLC**

321 W. Lake Street ♦ Suite J ♦ Elmhurst, IL 60126
(630) 941-1951 ♦ (630) 941-1952

April 9, 2007

Prime Architectural Metals and Glass
Attention: Estimating
926 Lunt Avenue
Schaumburg, IL 60193

08CV4166
JUDGE GUZMAN
MAGISTRATE JUDGE SCHENKIER


TC

**Regarding: 1401 S. State – Chicago, IL**

Dear Sirs,

Huron Valley Glass LLC is currently under contract to WE O'Neil Construction
Company to furnish and install the preglazed aluminum windows from floors 3-22 on the
project. The preglazed windows are being supplied by PDMI of Singapore and are
scheduled to begin arriving in mid May 2007.

Huron Valley Glass LLC is soliciting bids from Local 27 signatories that can provide the
following:

1) Labor to unload, distribute and install.
2) EMR rating of <1.0
3) Payment and Performance Bonds

Your firm is one of three Local 27 signatories that are being considered.

Enclosed is a CD containing PDF copies of HVG's shop drawings. Architectural
drawings and specifications can be referenced at: www.accaterepro.com .

Bids are due April 20, 2007.

Thank you,


Dan Lindsey
Project Manager


**A NATIONAL CONSTRUCTION ENTERPRISES COMPANY**

**HVG**

# HURON VALLEY GLASS COMPANY, LLC

321 W. Lake Street ♦ Suite J ♦ Elmhurst, IL 60126
(630) 941-1951 ♦ (630) 941-1952

April 9, 2007

Service Glass Company
Attention: Estimating
4161 South Morgan Street
Chicago, IL 60609

Regarding: 1401 S. State – Chicago, IL

Dear Sirs,

Huron Valley Glass LLC is currently under contract to WE O'Neil Construction
Company to furnish and install the preglazed aluminum windows from floors 3-22 on the
project. The preglazed windows are being supplied by PDMI of Singapore and are
scheduled to begin arriving in mid May 2007.

Huron Valley Glass LLC is soliciting bids from Local 27 signatories that can provide the
following:

1) Labor to unload, distribute and install.
2) EMR rating of <1.0
3) Payment and Performance Bonds

Your firm is one of three Local 27 signatories that are being considered.

Enclosed is a CD containing PDF copies of HVG's shop drawings. Architectural
drawings and specifications can be referenced at: www.accuraterepro.com .

Bids are due April 20, 2007.

Thank you,

Dan Lindsey
Project Manager

A NATIONAL CONSTRUCTION ENTERPRISES COMPANY



# HURON VALLEY GLASS COMPANY, LLC

### 321 W. Lake Street ◆ Suite J ◆ Elmhurst, IL 60126
### (630) 941-1951 ◆ (630) 941-1952

April 9, 2007

CAD Contract Glazing
Attention: Estimating
508 Mercantile Court
Wheeling, IL 60090

**Regarding: 1401 S. State -- Chicago, IL**

Dear Sirs,

Huron Valley Glass LLC is currently under contract to WE O'Neil Construction Company to furnish and install the preglazed aluminum windows from floors 3-22 on the project. The preglazed windows are being supplied by PDMI of Singapore and are scheduled to begin arriving in mid May 2007.

Huron Valley Glass LLC is soliciting bids from Local 27 signatories that can provide the following:

1) Labor to unload, distribute and install.
2) EMR rating of <1.0
3) Payment and Performance Bonds

Your firm is one of three Local 27 signatories that are being considered.

Enclosed is a CD containing PDF copies of HVG's shop drawings. Architectural drawings and specifications can be referenced at: www.accuraterepro.com .

Bids are due April 20, 2007.

Thank you,


Dan Lindsey
Project Manager



## HURON VALLEY GLASS COMPANY, LLC

321 W. Lake Street ◆ Suite J ◆ Elmhurst, IL 60126
(630) 941-1951 ◆ (630) 941-1952

April 21, 2007

Glaziers Local 27
Attention: Michael O'Donnell
4225 Lawndale Avenue
Lyons, IL 60534

**Regarding: 1401 S. State Project**

Michael,

I enjoyed meeting with you at your office on April 4th to discuss the project. Huron Valley Glass LLC intends to subcontract the installation work to a local Chicago erector, for a variety of reasons. Huron Valley Glass incurred an unusual amount of Workers Compensation Claims at Old Orchard Woods as well as equipment theft and material theft. To survive in the Chicago market we have made a business decision that we need to subcontract the labor on 1401 to mitigate the risks.

One of the subcontractors that we're considering using is Desire, operated by Robert Keeling. Mr. Keeling wasn't interested in the preglazed window portion but he is interested in the field set storefront glass and I'm optimistic that we will be able to reach an agreement in the future.

At the April 4th meeting I made the commitment to solicit installation quotes from Local 27 signatories. On Monday April 9th I forwarded bid packages to:
1) Service Glass
2) Underland Architectural
3) Prime Architectural
4) CAD Contract Glazing

I asked for pricing by Friday April 20th but did not receive a single bid. I have a project that needs to be installed so I've made the decision to award the erection to a non Local 27 signatory. This is not to say that Huron Valley Glass does not intend to pursue Local 27 type work in the future and employ glaziers. But to survive in the Chicago market, after a difficult experience at Old Orchard Woods, Huron Valley Glass needs to mitigate risk.

Thank you,

Kevin Anderson
Regional Operations Manager – Huron Valley Glass Company LLC





PHONE 708-443-2000
FAX 708-443-2007

# Glaziers, Architectural Metal and Glass Workers
## Local Union No. 27, Chicago and Vicinity

OF THE

INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, AFL-CIO
AFFILIATED WITH PAINTERS' DISTRICT COUNCIL NO. 14

MEETS THE 4TH MONDAY OF EACH MONTH, 6309 WEST 26TH STREET, BERWYN

4225 LAWNDALE AVENUE • LYONS, IL 60534

TERRENCE FITZMAURICE
BUSINESS MANAGER
SECRETARY-TREASURER

MICHAEL MABUS
BUSINESS REPRESENTATIVE

MICHAEL O'DONNELL
BUSINESS REPRESENTATIVE

MICHAEL COOK
BUSINESS REPRESENTATIVE

JAMES AUGUSTYN
PRESIDENT

RICHARD GADEUS
VICE PRESIDENT

MICHAEL OHM
RECORDING SECRETARY

LAWRENCE TABIC
FINANCIAL SECRETARY

May 2, 2007

By Facsimile
and Regular Mail
Mr. Kevin Anderson
Huron Valley Glass Company, LLC
321 W. Lake Street, Suite J
Elmhurst, Illinois  60126

Re:    1401 S. State Project

Dear Sir:

Local 27 is in receipt of your April 21, 2007 correspondence.  I hope that Huron Valley Glass is not implying that Local 27 members were the cause of your "difficult experience at Old Orchard Woods" or that they filed "an unusual amount of workers compensation claims and equipment and material theft".  If you have any proof, please provide it.  To my knowledge, Local 27 members out performed workers from other trades on that project.

This is to advise that of the four contractors from whom bid packages were solicited by you, two, Underland Architectural and Prime Architectural <u>are not</u> signatories to a Local 27 bargaining agreement.

Your letter concludes Huron Valley Glass will award the work to a "non-Local 27 signatory". As advised in our counsel's letter to you of March 7, 2007, Glaziers 27 will pursue all contract rights related to the project and seek pay in lieu of work measured by the hours worked by all non Local 27 personnel for work covered by our collective bargaining agreement, having as a courtesy given you prior notice and an opportunity to correct the breach and mitigate potential damages.

Please call if you wish to discuss resolution further.

Yours truly,

Michael Mabus

Michael Mabus

Association of Glazing Contractors and
Painters District Council No. 14 and Its Affiliate
Glaziers Architectural Metal and Glass Workers Union No. 27
Joint Committee

In the Matter of:                        )
                                         )
Huron Valley Glass Company LLC           )
                                         )
            Respondent,                  )
                                         )
     and                                 )
                                         )
Glaziers Architectural Metal and         )
Glassworkers Local 27                    )
                                         )

AMENDED
**NOTICE OF JOINT COMMITTEE HEARING**

**To:**   By Facsimile (734)-434-2046
          CERTIFIED MAIL
          RETURN RECEIPT REQUESTED
          Regular Mail
          Mr. Dennis Ahearn
          Huron Valley Glass
          5075  Carpenter Rd
          Ypsilanti, MI. 48187

    **PLEASE TAKE NOTICE** that Glaziers Architectural Metal and Glassworkers
Local 27 (the "Union") has requested that the Joint Committee, established pursuant to
Article 18 of the Collective Bargaining Agreement between the Association of Glaziers
Contractors and the Union, be convened to hear a dispute over present and future work
performance between Huron Valley Glass Co. LLC. and the Union concerning the
following provisions of the June 1, 2006 through May 31, 2009 Collective Bargaining
Agreement and predecessor agreements between Huron Valley Glass Co. LLC and
Glaziers Local No. 27:

**Article 2**       Section 1     Recognition
                    Section 3     Union Security
                    Section 4     Dues Checkoff
                    Section 7     Non Discrimination

**Article 5**       Wages

**Article 7**       Classifications



0080

1

| | |
|---|---|
| **Article 9** | Subcontracting |
| **Article 16** | Glass Schedule |
| **Article 17** | Resetting glass |
| **Article 20** | Health, Pension and Annuity Contributions and Trust Agreements incorporated by reference therein. |
| | Section 1-5<br>Sections 6    bonding |
| **Article 21** | Chicagoland Constructive Safety Council/<br>Labor Management Initiative |

As a remedy for these violations, Glaziers Local 27 seeks an order of specific performance requiring Huron Valley Glass Company, LLC to comply with the provisions of the contract and seeks pay in lieu of work measured by all hours worked by subcontractor(s) who employ members of Ornamental Iron Workers Local 63 or any other trade rather than Glaziers Local 27 at any job or project where such persons are or will be performing work described in Article 7 from March 1, 2007 forward or in the future. Local 27 seeks all available remedies at law and in equity including an accounting to determine amounts of wages and benefits owed, interest, liquidated damages and attorneys fees pursuant to 29 U.S.C. 1145 and 1132(g)(2).

The Joint Committee will convene on February 6, 2008 at:

| | |
|---|---|
| **Place:** | 4225 Lawndale Avenue<br>Lyons, Illinois  60534 |
| **Time:** | 11:30 a.m. |

or as soon thereafter as the dispute may be heard.

Both you and the Union are entitled to appear at the hearing. You may be accompanied by counsel. The parties may present evidence (either through testimony or through exhibit). The Committee does not apply formal rules of evidence, but the Committee may restrict the presentation to such matters that the Committee believes are relevant and material to this dispute.

0081

You may remain in the hearing room throughout the presentation of the evidence, and you will be allowed to question witnesses within limits set by the Committee. The Committee itself may restrict the presentation to such matters that the Committee believes are relevant and material to this dispute.

Following the presentation of the evidence, you will be permitted to present to the Committee any argument you believe will be helpful to the Committee in reaching its decision. If you wish to present your argument in written form, it must be prepared in advance and be presented to the Committee immediately after the presentation of the evidence.

After you and the Union have presented evidence relating to this case, both you and the Union representative involved will be requested to leave the hearing room. The Committee will thereafter make its decision, which will be prepared and forwarded to both parties by first class and certified mail.

The decision of the Joint Committee is final and binding upon both parties, pursuant to Article 18, Step 2 of the Collective Bargaining Agreement. You are encourage to attend the hearing. **You should clearly understand that if you do not appear and present your case, the Committee will reach its decision based upon whatever evidence is presented to it at the time of the hearing, and its decision will be just as binding on you as if you attended the hearing.**

By: _____

Association of Glazing Contractors and
Painters District Council No. 14 and Its Affiliate
Glaziers Architectural Metal and Glass Workers
Union No. 27 Joint Committee

Dated: January 30, 2008

0082

3

<u>CERTIFICATE OF SERVICE</u>

I, Angela Mabus, on oath state that I served this Notice of Joint Committee Hearing by mailing a copy to the individual(s) listed below, at their respective addresses, on January 30, 2008, at or before 5:00 p.m.

Mr. Dennis Ahearn
Huron Valley Glass Co. LLC
5075 Carpenter Rd.
Ypsilanti, MI 48187

Richard H. Chapman
&
Edward L. Filer
150 N. Michigan Ave.
Suite 2400
Chicago, IL . 60601

Glaziers Local Union No. 27
4226 Lawndale Avenue
Lyons, Illinois 60534

Painters District Council No. 14
1456 W. Adams Street
Chicago, Illinois 60607

Arnold and Kadjan
19 W. Jackson Boulevard
Suite 300
Chicago, Illinois 60604

Association of Glazing Contractors
Post Office Box 1446
Elk Grove Village, Illinois 60009

0083



**CLARK HILL**
PLC
A T T O R N E Y S   A T   L A W

150 North Michigan Avenue
Suite 2400
Chicago, Illinois 60601
Tel. (312) 985-5900 ▌ Fax (312) 985-5999
www.clarkhill.com

Richard H. Chapman
Phone: (312) 985-5904
E-Mail: rchapman@clarkhill.com

January 31, 2008

BY ELECTRONIC AND FIRST CLASS MAIL

Donald D. Schwartz, Esq.
Arnold and Kadjan
19 West Jackson Blvd
Chicago, Illinois 60604

   Re: Huron Valley Glass Company, LLC and W & G, Inc.-Claims of Glaziers
      Architectural Metal and Glass Workers Local 27 and Trustees of Funds

Dear Don:

In furtherance of our conference this past Monday and our telephone conference on Tuesday, could you please follow up with Mike Cook to get a full copy of the July 22, 2005 "Articles of Agreement" that we have discussed and a portion of which you had attached to the Funds' original complaint. That Agreement is purportedly entered into by the Glaziers with Huron Valley and was purportedly signed by W & G, Inc. To my knowledge, neither Huron Valley, nor W & G, is a member of the Association of Glazing Contractors. As such, the Glaziers' Articles of Agreement with the Association would not seem to apply. Further, the Glaziers' June 1, 2003 "Articles of Agreement" with the Association does not duplicate the partial copy of the July 22, 2005 "Articles of Agreement."

Based upon the June 1, 2003 Articles of Agreement you provided me, I suspect that the July 22, 2005 Articles of Agreement has a similar "Article 25-Contract Duration/Signature Page." As you can see, I need to see an authentic and complete copy of the July 22, 2005 Articles of Agreement so that I may evaluate its application to the claims of the Glaziers' Union and the Glaziers' Fund.

I have received the initial and amended "Notices of Joint Committee Hearing" for February 6, 2008 that Mike Cook forwarded to Ed Filer and me on January 29, 2008 and January 30, 2008. I request that the Joint Committee Hearing set for February 6, 2008 be continued to a mutually agreeable date and time, subject to the Committee's availability and schedule based upon, among other things, the status of our current negotiations, as well as the need for the Union and the Funds to provide us with a copy of an Agreement that it believes binds either or both of Huron Valley or W & G.

CLARK HILL*PLC*

Donald D. Schwartz, Esq.
January 30, 2008
Page 2

In accordance with our discussions, I am also sending copies of this letter to Messrs. Cook, Shapiro, and Fitzmaurice in relation to the request to continue the Joint Committee Hearing.

CLARK HILL PLC

Richard H. Chapman

RHC:pp


cc:    Mr. Michael Cook (via facsimile and regular mail)
       Mr. Terrence Fitzmaurice (via facsimile and regular mail)
       Mr. Albert Shapiro (via facsimile and regular mail)


0086

# ARTICLES OF AGREEMENT

**ARTICLES OF AGREEMENT** made this 22st day of July, 2005 by and between HURON VALLEY GLASS COMPANY, LLC, 5075 CARPENTER, YPSILANTI, MI 48197, (734)434-1160, and PAINTERS DISTRICT COUNCIL NO. 14 and its affiliate, GLAZIERS, ARCHITECTURAL METAL AND GLASS WORKERS LOCAL UNION NO. 27, CHICAGO AND VICINITY, of the International Union of Painters and Allied Trades, AFL-CIO (the "Union").

## ARTICLE 1

## PARTIES

Whenever the word "Association" is used herein, it shall mean the ASSOCIATION OF GLAZING CONTRACTORS and all of its members individually and collectively, whether now belonging to said Association or who may hereafter be admitted to membership. The members of said Association [and any other employer who is not a member of the Association but is otherwise bound by this Agreement] being sometimes hereinafter referred to as "Employer."

Whenever the word "Union" is used herein, it shall mean the PAINTERS DISTRICT COUNCIL NO. 14 and its affiliate, GLAZIERS, ARCHITECTURAL METAL AND GLASS WORKERS LOCAL UNION NO. 27, CHICAGO AND VICINITY, of the International Union of Painters and Allied Trades, AFL-CIO and all of the local unions affiliated therewith and all of the members thereof, individually and collectively bound hereafter, whether now members of said local unions or who may hereafter become members of said unions. The members of said unions being sometimes referred to hereinafter as "Employees."

## ARTICLE 2

## RECOGNITION -- UNION SHOP

**Section 1.    Recognition of Union.** The Association and the employers it represents in bargaining and such other employers as may become members of the Association or who agree to be bound by the terms of this contract recognize the Union as the sole and exclusive bargaining agent for a unit of employees appropriate for bargaining within Section 9(a) of the National Labor Relations Act. The Association and the employers it represents in bargaining agree that this recognition is predicated on a clear showing of majority support indicated by bargaining unit employees without the need for a National Labor Relations Board certified election under Sections 9(a) and (c) of the Act, for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment, employment practices, standards of workmanship, safety practices and other conditions of employment.

**Section 2.    Recognition of Association.**    (a) The Union recognizes the Association as the sole and exclusive bargaining agent of the Employer members of the Association and of such other

EXHIBIT

tabbies®

0001

Employers as may become members of the Association or agree to be bound by the terms of this agreement, as to all matters concerning Employees in the Bargaining Unit.

(b)     The Association has been designated as the sole and exclusive bargaining agent of its Employer members and agrees to produce evidence requested by the Union to confirm this authority, including its Constitution, By-Laws, and applications for members.

(c)     The Association shall notify the Union of each additional individual signing up in writing within twenty-four (24) hours following the approval of the application for membership in the Association. Any individual Employer who seeks to withdraw membership in the Association must notify the Union and the Trust Funds in writing and remain bound to the collective bargaining agreement as amended thereafter in future negotiations with the Association unless timely notice is given.

<u>Section 3.</u>     <u>Union Security Clause</u>

All present employees who are members of the Union on the effective date of this Agreement or on the date of execution of this Agreement, whichever is the later, shall remain members of the Union in good standing as a condition of employment. All present employees who are not members of the Union and all employees who are hired hereafter shall become and remain members in good standing of the Union as a condition of employment on and after the eighth day following the beginning of their employment, or on and after the eighth day following the effective date of this Agreement or the date of execution of this Agreement, whichever is the later.

<u>Section 4.</u>     <u>Dues Checkoff</u>

Every Employer subject to and bound to this Agreement, hereby agrees to check-off from the wages of any Glaziers employed by such Employer, during the terms of this Agreement, Administrative Dues per the conditions set forth in the Union's By-Laws and remit two percent (2%) of the gross pay or such amount as may be determined by the International Union of Painters and Allied Trades to the Union on or before the 10th day of the following month.

<u>Section 5.</u>   <u>Voluntary Payroll Deduction of Political Contributions.</u>

(a)     Commencing June 1, 2003 and for the life of the agreement the Employer shall honor authorizations for check off of political contributions deductions from wages of Employees employed by such employer during the term of this agreement in the amount of five cents (5¢) per hour worked to the Painters District Council No. 14 Illinois Political Committee (LPC) and to forward all contributions deducted in the employees name and reports on contributions on or before the 10th day of each month for the previous work month to Painters District Council No. 14 LPC Fund.

0002

(b)    The Union shall defend, indemnify and save the Employer harmless against any and all claims, demands, suits or other forms of liability that may arise out of or by reason of action taken regarding the creation and administration of the political action check off established by this Article.

**Section 6.**  When hiring new Employees, the Employer shall give first consideration to qualified Glaziers and Apprentice Glaziers who have prior experience with Employers covered by this Agreement and performing work within the area covered by this Agreement.  It is recognized, however, that the Employer has the final right to select the Employees to be hired.  It shall be the responsibility of the Union to assist the Employer in obtaining competent Glaziers.

Upon an Employer's request for specific manpower, the Union will advise which glaziers then available for referral are certified welders, have completed safety courses and are certified to and will work from swing stages and scaffolds.

If an Employer is unable to obtain sufficient employees in any classification through the Glaziers Local 27 referral procedure within 48 hours excluding Saturday, Sunday and holidays from the time the request is made, it may subcontract the work for that job to a union contractor without regard to any other provision of this Agreement.

**Section 7.    Non-Discrimination.**

The Employer, the Union, and Employees agree to conform to any law applicable and that there will be no discrimination in the hiring of Employees or in their training, layoff, discipline, discharge, referral, membership in the Union, or otherwise because of race, color, creed, national origin, religion or sex.

## ARTICLE 3

## HOURS AND WORK RULES

**Section 1.**    Eight (8) hours shall constitute a day's work between the hours of 7:00 A.M. and 4:30 P.M., with one-half (½) hour interval for lunch.  A day will be 7:00 A.M. to 3:30 P.M. or 8:00 A.M. to 4:30 P.M., as directed by the Employer.  Except when the Union, Employer and Employee agree for safety and efficiency of work on new construction **hoisting only**, 6:00 A.M. starting time may be used.  No Employee will be employed for a fractional part of a day's work.  Any Employee who is late in reporting for work will only be paid for the time he actually works, provided work originally scheduled is available.  If any Employee is late or fails to appear, immediate efforts to obtain a replacement, if it is known he is not going to appear, will be made, and the remaining Employees will immediately start work that can be performed without the absentee(s) or his/her/their replacement(s).  Any replacement will only be paid for the time he/she actually works.

The Union will permit a 6:00 a.m. start time for a 6:00 a.m. to 2:30 p.m. work day only if Employer gives the Union advance written notice of its request for an early start which may be via

3

**Section 3.**     No Employees covered by this Agreement will be allowed to work before 8:00 A.M., after 4:30 P.M., or on Saturdays, Sundays or holidays without notification to the Union prior to such work, except as otherwise provided in Article 2, Section 1, herein.  All overtime will be manned by the Glaziers who manned that job during the normal working day.

Employer may assign on a trial basis work to be performed on Saturday and Sunday to qualified members of the bargaining unit from June 1, 2003 to May 31, 2004.  Notice of any complaints or abuse will be submitted to the Association.  The Union will review this practice to determine if it will continue for the second year of the contract.  Should it continue, review will be made prior to May 31, 2005 to determine if it will continue through May 31, 2006.

The Union will have the right to refuse such overtime to Employers and Employees who are in arrears of Health and Welfare, Pension and Apprentice Fund Fringes, Dues Check off or Local Dues.

**Section 4.**     The following days shall be observed as holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day.  No work shall be performed on Labor Day.

**Section 5.**     All regular Employees working for an Employer shall be rotated equally where possible, consistent with efficient operations.

**Section 6.**     Employees will adhere to job safety regulations.

## ARTICLE 4

## OVERTIME

When Employees are asked to work after cessation of a regular day's work (minimum of one-half (½) hour work), time and one-half (1 ½) shall be paid for the first two (2) hours of such overtime each day, Monday through Friday, and double time shall be paid after such two (2) hour overtime period each day, Monday through Friday. Saturdays, Sundays and holidays shall be paid at the rate of double time.  The Employee shall be paid to the next nearest one-half (½) hour for all work performed on overtime.

However, on Saturdays and Sundays when the job duration does not exceed four (4) hours, eight (8) hours pay at the straight time rate will be allowed through mutual agreement between the Employer and Union (between the hours of 8:00 A.M. and 4:30 P.M.). There shall be no fractional part of the 8:00 A.M. to 12 P.M.(noon), or 12:30 P.M. to 4:30 P.M. except when the Union, Employer and Employee agree for safety and efficiency of work on new construction <u>hoisting only</u>, starting time may by 6:00 A.M. or 7:00 A.M.

5

fax or electronic mail, no later than 4:00 p.m. the business day before the work is to be performed. The notice shall state: (1) the job location; (2) the men working on the site; (3) the duration of the project; and (4) day(s) for which an early start is requested.

Failure of the Employer to give prior advance written notice will result in premium pay being due for all hours worked before the regular 7:00 a.m. start time subject to review by the Joint Grievance Board. An employee pay claim for premium pay for early start must be brought within two pay periods of the occurrence.

With mutual consent of both Employer, Employee and the Union, for shops employing four (4) or less Employees, that the interchange of Employees be allowed for jobs under four (4) hours with shops employing no more than five Employees.

When an Employee reports on a job and is told not to start work, the Employer shall pay two (2) hours show up time, at the prevailing rate of wages. Once work has started and weather conditions become such that the Foreman and the Union decide the job is unworkable, the Foreman and entire crew may be sent home and paid for a four (4) hour day. At the start of the fifth hour, Employees must be paid for eight (8) hours.

When a specific job calls for shift work (night work), Three Dollars and Fifty Cents ($3.50) per hour above the prevailing rate shall be paid. Employees shall be prohibited from working back to back shifts, including all foremen and superintendents. Shift work will not take the place of premium time work. The Union must be notified of any shift work jobs.

**Section 2A.** The Employer agrees not to require the Employees covered by this Agreement to transport any materials or equipment within their own private automobile, except the employee's own tools. However, an Employee may agree to transport the Employer's material and equipment in his car, but he will not be liable for loss or damage. It is agreed an employee's automobile shall not be considered as a condition of employment. However, each Employee is required, as a condition of employment to provide the following hand tools: Tool box or bag, chisels, screwdrivers (straight and Phillips), nail set, hack saw, awl, Stanley knife, claw hammer, mallet, rule, file, rubber or vinyl cutter, glass pliers, wonder tool (jimmy bar, small), putty knives (straight and bent). The Employer shall furnish his Employees with their first hard hat but the employee may pay for replacements for such hard hat, normal wear and tear expected. The Employer will also provide all power tools and suction cups. Employees will be required to sign an official form to use company suction cups and power tools for the term of the employment. The Employee will be held responsible if the cups and power tools are not returned and will be charged the price of a comparable cup or power tool.

**Section 2B.** No Employee shall be required to walk up more than eight (8) floors from any level on any job site, this section to become effective providing a majority of other crafts of the Building Trades in the Chicago Metropolitan area have agreed to the same type of arrangement in their respective Union Labor Agreement.

4

## ARTICLE 5

## WAGES

**Section 1.** For the period beginning June 1, 2003 through May 31, 2004 the rate of wages to be paid by the Employer to Journeyperson Glaziers shall be Twenty Nine Dollars and Zero Cents ($29.00) per hour or Two Hundred Thirty Two Dollars and No Cents ($232.00) per day.

Effective June 1, 2004 to May 31, 2005, the negotiated increase to the Union's total economic package shall be Two Dollars and 40/100 Cents ($2.40) per hour to be allocated between wages and benefits by the Union in its sole discretion.

Effective June 1, 2005 to May 31, 2006, the negotiated increase to the Union's total economic package shall be Two Dollars and 40/100 Cents ($2.40) per hour to be allocated between wages and benefits by the Union in its sole discretion.

**Section 2.** There shall be an established pay day for all employees at least one (1) day each week of the Agreement. Employers shall not hold back more than three (3) days' pay. All deductions, such as Social Security, withholding tax, administrative dues, etc., must be noted on the check stubs. Employer's failure to issue pay checks or tender an insufficient fund check for wages shall not be subject to the no strike provisions of Article 18, Section 2.

**Section 3.** When employees are laid off or discharged, they shall be paid in full at the time of such layoff or discharge. An employee quitting of his own accord shall be paid on the next regular pay day.

**Section 4.** Employees working on a daily referral will be paid on the next regular pay day.

## ARTICLE 6

## BONUSES

**Section 1.** It is agreed that the Employer shall not pay bonuses of any kind or description to Journeyperson Glaziers, directly or indirectly, except as provided for in Article 5; Article 12; and Article 13.

## ARTICLE 7

## CLASSIFICATION/SCOPE OF WORK

**Section 1.** Glaziers, Architectural Metal and Glass Workers General Glazing will include, but not be limited to: (1) the installation, setting, cutting, preparing, distributing, handling or removal of the following on site: art glass, prism glass, beveled glass, leaded glass, protection

6

glass, plate glass, window glass, pre-glazed windows, mirrors of all types, wire glass, ribbed glass, ground glass, colored glass, figured glass, vitrolite glass, carrara glass, all types of opaque glass, glass chalk boards, structural glass, stick curtainwall systems, tempered and laminated glass, thiokol, neoprene, all types of insulating glass units, all plastics or other similar materials when used in place of glass to be set or glazed in its final resting place with or without putty, vinyl, molding, rubber, lead, sealants, silicone and all types of mastics in wood, iron, aluminum, sheet metal or vinyl sash, skylights, doors, frames, stone wall cases, show cases, book cases, sideboards, partitions and fixtures; (2) the installation of the above materials on the job site, either temporary or permanent, on or for any building in the course of repair, remodel, alteration, retrofit or construction; (3) the installation and welding of all extruded, rolled or fabricated materials including, but not limited to, all metals, plastics and vinyls, or any materials that replace same, metal and vinyl tubes, mullions, metal facing materials, corrugated flat metals, aluminum panels, muntins, facia, trim moldings, porcelain panels, architectural porcelain, plastic panels, unitized panels as set forth below, skylights, showcase doors, all handrails and relative materials, including those in any or all types of building related to store front, door/window construction and stick curtain wall systems and unitized systems as set forth below: (4) the glazing of automatic door and entrances and revolving doors; the installation of door(s) and window(s) frame assemblers such as patio sliding or fixed doors, vented or fixed windows, shower doors, bathtub enclosures, storm sash where the glass becomes an integral part of the finished product, including the maintenance and repair of all of the above; the fabrication and distribution of all glass and glass-related products on site; (5) any and all handling, unloading and loading of tools, equipment and materials will be performed by members of this International Union.

The Employer shall, when requested by the Union, deliver a "Letter of Assignment" and/or a "Letter of Past Performance" in form and substance as will clearly state that a certain type of work was assigned to and performed at a given location by Glaziers under this Agreement.

For unitized systems involving curtain walls an employer who has never performed this work may subcontract the work without violating this agreement. Subject to the provisions of Article 8 below, if an employer performs this work with his own employees, it must be performed by glaziers.

Scaffolding of any type or description incorporating all safety rules (except scaffolding provided by the General Contractor and/or patent type scaffolding, the use and erection of which shall have been contracted for by the Employer); and the installation of the above materials when in the shop or on the job site, either temporary or permanent, on, or for any building in the course of repair, remodel, alteration or construction.

## ARTICLE 8

## RECOGNITION OF PAST PRACTICES

That an employer who as of January 1, 2003 is signatory to a written collective bargaining agreement with both Glaziers Local 27 and another labor organization that claims overlapping

7

work jurisdiction may assign that portion of the work consistent with that employer's past practice in effect before January 1, 2003.

That for such dual signator employers signed to both agreements as of January 1, 2003, the Union waives any grievances and/or contract claims for pay in lieu of work performed by another trade. Welfare, Pension and Apprentice Training fringe benefits based upon hours worked in covered employment by members of another labor organization shall not be due.

That a dual signator employer who was signed as of January 1, 2003 to both Union agreements may subcontract work consistent with and in conformance with that employer's past practice prior to January 1, 2003.

Employer must provide evidence of past practice immediately upon request by the Union.

That the Union with its own counsel and employer's cooperation will defend an employer in a jurisdictional dispute commenced by another labor organization claiming work covered within the Glaziers work jurisdiction brought before the National Labor Relations Board.

All employers must assign and subcontract work consistent with the terms of the Glaziers Union agreement subject to the above.

The employer shall, when requested by the Union, deliver a "Letter of Assignment" and/or "Letter of Past Performance" in form and substance as will clearly state that a certain type of work was assigned to and performed by Glaziers under this Agreement.

## ARTICLE 9

## SUB-CONTRACTING

**Section 1.**    Subject to the provisions of Article 8 above, all covered work under this Agreement undertaken by the Employer within the geographic territory described in Article 10 above shall be performed by Employees covered by this Agreement.

**Section 2.**    Employers shall not contract any work covered by this Agreement to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work to any person, firm, or company who does not have an existing labor agreement with Glaziers Local 27.

## ARTICLE 10

## GEOGRAPHICAL AREA

**Section 1.**    This Agreement applies to all covered work under the terms of this Agreement performed within the following geographical area:

8

On the north the Wisconsin State line, on the west Route 47, from the Wisconsin State line north, to Route 24 south, with a ten (10) mile buffer zone, east of Route 47, from Route 52 north to Route 24 south, with full jurisdiction given to Local 1164 regarding the following towns on Route 47: Sugar Grove, Yorkville, Morris and Dwight; on the east, Route 53, Gary, Indiana to Highway 6, then west to Highway 55 then south to Fowler, Indiana and on the south to Route 24. See map on the following page.

and such additional jurisdiction as set forth in the Union's Grant of Charter and as determined by the General Executive Board from time to time under Section 70 of the IUPAT General Constitution.

**Section 2.**    It is agreed that where glazing contracts are taken outside of the specified territory covered by the Agreement, not less than twenty-five (25%) percent of the Glaziers or Apprentices employed shall be among the Employees of the Employer who are then employed under the terms of this Agreement.

**Section 3.**    The contractor or the employer party to this agreement, when engaged in work outside the geographical jurisdiction of the Union party to this agreement, shall employ not less than fifty percent (50%) of the workers employed on such work from the residents of the area where the work is performed or from among persons who are employed the greater percentage of their time in such area.

## ARTICLE 11

## LODGING

When Glaziers are sent out of the area specified in Section 1, Article 8, where it is impractical for them to return home each night, the board, lodging if necessary, and transportation costs shall be paid by the Employer, and all riding time, but not to exceed four (4) hours, shall be paid at the rate of single time.

## ARTICLE 12

## APPRENTICES

**Section 1.**    Apprentices shall be indentured in the employ of the Employer in accordance with the Apprenticeship Program approved by the United States Department of Labor.

**Section 2.**    The Employer shall be entitled to one (1) Apprentice for the first three (3) Journeyperson Glaziers employed and one (1) for each additional six (6) Journeyperson Glaziers employed.

(Exception: If the Employer's right to train apprentices has been revoked by the Joint

9

Apprenticeship and Training Committee). This section shall not be construed to replace any Journeyperson in any shop when the Joint Apprenticeship and Training Committee determines that substantial unemployment exists in the area.

**Section 3.**    The wages of the apprentice shall be as follows:

1. First six months    –    35% of Journeyperson's wage rate
2. Second six months    –    45% of Journeyperson's wage rate
3. Third six months    –    55% of Journeyperson's wage rate
4. Fourth six months    –    70% of Journeyperson's wage rate
5. Fifth six months    –    80% of Journeyperson's wage rate
6. Sixth six months    –    90% of Journeyperson's wage rate

After three (3) years of apprenticeship and upon certification of the J.A.T.C. Instructor and J.A.T.C. Trustees, he or she shall be given the Journeyperson's wage rate.

**Section 4.**    Apprentices can be used on all glass requiring more than three (3) persons according to the glass size schedule. Not more than one (1) apprentice may be used except where six (6) or more persons are required as provided in Article 14.

**Section 5.**    A Joint Apprenticeship Committee composed of three (3) representatives of the Glazing Contractors of Chicago and Vicinity and three (3) Union representatives shall be established in conformity by the United States Department of Labor, Bureau of Apprenticeship and the Glaziers Joint Apprenticeship Agreement of Chicago and Vicinity.

It shall be the duty of this Committee to implement the present Apprenticeship Program and to establish the rules of its operation and such Committee shall meet at least once each quarter for such purpose.

**Section 6.**    Apprentices shall not work alone and shall be with a Journeyperson Glazier on each job. Apprentices shall be allowed to work overtime as long as a Journeyperson is not bumped for such overtime. Apprentices will not be allowed to work overtime on his or her regularly scheduled school night.

**Section 7.**    The parties hereby agree to become participants in the National Glaziers and Glassworkers Industry Apprenticeship Training and Journeyman Education Fund, and the Employer shall contribute to said Fund, Forty Cents ($.40) for each hour worked by employees under this Agreement, effective June 1, 2003 plus such additional amounts as may be allocated by the Union in its sole discretion June 1, 2004 and June 1, 2005.

Effective January 1, 2003 contributions on behalf of the National Apprentice Fund shall be made to the Glaziers Union Local No. 27 Joint Apprenticeship Fund.

0010

**Section 8.** Employers will be notified by the Glaziers Union Local No. 27 Joint Apprenticeship Training Committee when Journeyperson classes are offered.

## ARTICLE 13

## SWING STAGE/SCAFFOLD/INSURANCE

**Section 1.** Whenever Glaziers and Apprentices are required to work on swing stages, scaffold, hydraulic or electric scaffold or jacks of any description or with window washer belts where there is a thirty (30) foot or more fall, they shall receive Fifty Cents ($.50) per hour over the prevailing rate of wages for such work.

**Section 2.** Where skylights are glazed and are held in place by bolts, screws or nuts from the inside of the opening, which creates a most hazardous condition for the Glazier, Fifty Cents ($.50) per hour over the prevailing rate of wages shall be paid for such work.

**Section 3.** It is agreed that all necessary scaffolding, etcetera, required on any building during the course of construction or repair, shall be furnished by the Employer. It is agreed that scaffolding, either rented or owned by the Employer, can be erected initially and dismantled by Glaziers or qualified erecting companies provided that such work is done in conformity with the State Laws of Illinois.

**Section 4.** It is also agreed that the Employer must carry all necessary and required insurance, covering all of his Employees. He shall carry Worker's Compensation Insurance in the State in which his Employees are working. He shall also make contributions for Social Security and unemployment insurance as required by law regardless of the number of men employed by him. Each Employer shall file with the Union a certificate of such Workmen's Compensation Insurance containing not less than a ten (10) day notice of cancellation.

**Section 5.** Should any Employee meet with an accident while at work, the person in charge of the work shall see that the Employee is cared for. Transportation shall be furnished to a doctor or to a hospital by the Employer at the Employer's expense. All injuries, regardless of how minor, will be reported to the Employer within twenty-four (24) hours by the foreman, supervisor and/or the injured Employee.

## ARTICLE 14

## FOREMAN/SHOP STEWARD

**Section 1.** The Business Representative and Shop Steward shall be furnished a list of all new hires by the Employer.

11

**Section 2.**    The Union shall have the right to appoint a Shop or Job Steward in each shop from the Union members regularly employed in each shop.

**Section 3.**    The duty of all stewards is to enforce the rules of this Agreement and to report to the Business Representatives any infractions or violations that may come to his attention. He/she shall have the right to examine working cards and to object to any employee working not in possession of the current quarterly working card. A shop steward shall not be discharged for performing duties of a shop steward.

**Section 4.**    All Foremen shall receive One Dollar and No Cents ($1.00) per hour above the prevailing scale. At the option of the Employer, a General Foreman can be appointed and be paid One Dollar and Twenty Five Cents ($1.25) per hour above the prevailing scale.

**Section 5.**    A Foreman shall be appointed by the Employer for all work contracted for by the Employer, when the size of the crew exceeds three (3) persons.

The duties of the Foreman, among others, shall be as follows:

(A)    Seeing that material requirements and equipment are available for the most efficient conclusion of the job.

(B)    When necessary, inform his/her Employer of glass types and sizes required.

(C)    Coordinate glass and glazing work with other trades.

(D)    When requested, report Glaziers' time on Employer's regular time cards.

## ARTICLE 15

## EXPENSE MONEY

Each Journeyperson Glazier and Apprentice Glazier shall receive Five Dollars ($5.00) per day Expense Money regardless of where they work.

## ARTICLE 16

## GLASS SCHEDULE

**Section 1.**    It is agreed that the following glass schedule of work and persons shall apply for all work contracted by the Employer:

12

Number of Persons up to, but not including 3/8"

From 120 united inches up to 150 'united inches -    2
Not over 175 united inches                      -    3
Not over 200 united inches                      -    4
Not over 225 united inches                      -    5
Not over 240 united inches                      -    6
Not over 260 united inches                      -    7
Not over 300 united inches                      -    8

Over 300 united inches, Add one person for each 15 united inches.

Glass schedule for 3/8" and above is based on 3.25 lbs. Per 1/4" of glass and square footage calculated on actual inch above fractions, i.e. 60 ½ = 61.

3/8" and up to but not including 3/4"

Will be total weight divided by sixty pounds (60#) per person. (See schedules attached hereto as Appendix A and Appendix B.

3/4" and above

Will be total weight divided by seventy pounds (70#) per persons. (See schedule attached hereto as Appendix C).

When automatic lift equipment is used, the person power requirements set forth in the up to, but not including 3/8" schedule shall apply (providing the glass does not have to be unloaded or moved manually).

**Section 2.**    To determine the number of persons required for Insulating Glass Units, use total glass thickness as follows:

Up to 3/8" of glass, use up to, but not including 3/8" schedule
From 3/8" up to 3/4" use - 60 lbs. per person
For 3/4" and over use - 70 lbs. per person

e.g.    1/8" glass - 1/4" air space - 1/8" glass = 1/4" - use schedule
        1/4" glass - ½" air space - 1/4" glass = ½" - use 60 lbs. per person
        ½" glass - ½" air space - 1/4" glass = 3/4" - use 70 lbs. per person

**Section 3.**    It is further agreed that: (1) when glass is manually lifted seven (7) feet or more to platform level, or (2) when weather conditions require it, additional persons shall be used on the following basis:

13

0013

First size enumerated in the applicable schedule -    1 Additional Person

Next two sizes enumerated in the applicable schedule -    2 Additional Persons

Next three sizes enumerated in the applicable schedule -    3 Additional Persons

Next four sizes enumerated in the applicable schedule -    5 Additional Persons

## Union Glazing Schedule
### Persons Required

Plastics Up To and Including ½"

| UNITED INCHES | When manually lifted Under 7 ft. to platform level - persons required | When manually lifted 7 ft. or more to platform level - persons required |
|---|---|---|
| From 120 United Inches | 2 | 3 |
| Up to 160 United Inches | 3 | 4 |

All safety precautions will be adhered to.

**Section 4.** Upon request of the Foreman for extra help, the same shall be furnished by the Employer.

**Section 5.** It is further agreed that all trucks setting glass shall be equipped with a first aid kit. If employees ride the back end of the truck, the truck must be equipped with a tarpaulin.

**Section 6.** It is further agreed that chauffeurs, drivers of trucks, glazing superintendents (so-called) or Employer shall in no way assist directly or indirectly in the setting of glass.

**Section 7.** Chauffeurs or drivers of trucks shall not hold ladders or in any manner shape or form be the supervisor of Glaziers on any glazing job. Truck drivers belong on the truck only.

**Section 8.** It is also agreed that the Employer shall identify all trucks or vehicles used in the glass and glazing trade by the name of the Employer permanently affixed to each side of the truck of vehicle.

**Section 9.** All wood sash shall be bedded in putty, blocked and sufficiently pointed, and the putty line must be extended to cover to the end of the rabbet.

**Section 10.** The Business Representatives or any other authorized representative of the Union, shall have the right to visit all places, shops or jobs where work is going on for the purpose of inspection. They shall also have the right to examine working cards and pay envelopes of all employees covered by this Agreement.

14

**Section 11.**     No Employer shall at any time make any arrangements whatsoever, written or oral, with any Glazier for the performance of glazing work or any description whatsoever, other than to employ Glaziers as provided for in this Agreement in the usual and regular manner.

# ARTICLE 17

## RESETTING GLASS/REMOVAL OF GLASS

It is also agreed that where storefronts are to be reset, the glass schedule shall apply when glass is removed from the opening.

When a plate is broken and a replacement is being made in two (2) or more lites, the salvage may be stripped out of the opening with the crew required for one-half (½) the opening (minimum three (3) persons required), so long as no single piece larger than one-half (½) of the opening is removed.

# ARTICLE 18

## GRIEVANCE PROCEDURE

Any grievance arising under this contract shall first be brought before the Board of Business Agents of the Union. If the Union and the Employer are unable to resolve the dispute, either party may submit the matter to Step 2 for final and binding resolution.

**Step 2.**     Any grievance, dispute, misunderstanding or difference arising during the life of this Agreement, interpretation of the same shall be decided by a Committee composed of three (3) representatives appointed by the Employers and three (3) by the Union whose majority decision shall be final and binding upon all parties to the dispute. Representatives will be appointed only for the length of the contract. In the event of the Committee's inability to decide an issue or a deadlock by the Committee, a third party shall be selected by them to act as an Arbitrator. In the event that they are unable to agree, an impartial arbitrator shall be selected from a list submitted by the Federal Mediation and Conciliation Service upon the request of either party to this Agreement.

The Federal Mediation and Conciliation Service will submit a list of five (5) Arbitrators. The Union shall strike the first name from the list and the Employer shall then strike one name, and thereafter the parties shall strike alternately.  The person whose name remains, shall be the Arbitrator, provided that either party, before striking any name, shall have the right to reject one (1) panel of Arbitrators. The Arbitrator shall be notified of this selection by a joint letter from the Employer and the Union requesting that he/she set a time and place for the hearing, subject to availability of the Employer and the Union representative. The letter shall specify the issue(s) to the Arbitrator.

The Arbitrator shall have no right to amend, modify, nullify, ignore or add to the provisions

0015

of the Agreement. He/she shall consider and decide only the particular issue(s) presented to him/her in writing by the Employer and the Union, and his/her decision and award shall be based solely upon his/her interpretation of the meaning or application of the terms of this Agreement to the facts of the grievance presented. The award of the Arbitrator shall be final and binding on the Employer, the Union and the Employee(s) involved.

The expenses of the Arbitrator, including his/her fee, shall be equally shared by the Employer and the Union. If an Arbitrator determines that the violation of the Agreement is willful, he/she shall have the authority to attach to any monetary award rendered hereunder a liquidated damage of Twenty Five Percent (25%) of such award to be paid to the grieving party.

If the Employer fails to comply with any award or decision of the Arbitrator, then the Union will not be prohibited by Section 2 of this Article from resorting to economic and/or legal action including withholding of services, striking or picketing during the period of such non-compliance; providing the Union, before resorting to such economic action, shall give the Employer two (2) business days' written notice of its intention to take such economic action.

To be a legal grievance under this Agreement, the Employee or the Union must present said grievance in writing to the Employer representative within thirty (30) days of the event giving rise to the grievance or within thirty (30) days after such grievance comes to the knowledge of the aggrieved Employee.

**Section 2.**    Except as otherwise provided in the wage and benefit provisions of this Agreement and in Article 2, Section 3, the grievance machinery provided herein and the administrative and judicial remedies and procedures provided by the statute are the sole means of settling any dispute by the employees against the Employers whether relating to the interpretation of this Agreement or otherwise; accordingly, neither the Union nor the Employees will instigate, promote, or engage in any strike, slow-down, or concerted withholding of services during the term of this Agreement, provided no Employee shall be disciplined for refusing to cross a lawful primary picket line established by any other union. The Employer agrees that there will be no lockout during the term of the Agreement.

**Section 3.**    Employees, Employers and the Union are encouraged to utilize the Grievance Procedure prior to seeking judicial remedies.

## ARTICLE 19

## VACATIONS

Each Employee may take a two (2) week vacation. Vacations will, in so far as possible, be granted at times most desired by the Employee. However, in order to insure an orderly operation, sufficient notice in advance must be given and then mutually agreed to by the Employer. An Employee may take a third week's vacation.

16

0016

# ARTICLE 20

## HEALTH AND PENSION AND ANNUITY CONTRIBUTIONS

**Section 1.**　Effective June 1, 2003, the Employer shall pay Five Dollars and Thirty Four Cents ($5.34) for each hour worked be each Journeyperson and Apprentice Glazier into the Health and Welfare Trust Fund plus such additional amounts as the Union chooses to allocate from its total economic adjustment package in its sole discretion in years two and three of this Agreement on June 1, 2004 and June 1, 2005. The Employer is required to make contributions to the Fund for employee/owner, partial owner, or direct relative; husband, wife, brother or sister, son or daughter, performing work of a type not falling within the jurisdiction of this Agreement, including but not limited to supervision, general management, sales, estimating, clerical or maintenance work, the Employer of the Employee shall make contributions to the Health and Welfare Fund on behalf of that Employee for a minimum of one hundred sixty (160) hours per month.

**Section 2.**　Effective June 1, 2003, the Employer shall pay Four Dollars and Forty Cents ($4.40) for each hour worked by Journeyperson Glaziers into the Local No. 27 Pension and Retirement Plan plus such additional amounts as the Union chooses to allocate from its total economic adjustment package in its sole discretion in years two and three of this Agreement on June 1, 2004 and June 1, 2005. The Employer is required to make contributions to the Fund for the Employee/owner, partial owner, or direct relative; husband, wife, brother or sister, son or daughter, performing work of a type not falling within the jurisdiction of this Agreement, including but not limited to, supervision, general management, sale, estimated, clerical or maintenance work, the Employer of the Employee shall make contributions to the Pension and Retirement Plan on behalf of that Employee for a minimum of one hundred sixty (160) hours per month.

**Section 3.**　1a.　Commencing the first day of June 1974, and for the duration of the Agreement plus such additional amounts as the Union chooses to allocate from its total economic adjustment package in its sole discretion in years two and three of this Agreement on June 1, 2004 and June 1, 2005, and any renewals or extensions thereof, the Employer agrees to make payments to the International Brotherhood of Painters and Allied Trades Union and Industry Pension and Annuity Fund for each Employee covered by this Agreement, as follows:

1b.　Effective June 1, 2003 for each hour or portion thereof, for which an employee received pay, the Employer shall make a contribution of Three Dollars and Fifty Cents ($3.50) to the above named Pension and Annuity Fund plus such additional amounts as the Union chooses to allocate from its total economic adjustment package in its sole discretion in years two and three of this Agreement on June 1, 2004 and June 1, 2005.

1c.　For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and other hours for which pay is received by the Employee in accordance with this Agreement, shall be counted as hours for which contributions are payable.

17

0017

1d.     Contributions shall be paid on behalf of any Employee starting with the Employee's first day of employment in a job classification, covered by this Agreement. This includes, but is not limited to, apprentices, helpers, trainees, and probationary employees.

1e.     The payments to the Pension and Annuity Fund required above, shall be made to the International Brotherhood of Painters and Allied Trades Union and Industry National Pension and Annuity Fund, which was established under an Agreement and Declaration of Trust, dated April 1, 1967. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as though he had actually signed the same.

2.     The Employer hereby irrevocably designates as its representatives on the Board of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors. The Employer further agrees to be bound by all actions taken by the Trustees pursuant to the said Agreement and Declaration of Trust.

3.     All contributions shall be made at such time and in such manner as the Trustees require; and the Trustees shall have the authority to have an independent Certified Public Accountant audit the payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the Pension and Annuity Fund.

4.     If an Employer fails to make contributions to the Pension and Annuity Fund within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provisions hereof to the contrary notwithstanding, and the Employer shall be liable for all costs for collection of the payments due together with attorney's fees and such liquidated damages not to exceed Fifteen Percent (15%) as may be assessed by the Trustees. The Employer's liability for payment under this Article or for non payment of wages shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause or for non-payment of wages which may be provided or set forth elsewhere in this Agreement.

5.     The Pension and Annuity Plan adopted by the trustees of said Pension and Annuity Fund shall at all times conform with the requirements of the Internal Revenue Code so as to enable the Employer at all times to treat contributions to the Pension Fund as a deduction for income tax purposes.

**Section 4.**     Payments to the Glaziers Union Local No. 27, Pension and Retirement Plan and Glazing Employers and Glaziers Union Local No. 27 Health and Welfare Plan, shall be made monthly, no later than the tenth (10th) day of the succeeding month for which hours are reportable.

Each Employer agrees that any payment not made within fifteen (15) days of the succeeding month for which hours are reportable, shall be subject to liquidated damages of Fifteen Percent (15%) in addition to the amount originally required under the terms of this Agreement requiring a contribution to the Pension and Retirement and Health and Welfare Plan.

0018

**Section 5.**     If an Employer fails to make contributions to any of the Funds referred to in this Article within ten (10) days after the date required by the Trustees of this Agreement, the Union shall have the right to take whatever legal steps are necessary to secure compliance with this Agreement, and any other provisions hereof to the contrary notwithstanding and the Employer shall be liable for all costs for collection of the payments due together with attorney's fees and such liquidated damages not to exceed Fifteen Percent (15%) as may be levied by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no strike" clause which may be provided or set forth elsewhere in this Agreement; providing the Union, before resorting to economic action such as striking or picketing, shall give the Employer two (2) business days' written notice of its intention to take such economic action.

## BONDING

**Section 6.**     Each Employer agrees that before commencing any work to which this Agreement applies, a performance bond in the sum of Thirty Thousand Dollars ($30,000.00) shall be provided to insure the prompt and full payment of all contributions due to the Welfare Fund, Pension Fund, and the Apprenticeship Fund.

(b) In the event an Employer fails for any reason to satisfy the bonding requirement above, the Employer shall be personally liable to the above Funds in the amount of Thirty Thousand Dollars ($30,000.00) plus all unpaid amounts in excess of that sum which are due the Funds by that Employer and legal fees and cost of collection. In the event the Employer is a corporation, liability under this paragraph shall be imposed not only on the corporation, but also personally on each corporate official of that Employer empowered to execute agreements or sign checks on the corporation's behalf, or to designate the persons empowered to do so. The provisions of this paragraph shall in no way relieve or excuse any Employer of the obligation to provide the bond described above, nor shall this provision limit the personal liability of said corporate officers based on operation of law.

(c) Any Employer commencing work in violation of the requirements set forth above shall be in violation of this Fringe Benefit Fund contribution payment provision of this Agreement.

## ARTICLE 21

## CHICAGOLAND CONSTRUCTION SAFETY COUNCIL/LABOR MANAGEMENT INITIATIVE

**Section 1.**     Effective June 1, 2003, each Employer shall contribute Three Cents ($.03) for each hour worked by employees under this Agreement to the Chicagoland Construction Safety

19

0019

Council, a not-for-profit corporation.

Section 2. Effective June 1, 2003, each Employer shall contribute Five Cents ($.05) for each hour worked by employees under this Agreement to the Painters and Allied Trade Labor Management Cooperation Initiative (P&ATLMCI), a not-for-profit organization. Contributions will be remitted to the Apprentice Training Fund for distribution to the P&ATLMCI.

## ARTICLE 22

## DISCIPLINARY ACTION

The Union agrees to cooperate with Management and support disciplinary bars given to Employees for just cause.

## ARTICLE 23

## FEDERAL AND STATE LEGISLATION

Section 1. The provisions of this Agreement shall be effective only to the extent permitted by the Labor Management Relations Act of 1947, as amended.

Section 2. In the event that any Federal or State legislation, governmental regulation or court decisions cause invalidation of any Article or Section of this Agreement, all other Articles and Sections not so invalidated shall remain in full force and effect.

## ARTICLE 24

Having complied with all the provisions of this Agreement on its part to be performed, the Employer shall be permitted to advertise and otherwise identify the Employer as a Union shop.

In the event this Agreement is terminated, then all such advertising shall be immediately canceled or otherwise recalled.

## ARTICLE 25

## CONTRACT DURATION/SIGNATURE PAGE

This Agreement shall continue in full force and effect from June 1, 2003 through May 31, 2006 and shall continue in force and effect from year to year thereafter, unless either party shall desire to change any of the terms herein, in which case a written notice of the desired change(s) must be served to the other party not less than sixty (60) days nor more than ninety (90) days written notice by registered mail or certified mail prior to the expiration date.

0020

IN WITNESS WHEREOF, said parties have to this Agreement, or by their representatives on their behalf, respectively, set their hands and seals.

PAINTERS DISTRICT COUNCIL NO. 14

**W & G, Inc.**

By: _____
Terrence Fitzmaurice, Bus. Mgr./Secy Treas

GLAZIERS, ARCHITECTURAL METAL AND
GLASS WORKERS LOCAL UNION NUMBER 27
CHICAGO AND VICINITY, INTERNATIONAL
UNION OF PAINTERS AND ALLIED
TRADES, AFL-CIO

BY _____
GEORGE STRIPP
(Please print name signed above)

BY: _____
Michael Mabus, Business Representative

DATE: _October 4, 2005_

21



## HURON VALLEY GLASS COMPANY, LLC

5075 Carpenter Road ◆ Ypsilanti, MI 48197
(734) 434-1160 ◆ (734) 434-2046 FAX

Thursday, August 04, 2005

Michael Mabus
Glaziers, Architectural Metal and Glass Workers, Local Union Number 27
4225 Lawndale Avenue
Lyons, Illinois 60534

Dear Michael:

It was a pleasure speaking with you yesterday. Pursuant to our conversation regarding your Articles of Agreement, we would appreciate your please clarifying the following by letter:

**Paragraph one & Article 10**
Please clarify that this agreement has no ramifications beyond the territorial reach of Local 14.

**Article 2, sections 1, 2 & 3; Article 7; Article 9; Article 13, section 3 and Article 14, section 2**
It is our intention to employ Ironworkers as well as Glaziers. We fear that by signing this agreement we will immediately be in default. Also please clarify that the term *Shop*, used in these articles and any others, refers strictly to the field and will not affect any intentions we may have relative to factory work.

**Article 2, section 6**
It is our intention to employ a consistent crew of thirty to forty men once our operations reach critical mass in the Chicago area. This being the case, we do not wish to rely on a referral process.

**Article 3, section 3**
We cannot guarantee that the last sentence will be adhered to given the intentions expressed above.

**Article 8**
Given our intentions expressed above, we may find difficulty in delivering a "Letter of Assignment" and/or "Letter of Past Performance."

**Articles 15**
As we discussed, we cannot guarantee adherence to the Glass Schedule. Practical weight and size limitations must prevail.

**Articles 15, sections 4 & 6**
As we discussed, our field forces in the early going will be directed by men who are Cleveland Glaziers and will function as our General Foremen. We expect to have a Local Glazier Foreman, but all hiring, firing and crewing decisions will be at the discretion of the men we send. We do not presently have a need for other decision makers.

We await your response and look forward to a long and profitable relationship with Local 14.

Sincerely,

Vincent V. Klees
President



MICHAEL RABUS
BUSINESS COMPANITIVE

MICHAEL O'DONNELL
BUSINESS REPRESENTATIVE

MICHAEL COOK
BUSINESS REPRESENTATIVE

JAMES AUGUSTYN
PRESIDENT

RICHARD GABDELIC
VICE PRESIDENT

MICHAEL ONM
RECORDING SECRETARY

LAWRENCE TISIC
FINANCIAL SECRETARY

**Glaziers, Architectural Metal and Glass Workers**
**Local Union No. 27, Chicago and Vicinity**

OF THE

INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, AFL-CIO
AFFILIATED WITH PAINTERS' DISTRICT COUNCIL NO. 14
MEETS THE 4TH MONDAY OF EACH MONTH, 6309 WEST 26TH STREET, BERWYN

4225 LAWNDALE AVENUE • LYONS, IL 60534



TERRENCE FITZMAURICE
BUSINESS MANAGER/
SECRETARY-TREASURER

August 11, 2005

By Facsimile (734) 434-2046
and Regular Mail
Mr. Vincent Klees
President
Huron Valley Glass Company, LLC
5075 Carpenter Road
Ypsilanti, Michigan 48187

Re:    Glaziers Local 27 Agreement

Dear Sir:

I am responding to your August 4, 2005 letter seeking clarification of certain articles of the agreement. While I lack authority to vary the contract terms, I can address their practical application.

1.    **Geographical Territory, Article 10 Pages 13-14**

Your conclusion is generally correct. The map contained at Article 10, Section 1 defines Local 27's geographic jurisdiction. The contract would apply outside the defined area if an employer took a Local 27 member domiciled here to another jurisdiction to perform work (see Article 10, Sections 2 and 3). Those Local 27 members working in a foreign jurisdiction would be entitled to the wages, benefits and working conditions under this contract which they regularly enjoy and lodging under Article 11.

2.    **Assignments**

Your items 2 and 5 are addressed together as they are related. You have stated your intent to employ Glaziers and Ornamental Ironworkers. In the past other employers have utilized composite crew arrangements as a solution to potential jurisdictional disputes to perform all work under both agreements. Glaziers 27 would abide by such a work assignment provided the crew is composed of a minimum of 50% glaziers.    will △

The above paragraph should address your overall concerns; but, as you include a variety of contract articles, I will address each.

Mr. Vincent Klees
President
Huron Valley Glass Company, LLC
August 11, 2005
Page Two

Recognition, Sections 1, 2 and 3

The contract is a 9(a) agreement, all glaziers are required to join the Union.

Subcontracting, Article 9

Having discussed your ability to utilize a composite crew, there should be little need for
subcontracting. Enforcement of Article 9, Section 2, Glaziers 27 signatory
subcontracting clause can be expected as it pertains to covered work by others. It is a
work preservation clause.

*caulkers signatory*

Scaffolding, Article 13, Section 3

The above article permits erection by scaffolding companies, and thus not a violation of
the above subcontracting section. Presumably it would be subject to composite crew
arrangements if performed by your own work force.

Stewards, Article 14, Section 2

Local 27's right to appoint a steward on the project from within the employer's glazier
workforce remains unchanged. The steward is a working steward subject to the same
performance as any other employee. I presume you reference this because of the word
"shop" which is explained below.

2.(b)    Shop Work

        You are correct. The Articles of Agreement do not extend to factory work. Local
27 has a separate factory agreement.

*will expand*

3.      Hiring, Article 2, Section 6, Page 4

        Glaziers 27 does not have an exclusive hiring hall. Should you require additional
manpower, we would be delighted to supply candidates for hire if so requested, but they
are not the sole source of referral.

0024

Mr. Vincent Klees
President
Huron Valley Glass Company, LLC
August 11, 2005
Page Three

4.    **Overtime Manning**, Article 3, Section 3, Page 7

Glaziers 27's concern here is that if a composite crew is utilized (which is what I understand to mean when you say "given the intentions expressed above") that all the overtime could be assigned to another trade. Glaziers 27 would expect that in an overtime assignment situation the employer would at a minimum offer the Glaziers manning the job the overtime assignment on the project consistent with the manning of the composite crew. Should they decline the overtime, management could approach others to maintain the crew percentage.

5.    See Item 2 above, Article 8, Page 12.

6.    **Glass Schedule**, Article 16

Article 16 applies to the setting and lifting of raw glass. This article is an integral part of the agreement. As explained, the schedule is not adhered to for pre-glazed and/or panelized systems.

7.    **Foreman**, Article 14

Local 27 understands your need to provide key men for the operation from out of town and does not object to this. Should employer place a Local 27 member in a position of authority, putting him in charge of three or more men, the glazier should receive an additional $1.00 (one dollar) per hour above scale. It is presumed that your key men are paid in excess of Local 27 foreman rates.

Local 27 shares your desire for "a long and profitable relationship". I hope with this information that you will promptly sign our agreement.

Should you have any further questions, do not hesitate to call.

Fraternally yours,

Mike Mabus



PHONE 708-443-9000
FAX 708-443-9007

TERRENCE FITZMAURICE
BUSINESS MANAGER
SECRETARY-TREASURER

MICHAEL MABUS
BUSINESS REPRESENTATIVE

MICHAEL O'DONNELL
BUSINESS REPRESENTATIVE

MICHAEL COOK
BUSINESS REPRESENTATIVE

JAMES AUGUSTYN
PRESIDENT

RICHARD GAIDELIS
VICE-PRESIDENT

MICHAEL OHM
RECORDING SECRETARY

LAWRENCE TASIC
FINANCIAL SECRETARY

# Glaziers, Architectural Metal and Glass Workers
# Local Union No. 27, Chicago and Vicinity

OF THE

INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, AFL-CIO
AFFILIATED WITH PAINTERS' DISTRICT COUNCIL NO. 14

MEETS THE 4TH MONDAY OF EACH MONTH. 6309 WEST 26TH STREET, BERWYN

4225 LAWNDALE AVENUE • LYONS, IL 60534

Mr. Vince Klees
Huron Valley Glass LLC
5075 Carpenter Road
Ypsilanti Michigan, 48187

Dear Mr. Klees,

As per our conversation on August 16, 2005 I agree to amend my letter dated August 11, 2005. Amendment as follows;

**Number 2**    **Assignment-** Delete last sentence, "Glaziers Union Local No.27 would abide by such a work assignment provided the crew is composed of a minimum of 50 % Glaziers."

**Number 2(b)  Shop Work –** You are correct. The Articles of Agreement do not extend to factory work. Glaziers Union Local No.27 has a separate Factory Agreement. If you choose to open up a Non-Union fabrication shop within Local 27 jurisdictional area we will not pursue the organization of that shop. That said shop would peacefully co-exist with our outside Agreement.

Sincerely,

Michael Mabus

Michael Mabus
Business Representative
Glaziers Union Local No.27

0026

# ARTICLES OF AGREEMENT

**ARTICLES OF AGREEMENT** made this first day of June, 2006 by and between **ASSOCIATION OF GLAZING CONTRACTORS ASSOCIATION and PAINTERS DISTRICT COUNCIL NO. 14 and its affiliate, GLAZIERS, ARCHITECTURAL METAL AND GLASS WORKERS LOCAL UNION NO. 27, CHICAGO AND VICINITY,** of the International Union of Painters and Allied Trades, AFL-CIO (the "Union")

08CV4166

JUDGE GUZMAN

MAGISTRATE JUDGE SCHENKIER

TC

## ARTICLE 1

## PARTIES

Whenever the word "Association" is used herein, it shall mean the ASSOCIATION OF GLAZING CONTRACTORS and all of its members individually and collectively, whether now belonging to said Association or who may hereafter be admitted to membership. The members of said Association [and any other employer who is not a member of the Association but is otherwise bound by this Agreement] being sometimes hereinafter referred to as "Employer."

Whenever the word "Union" is used herein, it shall mean the PAINTERS DISTRICT COUNCIL NO. 14 and its affiliate, GLAZIERS, ARCHITECTURAL METAL AND GLASS WORKERS LOCAL UNION NO. 27, CHICAGO AND VICINITY, of the International Union of Painters and Allied Trades, AFL-CIO and all of the local unions affiliated therewith and all of the members thereof, individually and collectively bound hereafter, whether now members of said local unions or who may hereafter become members of said unions. The members of said unions being sometimes referred to hereinafter as "Employees."

## ARTICLE 2

## RECOGNITION -- UNION SHOP

**Section 1.   Recognition of Union.**          The Association and the employers it represents in bargaining and such other Employer as may become members of the Association or who agree to be bound by the terms of this contract recognize the Union as the sole and exclusive bargaining agent for a unit of employees appropriate for bargaining within Section 9(a) of the National Labor Relations Act. The Association and the Employers it represents in bargaining agree that this recognition is predicated upon the Union's unequivocal demand for 9(a) recognition as majority representative of a unit of all glazing employees and the Union's contemporaneous showing of and offer to provide an evidentiary basis of its majority support based upon signed and dated authorization cards, the Association acknowledges and accepts the proof of a clear showing of majority support by bargaining unit employees without the need for a National Labor Relations Board certified election under Sections 9(a) and (c) of the Act and agrees it (they) will not request an NLRB election and expressly waives the right to do so for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment, employment practices, standards of workmanship, safety practices and other conditions of employment.

-1-

EXHIBIT

Z

0027

**Section 2.  Recognition of Association.**    (a) The Union recognizes the Association as the sole and exclusive bargaining agent of the Employer members of the Association and of such other Employers as may become members of the Association or agree to be bound by the terms of this agreement, as to all matters concerning Employees in the Bargaining Unit.

(b)    The Association has been designated as the sole and exclusive bargaining agent of its Employer members and agrees to produce evidence requested by the Union to confirm this authority, including its Constitution, By-Laws, and applications for members.

(c)    The Association shall notify the Union of each additional individual signing up in writing within twenty-four (24) hours following the approval of the application for membership in the Association. Any individual Employer who seeks to withdraw membership in the Association must notify the Union and the Trust Funds in writing and remain bound to the collective bargaining agreement as amended thereafter in future negotiations with the Association unless timely notice is given.

**Section 3.    Union Security Clause**

All present employees who are members of the Union on the effective date of this Agreement or on the date of execution of this Agreement, whichever is the later, shall remain members of the Union in good standing as a condition of employment. All present employees who are not members of the Union and all employees who are hired hereafter shall become and remain members in good standing of the Union as a condition of employment on and after the eighth day following the beginning of their employment, or on and after the eighth day following the effective date of this Agreement or the date of execution of this Agreement, whichever is the later.

**Section 4.    Dues Checkoff**

Every Employer subject to and bound to this Agreement, hereby agrees to check-off from the wages of any Glaziers employed by such Employer, during the terms of this Agreement, Administrative Dues per the conditions set forth in the Union's By-Laws and remit two percent (2%) of the gross pay or such amount as may be determined by the International Union of Painters and Allied Trades to the Union on or before the 10th day of the following month.

**Section 5.  Voluntary Payroll Deduction of Political Contributions.**

(a)    Commencing June 1, 2006 and for the life of the agreement the Employer shall honor authorizations for check off of political contributions deductions from wages of Employees employed by such employer during the term of this agreement in the amount of five cents (5¢) per hour worked to the Painters District Council No. 14 Illinois Political Committee (LPC) and to forward all contributions deducted in the employees name and reports on contributions on or before the 10th day of each month for the previous work month to Painters District Council No. 14 LPC Fund.

0028

(b)    The Union shall defend, indemnify and save the Employer harmless against any and all claims, demands, suits or other forms of liability that may arise out of or by reason of action taken regarding the creation and administration of the political action check off established by this Article.

**Section 6**.    When hiring new Employees, the Employer shall give first consideration to qualified Glaziers and Apprentice Glaziers who have prior experience with Employers covered by this Agreement and performing work within the area covered by this Agreement. It is recognized, however, that the Employer has the final right to select the Employees to be hired. It shall be the responsibility of the Union to assist the Employer in obtaining competent Glaziers.

Upon an Employer's request for specific manpower, the Union will advise which glaziers then available for referral are certified welders, have completed safety courses and are certified to and will work from swing stages and scaffolds.

If an Employer is unable to obtain sufficient employees in any classification through the Glaziers Local 27 referral procedure within 48 hours excluding Saturday, Sunday and holidays from the time the request is made, it may subcontract the work for that job to a union contractor without regard to any other provision of this Agreement.

**Section 7.**    **Non-Discrimination.**

The Employer, the Union, and Employees agree to conform to any law applicable and that there will be no discrimination in the hiring of Employees or in their training, layoff, discipline, discharge, referral, membership in the Union, or otherwise because of race, color, creed, national origin, religion or sex.

## ARTICLE 3

## HOURS AND WORK RULES

**Section 1**.    Eight (8) hours shall constitute a day's work between the hours of 7:00 A.M. and 4:30 P.M., with one-half (½) hour interval for lunch. A day will be 7:00 A.M. to 3:30 P.M. or 8:00 A.M. to 4:30 P.M., as directed by the Employer. No Employee will be employed for a fractional part of a day's work. Any Employee who is late in reporting for work will only be paid for the time he actually works, provided work originally scheduled is available. If any Employee is late or fails to appear, immediate efforts to obtain a replacement, if it is known he is not going to appear, will be made, and the remaining Employees will immediately start work that can be performed without the absentee(s) or his/her/their replacement(s). Any replacement will only be paid for the time he/she actually works.

0029

The Union will permit a 6:00 a.m. start time for a 6:00 a.m. to 2:30 p.m. work day only if Employer gives the Union advance written notice of its request for an early start which may be via fax or electronic mail, no later than 4:00 p.m. the business day before the work is to be performed. The notice shall state: (1) the job location; (2) the men working on the site; (3) the duration of the project; and (4) day(s) for which an early start is requested.

Failure of the Employer to give prior advance written notice will result in premium pay being due for all hours worked before the regular 7:00 a.m. start time subject to review by the Joint Grievance Board. An employee pay claim for premium pay for early start must be brought within two pay periods of the occurrence.

With mutual consent of both Employer, Employee and the Union, for shops employing four (4) or less Employees, that the interchange of Employees be allowed for jobs under four (4) hours with shops employing no more than five Employees.

When an Employee reports on a job and is told not to start work, the Employer shall pay two (2) hours show up time, at the prevailing rate of wages. Once work has started and weather conditions become such that the Foreman and the Union decide the job is unworkable, the Foreman and entire crew may be sent home and paid for a four (4) hour day. At the start of the fifth hour, Employees must be paid for eight (8) hours.

Any work performed on a single shift outside the regular hours of work set forth in Section 1 above shall be paid at double time.

When a specific job requires glazing employees to work a single shift between the hours of 4:30 p.m. to 6:00 a.m. for not less than five (5) continuous work days duration, Employees shall be paid fifteen (15%) percent over and above the regular straight time hourly rate of pay for each hour worked. The pay rate for this work shall not be applied in excess of eight (8) hours per day. Failure to report to the Union prior to commencement of the work will require full premium pay for all hours worked on the project.

Shift work means work performed Monday through Friday exclusive of weekends and holidays. Any work performed on weekends shall be paid at premium pay. Duration refers to the job and not to the man.

A shift must begin on a Monday and end on a Friday. "Shift" refers to job and duration (five days) and not men. Men may be added after the shift begins. Men beginning a shift must complete the shift. No Employee shall lose work as a result of the shift.

**Section 2A.**    The Employer agrees not to require the Employees covered by this Agreement to transport any materials or equipment within their own private automobile, except the employee's own tools. However, an Employee may agree to transport the Employer's material and equipment in

4

his car, but he will not be liable for loss or damage. It is agreed an employee's automobile shall not be considered as a condition of employment. However, each Employee is required, as a condition of employment to provide the following hand tools: Tool box or bag, chisels, screwdrivers (straight and Phillips), nail set, hack saw, awl, Stanley knife, claw hammer, mallet, rule, file, rubber or vinyl cutter, glass pliers, wonder tool (jimmy bar, small), putty knives (straight and bent). The Employer shall furnish his Employees with their first hard hat but the employee may pay for replacements for such hard hat, normal wear and tear expected. The Employer will also provide all power tools and suction cups. Employees will be required to sign an official form to use company suction cups and power tools for the term of the employment. The Employee will be held responsible if the cups and power tools are not returned and will be charged the price of a comparable cup or power tool.

**Section 2B.**    No Employee shall be required to walk up more than eight (8) floors from any level on any job site, this section to become effective providing a majority of other crafts of the Building Trades in the Chicago Metropolitan area have agreed to the same type of arrangement in their respective Union Labor Agreement.

**Section 3.**    No Employees covered by this Agreement will be allowed to work before 8:00 A.M., after 4:30 P.M., or on Saturdays, Sundays or holidays without notification to the Union prior to such work, except as otherwise provided in Article 2, Section 1, herein.

Employer may assign work to be performed on Saturday and Sunday to qualified members of the bargaining unit from June 1, 2006 to May 31, 2009. Notice of any complaints or abuse will be submitted to the Association.

The Union will have the right to refuse such overtime to Employers and Employees who are in arrears of Health and Welfare, Pension and Apprentice Fund Fringes, Dues Check off or Local Dues.

**Section 4.**    The following days shall be observed as holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day. No work shall be performed on Labor Day.

**Section 5.**    All regular Employees working for an Employer shall be rotated equally where possible, consistent with efficient operations.

**Section 6.**    Employees will adhere to job safety regulations.

### ARTICLE 4

### OVERTIME

When Employees are asked to work after cessation of a regular day's work (minimum of one-

5

half (½) hour work), time and one-half (1 ½) shall be paid for the first two (2) hours of such overtime each day, Monday through Friday, and double time shall be paid after such two (2) hour overtime period each day, Monday through Friday. Saturdays, Sundays and holidays shall be paid at the rate of double time. The Employee shall be paid to the next nearest one-half (½) hour for all work performed on overtime.

However, on Saturdays and Sundays when the job duration does not exceed four (4) hours, eight (8) hours pay at the straight time rate will be allowed through mutual agreement between the Employer and Union (between the hours of 8:00 A.M. and 4:30 P.M.). There shall be no fractional part of the 8:00 A.M. to 12 P.M.(noon), or 12:30 P.M. to 4:30 P.M. except when the Union, Employer and Employee agree for safety and efficiency of work on new construction hoisting only, starting time may by 6:00 A.M. or 7:00 A.M.

## ARTICLE 5

### WAGES

**Section 1.**     Effective June 1, 2006 through May 31, 2007 the rate of wages to be paid by the Employer to journeyperson glaziers shall be Thirty Three Dollars ($33.00) per hour or Two Hundred Sixty Four Dollars ($264.00) per day.

Effective June 1, 2007 to May 31, 2008, the negotiated increase to the Union's total economic package shall be Three Dollars and 25/100 ($3.25) per hour to be allocated between wages and benefits by the Union in its sole discretion.

Effective June 1, 2008 to May 31, 2009, the negotiated increase to the Union's total economic package shall be Three Dollars and 35/100 ($3.35) per hour to be allocated between wages and benefits by the Union in its sole discretion.

**Section 2.**     There shall be an established pay day for all employees at least one (1) day each week of the Agreement. Employers shall not hold back more than three (3) days' pay. All deductions, such as Social Security, withholding tax, administrative dues, etc., must be noted on the check stubs. Employer's failure to issue pay checks or tender an insufficient fund check for wages shall not be subject to the no strike provisions of Article 18, Section 2.

**Section 3.**     When employees are laid off or discharged, they shall be paid in full at the time of such layoff or discharge. An employee quitting of his own accord shall be paid on the next regular pay day.

**Section 4.**     Employees working on a daily referral will be paid on the next regular pay day.

0032

## ARTICLE 6

## BONUSES

**Section 1.**      It is agreed that the Employer shall not pay bonuses of any kind or description to Journeyperson Glaziers, directly or indirectly, except as provided for in Article 5; Article 12; and Article 13.

## ARTICLE 7

## CLASSIFICATION/SCOPE OF WORK

**Section 1.**      Glaziers, Architectural Metal and Glass Workers General Glazing will include, but not be limited to: (1) the installation, setting, cutting, preparing, distributing, handling or removal of the following on site:  art glass, prism glass, beveled glass, leaded glass, protection glass, plate glass, window glass, pre-glazed windows, mirrors of all types, wire glass, ribbed glass, ground glass, colored glass, figured glass, vitrolite glass, carrara glass, all types of opaque glass, glass chalk boards, structural glass, stick curtainwall systems, tempered and laminated glass, thiokol, neoprene, all types of insulating glass units, all plastics or other similar materials when used in place of glass to be set or glazed in its final resting place with or without putty, vinyl, molding, rubber, lead, sealants, silicone and all types of mastics in wood, iron, aluminum, sheet metal or vinyl sash, skylights, doors, frames, stone wall cases, show cases, book cases, sideboards, partitions and fixtures; (2) the installation of the above materials on the job site, either temporary or permanent, on or for any building in the course of repair, remodel, alteration, retrofit or construction; (3) the installation and welding of all extruded, rolled or fabricated materials including, but not limited to, all metals, plastics and vinyls, or any materials that replace same, metal and vinyl tubes, mullions, metal facing materials, corrugated flat metals, aluminum panels, muntins, facia, trim moldings, porcelain panels, architectural porcelain, plastic panels, unitized panels as set forth below, skylights, showcase doors, all handrails and relative materials, including those in any or all types of building related to store front, door/window construction and stick curtain wall systems and unitized systems as set forth below; (4) the glazing of automatic door and entrances and revolving doors; the installation of door(s) and window(s) frame assemblers such as patio sliding or fixed doors, vented or fixed windows, shower doors, bathtub enclosures, storm sash where the glass becomes an integral part of the finished product, including the maintenance and repair of all of the above; the fabrication and distribution of all glass and glass-related products on site; (5) any and all handling, unloading and loading of tools, equipment and materials will be performed by members of this International Union.

The Employer shall, when requested by the Union, deliver a "Letter of Assignment" and/or a "Letter of Past Performance" in form and substance as will clearly state that a certain type of work was assigned to and performed at a given location by Glaziers under this Agreement.

For unitized systems involving curtain walls an employer who has never performed this work

7

may subcontract the work without violating this agreement. Subject to the provisions of Article 8 below, if an employer performs this work with his own employees, it must be performed by glaziers.

Scaffolding of any type or description incorporating all safety rules (except scaffolding provided by the General Contractor and/or patent type scaffolding, the use and erection of which shall have been contracted for by the Employer); and the installation of the above materials when in the shop or on the job site, either temporary or permanent, on, or for any building in the course of repair, remodel, alteration or construction.

## ARTICLE 8

## RECOGNITION OF PAST PRACTICES

That an employer who as of January 1, 2003 is signatory to a written collective bargaining agreement with both Glaziers Local 27 and another labor organization that claims overlapping work jurisdiction may assign that portion of the work consistent with that employer's past practice in effect before January 1, 2003.

That for such dual signator employers signed to both agreements as of January 1, 2003, the Union waives any grievances and/or contract claims for pay in lieu of work performed by another trade. Welfare, Pension and Apprentice Training fringe benefits based upon hours worked in covered employment by members of another labor organization shall not be due.

That a dual signator employer who was signed as of January 1, 2003 to both Union agreements may subcontract work consistent with and in conformance with that employer's past practice prior to January 1, 2003.

Employer must provide evidence of past practice immediately upon request by the Union.

That the Union with its own counsel and employer's cooperation will defend an employer in a jurisdictional dispute commenced by another labor organization claiming work covered within the Glaziers work jurisdiction brought before the National Labor Relations Board.

All employers must assign and subcontract work consistent with the terms of the Glaziers Union agreement subject to the above.

The employer shall, when requested by the Union, deliver a "Letter of Assignment" and/or "Letter of Past Performance" in form and substance as will clearly state that a certain type of work was assigned to and performed by Glaziers under this Agreement.

0034

# ARTICLE 9

## SUB-CONTRACTING

**Section 1.**    Subject to the provisions of Article 8 above, all covered work under this Agreement undertaken by the Employer within the geographic territory described in Article 10 above shall be performed by Employees covered by this Agreement.

**Section 2.**    Employers shall not contract any work covered by this Agreement to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work to any person, firm, or company who does not have an existing labor agreement with Glaziers Local 27.

# ARTICLE 10

## GEOGRAPHICAL AREA

**Section 1.**    This Agreement applies to all covered work under the terms of this Agreement performed within the following geographical area:

> The territorial jurisdiction of the District Council for Glaziers
> shall be as follows:  Cook, DuPage, Lake, McHenry, Will,
> Kankakee, Grundy, Kendall and Kane Counties in Illinois,
> and the Indiana counties of Lake (east to Route 53) and Newton
> (east to Route 55).

and such additional jurisdiction as set forth in the Union's Grant of Charter and as determined by the General Executive Board from time to time under Section 70 of the IUPAT General Constitution.

**Section 2.**    It is agreed that where glazing contracts are taken outside of the specified territory covered by the Agreement, not less than twenty-five (25%) percent of the Glaziers or Apprentices employed shall be among the Employees of the Employer who are then employed under the terms of this Agreement.

**Section 3.**    The contractor or the employer party to this agreement, when engaged in work outside the geographical jurisdiction of the Union party to this agreement, shall employ not less than fifty percent (50%) of the workers employed on such work from the residents of the area where the work is performed or from among persons who are employed the greater percentage of their time in such area.

0035

## ARTICLE 11

## LODGING

When Glaziers are sent out of the area specified in Section 1, Article 8, where it is impractical for them to return home each night, the board, lodging if necessary, and transportation costs shall be paid by the Employer, and all riding time, but not to exceed four (4) hours, shall be paid at the rate of single time.

## ARTICLE 12

## APPRENTICES

**Section 1.**    Apprentices shall be indentured in the employ of the Employer in accordance with the Apprenticeship Program approved by the United States Department of Labor.

**Section 2.**    The Employer shall be entitled to one (1) Apprentice for the first three (3) Journeyperson Glaziers employed and one (1) for each additional three (3) Journeyperson Glaziers employed.

(Exception: If the Employer's right to train apprentices has been revoked by the Joint Apprenticeship and Training Committee). This section shall not be construed to replace any Journeyperson in any shop when the Joint Apprenticeship and Training Committee determines that substantial unemployment exists in the area.

**Section 3.**    The wages of the apprentice shall be as follows:

| | | | |
|---|---|---|---|
| 1. | First six months | - | 50% of Journeyperson's wage rate |
| 2. | Second six months | - | 55% of Journeyperson's wage rate |
| 3. | Third six months | - | 65% of Journeyperson's wage rate |
| 4. | Fourth six months | - | 75% of Journeyperson's wage rate |
| 5. | Fifth six months | - | 85% of Journeyperson's wage rate |
| 6. | Sixth six months | - | 95% of Journeyperson's wage rate |

After three (3) years of apprenticeship and upon certification of the J.A.T.C. Instructor and J.A.T.C. Trustees, he or she shall be given the Journeyperson's wage rate.

10

0036

**Section 4**.    Apprentices can be used on all glass setting as follows:

| Persons required per setting schedule | Apprentices allowed |
|---|---|
| 2-5 | 1 |
| 6-8 | 2 |
| *9 and above | 3 |

*3 Apprentices is the maximum allowed on any size glass.

Any time 3 apprentices are used, at least one of the three must be in his/her final year of apprenticeship.

**Section 5**.    A Joint Apprenticeship Committee composed of three (3) representatives of the Glazing Contractors of Chicago and Vicinity and three (3) Union representatives shall be established in conformity by the United States Department of Labor, Bureau of Apprenticeship and the Glaziers Joint Apprenticeship Agreement of Chicago and Vicinity.

It shall be the duty of this Committee to implement the present Apprenticeship Program and to establish the rules of its operation and such Committee shall meet at least once each quarter for such purpose.

**Section 6**.    Apprentices shall not work alone and shall be with a Journeyperson Glazier on each job. All journeymen shall first be given the right of first refusal to available overtime before an apprentice shall be permitted to work overtime. Apprentices will not be scheduled to work on his or her regularly scheduled school day.

**Section 7**.    The parties hereby agree to become participants in the National Glaziers and Glassworkers Industry Apprenticeship Training and Journeyman Education Fund, and the Employer shall contribute to said Fund, Sixty Five Cents ($.65) for each hour worked by employees under this Agreement, effective June 1, 2006 plus such additional amounts as may be allocated by the Union in its sole discretion June 1, 2007 and June 1, 2008.

Effective January 1, 2003 contributions on behalf of the National Apprentice Fund shall be made to the Glaziers Union Local No. 27 Joint Apprenticeship Fund.

**Section 8**.    Employers will be notified by the Glaziers Union Local No. 27 Joint Apprenticeship Training Committee when Journeyperson classes are offered.

11

0037

# ARTICLE 13

## SWING STAGE/SCAFFOLD/INSURANCE

**Section 1.**    Whenever Glaziers and Apprentices are required to work on swing stages, scaffold, hydraulic or electric scaffold or jacks of any description or with window washer belts where there is a thirty (30) foot or more fall, they shall receive Fifty Cents ($.50) per hour over the prevailing rate of wages for such work.

**Section 2.**    Where skylights are glazed and are held in place by bolts, screws or nuts from the inside of the opening, which creates a most hazardous condition for the Glazier, Fifty Cents ($.50) per hour over the prevailing rate of wages shall be paid for such work.

**Section 3.**    It is agreed that all necessary scaffolding, etcetera, required on any building during the course of construction or repair, shall be furnished by the Employer. It is agreed that scaffolding, either rented or owned by the Employer, can be erected initially and dismantled by Glaziers or qualified erecting companies provided that such work is done in conformity with the State Laws of Illinois.

**Section 4.**    It is also agreed that the Employer must carry all necessary and required insurance, covering all of his Employees. He shall carry Worker's Compensation Insurance in the State in which his Employees are working. He shall also make contributions for Social Security and unemployment insurance as required by law regardless of the number of men employed by him. Each Employer shall file with the Union a certificate of such Workmen's Compensation Insurance containing not less than a ten (10) day notice of cancellation.

**Section 5.**    Should any Employee meet with an accident while at work, the person in charge of the work shall see that the Employee is cared for. Transportation shall be furnished to a doctor or to a hospital by the Employer at the Employer's expense. All injuries, regardless of how minor, will be reported to the Employer within twenty-four (24) hours by the foreman, supervisor and/or the injured Employee.

**Section 6.**    Apprentices shall attend school for a full eight (8) hour day conducted during the regular work week. Once every other week on a bi-weekly basis during the regular apprentice school term to achieve their required 144 hours of training per year. Apprentices shall not be scheduled to work on their school day. Employer shall not be responsible for payment of wages or benefits for the apprentice's school day.

## ARTICLE 14

## FOREMAN/SHOP STEWARD

**Section 1.**    The Business Representative and Shop Steward shall be furnished a list of all new hires by the Employer.

**Section 2.**    The Union shall have the right to appoint a Shop or Job Steward in each shop from the Union members regularly employed in each shop.

**Section 3.**    Where an Employer has been found to have engaged in:

(a)    multiple violations of the provisions of this Agreement by the Joint Grievance Committee or by an arbitrator;

(b)    a violation of the fringe benefit provisions of this Agreement, either by a court order or by a delinquency settlement agreement; or

(c)    a violation of the rules of the apprenticeship program as determined by the JATC;

then for the next twelve (12) months of active glazier employment, the Union shall have the right to appoint and place with the Employer a steward of its own choosing from outside the Employer's work force in order to police the agreement.

**Section 4.**    All Foremen shall receive One Dollar and 50/100 ($1.50) per hour above the prevailing scale. At the option of the Employer, a General Foreman can be appointed and be paid Two Dollars and 00/100 ($2.00) per hour above the prevailing scale.

**Section 5.**    A Foreman shall be appointed by the Employer for all work contracted for by the Employer, when the size of the crew exceeds three (3) persons.

The duties of the Foreman, among others, shall be as follows:

(A)    Seeing that material requirements and equipment are available for the most efficient conclusion of the job.

(B)    When necessary, inform his/her Employer of glass types and sizes required.

(C)    Coordinate glass and glazing work with other trades.

13

0039

(D)    When requested, report Glaziers' time on Employer's regular time cards.

## ARTICLE 15

## EXPENSE MONEY

Each Journeyperson Glazier and Apprentice Glazier shall receive Five Dollars ($5.00) per day Expense Money regardless of where they work.

## ARTICLE 16

## GLASS SCHEDULE

**Section 1.**    It is agreed that the following glass schedule of work and persons shall apply for all work contracted by the Employer:

Number of Persons up to, but not including 3/8"

| | |
|---|---|
| From 120 united inches up to 150 `united inches - | 2 |
| Not over 175 united inches    - | 3 |
| Not over 200 united inches    - | 4 |
| Not over 225 united inches    - | 5 |
| Not over 240 united inches    - | 6 |
| Not over 260 united inches    - | 7 |
| Not over 300 united inches    - | 8 |

Over 300 united inches, Add one person for each 15 united inches.

Glass schedule for 3/8" and above is based on 3.25 lbs. Per 1/4" of glass and square footage calculated on actual inch above fractions, i.e. 60 ½ = 61.

3/8" and up to but not including 3/4"

Will be total weight divided by sixty pounds (60#) per person.  (See schedules attached hereto as Appendix A and Appendix B.

3/4" and above

Will be total weight divided by seventy pounds (70#) per persons.  (See schedule attached hereto as Appendix C).

When automatic lift equipment is used, the person power requirements set forth in the up to,

14

0040

but not including 3/8" schedule shall apply (providing the glass does not have to be unloaded or moved manually).

**Section 2.**    To determine the number of persons required for Insulating Glass Units, use total glass thickness as follows:

Up to 3/8" of glass, use up to, but not including 3/8" schedule
From 3/8" up to 3/4" use - 60 lbs. per person
For 3/4" and over use  - 70 lbs. per person

e.g.    1/8" glass - 1/4" air space - 1/8" glass = 1/4" - use schedule
1/4" glass - ½" air space - 1/4" glass = ½" - use 60 lbs. per person
½" glass - ½" air space - 1/4" glass = 3/4" - use 70 lbs. per person

**Section 3.**    It is further agreed that: (1) when glass is manually lifted seven (7) feet or more to platform level, or (2) when weather conditions require it, additional persons shall be used on the following basis:

| | |
|---|---|
| First size enumerated in the applicable schedule - | 1 Additional Person |
| Next two sizes enumerated in the applicable schedule - | 2 Additional Persons |
| Next three sizes enumerated in the applicable schedule - | 3 Additional Persons |
| Next four sizes enumerated in the applicable schedule - | 5 Additional Persons |

Union Glazing Schedule
Persons Required

Plastics Up To and Including ½"

| UNITED INCHES | When manually lifted Under 7 ft. to platform level - persons required | When manually lifted 7 ft. or more to platform level - persons required |
|---|---|---|
| From 120 United Inches | 2 | 3 |
| Up to 160 United Inches | 3 | 4 |

All safety precautions will be adhered to.

**Section 4.**    Upon request of the Foreman for extra help, the same shall be furnished by the Employer.

**Section 5.**    It is further agreed that all trucks setting glass shall be equipped with a first aid

15

kit.  If employees ride the back end of the truck, the truck must be equipped with a tarpaulin.

0042

**Section 6**.    It is further agreed that chauffeurs, drivers of trucks, glazing superintendents (so-called) or Employer shall in no way assist directly or indirectly in the setting of glass.

**Section 7**.    Chauffeurs or drivers of trucks shall not hold ladders or in any manner shape or form be the supervisor of Glaziers on any glazing job.  Truck drivers belong on the truck only.

**Section 8**.    It is also agreed that the Employer shall identify all trucks or vehicles used in the glass and glazing trade by the name of the Employer permanently affixed to each side of the truck of vehicle.

**Section 9**.    All wood sash shall be bedded in putty, blocked and sufficiently pointed, and the putty line must be extended to cover to the end of the rabbet.

**Section 10**.    The Business Representatives or any other authorized representative of the Union, shall have the right to visit all places, shops or jobs where work is going on for the purpose of inspection.  They shall also have the right to examine working cards and pay envelopes of all employees covered by this Agreement.

**Section 11**.    No Employer shall at any time make any arrangements whatsoever, written or oral, with any Glazier for the performance of glazing work or any description whatsoever, other than to employ Glaziers as provided for in this Agreement in the usual and regular manner.

## ARTICLE 17

## RESETTING GLASS/REMOVAL OF GLASS

It is also agreed that where storefronts are to be reset, the glass schedule shall apply when glass is removed from the opening.

When a plate is broken and a replacement is being made in two (2) or more lites, the salvage may be stripped out of the opening with the crew required for one-half (½) the opening (minimum three (3) persons required), so long as no single piece larger than one-half (½) of the opening is removed.

## ARTICLE 18

## GRIEVANCE PROCEDURE

Any grievance arising under this contract shall first be brought before the Board of Business Agents of the Union.  If the Union and the Employer are unable to resolve the dispute, either party may submit the matter to Step 2 for final and binding resolution.

**Step 2.**    Any grievance, dispute, misunderstanding or difference arising during the life of

17

0043

this Agreement, interpretation of the same shall be decided by a Committee composed of three (3) representatives appointed by the Employers and three (3) by the Union whose majority decision shall be final and binding upon all parties to the dispute. Representatives will be appointed only for the length of the contract. In the event of the Committee's inability to decide an issue or a deadlock by the Committee, a third party shall be selected by them to act as an Arbitrator. In the event that they are unable to agree, an impartial arbitrator shall be selected from a list submitted by the Federal Mediation and Conciliation Service upon the request of either party to this Agreement.

The Federal Mediation and Conciliation Service will submit a list of five (5) Arbitrators. The Union shall strike the first name from the list and the Employer shall then strike one name, and thereafter the parties shall strike alternately. The person whose name remains, shall be the Arbitrator, provided that either party, before striking any name, shall have the right to reject one (1) panel of Arbitrators. The Arbitrator shall be notified of this selection by a joint letter from the Employer and the Union requesting that he/she set a time and place for the hearing, subject to availability of the Employer and the Union representative. The letter shall specify the issue(s) to the Arbitrator.

The Arbitrator shall have no right to amend, modify, nullify, ignore or add to the provisions of the Agreement. He/she shall consider and decide only the particular issue(s) presented to him/her in writing by the Employer and the Union, and his/her decision and award shall be based solely upon his/her interpretation of the meaning or application of the terms of this Agreement to the facts of the grievance presented. The award of the Arbitrator shall be final and binding on the Employer, the Union and the Employee(s) involved.

The expenses of the Arbitrator, including his/her fee, shall be equally shared by the Employer and the Union. If an Arbitrator determines that the violation of the Agreement is willful, he/she shall have the authority to attach to any monetary award rendered hereunder a liquidated damage of Twenty Five Percent (25%) of such award to be paid to the grieving party.

If the Employer fails to comply with any award or decision of the Arbitrator, then the Union will not be prohibited by Section 2 of this Article from resorting to economic and/or legal action including withholding of services, striking or picketing during the period of such non-compliance; providing the Union, before resorting to such economic action, shall give the Employer two (2) business days' written notice of its intention to take such economic action.

To be a legal grievance under this Agreement, the Employee or the Union must present said grievance in writing to the Employer representative within thirty (30) days of the event giving rise to the grievance or within thirty (30) days after such grievance comes to the knowledge of the aggrieved Employee.

**Section 2.**    Except as otherwise provided in the wage and benefit provisions of this Agreement and in Article 2, Section 3, the grievance machinery provided herein and the

0044

administrative and judicial remedies and procedures provided by the statute are the sole means of settling any dispute by the employees against the Employers whether relating to the interpretation of this Agreement or otherwise; accordingly, neither the Union nor the Employees will instigate, promote, or engage in any strike, slow-down, or concerted withholding of services during the term of this Agreement, provided no Employee shall be disciplined for refusing to cross a lawful primary picket line established by any other union. The Employer agrees that there will be no lockout during the term of the Agreement.

**Section 3.**    Employees, Employers and the Union are encouraged to utilize the Grievance Procedure prior to seeking judicial remedies.

## ARTICLE 19

## VACATIONS

Each Employee may take a two (2) week vacation. Vacations will, in so far as possible, be granted at times most desired by the Employee. However, in order to insure an orderly operation, sufficient notice in advance must be given and then mutually agreed to by the Employer. An Employee may take a third week's vacation.

## ARTICLE 20

## HEALTH AND PENSION AND ANNUITY CONTRIBUTIONS

**Section 1.**    Effective June 1, 2006, the Employer shall pay Six Dollars and Seventy Four Cents ($6.74) for each hour worked by all persons performing bargaining unit work into the Health and Welfare Trust Fund plus such additional amounts as the Union chooses to allocate from its total economic adjustment package in its sole discretion in years two and three of this Agreement on June 1, 2007 and June 1, 2008. The Employer is required to make contributions to the Fund for employee/owner, partial owner, or direct relative; husband, wife, brother or sister, son or daughter, performing work of a type included or not included within the jurisdiction of this Agreement, including but not limited to supervision, general management, sales, estimating, clerical or maintenance work, the Employer of the Employee shall make contributions to the Health and Welfare Fund on behalf of that Employee for a minimum of one hundred sixty (160) hours per month.

**Section 2.**    Effective June 1, 2006, the Employer shall pay Five Dollars and Forty Cents ($5.40) for each hour worked by all persons performing bargaining unit work into the Local No. 27 Pension and Retirement Plan plus such additional amounts as the Union chooses to allocate from its total economic adjustment package in its sole discretion in years two and three of this Agreement on June 1, 2007 and June 1, 2008. The Employer is required to make contributions to the Fund for the Employee/owner, partial owner, or direct relative; husband, wife, brother or sister, son or daughter,

0045

performing work of a type included or not included within the jurisdiction of this Agreement, including but not limited to, supervision, general management, sale, estimated, clerical or maintenance work, the Employer of the Employee shall make contributions to the Pension and Retirement Plan on behalf of that Employee for a minimum of one hundred sixty (160) hours per month.

**Section 3.**    1a.    Commencing the first day of June 2006, and for the duration of the Agreement plus such additional amounts as the Union chooses to allocate from its total economic adjustment package in its sole discretion in years two and three of this Agreement on June 1, 2007 and June 1, 2008, and any renewals or extensions thereof, the Employer agrees to make payments to the International Brotherhood of Painters and Allied Trades Union and Industry Pension and Annuity Fund for each Employee covered by this Agreement, as follows:

1b.    Effective June 1, 2006 for each hour or portion thereof, for which an employee received pay, the Employer shall make a contribution of Four Dollars and Seventy Five Cents ($4.75) to the above named Pension and Annuity Fund plus such additional amounts as the Union chooses to allocate from its total economic adjustment package in its sole discretion in years two and three of this Agreement on June 1, 2007 and June 1, 2008.

1c.    For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and other hours for which pay is received by the Employee in accordance with this Agreement, shall be counted as hours for which contributions are payable.

1d.    Contributions shall be paid on behalf of any Employee starting with the Employee's first day of employment in a job classification, covered by this Agreement. This includes, but is not limited to, apprentices, helpers, trainees, and probationary employees.

1e.    The payments to the Pension and Annuity Fund required above, shall be made to the International Brotherhood of Painters and Allied Trades Union and Industry National Pension and Annuity Fund, which was established under an Agreement and Declaration of Trust, dated April 1, 1967. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as though he had actually signed the same.

2.    The Employer hereby irrevocably designates as its representatives on the Board of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors. The Employer further agrees to be bound by all actions taken by the Trustees pursuant to the said Agreement and Declaration of Trust.

3.    All contributions shall be made at such time and in such manner as the Trustees require; and the Trustees shall have the authority to have an independent Certified Public Accountant audit the payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the Pension and Annuity Fund.

0040

4.    If an Employer fails to make contributions to the Pension and Annuity Fund within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provisions hereof to the contrary notwithstanding, and the Employer shall be liable for all costs for collection of the payments due together with attorney's fees and such liquidated damages not to exceed Fifteen Percent (15%) as may be assessed by the Trustees. The Employer's liability for payment under this Article or for non payment of wages shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause or for non-payment of wages which may be provided or set forth elsewhere in this Agreement.

5.    The Pension and Annuity Plan adopted by the trustees of said Pension and Annuity Fund shall at all times conform with the requirements of the Internal Revenue Code so as to enable the Employer at all times to treat contributions to the Pension Fund as a deduction for income tax purposes.

**Section 4.**    Payments to the Glaziers Union Local No. 27, Pension and Retirement Plan and Glazing Employers and Glaziers Union Local No. 27 Health and Welfare Plan, shall be made monthly, no later than the tenth (10th) day of the succeeding month for which hours are reportable.

Each Employer agrees that any payment not made within fifteen (15) days of the succeeding month for which hours are reportable, shall be subject to liquidated damages of Fifteen Percent (15%) in addition to the amount originally required under the terms of this Agreement requiring a contribution to the Pension and Retirement and Health and Welfare Plan.

**Section 5.**    If an Employer fails to make contributions to any of the Funds referred to in this Article within ten (10) days after the date required by the Trustees of this Agreement, the Union shall have the right to take whatever legal steps are necessary to secure compliance with this Agreement, and any other provisions hereof to the contrary notwithstanding and the Employer shall be liable for all costs for collection of the payments due together with attorney's fees and such liquidated damages not to exceed Fifteen Percent (15%) as may be levied by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no strike" clause which may be provided or set forth elsewhere in this Agreement; providing the Union, before resorting to economic action such as striking or picketing, shall give the Employer two (2) business days' written notice of its intention to take such economic action.

## BONDING

**Section 6.**    Each Employer agrees that before commencing any work to which this Agreement applies, a performance bond in the sum of Fifty Thousand Dollars ($50,000.00) shall be

0047

provided to insure the prompt and full payment of all contributions due to the Welfare Fund, Pension Fund, and the Apprenticeship Fund.

(b) In the event an Employer fails for any reason to satisfy the bonding requirement above, the Employer shall be personally liable to the above Funds in the amount of Fifty Thousand Dollars ($50,000.00) plus all unpaid amounts in excess of that sum which are due the Funds by that Employer and legal fees and cost of collection. In the event the Employer is a corporation, liability under this paragraph shall be imposed not only on the corporation, but also personally on each corporate official of that Employer empowered to execute agreements or sign checks on the corporation's behalf, or to designate the persons empowered to do so. The provisions of this paragraph shall in no way relieve or excuse any Employer of the obligation to provide the bond described above, nor shall this provision limit the personal liability of said corporate officers based on operation of law.

(c). Any Employer commencing work in violation of the requirements set forth above shall be in violation of this Fringe Benefit Fund contribution payment provision of this Agreement.

## ARTICLE 21

## CHICAGOLAND CONSTRUCTION SAFETY COUNCIL/LABOR MANAGEMENT INITIATIVE

**Section 1.**    Effective June 1, 2006, each Employer shall contribute Three Cents ($.03) for each hour worked by employees under this Agreement to the Chicagoland Construction Safety Council, a not-for-profit corporation.

**Section 2.**    Effective June 1, 2006, each Employer shall contribute Five Cents ($.05) for each hour worked by employees under this Agreement to the Painters and Allied Trade Labor Management Cooperation Initiative (P&ATLMCI), a not-for-profit organization. Contributions will be remitted to the Apprentice Training Fund for distribution to the P&ATLMCI.

## ARTICLE 22

## DISCIPLINARY ACTION

The Union agrees to cooperate with Management and support disciplinary bars given to Employees for just cause.

## ARTICLE 23

## FEDERAL AND STATE LEGISLATION

**Section 1.**    The provisions of this Agreement shall be effective only to the extent

0040

permitted by the Labor Management Relations Act of 1947, as amended.

**Section 2.**    In the event that any Federal or State legislation, governmental regulation or court decisions cause invalidation of any Article or Section of this Agreement, all other Articles and Sections not so invalidated shall remain in full force and effect.

0049

## ARTICLE 24

Having complied with all the provisions of this Agreement on its part to be performed, the Employer shall be permitted to advertise and otherwise identify the Employer as a Union shop.

In the event this Agreement is terminated, then all such advertising shall be immediately canceled or otherwise recalled.

## ARTICLE 25

## DRUG TESTING

If an owner or general contractor requires the Glazing Contractors employees to submit to a drug testing program or policy, the Union will permit such testing provided it is applied equally to all trades on the site.

An Employer may request a drug free work place, provided Employer tests all company personnel, including management, office personnel, glaziers, other union and hourly employees of other trades employed by the Employer. All such personnel are required to be tested and have a drug free card.

All drug testing and notifications shall be conducted by Employer at his expense.

## ARTICLE 26

## EXECUTION

The Association hereby agrees that all of its members and those employers who have assigned their bargaining rights, both collectively and individually, shall be bound by this Agreement, just as surely as if each and every member signed it and whether or not each does so individually and whether or not membership is retained in the Employer Association party to this Agreement. The Employer, as an Association, through its duly elected officers and representatives hereby declares and affirms that each and every member has so agreed and has authorized the officers and representatives named below to sign this agreement, both for the Association and for each member individually. Individual executions are not required for this Agreement and any amendments, extensions or renewals thereof to be binding on such individual employers represented by the Association.

0050

## ARTICLE 27

### CONTRACT DURATION

This Agreement shall continue in full force and effect from June 1, 2006 through May 31, 2009 and shall continue in force and effect from year to year thereafter, unless either party shall desire to change any of the terms herein, in which case a written notice must be served to the other party not less than sixty (60) days nor more than ninety (90) days by registered mail or certified mail prior to the expiration date.

IN WITNESS WHEREOF, said parties have to this Agreement, or by their representatives on their behalf, respectively, set their hands and seals.

PAINTERS DISTRICT COUNCIL NO. 14

By: _____
Business Manger /Secretary Treasurer
DATE: _10-18-06_

ASSOCIATION OF
GLAZING CONTRACTORS

BY: _____
Signature

_ALFRED SHAPIRo_
(Please print name signed above)

GLAZIERS, ARCHITECTURAL METAL
AND GLASS WORKERS UNION LOCAL
#27, CHICAGO AND VICINITY
INTERNATIONAL UNION OF
PAINTERS AND ALLIED TRADES
AFL-CIO

BY _____
Business Representative

DATE: _10-19-06_

DATE: _10-18-2006_

1

ASSOCIATION OF GLAZING CONTRACTORS AND

PAINTERS DISTRICT COUNCIL NO. 14 AND ITS AFFILIATE

GLAZIERS ARCHITECTURAL METAL AND GLASS WORKERS UNION 27

JOINT ARBITRATION COMMITTEE

IN THE MATTER OF:                    )        08CV4166
                                     )        JUDGE GUZMAN
HURON VALLEY GLASS, LLC,             )        MAGISTRATE JUDGE SCHENKIER
W & G, INC.,                         )
GEORGE STRIPP, Individually, and     )        TC
W & G, LLC,                          )
                                     )
          Employer/Respondents,      )
                                     )
     and                             )
                                     )
GLAZIERS ARCHITECTURAL METAL         )
AND GLASSWORKERS LOCAL 27,           )
                                     )
          Grievant.                  )

        Record of proceedings before the Association of
Glazing Contractors and Glaziers Local 27 Joint
Arbitration Committee, at 4225 Lawndale Avenue, Lyons,
Illinois commencing at 9 a.m. on the 20th day of March,
A.D. 2008 upon the hearing of the above-entitled cause.

Huron Valley Glass vs Local 27    March 20, 2008

2 (Pages 2 to 5)

**Page 2**

```
1
2   APPEARANCES:
    CLARK HILL, PLC by
    MR. RICHARD H. CHAPMAN
3   150 North Michigan Avenue, Suite 2400
    Chicago, Illinois 60601
4   1-312-985-5904
5     on behalf of the Respondent Huron Valley
        Glass, LLC.
6
    ARNOLD AND KADIAN by
7   MR. JOHN J. TOOMEY and
    MR. DONALD D. SCHWARTZ
8   19 West Jackson Boulevard, Suite 300
    Chicago, Illinois 60604
9   1-312-236-0415
10    appeared on behalf of the Grievant.
11  ASSOCIATION OF GLAZING CONTRACTORS AND GLAZIERS
    LOCAL 27 JOINT ARBITRATION COMMITTEE:
12  Mr. Alfred Shapiro, Chair
    Mr. Thomas Hill
13  Mr. Arnie Harris
    Mr. Daniel Goodwin
14  Mr. Jim Augustyn
    Mr. Michael O'Donnell
15
    ALSO PRESENT: Mr. Dennis Ahearn
16        President
          Huron Valley Glass
17
          Mr. Michael Mabus
18        Business Agent
          Painters' District Council 14
19
20
21
22
23
24
```

**Page 3**

```
1   EXAMINATION                        PAGE
2   RICHARD J. WOLF
    Direct Examination by Mr. Schwartz......57
3   Cross Examination by Mr. Chapman......61
4   DENNIS AHEARN (Adverse witness)
    Cross Examination by Mr. Schwartz.......64
5   Examination by Mr. Schapiro..........133
6   MICHAEL MABUS
    Direct Examination by Mr. Schwartz......149
7   Examination by Mr. Shapiro..........182
    Cross Examination by Mr. Chapman......187
8   Redirect Examination by Mr. Schwartz....223
9   AARON PURSER
    Direct Examination by Mr. Chapman......229
10  Cross Examination by Mr. Schwartz......248
11  MICHAEL A. COOK
    Direct Examination by Mr. Schwartz......252
12  Cross Examination by Mr. Chapman......264
    Redirect Examination by Mr. Schwartz....266
13  Examination by Mr. Shapiro..........268
    Further Redirect Examination by Mr. Schwartz.269
14  Further Examination by Mr. Shapiro......270
15  DENNIS AHEARN
    Direct Examination by Mr. Chapman......271
16  Cross Examination by Mr. Schwartz......280
    Examination by Mr. Shapiro..........287
17  Examination by Mr. O'Donnell........290
    Further Cross Examination by Mr. Schwartz..292
18
19
20
21
22
23
24
```

**Page 4**

```
1       MR. SHAPIRO:  My name is Alfred Shapiro.  I am the
2   chair of the Joint Arbitration Board between the
3   Glaziers Local 27 and the Association of Glazing
4   Contractors.  We are here today to hear the Union's
5   grievance against Huron Valley Glass Company, LLC.
6   There are six members of the Committee, three appointed
7   by management and three appointed by the Union.  There
8   is also an alternate for each side.  Our decision is
9   based on majority vote of the Committee members.  The
10  Management Committee is myself, Al Shapiro.  I am with
11  the Active Glass Company.
12      MR. HILL:  Glass Solutions.
13      MR. HARRIS:  Contract Mirror and Supply.
14      MR. SHAPIRO:  And the Union, can you introduce
15  yourself, please.
16      MR. O'DONNELL:  Mike O'Donnell.
17      MR. AUGUSTYN:  Jim Augustyn.
18      MR. GOODWIN:  Dan Goodwin.
19      MR. SHAPIRO:  This hearing is being recorded by a
20  court reporter.  We will proceed as follows in the
21  hearing:  The Union will make an opening statement.  The
22  Company's attorney may or may not make an opening
23  statement or wait to do so until the Company presents
24  its case.  The Union will present its case.  The Company
```

**Page 5**

```
1   will present its case.  We will accept closing arguments
2   at the end of the evidence.  The Committee will make all
3   rulings on whether evidence will be admitted or not.  We
4   will rule on all objections to evidence.  We will meet
5   privately to discuss our ruling, and a written decision
6   will be rendered.
7       All witnesses will be sworn in by the court
8   reporter.
9       (Whereupon Mike Mabus and Dennis Ahearn were
10      sworn in.)
11      MR. SHAPIRO:  All witnesses will be excluded from
12  the room until they testify, except that each side may
13  have one representative present during the testimony.
14      Go ahead.
15      MR. TOOMEY:  Good morning.  My name is John Toomey,
16  and I will be making the opening statement on behalf of
17  the Glaziers Local 27 who are the grieving party here
18  today.  And the Glaziers 27 Collective Bargaining
19  Agreement signed by the Employer October 24, which is
20  Exhibit 1 in your book, contains in Article 9 a
21  sub-contracting clause.  And by the way, if I put you to
22  sleep or you miss anything I might say, there is a copy
23  of the opening statement contained in your books; you
24  will also find a memorandum in support of our position;
```

Huron Valley Glass vs Local 27     March 20, 2008

**6**

1  and finally, the last document contained in the pocket
2  on the side is Union's proposed findings of fact and
3  conclusions of law which you may or may not adopt.
4  That's certainly up to you.
5      But what brings us here today is Exhibit 1, the
6  Collective Bargaining Agreement, contains that Article
7  9, the subcontracting clause, which provides:  The
8  employers shall not contract any work covered by this
9  Agreement to be done at the site of the construction,
10 alteration, painting, or repair of a building,
11 structure, or other work to any person, firm, or company
12 who does not have an existing labor agreement with
13 Glaziers Local 27.
14     Evidence will show that on October 23rd, 2006,
15 Huron Valley Glass, LLC was awarded a $5,595,000 glazing
16 contract for labor and material at the project known as
17 the Reebie Loft Apartments, 1401 South State Street,
18 Chicago, Illinois.  W.E. O'Neil was the prime
19 contractor.  And that contract you will find in your
20 books as Exhibit Number 14.
21     Huron Valley in turn subcontracted all of the
22 labor for the installation of glass to J & D Erectors,
23 Incorporated, in a $1,253,000 subcontract dated February
24 21, 2007.  It included storefront glass on Floors 1 and

**7**

1  2 and installation of preglazed windows on Floors 3
2  through 22.  That subcontracting agreement is Exhibit
3  15 in your books.  J & D Erectors is not a signator to a
4  Glaziers 27 agreement.  J & D did not commence
5  installation work until about August 2007, six months
6  later.  Huron Valley gave the Glaziers Union work away
7  February 21, the day it let the contract.
8      Huron Valley breached the Glaziers
9  subcontracting provision that day it let the subcontract
10 to a nonunion signator in breach of the union only
11 subcontracting clause.
12     Huron was promptly advised of that breach and
13 given an opportunity to cure by the Union.  In February
14 2007, the Glaziers Union did not know that a contract
15 was yet in place, but it was rumored Huron Valley was
16 considering subcontracting the work at the site
17 exclusively to an ironworker subcontractor.
18     On March 5, 2007, less than two weeks after the
19 subcontract date, Local 27 notified Huron Valley that
20 such action would violate the Glaziers 27 subcontracting
21 clause citing extensive appropriate legal authority.
22 That's Exhibit 4 in your books.
23     Further, the damages for that contract breach
24 would be sought and asked that their lawyers call.

**8**

1  Nothing occurred.  The letter stated that absent
2  resolution, Local 27 would proceed with a grievance.
3  The measure of contract damage would be in the amount of
4  money to place the Union in the position it would have
5  been, but for the breach, what is commonly known as pay
6  in lieu of work.
7      This pre-job commencement heads up letter was
8  sent to give Huron Valley Glass, LLC an opportunity to
9  correct the situation and to mitigate any potential
10 damages for the clear contract breach of Article 9.
11     When no response came, Huron Valley was sent on
12 March 14, 2007 a Notice to Appear before the Board of
13 Business Agents as required in Article 18 of the
14 contract.  They sought two continuances, March 14, 2007
15 and April 4, 2007, and never appeared.
16     Huron Valley never let on it had already
17 awarded the subcontract with another trade.  It went
18 through a charade saying on April 29, 2007, which you
19 will see as Exhibit 4, that it had sought bids from two
20 Glazier 27 contractors.  It claimed four, but only two
21 had Glazier contracts.  It never let on the contract was
22 already signed.  It proceeded with J & D who completed
23 the job work as they had always intended.  So the
24 so-called glazier bids were a sham as the job had

**9**

1  already been let.
2      The measure of damages for the subcontracting
3  breach I spoke of is pay in lieu of work.  It is simply
4  the total hours worked by the subcontractor's employees
5  in covered work on the project, multiplied by the
6  Glaziers wage rates as per the contract, and those wage
7  rates are at Exhibit 11 in your book.  The hours are
8  accurate, they were provided by J & D Erectors who
9  routinely had six men working on the project.  J & D's
10 printout of hours worked is contained at Exhibit 8 in
11 the book.  It is -- the measure of damages was computed
12 at straight time for all hours.  Fringe benefits are not
13 included as they are not sought before this tribunal.
14 An audit based on J & D Erectors is attached computing
15 10,770.2 hours on the job for a total of $396,936.50 in
16 damages for the contract breach.  That's contained at
17 Exhibit 13.
18     Article 18 of the Glaziers contract, the Joint
19 Trade Board provisions further permits the Committee to
20 attach to any monetary award an additional 25 percent
21 for a willful breach.  The Union will at the close of
22 the case make such request in light of the contract
23 dated February 21, the Employer's lack of candor about
24 the letting of the agreement and the notice and legal

Huron Valley Glass vs Local 27    March 20, 2008

4 (Pages 10 to 13)

**10**

1  authority provided to the Employer at the outset on
2  March 5th. That 25 percent totals $99,234 for a grand
3  total of $496,170.
4      These facts are simple, straightforward, and
5  undisputed. You may also see at this proceeding some
6  additional slight of hand tricks performed by Huron
7  Valley. This is a sideshow, a shell game about who is,
8  in fact, bound to the bargaining agreement. The Union
9  will show that the Committee has jurisdiction over all
10 entities who are jointly and severally bound to this
11 agreement.
12      You will hear the name Huron Valley Glass, LLC
13 which corporately is not presently in good standing in
14 Illinois, W & G, Inc., a defunct Michigan corporation,
15 and W & G, LLC where Huron Valley is also located.
16 George Stripp, Individually who signed the labor
17 contract and W & G, LLC all operating from the same
18 address.
19      All pre-contract negotiations and
20 correspondence was conducted with Huron Valley Glass,
21 LLC, 5075 Carpenter Road, Ypsilanti, Michigan where
22 W & G, LLC is also located. The bargaining agreement
23 was sent to Huron Valley who is named as the employer in
24 the first paragraph of the agreement, and they returned

**11**

1  it, signed by W & G, Inc., and George Stripp. Huron
2  Valley without notice to the Union had altered the
3  signature page changing the name on the signature to a
4  different company, but not the front page of the
5  contract.
6      Huron abided by the terms and conditions of the
7  contract and paid the rates and benefits required
8  thereunder through yet a third entity, W & G, LLC. We
9  ask that you extend jurisdiction to all entities
10 individually, corporately, and otherwise.
11      When the Company wanted apprentices, they were
12 requested by Huron Valley Glass, LLC but paid under
13 W & G, LLC who has headquarters again at 5075 Carpenter
14 Road, Ypsilanti, Michigan. We ask that the Committee
15 find that they are, in fact, the same company,
16 alter egos of one another, and that Huron Valley, LLC,
17 the defunct W & G, Inc., and George Stripp,
18 Individually, and W & G, LLC are all bound, jointly and
19 severally to the current Association agreement through
20 May 31, 2009 as the Huron Valley companies have adopted
21 through their course of conduct, the current wages,
22 benefit levels and payments, bonding and referral
23 procedures of the current and existing Association
24 agreement, just as if they had signed it rather than the

**12**

1  2006 rates rolling over from year to year.
2      Finally, Employer may argue that the damages
3  based on J & D Erectors hours are excessive. Not
4  because those hours weren't worked by J & D, but because
5  at the time the work was performed during the height of
6  the construction season, the Union might not have had
7  adequate manpower on the out-of-work list to perform the
8  project on each and every day. This does not matter for
9  damage purposes.
10      The Collective Bargaining Agreement was
11 breached February 21, 2007, when the contract was let.
12 There were plenty of persons out of work at that time.
13 Had they been promised months of steady work in August,
14 September, and October, and thereafter, they would have
15 been available. A proper damage award for a knowing
16 breach of contract will encourage a good faith effort to
17 abide by the contract in the future.
18      Moreover, had a Local 27 subcontractor been
19 used in February 2007, there would have been no issue as
20 the manpower would have been adequately planned and
21 scheduled in advance.
22      The affected class of glaziers suffered an
23 economic loss of work and the Union suffered as it
24 reflects adversely on them in the marketplace and

**13**

1  injures their standing among their members regarding its
2  ability to enforce, abide, and police their contract.
3  The Union is entitled to protection from this type of
4  injury and loss of face and prestige among its
5  membership and in the marketplace. If one employer is
6  allowed to breach the contract, all will seek to breach
7  the agreement in the same fashion.
8      Frequently arbitration awards are made to the
9  Union who is permitted to distribute the funds to
10 persons on the out of work list in their discretion and
11 to deduct from those sums the amounts the Union would
12 have received in dues which they were deprived of by the
13 Employer's actions.
14      At the conclusion of the case, we will request
15 such an award and that the Employer's mitigation claims
16 be disregarded as it took no steps to cure the breach,
17 and thus, the Union is entitled to $496,170.50 with no
18 reduction in mitigation to the Employer. And we have
19 asked further that that damage amount be determined to
20 be jointly and severely owing from Huron Valley Glass,
21 LLC; W & G, Inc.; George Stripp, Individually; and
22 W & G, LLC. Thank you.
23      MR. SHAPIRO: Would you like to make a statement?
24      MR. CHAPMAN: Yes, Mr. Shapiro. Thank you.

14

1  Gentlemen, thank you.
2      I have a few points to raise just in contrast
3  to Mr. Toomey. Number one, just if I might,
4  Mr. Shapiro, at the get go, note that the proceeding
5  today was convened against Huron Valley. There has been
6  no issuance of any notice of grievance as to any other
7  entity at this point; and as a result, just for the
8  record, we would object to any other entity who has not
9  been properly brought before the Committee to be in a
10  position for them to have to potentially be considered
11  for liability. There would be no due process to permit
12  this at that time.
13      As I mentioned to Mr. Schwartz, we are here as
14  Huron Valley, take responsibility for purposes of this
15  hearing as Huron Valley.
16      Let me then go and just give some different
17  facts that I believe the evidence will show following
18  the testimony and your review of the exhibits.
19      The -- many of the things that Mr. Toomey has
20  said are, indeed, correct, but we need to start off as
21  far as Huron Valley's good faith. It came into town, as
22  you will hear from Mr. Ahearn, before 2006 and began
23  work with a composite crew at the Optima project in
24  Skokie, Illinois, which many of you may be familiar

15

1  with. It's been a long-term project, it's still going
2  on, and glaziers are still on that job exclusively.
3  There are no ironworkers on that job, although there had
4  been ironworkers as part of a composite crew in
5  accordance with the normal practice here of Local 27, as
6  well as the Ironworkers Union; and I don't have to tell
7  you at all about the nature of that arrangement which
8  has prevailed here certainly since the late '80s as a
9  result of litigation that had gone on between Local 27
10  and the applicable Ironworkers Union.
11      But going past that, the fact of it is and what
12  you will hear through the evidence is that Huron Valley
13  had absolutely made a good faith effort to employ
14  glaziers, likes glaziers a great deal. You will hear
15  from Mr. Ahearn that, in fact, he was a glazier and a
16  member of the Union himself. Not Local 27, but is very
17  familiar, obviously, with the trade and has a great deal
18  of respect for it.
19      The Optima job, as you will hear, proceeded for
20  a very lengthy period of time; not without its problems,
21  but ultimately, it did proceed.
22      There did come a time where an opportunity did
23  present itself to Huron Valley to be in a position to
24  take on another project. That is the 1401 South State

16

1  Street project, which Mr. Toomey mentioned. That
2  project was one that had not started in February of '07.
3  It had -- when Mr. Toomey does mention that the contract
4  was let that day, I would respectfully disagree with him
5  and note to you that if you look at the last page, the
6  signature pages of that contract, you will see that
7  J & D did not sign that contract until April of '07,
8  April 6th, and HVG did not sign that contract until
9  April 23rd of 2007. So if there was ever a binding
10  agreement between J & D and HVG, the evidence will show
11  that it certainly wasn't on February 26th or so of 2007.
12  So again, I would respectfully disagree with Mr. Toomey
13  and his approach because I don't think there was any
14  slight of hand at all, and I think what you will see
15  through the evidence is that, in essence, rather than
16  going ahead and letting the contract, HV stopped, HVG
17  stopped. And when did they stop discussions with J & D
18  or at least stop having the contract is when they did,
19  in fact, receive notice from the Glaziers that they had
20  a protest about a potential agreement that they had
21  found out about with a subcontractor that was not
22  employing Local 27 persons or members. There is not
23  going to be any doubt about that, and I think Mr. Mabus
24  will be able to testify about that. Mr. Toomey wrote a

17

1  letter about it. There is no doubt that it came very
2  clear as early as March, a full two months before any
3  work began on that project, that there was going to be a
4  project.
5      What the evidence is also going to show is that
6  rather than attempting to escape its obligations to meet
7  with and to confer with the Union in an attempt to
8  resolve this subcontracting question, HVG actually did
9  meet, did meet with Mr. Mabus. Mr. Ahearn will testify
10  of that meeting. I'm sure Mr. Mabus will, too. There
11  were other people at that meeting. And then
12  Mr. O'Donnell was also at at least one of those
13  meetings, and his -- you will see correspondence
14  directed to him in relation to that.
15      The big issue that came up, the evidence is
16  going to show, is that the Union was given an
17  opportunity in accordance with the agreement, and
18  Mr. Toomey is correct when he points here is the
19  agreement. It's under Tab 1. It is executed as the
20  name Huron Valley Glass Company and it's signed in the
21  name of W & G. We're not going to into get that
22  silliness right now. We're simply going to say we are
23  Huron Valley, and we will stand up for this agreement
24  and this proceeding.

Huron Valley Glass vs Local 27    March 20, 2008

6 (Pages 18 to 21)

18

1     When -- the deal here that everyone in this
2  room I think knows is that Huron Valley or any other
3  contractor makes a commitment to do certain things under
4  the agreement and the Union makes a commitment to do
5  certain things under this agreement. So when there was
6  the meeting with Mr. Mabus and Mr. O'Donnell and
7  Mr. Ahearn and Mr. Anderson, you'll hear about this,
8  when they got together, the issue was, listen, we -- we
9  at Huron Valley are not going to be able to run crews
10 ourselves here. We are doing it at Optima, we have had
11 some difficulty, we're new to town, we're going to
12 subcontract the job. No mystery. There was never any
13 mystery. In fact, if you look at the date of the
14 agreement that Mr. Toomey mentions, the date was
15 February, but it's not signed until April. The fact is
16 word had gotten around, so no one is hiding. There is
17 no evidence that there is any slight of hand. The Union
18 did what it needed to do, what it was supposed to do.
19 It raised the issue.
20     Here is where the Union didn't do what it
21 needed to do, and it didn't do it because it couldn't do
22 it, and it's a good news story unfortunately why it
23 couldn't do it. There was need for it to build a crew
24 for this 1401 job. It was clear to the Union members

19

1  and the Union of Business Agents what was going to need
2  to happen. You will look at correspondence that the
3  Union sent that basically said we object, we have a
4  grievance, you are doing -- you are about to do wrong --
5  the heads up letter as Mr. Toomey says. What it doesn't
6  say, what you will not see is a letter or a writing of
7  any kind from the Union saying, hey, wait a minute, we
8  have people who can work on this job. In contrast to
9  what Mr. Toomey said, well, if we only had notice, they
10 did have notice. They had two months' notice to help to
11 assemble a crew to go on this job. This job never
12 started. You will not see one writing that says we have
13 people. You will not see one writing that says if you
14 are going to subcontract, we want you to subcontract to
15 a Local 27 signatory. In fact, you will not see a
16 document that says who those signatories might have
17 been. You will not also see anything that says, Would
18 you give us some time before you start because we can
19 get people. Here is -- there was nothing. There was
20 nobody. Now, one of the things that we're going to talk
21 about later is that before there can be any liability
22 assessed against Huron Valley, it would have to be shown
23 that there were people available.
24     And I want to again take just in contrast to

20

1  what Mr. Toomey says respectfully, this isn't about
2  throwing money into the middle of the room and deciding
3  who should get it later. This is a proceeding, which I
4  know you have all been involved in the past, where the
5  Union is acting on behalf of specifically aggrieved
6  members. Somebody got hurt. It wasn't the Union that
7  got hurt. It was its members, if anyone got hurt. So
8  it's the individual members who are entitled to recover.
9  You're not going to hear any evidence about any single
10 member that got hurt because of this subcontract. And
11 regardless of how distasteful or upsetting it may be
12 that this subcontract went, this is not a punitive
13 proceeding. It's a compensatory one. Who got hurt?
14     We were given by the Union -- and you have seen
15 it, and you'll see it in both notebooks -- the off work
16 lists, and I think both the Union members as well as the
17 contractor members knows -- know what the nature of the
18 labor supply was during the period that we're talking
19 about, and we're talking about February '07 going
20 forward. The job did not begin in May, so let's talk
21 May '07, even through now.
22     You're going to see in your documents an
23 exhibit that we will prove up here which, in essence,
24 will show how few people there were available off the

21

1  off list and how quickly those people were able to get
2  positions without regard to the subcontract, and you
3  will see that, in fact, there were really no damages
4  suffered by any individual members based upon who was
5  qualified to participate on the 1401 job. When we get
6  into it, you're going to see zero after zero after zero.
7  These are the number of hours that people were missing
8  that they didn't get for a substantial majority.
9  Virtually the entire group of people on that off work
10 list you will see zeros. That is, they were working.
11 That was the pool that we had to choose from, or, if you
12 take the Union's view of it, who we should have chosen
13 from. That's the good news part of the story. We had a
14 very well employed Union workforce at this time. You're
15 going to see that.
16     You're going to hear that when -- we did ask
17 for help. Huron Valley did say, Tell us some people,
18 give us some people to go on this job. We were still
19 employing people at Optima. We had successfully built a
20 crew at the Optima project which has gone months beyond
21 its original schedule. You're going to see that we were
22 given no names. And, yes, we did make a mistake when it
23 came down to isolating Union subcontractors,
24 subcontractors for labor who had Union members, but

**22**

1  nonetheless, we followed the direction that we were
2  given during our meetings with Mr. Mabus and
3  Mr. O'Donnell, which is go find a Union subcontractor.
4  And why they said that as opposed to find -- yeah, we'll
5  give you some employees. Well, part of it was there
6  weren't any employees of substance available to go onto
7  this job, and the numbers reflect it. I'm not going to
8  go make it up.
9      So when we come to the end of the story and we
10  look and say the underhanded tactics, as Mr. Toomey may
11  say, or the shell game, the fact was everything was
12  known. It was known from day one. This is not a
13  punitive proceeding. As much as we want to say this
14  should never have occurred, it's not the issue. This is
15  who got damaged and how much.
16      There is no way to tell from the J & D Erectors
17  materials anything beyond hours, and the law that you
18  will see in our posthearing brief that is also going to
19  be shared with you as Mr. Toomey mentioned about in his
20  brief is going to show very clearly what the NLRB has
21  said, what the federal courts have said about how
22  damages should be awarded. This, in essence, the
23  evidence will show and as you will see from our
24  authority is like any other breach of contract case.

**23**

1  Breach in contracts are never recognized or favored, but
2  people have a right to do them if they wish and measure
3  damages based on that. Again, I am not suggesting that
4  we have breached a contract. In fact, the Union cannot
5  show that it did what it was necessary to do to even
6  invoke the protections of the contract when it didn't
7  supply labor under the referral process, didn't supply
8  an alternative subcontractor in accordance with that
9  process.
10      Absent there being any proof of a breach, there
11  can't be any award against Huron Valley. But even
12  assuming, and this is always the struggle we have if we
13  want to say you are not entitled to anything but we're
14  going to tell you why even if you are that those damages
15  aren't appropriate, when you look through this chart,
16  when you see the off work list, when the contractors
17  themselves and the Union members themselves know what
18  the state of the workforce was at the time we're talking
19  about -- again, the good news -- and you will see that the
20  damages are not appropriate, that, in fact, there are
21  glaziers on the 1401 job today, there are no ironworkers
22  on that job today, the glaziers are getting 100 percent
23  of the hours of that job. That's not as underhanded as
24  you might believe when Mr. Toomey says; and

**24**

1  respectfully, to him, I understand his position, but the
2  fact is no one has been trying to run away from the
3  Glaziers, no one is trying to run away from their
4  obligation to do this, and, in fact, they entered into
5  the '05 agreement with representations that Mr. Mabus
6  had said, and you will see it in his letters, if you can
7  do 50 percent, that works for us. That's the measure of
8  damages here, if there are any.
9      When you look at this, you will see there
10  should be offsets for, number one, the amount of hours
11  that were actually available which isn't tied to what
12  hours that J & D's people made because they're different
13  every week; so to put a lump sum on there is a
14  speculative, unfair, and impractical form of damages.
15      Secondly, you will see -- excuse me, there
16  should be an offset for the amount of hours that the
17  glaziers have received well beyond the 50 percent and
18  continue to do so, and it's our intention to continue
19  using glaziers. And you will also hear there are
20  projects in the offing where it was our intention to
21  continue to use the glaziers. And that's the
22  unfortunate part of where we are today.
23      You will also see there should be offsets
24  recognized for people -- and, again, the law supports

**25**

1  this, for people that either did or should have gotten
2  unemployment benefits.
3      When you take all of that together, and you
4  will see it from our chart, you will see that there are
5  no damages properly awardable under any circumstances.
6      So with that, I respectfully appreciate your
7  attention, and obviously, we can move ahead whenever the
8  panel desires.
9      MR. SHAPIRO: Thank you.
10      Mr. Schwartz, do you --
11      MR. SCHWARTZ: Yes. Well, I would like to first
12  offer several stipulations that counsel and I agreed to
13  yesterday, and I want to make sure that it's adequately
14  reflected in the record.
15      First, as to Exhibit Number 6 in the Union's
16  booklet has to do with the report forms submitted from
17  June of '05 through -- I believe it's '07, signed by
18  W & G, LLC. There is a stipulation that these are, in
19  fact, report forms submitted by W & G, LLC reflecting
20  their own employees employed for that period of time.
21      Could we get then a stipulation on that point?
22      MR. CHAPMAN: We are stipulating that they are
23  authentic records.
24      MR. SCHWARTZ: Correct, and that they were submitted

26

1  to the Fund by W & G.
2  MR. CHAPMAN: We stipulate to the — they say what
3  they say, and we stipulate to the accuracy of what they
4  say.
5  MR. SCHWARTZ: And the second — a second
6  stipulation is to the accuracy of the numbers of the
7  hours reflected in Exhibit Number 8 which is the
8  documentation prepared by the subcontractor J & D
9  Erectors which, as Mr. Toomey indicated, was — reflects
10  10,770.2 hours worked by ironworker contractors —
11  excuse me, ironworker employees at the 1401 South State
12  Street job from May '07 through February '08.
13  MR. CHAPMAN: Yes. We stipulate to the accuracy of
14  the J & D records.
15  MR. SCHWARTZ: And thirdly, that we are stipulating
16  today that HVG is bound to the CBA for the purposes of
17  this arbitration.
18  MR. CHAPMAN: For the purposes of this arbitration
19  only. Obviously because there's another court
20  proceeding pending, that I don't want there to be a
21  sense that we're prejudicing our rights in relation to
22  that, but for our hearing today, we stipulate to that.
23  MR. SCHWARTZ: And also that there are no procedural
24  impediments to proceeding today.

27

1  MR. CHAPMAN: As against HVG —
2  MR. SCHWARTZ: Right.
3  MR. CHAPMAN: — there are no procedural
4  impediments. Again, for the record, any activity
5  directed against Mr. Stripp or W & G or other entities
6  that have not been properly made parties to these
7  proceedings we do object as there is a procedural
8  impediment.
9  MR. SCHWARTZ: But not as to HVG.
10  MR. CHAPMAN: Not as to HVG, but to the extent that
11  Mr. Toomey has raised these other entities or that
12  individual, we do have a strenuous objection because
13  they are not represented here today.
14  MR. SCHWARTZ: Okay. So those are the stipulations
15  that we would like to make as a matter of record, so
16  we'll proceed. I'm going to call Mr. Ahearn —
17  MR. CHAPMAN: May I ask one question?
18  MR. SCHWARTZ: Sure.
19  MR. CHAPMAN: Mr. Shapiro, if it's possible, based
20  upon the nature of the proceedings that you have seen
21  today, and that is how the — this proceeding has gone,
22  we would ask that the panel rule at the outset that the
23  proceedings should be and shall be directed against HVG
24  only and that it would not be proper to have any further

28

1  issue raised with W & G or Mr. Stripp unless or until
2  they are properly made a party to these proceedings,
3  which they haven't been. And rather than have this
4  proceeding potentially muddled up by a procedural
5  impropriety, we're asking that the panel, that the
6  Committee, direct that the Union not be permitted to
7  raise those issues at this time and in this forum.
8  MR. SCHWARTZ: Our response to that would be is that
9  Huron Valley Glass was the signator party indicated on
10  the preamble of the contract, and it has come to light
11  only recently that there are these other entities that
12  are involved in the proceeding, and I would think that
13  the Board does have jurisdiction to impose liability on
14  anybody that might be deemed to be an alter ego or a
15  co-signator to the Collective Bargaining Agreement, and
16  therefore, that the Board does have jurisdiction; so we
17  would obviously vigorously oppose any limitation in your
18  award to HVG only.
19  MR. SHAPIRO: Do you want to answer that?
20  MR. CHAPMAN: Yes, please.
21  MR. SHAPIRO: Okay. Then explain —
22  MR. CHAPMAN: This — here is the thing. The Union
23  has been in possession of this agreement since it was
24  signed in 2005. It had every opportunity from that time

29

1  forward to assert a claim against W & G. All right?
2  While there will be some speculation as to who made
3  changes in the agreement, the fact of the matter is that
4  W & G is not a party here. We have one party to this
5  agreement, and it's HVG for purposes of this hearing.
6  It is — to suggest that there would be — that the
7  panel, that the Committee would attempt to assert
8  jurisdiction to render a judgment against someone who is
9  not represented here or against a company that is merely
10  related to another company is respectfully very improper
11  and clouds these proceedings and unfortunately creates
12  challenges to them that doesn't allow us to get to where
13  we need to go. If the Union wanted to name these
14  parties, then it very well could have and could have
15  done so at every point in time and chose not to, and
16  now, to come in on the day of the hearing and make a
17  suggestion that, okay, all of the sudden we want to name
18  these other two is unfair, but more than that, it's just
19  simply improper, and any party has a right to even
20  contest their — liability to the agreement. They
21  have no right to do that. They're not here.
22  MR. SCHWARTZ: Well, we put you on notice several
23  weeks ago by correspondence —
24  MR. CHAPMAN: It was you, that's right.

**30**

1    MR. SCHWARTZ: — I did, on behalf of the Union —
2    MR. SHAPIRO: I have a question. Wait. Do these
3    three parties reside at your corporate offices in
4    Michigan?
5    MR. CHAPMAN: I believe they do, but I can't speak
6    to it though. I can speak to HVG. That's who I
7    represent here.
8    MR. SHAPIRO: Why are there different signator —
9    why is there one signator and why are there different
10    checks coming from different companies?
11    MR. CHAPMAN: I don't know why. I do know and this
12    is what I tried to deal with with Mr. Schwartz in
13    advance to say if there is an issue here, he had asked
14    me, Are you going — he asked me, Are you going to raise
15    the issue that HVG isn't liable because there is a W & G
16    signature line. And I said, For purposes of this
17    procedure, no — for this proceeding, no, Let's get to
18    the ascertainment of liability and damages, if any,
19    against the entity who has been — against the entity
20    who is charged with doing something wrong. There is no
21    indication that — if HVG is not making an issue of it
22    and is here and would be subject to an award as it has
23    subjected itself to be, then there is no point, and it's
24    not properly procedural.

**31**

1    And if I might hit your point head on, I
2    appreciate what you're saying about, well, why is this
3    and why is that. That — but what I'm saying is I'm not
4    the person that's properly able to answer that because
5    I'm not representing W & G in this proceeding. It
6    hasn't been named as a party. There may be all kinds of
7    great answers. I just don't know what they are, and I'm
8    not prepared to do that. The notice that Mr. Schwartz
9    is suggesting he gave was notice that has come in the
10    past several days, for the past day or so, in saying,
11    okay, this is the first time I have heard Mr. Toomey —
12    well, this is the first time I met Mr. Toomey
13    respectfully. He seems like a nice enough fellow. This
14    is the first time I even heard the words George Stripp
15    in this proceeding. This is the first time I have
16    actually heard somebody is going to seek liability.
17    There is not a written document that you will see other
18    than what got tendered today, which I haven't even
19    looked at, that talks about W & G as a liable party or
20    George Stripp as the liable party. It's just not fair,
21    and it's going to cloud our proceedings.
22    MR. SCHWARTZ: We put Mr. — we notified counsel
23    several weeks ago of the fact that we sought remedy
24    against all of the entities that were involved in the

**32**

1    Huron Valley umbrella, and —
2    MR. SHAPIRO: Now, why did you do this?
3    MR. SCHWARTZ: Because of the fact that we saw for
4    the first time that the contract, even though it
5    names — the 2005 Collective Bargaining Agreement, even
6    though it names Huron Valley Glass, Inc., as the
7    signator party, for some reason which is unknown to us,
8    it was signed in the name of W & G, Inc., by Mr. George
9    Stripp. The reason we believe that liability is proper
10    against those two entities obviously is that W & G,
11    Inc., signed the document. Mr. Stripp, we believe — we
12    don't know who Mr. Stripp is — would be equally liable
13    with W & G, Inc., because in 2005, W & G, Inc., had
14    been, in fact, a dissolved corporation for ten years.
15    It was dissolved in 1995. And under Illinois law, an
16    entity that is dissolved that still carries on business
17    imposes liability on a person that signs a contract in
18    the name of that defunct entity.
19    The reason we added W & G, LLC is because even
20    though all of the documents you will see in the
21    correspondence leading up to the signing of the
22    Collective Bargaining Agreement and the notifications of
23    the grievance were between the Union and Huron Valley
24    Glass, the report forms are signed in the name of

**33**

1    Huron — or excuse me, of W & G, LLC. So that's why
2    W & G, LLC, it should be deemed to be an alter ego or
3    successor or single employer with Huron Valley in that
4    they are essentially just a shell payroll company for
5    all operations that are really being conducted in the
6    name of Huron Valley. The contract with W.E. O'Neil is
7    under Huron Valley, the Optima job was under the name of
8    Huron Valley, and they are just simply using this W & G,
9    Inc., LLC entity to pay payroll, and so we think that
10    that is a clear basis for imposing liability on that
11    entity as well as on the signator.
12    MR. CHAPMAN: I think what Mr. Schwartz's argument
13    actually points to is exactly what we're saying. He is
14    suggesting that, in essence, there are shreds here of
15    W & G, and HVG cannot use those shreds to escape its own
16    liability. Well, the fact is it's here. The wrong, if
17    you will, is not a wrong. We're here. There is no
18    injustice. And again, forgetting everything else about
19    the procedural propriety of this, which, again, I must
20    strongly urge the Committee is very improper, it's going
21    to cause us to go backwards and not forwards. HVG is
22    standing here on this agreement. It submitted itself to
23    the jurisdiction of the panel. There was ample
24    opportunity for Mr. Schwartz or the Union or Mr. Toomey

Huron Valley Glass vs Local 27    March 20, 2008

10 (Pages 34 to 37)

34

1 or anyone else to make a very clear out-in-the-open
2 statement in writing that we are going to seek that
3 liability. It has not done so.
4         And I might tell you, there is another case
5 pending where -- and Mr. Schwartz filed an amended
6 complaint in that federal case on benefits only for
7 illustrate purposes which only within the last two days
8 did he actually name these people. But at least he
9 named them, and they will then have a right to interpose
10 a defense in their own name, and due process requires no
11 less here than it would in the federal court.
12     MR. SCHWARTZ: All right. Well, let me make a
13 response. First of all, we don't know, based on these
14 multiple shells that are being used, if Huron Valley is
15 nothing more than a name and W & G has all of the
16 assets; so it could very well be that they are
17 submitting to the jurisdiction of this Board under the
18 name Huron Valley because Huron Valley really has no
19 assets and we can get an award in accordance with
20 Mr. Toomey of a half a million dollars and say, well,
21 you can collect against Huron Valley, but Huron Valley
22 doesn't have anything, W & G is paying all of the
23 payroll, W & G has all of the assets, and so therefore,
24 an award against Huron Valley is noncollectible.

35

1     MR. CHAPMAN: But that's an enforcement
2 proceeding --
3     MR. SCHWARTZ: Well, but that is a reason why the
4 jurisdiction should be asserted here against any entity
5 that can be deemed to stand in the shoes of Huron Valley
6 or as an alter ego or a single employer with that entity
7 because of the fact that in the absence of extending
8 jurisdiction to all of the related companies that are
9 part of this shell game, we don't know which one
10 actually has assets; and so in the lacking of
11 jurisdiction or the Board lacking to assert jurisdiction
12 over these related entities, we could get an award that
13 is noncollectible, which I believe is -- would be
14 contrary to anything that it's intended. I mean we
15 don't know what W & G, LLC's assets are. And we don't
16 know what Huron Valley, LLC's assets are. We don't know
17 what Mr. Stripp's assets are. We don't know why the
18 contract was signed in the name of W & G, Inc., which
19 was defunct for ten years at the time the contract was
20 signed. So we don't know what of these multiple shells
21 has assets, and it would make it impossible for us to
22 collect in contravention of this proceeding.
23     MR. SHAPIRO: Counselor, can you tell me about each
24 company?

36

1     MR. CHAPMAN: No. Honestly I can't. I can tell you
2 about Huron Valley, and I can tell you the nature of its
3 business. It's president is here to tell you what he
4 does, and he can tell you about the nature of the
5 entity. He would do so anyway because he would provide
6 you background with the company.
7     MR. SCHWARTZ: Well, that's a perfect reason for
8 allowing testimony to proceed on this issue, and you can
9 reserve ruling on this motion until you hear the
10 relatedness of the companies through testimony and then
11 decide if they are properly -- if the award properly
12 extends to these related entities, but it's not proper
13 to do that without hearing evidence of how related the
14 companies are.
15     MR. CHAPMAN: But the panel is here to determine
16 whether there has been a breach or not of this
17 agreement. That's why we're here. That's what your
18 notice says --
19     MR. SCHWARTZ: Yes, but the problem is the Board
20 always has a right to retain jurisdiction to enforce the
21 award, and if it turns out that we try to collect
22 against Huron Valley and then they would -- we would
23 have to reconvene the hearing for the purpose of
24 determining whether W & G, LLC is, in fact, an alter

37

1 ego, we would be in a position of having to have a
2 second hearing on whether the damage award should be
3 extended to that entity anyway; so we might as well hear
4 it all in one proceeding and decide that issue at the
5 end based on the evidence that's presented.
6     MR. CHAPMAN: I respectfully disagree, and here is
7 why. There is no doubt that -- and I think everyone
8 here who does business knows, they may deal business
9 with a customer that ultimately doesn't pay, and I would
10 imagine that every -- certainly the contractor
11 representatives have had to file a suit against an
12 entity, and they might find that that judgment is
13 potentially uncollectible. But what do they do? Well,
14 they are able if they wish and they find out that, A,
15 it's not collectible, and that's where this thing
16 starts, not before they know that. They do that in a
17 subsequent proceeding where they are able to determine
18 under Illinois law whether the corporate vail, if you
19 will, should be pierced. It's not done at this initial
20 proceeding. And the reason for that is that party has a
21 right to be represented and to assert its position.
22 When it is compelled to submit itself to the Court
23 because it is sued in a later proceeding, an enforcement
24 proceeding, it's absolutely proper to do so. We are not

Huron Valley Glass vs Local 27    March 20, 2008

11 (Pages 38 to 41)

**38**

1  arguing that if it turns out that Huron Valley doesn't
2  have money to pay, which respectfully, I believe the
3  panel will find that it's not obliged to pay any money,
4  and that's why we're talking about kind of cart before
5  the horse, but that's not what this proceeding is about,
6  and you can't make something into a proceeding that a
7  contract doesn't set forth. You don't have anybody's
8  agreement to go beyond it. And the Courts have said
9  that, that an arbitration proceeding that attempts to go
10 beyond the jurisdiction of its contract is going to be
11 void. And so I would respectfully submit to
12 Mr. Schwartz we are actually going to take more time --
13    MR. SCHWARTZ:  Well, it's not going to take -- oh,
14 I'm sorry. Go ahead.
15    MR. CHAPMAN:  If I could. We are just getting into
16 a position where we take what is arguably going to be a
17 fair and appropriate proceeding by consenting parties
18 and muddying and dirtying it up with a question that is
19 pure speculation. And this man is not in a position to
20 come here and testify about the relationship between
21 W & G and HVG. He is not the president of W & G. He is
22 here taking responsibility for the entity that was
23 brought here. And again, I implore you that to attempt
24 to get at this issue prematurely is going to cause our

**39**

1  whole proceeding to be subject to attack later down the
2  road defeating the entire purpose of the arbitration
3  procedure in the first place.
4    MR. SCHWARTZ:  Well, I find it interesting that
5  Mr. Chapman would refer to this issue. The reason we
6  filed an amended lawsuit in the fringe benefit case in
7  federal court is because their -- his associate walked
8  into federal court two weeks ago and said that Huron
9  Valley isn't the proper party defendant to the contract.
10 And the reason we added W & G, Inc., Mr. Stripp, and
11 W & G, LLC is because they claimed in a motion to
12 dismiss that Huron Valley is not signator to the
13 contract because the signature page is signed under
14 W & G, Inc. Now, how W & G, Inc, is on the last page
15 and Huron Valley is on the first page, I don't know, but
16 I believe that this is clearly a reason why this Board
17 has jurisdiction and --
18    MR. CHAPMAN:  What's the -- Don, we moved to dismiss
19 it because you didn't attach the entire agreement to the
20 complaint.
21    MR. SCHWARTZ:  You were not in open court when she
22 said that W & G --
23    MR. CHAPMAN:  I know, but our motion says that very
24 point. You have made allegations based on an

**40**

1  agreement --
2    MR. SHAPIRO:  Is there a copy of this contract here?
3    MR. SCHWARTZ:  No. Oh, of the contract, sure,
4  Exhibit 1.
5    MR. SHAPIRO:  I want to see the face of it and
6  the --
7    MR. SCHWARTZ:  Exhibit 1, on the first page, it says
8  Huron Valley Glass Company, LLC, a Carpenter Road
9  address is the contracting party, then on the last page,
10 before the attachments which were the correspondences,
11 some of the correspondences, on page 21, you will see
12 that somebody typed in W & G, Inc., and was signed by a
13 George Stripp. Now, how that happened -- in his
14 corporate capacity as an officer, but we would think
15 that that's not who signed it; so they're playing some
16 shell game, that this W & G, Inc., you'll see in later
17 exhibits was dissolved in 1995 --
18    MR. SHAPIRO:  Why is there two different names on
19 this contract?
20    MR. CHAPMAN:  I have to tell you, if I could,
21 Mr. Shapiro, this was an agreement the Union drafted.
22 This is the Union's contract.
23    MR. SHAPIRO:  But why is it --
24    MR. CHAPMAN:  I have no idea.

**41**

1    MR. SHAPIRO:  I'm sure the Union did not type in
2  W & G, Inc., on the last page.
3    MR. CHAPMAN:  Well, but let me suggest this. I'm
4  not -- I don't know. I couldn't know. I'm not a
5  handwriting expert, I'm not a question document
6  examiner, but there is no name. There is no name for
7  Huron Valley. And so I'm not saying that it's right or
8  wrong. I'm just saying that somebody typed this in. I
9  haven't gone through the Union's records to find out who
10 it was that typed it. Mr. Schwartz is casting an
11 aspersion. He's basically saying, well, we don't know
12 how it got there, so it must have been you, and if it
13 was you, it must have been wrong and it must have been
14 deliberate and it must have been for an improper
15 purpose.
16    MR. SHAPIRO:  I have another question. Benefits are
17 being paid by a third company. Why is that different
18 than Huron Valley?
19    MR. CHAPMAN:  I don't know. I mean that -- all I'm
20 saying, Mr. Shapiro, is these questions may or may not
21 be legitimate questions. The trouble is we're
22 conducting a proceeding that was premised on one notice,
23 and now, in the midst of it at the start, we want to
24 change it into something else. You know, if he wants --

**42**

1  if the Union wishes to attempt to assert jurisdiction
2  over entities that aren't here, then my sense is go
3  ahead, file a grievance against those entities, and let
4  those entities have an opportunity to determine whether
5  this arbitration is proper. Asking you to make that
6  decision now based upon aspersions and little pieces of
7  evidence that aren't material to the Union's fundamental
8  claim as whether there has been a breach to the
9  agreement is going to put this proceeding in tremendous
10 jeopardy. I'm not saying, and I hope that's clear, that
11 Mr. Schwartz's contention is either right or wrong about
12 piercing the corporate veil. What I do know about
13 Illinois law and piercing the corporate veil is there
14 are a number of elements that we couldn't possibly begin
15 to touch on here, and part of that is injustice to the
16 people that are asserting a piercing. This is a whole
17 nother kettle of fish.
18   MR. HARRIS: Can I ask a question? Are you denying
19 that the agreement that was signed by W & G does not, in
20 fact, include Huron Valley, that they are not by
21 implication the same company because one was named and
22 another one signed?
23   MR. CHAPMAN: I don't know. And, Mr. Harris, I'm
24 not trying to be difficult about this, and you may think

**43**

1  I'm trying to run around, but I'm here representing one
2  company based upon a claim that's been asserted. What
3  we're talking about is a different claim. It may be a
4  good claim, it may be an interesting claim, but that's
5  not what brought us in here today, and I imagine you're
6  no less surprised about it than I am that this is going
7  to be the source of what we're talking about. I don't
8  think the panel thought, oh, by the way, we're here for
9  Huron Valley but we're going to be talking about W & G
10 and an individual named George Stripp. That's not why
11 you were brought here.
12   MR. SCHWARTZ: We were brought here to discuss
13 contractual violations. They have contested for the
14 last four or five months who is bound. They are saying,
15 well, no one is bound because Huron Valley is named in
16 the preamble and W & G signed, so therefore, nobody is
17 bound. Well, you have to decide who is bound and under
18 what circumstance; so I think that it's incumbent upon
19 you to make the decision as to which entity is truly
20 signatory. Huron Valley is named in there, so it's
21 obvious in the preamble it's a contracting party, so
22 it's obvious we would name them in the grievance. It's
23 less obvious that they -- or that it's less required
24 that they would have to -- we would have to have named

**44**

1  all of these related entities that we might not have
2  even have known of at the time. We didn't know at the
3  time that W & G, Inc., was signing it. We didn't know
4  that they were a dissolved company. We didn't know that
5  benefits were going to be paid in the name of W & G,
6  LLC. So now, if you do limit your award to only Huron
7  Valley, you're going to come back for a second hearing
8  when if Huron Valley doesn't pay, if we assume we would
9  get an award, and then you're going to have to decide
10 whether the award should be extended to these other
11 entities. Rather than coming back another occasion
12 because we have given three continuances to the company
13 in this proceeding and we have been all inconvenienced
14 timewise, rather than coming back in three months and
15 say -- or six months when the award is not collected to
16 say we're going to reconvene and figure out whether
17 these other entities are equally bound to the contract
18 is a colossal waste of time when we can present evidence
19 today. The only person who can testify about it is
20 Mr. Ahearn. It's not going to be that much but a few
21 questions relating to the interrelationship of these
22 companies. It's not going to prolong the proceeding
23 very much. As a matter of fact, it would probably have
24 been less time than we have been arguing on this, and I

**45**

1  see no reason why the Board should not take evidence on
2  a question as to what entities are, in fact, signator to
3  this agreement. That's an essential element of any
4  grievance arbitration proceeding, is who is bound. They
5  are agreeing that HVG is, but they're not agreeing to
6  these other entities being bound. We think that these
7  other entities should be bound to the contract and,
8  therefore, equally liable for the obligation, and rather
9  than postponing that determination, we're here to
10 present evidence on that through Mr. Ahearn, and I think
11 the Board should assert jurisdiction at this time
12 regarding that issue.
13   MR. SHAPIRO: Mr. Toomey, do you have anything to
14 add?
15   MR. TOOMEY: I do. And I think the proper way to
16 handle this is probably for the Board to reserve ruling
17 until it's had an opportunity to hear all of the
18 evidence and seen all of the exhibits about these
19 various entities, and those are in our exhibit book, and
20 then, after hearing all sides and legal argument, if
21 necessary, can be presented, and then they can make a
22 informed decision based on everything that was put
23 before them.
24     Finally, I'd like to say that on February 28,

**46**

1    2008, counsel was sent a letter from our office saying
2    that we were going to proceed against all entities,
3    including Mr. Stripp, and that he could make any
4    argument he saw fit as to their liability at that time.
5    And the language in that letter came directly out of a
6    court case from the Seventh Circuit in a Joint
7    Arbitration Board. So the issue was posed before it was
8    researched, I'm sure, by all sides. And the argument
9    about surprise is really out of place here because
10   February 28th, which was prior to the first scheduled
11   hearing, is when this first came up, and then there has
12   been a couple of continuances, so --
13       MR. SHAPIRO: Would you care to answer that?
14       MR. CHAPMAN: Yes, please. If you -- I don't have
15   the notice of this grievance proceeding in front of me.
16   Maybe Mr. Schwartz, you do, but I will tell you that's
17   the notice that gave rise to this proceeding. That
18   notice says nothing about these other entities. And how
19   this panel would feel comfortable entering an award
20   against someone, especially Stripp because he's not even
21   here, and think that that's -- and be told that that's a
22   proper way to handle a contract dispute is very, very
23   concerning to me.
24       MR. SHAPIRO: Can you tell me who Mr. Stripp is?

**47**

1        MR. CHAPMAN: I understand him to be an officer of
2    W & G; but again, you're asking me, Mr. Shapiro, things
3    I just -- if -- I am speculating, and --
4        MR. SCHWARTZ: Well, you're not the witness. Your
5    witness probably knows who Mr. Stripp is.
6        MR. CHAPMAN: But he's asking me.
7        MR. SCHWARTZ: Well, that's why we should put
8    Mr. Ahearn on and let him tell us who all of these
9    people are and what these entities are and let the Board
10   decide. I don't believe Mr. Ahearn doesn't know.
11       MR. CHAPMAN: But that's not fair, Don. But what
12   Mr. -- Mr. Ahearn isn't an executive of that company.
13   Whatever he says is not representing that company. If
14   you're going to go ahead and -- A, I think this is just
15   a bogeyman, and that is why. If it were to turn out --
16   I still have faith that in this proceeding, this panel
17   is going to find there is no liability at all, and I
18   think we ought to have that chance before we get on to
19   who is going to pay before liability is established; and
20   number two, that if this arbitration were to proceed to
21   enforcement, which it would be, the Union -- if it were
22   so in a situation where HVG was found liable, which,
23   again, we respectfully suggest would be improper, then
24   they're going to have an enforcement proceeding in state

**48**

1    court to enforce this proceeding, an award against HVG.
2    They will also have an ample opportunity before a judge
3    with a jury, if it is necessary, to bring in any other
4    party that it feels should be liable for that judgment
5    because HVG can't or won't pay. But we're hurdling
6    over --
7        MR. SCHWARTZ: No, no; that's untrue. What the
8    Court is going to determine is the enforceability of the
9    award. If they -- if he decides that we're not going to
10   extend the award to these other entities, the Court
11   could not, in fact, do that, and then, we would have to
12   reconvene before these arbitrators to determine whether
13   these --
14       MR. CHAPMAN: I would respectfully disagree. I have
15   had this case come up, Don. I will tell you this, and I
16   have had the federal courts say exactly this point. If
17   you as a petitioner believe that there is an entity that
18   is liable for the amount of the award, you are free upon
19   confirmation of that award to pursue supplemental
20   proceedings against that entity, and that is Illinois
21   law through and through, and I know that you're with on
22   that.
23       MR. SCHWARTZ: This panel has the right to do that;
24   plus, that he just indicated that Huron Valley is still

**49**

1    employing people, but the payroll is all coming from
2    W & G. So I mean it's ridiculous to say that they are
3    not interrelated companies when Huron Valley is
4    employing the people, the contracts are all in Huron
5    Valley's name, and the payroll and the report forms for
6    these people is under the name W & G, LLC; so it's a
7    waste of time not to determine what the
8    interrelationship is between these companies and whether
9    these related companies are all liable pursuant to the
10   Collective Bargaining Agreement. There are no report
11   forms under the name Huron Valley, they're all under
12   W & G, LLC, and yet, all of the employees think that
13   they work for Huron Valley, and all of the contracts are
14   signed with Huron Valley, all of the subcontracts are
15   with Huron Valley, all of the correspondence leads to
16   the Collective Bargaining Agreement with -- between the
17   Union and Huron Valley, and out of the blue, they start
18   submitting report forms to the Funds, which the Union
19   doesn't necessarily even have access to those report
20   forms, under W & G, LLC; so to say that there is a
21   reason not to assert jurisdiction is just facetious
22   because they're playing a shell game with corporations,
23   and this Board should assert jurisdiction over any
24   entity that could potentially be liable under the

Huron Valley Glass vs Local 27    March 20, 2008

14  (Pages 50 to 53)

**50**

1  Collective Bargaining Agreement, and we would
2  respectfully assert that this LLC entity, W & G, because
3  it's just making the payroll for Huron Valley Glass
4  employees is equally -- is bound to be equally liable
5  with Huron Valley for the contractual violation.
6      MR. SHAPIRO:  Your answer to that?
7      MR. CHAPMAN:  I am here for Huron Valley.  We are
8  here to participate in a proceeding that's convened
9  pursuant to this agreement.  We indicated when we came
10  in here that we certainly weren't going to play any kind
11  of shell game with anybody, that we were going to stand
12  up for the job, and deal with it directly with the
13  panel.  So in exchange for doing just that, we're now
14  going to get approached by bringing other people into
15  this who I don't represent as we sit here.  And I'm not
16  going to tell you I'd never represent them.  I'm just
17  telling you right here, right now, I couldn't pick
18  George Stripp out of a police lineup.  And if you asked
19  me about W & G, I couldn't tell you anything about it --
20      MR. SCHWARTZ:  But you're not a witness.  You keep
21  referring to you.  You're not relevant.  It's Mr. Ahearn
22  that is relevant.
23      MR. CHAPMAN:  No.  And Mr. -- here is my point.
24  We're going to take a good proceeding -- and that's all

**51**

1  I care about here on behalf of HVG, is having a good
2  proceeding that will stand up to enforcement if it's
3  going to be enforced either for our client or against
4  our client.  We're bringing in an issue that's going to
5  pollute it, and once it it's polluted, it can never get
6  cleaned up, and I think you will find ourselves redoing
7  this potentially not only here, but in a federal court.
8  It is -- so that's as far as I go with it because I
9  don't advocate on behalf of W & G.  I am not advocating
10  again based on Mr. Stripp.  They are not represented
11  here, and we're going to -- you know, we are going to
12  cause a problem where we have no reason to do so, and
13  we're going to put a burden on this panel and this
14  Committee that doesn't take it anywhere because there is
15  nothing shown about any injustice, impropriety.
16  Whatever has gone on here has gone on.  Everything that
17  Mr. Schwartz is saying the Union has known about from
18  day one.  They received the forms from day one.  They
19  saw the contract from day one.
20      MR. SCHWARTZ:  First of all, the Union does not get
21  report forms.  They go to Stuart Miller.  That we're
22  here as the Union representatives, not as Fund
23  representatives.
24      MR. CHAPMAN:  Yeah, but let's -- well, then do you

**52**

1  want to talk about piercing the corporate veil?  Don,
2  you're representing the Fund and the Union.
3      MR. SCHWARTZ:  I'm not representing the Fund in this
4  case.
5      MR. CHAPMAN:  No, but you represent the Fund and the
6  Union.  I mean if you want to say there is no
7  difference, you've got to go both ways with it then.
8  You know, the people that are -- you represent them
9  both.
10      MR. SCHWARTZ:  Not today.
11      MR. CHAPMAN:  Well, yes, you do today.
12      MR. SCHWARTZ:  Only one of the parties today.
13      MR. CHAPMAN:  Yeah, but you have a lawsuit that you
14  filed on the --
15      MR. SCHWARTZ:  That's not -- this Board has no
16  jurisdiction over that.
17      MR. CHAPMAN:  And that's my point.  This Board does
18  not have any jurisdiction over parties such as Stripp --
19      MR. SCHWARTZ:  Not parties.  It's the claim of the
20  Funds for benefits versus the claim here for wages.
21  That's what we're saying.
22      MR. SHAPIRO:  Don, what do you have?
23      MR. SCHWARTZ:  I have the letter dated February 28th
24  to Mr. Chapman that indicates to him very clearly that

**53**

1  we are intending to proceed, and I'd like to make this
2  part of the record, against all four entities the Huron
3  Valley LLC, W & G, Inc., Mr. Stripp individually, and
4  W & G, LLC.
5      MR. CHAPMAN:  You know, that's fine.  I'm not saying
6  to you the letter wasn't written.  I'm saying we operate
7  here based upon the notice.  The contract provides for a
8  notice, notice of a grievance directed to parties who
9  are liable to be let.  So the fact that he says, well,
10  we might proceed against you -- I'm familiar with it, it
11  was directed to me, I don't think he made it up --
12  that's the issue here.  So again, I cannot imagine that
13  anybody here doesn't understand what I'm saying.
14      MR. HARRIS:  We understand, but why can't questions
15  be asked to the witness as to the relationship between
16  the two and then be allowed to make a determination as
17  to whether or not there is an alter ego?
18      MR. SHAPIRO:  Before I rule and the other parties
19  who are a party to this mediation, we're going to move
20  forward to hear testimony, so we're going to proceed and
21  we will make a decision at the end whether or not the
22  other parties are a part of this.
23      MR. CHAPMAN:  And, Mr. Shapiro, without belaboring
24  it, I understand what you're saying.  If the panel were

Huron Valley Glass vs Local 27    March 20, 2008

15 (Pages 54 to 57)

**54**

1 to decide that, indeed, at least based on some evidence
2 that it heard that these other parties should be part of
3 this proceeding, I guess the question that I would have
4 is then do those parties get to participate and present
5 evidence on their own behalf?
6    MR. SHAPIRO: I need to hear the evidence. I need
7 to hear -- right now, I am troubled by the fact that I
8 see a contract here with different names on it. I am
9 troubled by it. I am troubled with the fact that I see
10 Huron Valley on the front, I see another name on the
11 back, and I see -- or I hear that payments are made by
12 still another company. Now, if it smells like a duck,
13 quacks like a duck, it must be a duck. Something isn't
14 right, and I want to get to the bottom of this, and I
15 hope we're able to do this with testimony, but I see
16 things here that just don't make sense to me.
17    MR. CHAPMAN: And I'm not going to tell you --
18    MR. SHAPIRO: I mean if I see a name that says one
19 name on the front, another name on the back, and payment
20 comes from another company, tell me how I'm -- I don't
21 think this is one party.
22    MR. CHAPMAN: And I just -- the only concern I have,
23 Mr. Shapiro, is that that's prejudging the issue.
24    MR. SHAPIRO: Well, but I look at this thing here.

**55**

1 If you tell me that there is different names here, tell
2 me how they are. Tell me why.
3    MR. CHAPMAN: But I'm here for Huron Valley. That's
4 who gave --
5    MR. SHAPIRO: Well, I want to hear testimony. Let's
6 move forward.
7    MR. CHAPMAN: Can we just take a quick washroom
8 break?
9    MR. SHAPIRO: Yes.
10    MR. CHAPMAN: Thank you very much. I appreciate
11 that.
12    (Brief break had.)
13    MR. SHAPIRO: I have a question.
14    THE REPORTER: On the record?
15    MR. SHAPIRO: On the record. My question is: Is
16 there case law that ties one company to another company
17 as a shell or a dual company?
18    MR. SCHWARTZ: Well, there is a lot of case law with
19 respect to the issue of alter ego status, which is -- I
20 have thrown out that term in a single employer status.
21 There is many cases. And, in fact, we'll be doing that
22 in the federal court litigation that Mr. Chapman was
23 alluding to to tie all of the companies together based
24 on commonality of certain factors that the courts deem

**56**

1 relevant, and that's why we believe that you have that
2 same authority to assert that jurisdiction at this point
3 as opposed to doing it in some kind of a postjudgment
4 collection proceeding where if it's deemed that we're
5 not able to collect against Huron Valley as to whether
6 the award that you intended -- that you made should also
7 be fully binding on these other entities.
8    MR. SHAPIRO: Do you have anything that you wish to
9 in the record today?
10    MR. SCHWARTZ: Well, in our closing -- in our post
11 hearing brief, there is reference to that case law.
12    MR. SHAPIRO: Okay.
13    MR. TOOMEY: Pages 9 and 10 in particular, and then
14 also, the idea about single and the -- employer and
15 alter egos is at page 10.
16    MR. SHAPIRO: Okay. Would you proceed then.
17    MR. SCHWARTZ: Okay. Before we start with our
18 witness. I would like to enter into the record, we made
19 copies for everybody, what we will mark as Union Exhibit
20 16, which is the letter to Mr. Chapman that he
21 acknowledged receipt of dated February 28th from myself
22 to Mr. Chapman notifying him that we did intend to
23 proceed in this proceeding against all of the entities
24 that we have been discussing this morning, as well as

**57**

1 Huron Valley, based on the commonality of the factors
2 and the commonality of them all being bound to the
3 Collective Bargaining Agreement. So I'd move for entry
4 of Union Exhibit 16.
5    MR. CHAPMAN: Do you want me to respond?
6    MR. SHAPIRO: Yes.
7    MR. CHAPMAN: Okay. I would say I acknowledge it's
8 authentic, and for the reasons noted earlier, I would
9 object to it's admission based on relevance here.
10    MR. SCHWARTZ: Are you going to accept the
11 documents?
12    MR. SHAPIRO: I accept them.
13    MR. SCHWARTZ: Okay. All right. We'll call as our
14 first witness Richard Wolf.
15    RICHARD WOLF,
16 called as a witness herein, having been first duly
17 sworn, was examined upon oral interrogatories and
18 testified as follows:
19    DIRECT EXAMINATION
20    by Mr. Schwartz:
21    MR. SCHWARTZ: Q Sir, could you please state your
22 name and spell your last name for the record.
23    A  Richard J. Wolf, W-O-L-F.
24    Q  And by where are you -- by whom are you

Huron Valley Glass vs Local 27    March 20, 2008

16 (Pages 58 to 61)

58

1  employed?
2    A  Richard J. Wolf & Company, Inc.
3    Q  And what does that company do?
4    A  We perform audits for pension and welfare funds
5  in various locals and unions.
6    Q  And how long have you personally been doing
7  these audits?
8    A  1989.
9    Q  Okay.  And what is your position with the
10  company?
11    A  President.
12    Q  How many audits would you believe you have
13  conducted since 1989?
14    A  1,000, 1500, somewhere in between.
15    Q  And were you asked to conduct a wage audit in
16  preparation for today's hearing?
17    A  Yes, I was.
18    Q  I would like to show you what was marked as
19  Union Exhibit 13.  It's towards the back there.
20    A  Yes.
21    Q  Do you have it?
22    A  Yes.
23    Q  Okay.  And can you identify this document?
24    A  Yes.  This is the document that we prepared, the

59

1  wage audit we prepared on Huron Valley Glass Company,
2  LLC and J & D Erectors, Inc.
3    Q  And this is a true and authentic copy of the
4  audit that you tendered to the Union in this matter?
5    A  Yes.
6    Q  Okay.  And can you tell us what you did to come
7  up with the findings, what records you reviewed?
8    A  Yes.  There was a time by job detail which
9  distinguished individuals with hours and dates, and we
10  basically went in and took the individuals, broke them
11  down by month, and then, we applied the applicable scale
12  rates to those individuals based on that time by job
13  detail report.
14    Q  And the time by job detail report is -- can you
15  turn to Exhibit 8?
16    A  8.
17    Q  These are the documents that we have stipulated
18  to in the past were from J & D Erectors.  Are these the
19  records that you reviewed in preparation of the audit?
20    A  Yes.
21    Q  And so what you did is to take the hours on
22  Exhibit 8 and apply the applicable wage rate at that
23  time and come up with the audit findings?
24    A  Yes.

60

1    MR. SCHWARTZ:  I would move for entry of Exhibit 13.
2    MR. SHAPIRO:  I accept.
3    MR. SCHWARTZ:  Do you have any objection?
4    MR. CHAPMAN:  No objection.
5    MR. SCHWARTZ:  Q  What were the amount of your wage
6  delinquency findings?
7    A  $396,936.50.
8    Q  Okay.  And I would like you to turn to Exhibit
9  11, if you would.
10    A  Okay.
11    Q  Are these documents in Exhibit 11 the wage
12  sheets that you used to determine the applicable wage
13  rate in effect at the time of the work being performed
14  by J & D?
15    A  Yes.  Actually --
16    MR. CHAPMAN:  Objection.  The wage rate for the
17  glaziers as opposed to --
18    MR. SCHWARTZ:  Yes, glaziers.
19    Q  Well, let me clarify.  The way your audit was
20  conducted, at glaziers' wage rates, not at ironworkers'
21  wage rates?
22    A  Correct.
23    Q  And Exhibit 11 are the glaziers' wage rate
24  applicable during the period -- at least part of it is

61

1  in -- applicable during the time of the audit?
2    A  That is correct.
3    Q  What is the period of audit that you audited?
4    A  It would be May 5th -- or May 7th, '07 to
5  February 8th, 2008.
6    Q  So you would have applied the '06, '07 wage
7  rates and '07, '08 wage rates?
8    A  That is correct.
9    Q  And the audit reflects those, the distinction
10  there?
11    A  That is correct.
12    Q  And the cost of the audit is on the first sheet
13  of your audit.  That's $1,020?
14    A  Correct.
15    MR. SCHWARTZ:  Okay.  I don't think I have anything
16  else.
17    MR. SHAPIRO:  Would you like to --
18    MR. CHAPMAN:  Just a few questions, please.
19    CROSS EXAMINATION
20    by Mr. Chapman:
21    MR. CHAPMAN:  Q  Mr. Wolf, thank you.  In preparing
22  your audit, other than what you testified earlier, did
23  you look at any other documents?
24    A  No.

Huron Valley Glass vs Local 27    March 20, 2008

62

1    Q  Did you have any communications with anybody as
2  to the nature of the jobs or duties or responsibilities
3  of the persons noted on the report which is Exhibit 8?
4    A  Just from counsel.
5    Q  So you don't know one way or another what these
6  particular persons performed at the particular -- on
7  behalf of J & D?
8    A  That wasn't my concern.
9    Q  So you don't know one way or the other?
10    A  No.
11    Q  Okay.  As far as your calculation, it does not
12  take into account at all -- I just want to make sure --
13  any particular damages that any particular Union --
14  Glazier's Union employee suffered; is that right?
15    A  That is correct.
16    Q  And you have no idea one way or another if any
17  monies were awarded pursuant to the Union's grievance as
18  to what person would receive what particular monies, do
19  you?  You don't know that?
20    A  I do not.
21    Q  Okay.  And you made no independent investigation
22  of any of the facts that counsel, Mr. Schwartz, provided
23  to you, did you?
24    A  No.  This is the only information I had to

63

1  conduct my audit.
2    Q  So there was -- you have not been asked to
3  prepare an estimation of damages for particular
4  employees; is that correct?
5    A  No.
6    Q  So as you sit here, you wouldn't know what
7  particular employees suffered any particular losses; is
8  that correct?
9    A  Yes, I don't.
10    MR. CHAPMAN:  That's all I have.
11    MR. SHAPIRO:  Thank you.
12    MR. SCHWARTZ:  Okay.  That's all.
13    I moved for the entry of Exhibit 13, right?
14    MR. CHAPMAN:  I think you did.
15    MR. SCHWARTZ:  Is this entered in?  13 was entered
16  into the record.  I think we already did that.
17    MR. CHAPMAN:  I didn't object to it.
18    MR. SCHWARTZ:  Right.  I have 13.  That's it.
19    MR. CHAPMAN:  Would you want to call Mr. Ahearn?
20    MR. SCHWARTZ:  I'd like to call Mr. Ahearn as an
21  adverse witness in this proceeding.
22    MR. SHAPIRO:  Has Mr. Ahearn been sworn in?
23    THE REPORTER:  Yes.
24    MR. SHAPIRO:  Okay.

64

1    DENNIS AHEARN,
2  called as an adverse witness, having been first duly
3  sworn, was examined upon oral interrogatories and
4  testified as follows:
5    CROSS EXAMINATION
6  by Mr. Schwartz:
7    MR. SCHWARTZ: Q  Mr. Ahearn, could you please --
8  I'm sorry.
9    MR. CHAPMAN:  I'm sorry.  Don, may I interrupt real
10  quick.
11    MR. SCHWARTZ:  Yes.
12    MR. CHAPMAN:  This is for the Committee to ask their
13  direction.  You know, typically, we would wait until
14  presenting our case to examine a witness like this.  I
15  don't have a problem making our examination of him as we
16  would do immediately after you.  I just wanted to --
17    MR. SCHWARTZ:  Either way.  However you want to do
18  it is fine.
19    MR. CHAPMAN:  I don't know if Mr. Shapiro has a
20  preference --
21    MR. SHAPIRO:  I have no preference.
22    MR. CHAPMAN:  All right.  Then he can start asking
23  the questions.
24    MR. SCHWARTZ: Q  Mr. Ahearn, could you please state

65

1  your name and spell your last name for us.
2    A  Dennis Ahearn, A-H-E-A-R-N.
3    Q  Oh, E-A-R-N?
4    A  Yeah, there is an A in the middle.
5    Q  And by whom are you employed?
6    A  Huron Valley Glass.
7    Q  LLC.
8    A  Yes.
9    Q  What is your title?
10    A  President.
11    Q  What's the company's address?
12    A  5075 Carpenter Road, Ypsilanti, Michigan 48197.
13    MR. SCHWARTZ:  Do you know how to spell Ypsilanti?
14    THE REPORTER:  I've got it.
15    THE WITNESS:  It's with a Y.
16    MR. SCHWARTZ:  Is it Yp?  Is it Yp?  How is it?
17  Ypsilanti?
18    THE WITNESS:  I think the Y is silent.  You start
19  with an I.  It's an Indian name, I believe.
20    MR. SCHWARTZ: Q  What are your duties as president
21  of HVG?
22    MR. CHAPMAN:  What aren't your duties.
23    A  Estimating, sales, administration, contract
24  management, going to hearings.

Huron Valley Glass vs Local 27    March 20, 2008

18 (Pages 66 to 69)

**66**

1    MR. SCHWARTZ:  Q  Getting sick before hearings?
2    A  Sometimes.
3    Q  So you do -- you're kind of like a
4  jack-of-all-trades for the company?
5    A  Yes, mostly -- yes, just normal presidential
6  duties.
7    Q  Do you go to job sites as well?
8    A  Yes.
9    Q  And how long have you been employed by HVG?
10    A  February of 2006.
11    Q  Were you hired in as president?
12    A  No.
13    Q  You were hired in as what position?
14    A  Vice president, general manager.
15    Q  And what's the difference between what you did
16  as a VP and president?
17    A  A title.
18    Q  Same duties?
19    A  Yes.  That was kind of -- when he hired me in, I
20  took the place of another president, but they didn't
21  give me that title.  They just said you would be vice
22  president and general manager, then there was no
23  president.  Then, after a while, they said, okay, now
24  you're president.

**67**

1    Q  And who was the person you took the place of?
2    A  His name was Vincent Klees.
3    Q  Did you ever work at the -- at HVG
4  simultaneously with Mr. Klees?
5    A  Yes.
6    Q  And for what period of time was that?
7    A  I took Mr. Vincent Klees's title of vice
8  president and general manager although he was present.
9  When they hired me on, Mr. Klees was transferred to
10  Chicago, and he was going to be -- have a new title
11  called regional sales manager slash project manager and
12  report to me.
13    Q  So you switched places eventually?
14    A  No.  I didn't work for HVG before I came to work
15  for them as vice president.  So here is Vince.  I come
16  in and take Vince's place.  Vince moves down.  Vince
17  reports to me.
18    Q  Is he still with the company?
19    A  No.  He quit in May of 2006.
20    Q  So there was very little overlap?  It was only a
21  few months --
22    A  Yeah, about three months or so.
23    Q  I see.  He was president and vice president
24  of--

**68**

1    A  No.  He was president only.  They just didn't
2  give me his title.  They gave he his responsibilities.
3  I don't know why.
4    Q  Do you have any title with W & G, LLC?
5    A  No.
6    Q  Do you know what W & G, LLC is?
7    A  I know it's another company, and it -- the
8  people who work for us in the field in all of our
9  cities --
10    Q  When you say us, we're talking about HVG?
11    A  Yes.
12    Q  Okay.
13    A  Well, actually, in other companies as well that
14  are part of an umbrella receive paychecks from W & G; so
15  W & G I know is a company that issues payroll checks to
16  Union employees throughout the country that work for us.
17  That's all I know about them.  I am not an officer, and
18  I don't know --
19    Q  Well, does W & G, LLC conduct any operations or
20  is it strictly a payroll entity?
21    A  I don't know.  I don't think -- they don't run
22  jobs or contract for jobs, and I know they do payroll,
23  but I don't know if that's only what they do.
24    Q  Is W & G LLC's office at 5075 Carpenter, the

**69**

1  same address as you?
2    A  No, because there is other -- let me try and
3  explain this.  There is a -- NCE is a holding company
4  that owns Huron Valley Glass.
5    Q  NCE, is there a full name for that or is that
6  just called NCE?
7    A  It's NCE, that's what I know of.
8    Q  So NCE owns Huron Valley Glass?
9    A  Yeah.  Huron Valley Glass is a company of
10  itself.  W & G issues payroll, and it seems like the
11  employees receive their paychecks -- not me, as an
12  employee, but the Union employees -- receive their
13  paychecks from W & G.  I don't know if it's just an
14  accounting thing related to -- I think it's mostly just
15  accounting.  It's not like they sign contracts or they
16  enter into agreements.  It's kind of -- I don't know.
17  It doesn't matter to me because I'm not --
18    Q  Okay.  Who do you get a paycheck from?
19    A  Huron Valley Glass, that's -- my paycheck says
20  Huron Valley Glass.
21    Q  What other companies does NCE own?
22    A  I'm not sure of the name of them, but they own
23  other companies that do other things.  Like drywall,
24  they own a drywall company, and they own a general

Huron Valley Glass vs Local 27     March 20, 2008

19 (Pages 70 to 73)

70

1  contracting company.
2      Q  Do they own any other glazing companies?
3      A  No. We're the only ones.
4      Q  Does Huron Valley conduct business nationwide?
5      A  We do work in Ohio and -- in Cleveland,
6  Columbus, Chicago here, Michigan.
7      Q  Okay.
8      A  That's where our jobs are.
9      Q  And what is exactly the type of work that Huron
10 Valley Glass does?
11     A  Well, we engineer, manufacture -- well, not
12 manufacture, fabricate and install and purchase framing
13 and glass products and install them on jobs as a glazing
14 contractor. You could call us a curtain wall and
15 glazing contractor.
16     Q  Is it all commercial work or do you do any --
17     A  No. Some of it is residential. Not residential
18 like homes, but high-rise residential, like this Reebie
19 Loft job.
20     Q  So have you ever seen representatives of W & G
21 housed at the 5075 Carpenter Road address?
22     A  I wouldn't know if they were W & G because if
23 somebody walked in the building, I would think they
24 either worked for Huron Valley Glass or one of the other

71

1  companies that NCE owns that occupies that building. I
2  wouldn't know a W & G employee from any -- I know all of
3  the Huron Valley Glass employees, but I wouldn't know.
4      Q  And the other companies, the drywall company and
5  the general contracting company, are also housed at
6  5075?
7      A  One of the drywall companies is, and then there
8  is a retail company that they -- NCE also owns that's in
9  that same building.
10     Q  Does NCE have offices there as well?
11     A  No. NCE is in Pontiac, Michigan. That's where
12 their headquarters are. So it's like one company owns a
13 group of other subsidiary companies that do different
14 types of scope of work: a drywall company, a general
15 contracting, and a glass company. I'm just one of the
16 companies they own.
17     Q  Are you an owner of the company?
18     A  No.
19     Q  No share in it at all?
20     A  No.
21     Q  Do you know -- and LLC has members or
22 shareholders -- or which is almost equivalent to
23 shareholders. Is NCE the only shareholder of HVG?
24     A  I'm not sure. I don't know. I don't know who

72

1  owns Huron Valley Glass. I know I don't.
2      MR. CHAPMAN: I think the rest of us could say the
3  same thing.
4      MR. SCHWARTZ: Q  Who are the other officers of
5  Huron Valley Glass?
6      A  I have the title of president, and there is a
7  gentleman who works more for me named Paul Becks, and
8  Paul is the vice president.
9      Q  Is it B-E-C-K-S or B-E --
10     A  Yes, it is. B-E-C-K-S.
11     Q  He's the vice president?
12     A  Yes.
13     Q  And he has the job you had when you first came
14 in?
15·    A  He was vice president of operations. Vince was
16 president. I come in. I took over for Vince. Vince
17 becomes a Chicago guy. I take over as president. Paul
18 keeps his title as vice president.
19     Q  So then Paul reports to you?
20     A  Yes.
21     Q  Do you know anything about this company W & G,
22 Inc.?
23     A  Other than the fact that I know the guys who
24 work for me in the field get their paychecks, and on

73

1  their paycheck, it says W & G.
2      Q  Okay. Well, let me -- I want to make a
3  distinction because the Collective Bargaining
4  Agreement -- let's turn to Exhibit 1. If you could open
5  your book to Exhibit 1.
6          Do you see the first page of that exhibit
7  indicates that the contract is supposed to be between
8  Huron Valley Glass and the Glaziers Union?
9      A  Correct.
10     Q  Now, if you would turn to page 21 of that
11 document, it indicates that an entity by the name of
12 W & G, Inc., not W & G, LLC -- do you want me to hold
13 that so you can see it?
14     A  No, I am looking. I've seen this before.
15     Q  Okay. W & G, Inc., is the entity that
16 supposedly signed this document?
17     A  Okay.
18     Q  Is that correct? You agree with that?
19     A  It looks that way to me.
20     MR. CHAPMAN: And I'm sorry, could you -- may I ask
21 that that answer to that question be read back very
22 quickly. Would that be okay?
23     MR. SHAPIRO: Yes.
24     MR. CHAPMAN: Thank you.

Huron Valley Glass vs Local 27     March 20, 2008

20 (Pages 74 to 77)

74

1       (Question and answer read.)
2       MR. SCHWARTZ: Q And now, we're all referring to
3   Exhibit 1.
4       A   Right.
5       Q   When I say the document, I mean the Collective
6   Bargaining Agreement.  You understand Exhibit 1 to be
7   the Union agreement between Huron Valley or — and/or
8   W & G, Inc., and the Glaziers Union?
9       A   Correct.
10      Q   That was signed in 2005?
11      A   Correct.
12      Q   You were not employed by any of those entities
13  at that time?
14      A   No.
15      Q   Do you know who a George Stripp is?
16      A   Yes.
17      Q   Who is George Stripp?
18      A   He is a gentleman who I have met before who is
19  part of — I don't know who he gets his paycheck from,
20  but he is part of the ownership group that has interest
21  in these companies.
22      Q   He's part of the owners of NCE?
23      A   I think, but I'm not sure.  I mean he has never
24  told me and I've never asked, but I —

75

1       Q   Is he officed in your offices?
2       A   Yes, he has an office at 5075 Carpenter Road.
3       Q   What does he do?
4       MR. CHAPMAN:  If you know.
5       A   Yeah, I don't always know —
6       MR. SCHWARTZ: Q Other than reading stock quotes,
7   what does he do?
8       A   No.  He — I think he's like an executive of NCE
9   that provides oversight for the companies they own.
10      Q   Does he interrelate with you at all, interact
11  with you?
12      A   Yeah, sometimes, sure.
13      Q   What is the nature of your conversations?
14      A   How are you doing, have you got any jobs, are
15  you making money.
16      Q   Nothing specific?
17      A   Not really, no.
18      Q   He doesn't review your financial statements?
19      A   He does, along with other people in the
20  ownership group that does.  You know, I have to submit
21  financial reports to the ownership group.  I'm sure
22  George Stripp is one of them that's privy to those
23  reports.
24      Q   So he's still around?

76

1       A   Yes.
2       Q   But you don't know who pays his salary?
3       A   No, I don't know — I don't know.
4       Q   Okay.  Do you know if he is authorized to sign
5   contracts on behalf of NCE or one of the subsidiary
6   entities?
7       A   No, I don't know that.
8       Q   Okay.  Do you know anything about the fact that
9   W & G, Inc. — there is two.  There is W & G, Inc., and
10  W & G, LLC.  So when I ask a question, make sure you're
11  listening and understand the question that you're being
12  asked because I'm not trying to trick you.
13      A   It's all W & G to me.
14      Q   Well, but it's not.  For the purpose of this
15  proceeding, it's not.
16      A   Okay.
17      Q   Do you know anything about when W & G, Inc., was
18  incorporated, when it was dissolved, when W & G, LLC was
19  incorporated or anything like that?
20      A   No.
21      Q   So you really have nothing to do with W & G,
22  LLC?
23      A   No.
24      Q   All of the employees that work in the field, to

77

1   your knowledge, such as that worked at Optima and 1401
2   are employed by Huron Valley, to your knowledge?
3       A   They're employed by them because I can hire and
4   fire them and things like that and assign them through
5   foremen that I have, but I know they get their checks
6   from W & G.  Their checks don't say Huron Valley Glass
7   on them, but I don't know why.  And again, I think it's
8   more of an accounting thing than anything legal or —
9       Q   But no one at W & G asserts any control over the
10  hiring or firing or —
11      A   No, because I don't even know who a W & G person
12  is.
13      Q   How does W & G get the payroll information so
14  that they issue paychecks to the glazier or ironworker
15  or field employee?
16      A   Well, the foremen fill out time cards and send
17  them in to an office at 5075 Carpenter Road or Pontiac
18  or other cities where NCE has companies, and then their
19  payroll clerk generates paychecks, I presume, that come
20  from the bank and get distributed weekly to the people.
21      Q   Where does Huron Valley bank?  Where do you get
22  your paychecks?  On what bank account?
23      A   I think LaSalle.
24      Q   Do W & G employees get bank account — or

Huron Valley Glass vs Local 27    March 20, 2008

21 (Pages 78 to 81)

78

1  checks --
2     A  I don't know. I had never got a W & G check.
3     Q  And you've never seen a W & G check?
4     A  No. All our checks get automatically deposited
5  in our bank. I never see my check anyway. It just --
6     Q  Do the employees get automatic deposit as well?
7     A  A good question. I don't know. I don't --
8  that's a good -- I don't think so. I think the glaziers
9  get their checks in an envelope. I don't think it's
10  direct deposited.
11     Q  But as far as bidding jobs where these glazier
12  employees are employed, that's something that Huron
13  Valley does, not W & G?
14     A  Correct.
15     Q  You don't consult with anybody from W & G to get
16  the jobs?
17     A  No.
18     Q  But somehow the paychecks are on this W & G, LLC
19  name?
20     A  Yes.
21     Q  How do you know that if you haven't seen them,
22  the checks, that is? How do you know they're not Huron
23  Valley checks that the employees in the field get?
24     A  Because -- somebody told me one time. I said to

79

1  somebody in a wise remark like Huron Valley pays me, and
2  somebody said, oh, well, W & G pays me. I mean it was
3  something like that. It was never formally told to me
4  what the difference is. I never asked, and I didn't
5  care. You know, it's -- it doesn't matter to me.
6     Q  So you -- okay. That's fine. Are you familiar
7  with the correspondence between Mr. Klees and Mr. Mabus
8  pertaining to the consummation of Exhibit 1?
9     A  Familiar means I have seen some letters. When I
10  came to this company, pardon me, but the files were
11  screwed up in a lot of -- on a lot of issues, so I might
12  not have in my possession in my office copies of letters
13  that went back from Mr. Klees to the Union. I haven't
14  found them, but if the Union has them or -- they could
15  be in a trash can somewhere. I don't know.
16     Q  You weren't a party to any of the discussions
17  leading up to the signing of the Collective Bargaining
18  Agreement between Huron Valley --
19     A  No, I wasn't with the company at that time.
20     Q  So you really never had discussions with
21  Mr. Klees with respect to the Collective Bargaining
22  Agreement --
23     A  No.
24     Q  -- with the Glaziers?

80

1     A  No, it was never part of our discussions. I
2  just knew there was an agreement.
3     Q  When you came in '06, you were familiar with the
4  fact that Huron Valley had a Collective Bargaining
5  Agreement with the Glaziers Local 27?
6     A  Yes, that was obvious to me because I knew we
7  had Glaziers on our payroll.
8     Q  Well, yeah, and in '06, you had already started
9  the Optima job, correct?
10     A  Yeah, it was still -- the Optima job started
11  before I came with the company.
12     Q  So you knew that there were Glaziers on the
13  payroll in the Chicago area?
14     A  Correct.
15     Q  And you knew they were operating under the
16  Collective Bargaining Agreement with the Glaziers Union
17  Local 27?
18     A  I assumed so, yes. I mean, yeah.
19     Q  You don't have anything really to do with
20  payroll yourself?
21     A  No.
22     Q  You didn't really hire the people that were
23  working on the Optima job in Chicago?
24     A  No. They were hired before I was hired.

81

1     Q  Right. What is your experience as a glazier?
2     A  Very little, but I was a glazier at one time.
3  I'm from St. Louis, Missouri, and I started out and I
4  had a degree and I started working as a general
5  contractor, and my father-in-law and my in-laws were
6  glaziers, and one summer they asked me to help them out
7  being a glazier and I married my wife and I said richer
8  or poorer, in sickness and in health, but I never said
9  nothing about working with my in-laws, but I ended up
10  working with them for a couple of years, and it was
11  good, and I had a glazing card. I went to work for a
12  couple of job in Tupelo, Mississippi, with my
13  brothers-in-law, and that was probably from '78 until
14  about 1980, and then, I decided to pursue other things
15  other than glazing by working with general contractors.
16     Q  So your glazing experience then was all on the
17  job?
18     A  Yes.
19     Q  You didn't go through an apprenticeship program?
20     A  No. At the time, I was assigned to a job out of
21  town, and I'm not exactly sure how that worked, but I
22  was given a Glaziers card, it's assigned as a Glaziers
23  card, and worked as a glazier, but I didn't -- you know,
24  I didn't learn the trade like a lot of them do growing

Huron Valley Glass vs Local 27    March 20, 2008

22 (Pages 82 to 85)

82

1   up. I went -- I had pursued other things.
2      Q  You were familiar with the Optima job, what is
3   called either a curtain wall or a unitized system,
4   correct? That's what you were installing at the Optima
5   job?
6      A  Yes. It's a window system, a unitized window
7   system, correct.
8      Q  And the State Street job was a similar type of
9   job?
10     A  Yes.
11     Q  And you're not contesting whether either of
12  those job, the nature of the work being performed by
13  glaziers, was covered under the Union contract? Clearly
14  it was.
15     MR. CHAPMAN:  Are you asking him --
16     MR. SCHWARTZ:  Yes.
17     MR. CHAPMAN:  -- or telling him?
18     MR. SCHWARTZ:  It's cross examination, so a little
19  bit of both.
20     A  I'm not contesting anything, so I mean --
21     Q  Well, do you agree that the nature of the work
22  being performed by glaziers at Optima and by the
23  ironworkers until recently at 1401 State is work that
24  would be covered under the Glaziers Union contact, the

83

1   work -- their scope of work jurisdiction?
2      MR. CHAPMAN:  Objection, just because the witness is
3   being asked to make a legal conclusion.
4      MR. SHAPIRO:  I think you can answer that.
5      A  Well, let me answer this way. When I came to
6   this company, I found out we had agreements with the
7   Ironworkers and the Glaziers.
8      MR. SCHWARTZ:  Q  Well, I'm not asking about the
9   ironworkers. The question is if they -- if the work is
10  covered under both contracts, that's fine. I'm only
11  asking specifically --
12     A  Well, that was my thought, that somehow we had
13  agreements with both unions to do that kind of work.
14     Q  Right. Covering some of the work, right. And
15  then that's -- that's not really the question I'm
16  asking, but, you know, so --
17     A  Okay. Ask it again.
18     Q  -- that if you're confused on that, it is --
19  that's -- I can't help that, but my only question is
20  whether the work that was being performed is work that
21  would typically be covered under the Glaziers Union
22  contract, and I'm talking about the Optima job and the
23  State Street job?
24     A  Are you asking in glaziers exclusively?

84

1      Q  No, no. Just whether it's within the scope of
2   work of the Glaziers contract?
3      A  Yes, right.
4      Q  That's all I wanted to know.
5         And it is true that to your knowledge, the
6   first job that Huron Valley Glass did in the Chicago
7   area was the Optima job in Skokie?
8      A  Wrong.
9      Q  Okay. What was the first job?
10     A  I think we did a job called IIT McCormick. This
11  was before the Optima job several years back. And, in
12  fact, I know we did.
13     Q  And what's the basis of your knowledge of that?
14  I mean you weren't with the company then.
15     A  Because we were trying to collect the money
16  still when I showed up.
17     Q  All right. It was the first job post-2005 -- or
18  during 2005 or later?
19     A  I think we did that job -- I think the job was
20  like done in 2004, maybe 2003.
21     Q  The IIT job?
22     A  Yes.
23     Q  Okay. So, well, I'll ask you. When did the
24  Optima job start?

85

1      A  I believe that started late fall of '05 in the
2   field.
3      Q  Right. And I don't really necessarily have to
4   put this in the record, but does this picture depict the
5   kind of work that was being done? It was basically the
6   unitized system?
7      A  That's the job, yes.
8      MR. CHAPMAN:  May I see?
9      MR. SCHWARTZ:  Sure.
10     MR. CHAPMAN:  Thank you. Are you going to mark it?
11     MR. SCHWARTZ:  No. I think it -- all right. We'll
12  mark it as Exhibit 17.
13     MR. SHAPIRO:  Do you have any questions on it?
14     MR. CHAPMAN:  I don't think -- it looks like a
15  picture of a building.
16     A  That's Optima.
17     MR. CHAPMAN:  That's as far as I would know.
18     MR. SCHWARTZ:  Q  All right. Well, we'll eventually
19  have it Union Exhibit 17, which you are acknowledging is
20  a picture of the Optima job in Skokie?
21     A  Correct.
22     Q  And all of the glass that we see on the outside
23  is what your company installed?
24     A  Correct.

Huron Valley Glass vs Local 27    March 20, 2008

23 (Pages 86 to 89)

86

1    Q  And the contract for that job was between Optima
2    and Huron Valley?
3    A  Yes.
4    Q  Okay.  There was no general -- Optima was the
5    general as well as the developer?
6    A  Architect, general, developer, they did it all.
7    Q  And you were a sub of -- directly of Optima?
8    A  Correct, that's right.
9    Q  And the contract was signed in the name of Huron
10   Valley, not W & G?
11   A  Right.
12   Q  But you were not a party to that contract
13   because it was entered into --
14   A  I hadn't been there yet.
15   Q  Right.  Now, Huron Valley Glass did the work
16   with its own workforce on the Optima job?
17   A  Correct.
18   Q  And it used a mixed crew of glaziers and
19   ironworkers to install the -- all of the -- the unitized
20   system and all of the glass work that we see in Union
21   Exhibit 17?
22   A  Correct.
23   MR. SCHWARTZ:  I'd move for entry of Exhibit 17.
24   MR. SHAPIRO:  I accept.

87

1    MR. SCHWARTZ:  Q  And your company, that is Huron
2    Valley, employed somewhere in the area of three to six
3    or seven glaziers at any one time or even more on the
4    Optima job?
5    A  Oh, more.
6    Q  What was the maximum number you employed?
7    A  When I got there, I believe there were no less
8    than like 40 people on that job.
9    Q  And how many were glaziers and how many were
10   ironworkers?
11   A  I'm not exactly sure.
12   Q  Approximately?
13   A  I don't know.  50/50 maybe.  Maybe 20 and 20, or
14   maybe 19 and 21.
15   Q  So it was close to 50/50?
16   A  I think so.
17   Q  So you did not hire the people?
18   A  Not me personally, no.
19   Q  When let's say, for instance, if someone got
20   fired, didn't show up.  Did you have anything to do with
21   replacing them?
22   A  Only to say we need to replace him, but I didn't
23   pick the people.
24   Q  Who was the representative of the company in the

88

1    Chicago area that was doing the hiring and firing and
2    direct supervision of the job?
3    A  There was a general foreman on the job named Tom
4    DiDonato who works for us.  He is a glazier, and he was
5    responsible for the field crews, and he hired and fired
6    mostly.
7    Q  Is he still working for your company?
8    A  Yes, he is.
9    Q  Still at the Optima job?
10   A  No.
11   Q  Where does he work now?
12   A  Columbus, Ohio.  That's where he lives.
13   Q  Oh, so he is not originally from the Chicago
14   area?
15   A  No.
16   Q  You brought him in from out of state?
17   A  I didn't.  Somebody else did.
18   Q  Someone from HVG did?
19   A  Right.
20   Q  Is that Optima job still going on?
21   A  Yes.
22   Q  And you are still employing glaziers at the job?
23   A  Yes.
24   Q  Ironworkers as well?

89

1    A  Several.
2    Q  How many glaziers are there --
3    A  Maybe there is six guys on that job now total.
4    Q  And how many are ironworkers and how many are
5    glaziers?
6    A  I think there is four glaziers and maybe two
7    ironworkers.
8    Q  Okay.
9    A  It's run by a guy who is a glazier.
10   Q  And what's his name?
11   A  Steve Lopez.
12   Q  When did Mr. Klees leave his position as
13   president of Huron Valley Glass?
14   A  The day before I came in, February 23rd, 2006.
15   Q  And when did he leave employment with Huron
16   Valley Glass in total?
17   A  I think it was May.
18   Q  Of '06.
19   A  Yes.  Or I don't know.  Maybe it was June.  I
20   don't know, Don.  It was one of them right in there.
21   Q  Could you turn to Exhibit Number 4.
22   Exhibit Number 4 contains a packet of
23   correspondence, mostly correspondence, between -- well,
24   initially between the Union and your company or between

Huron Valley Glass vs Local 27    March 20, 2008

24 (Pages 90 to 93)

**90**

1  our law office and your company pertaining to this issue
2  with respect to the 1401 State Street job. And you
3  understand that's the primary issue at issue today?
4      A  Correct, yes.
5      Q  Now, let me ask you some background questions to
6  that. When did -- Huron Valley Glass had a subcontract
7  with W.E. O'Neil for the 1401 South State Street job,
8  correct?
9      A  Correct.
10     Q  And that contract was entered into in about
11  October of '06?
12     A  Okay. Correct.
13     Q  Is that true?
14     A  Yes, I believe that's true.
15     Q  And why don't we move to that one just real
16  quick. I think it's Exhibit 14. Can you review Exhibit
17  14 and verify that Exhibit 14 is your contract, that is
18  HVG's contract --
19     A  This looks like a change order to J & D.
20     Q  The first two pages. It would be after that.
21     A  Yeah, this is the contract with W.E. O'Neil.
22     Q  Did you personally negotiate that contract?
23     A  Yeah, I was involved in it. I think I signed
24  it. Is that my signature --

**91**

1      MR. CHAPMAN: Don, can I just mention we're talking
2  about the -- we want the document that begins with the
3  Bates number 0513?
4      MR. SCHWARTZ: Well, it starts with 512, but -- it
5  is -- that's the correspondence, but the contract itself
6  I believe, yeah, it starts with 513, right.
7      MR. CHAPMAN: Just so we, you know, for the record,
8  we're talking about the same page, if that's okay.
9      MR. SCHWARTZ: Yes, right.
10     A  Yeah, I was involved in this, and I probably
11  signed the contract.
12     Q  And you signed that in 10 of '06, or the company
13  did it in any case?
14     A  Yeah, here's my signature here, 12 of '06.
15     Q  12 of 06? Okay. So as of 12 of '06, HVG was a
16  subcontractor to W.E. O'Neil to do the unitized glass
17  work, glazing work at the 1401 South State Street job?
18     A  Right.
19     Q  When did your company begin working -- well, no,
20  I can't say that. When was work to begin with respect
21  to the installation of glass at that job?
22     A  It was scheduled for May of '07.
23     Q  Okay. Now, when you submitted a bid, your
24  contract was at 5 million-plus for the job?

**92**

1      A  Okay.
2      Q  Is that --
3      A  Yes, right.
4      Q  And did you purchase the material for the job;
5  that is, your company?
6      A  Yes.
7      Q  And what was the purchase price of the material?
8  How much of the $5 million bid was attributable to
9  material, approximately?
10     A  Maybe 2 million, maybe 3 million. I don't --
11  God, I don't know that right now offhand, but that's
12  about right.
13     Q  Okay. And when you submitted the bid, it was an
14  open bid job; it wasn't just a solicitation to you,
15  right, or do you know?
16     A  No. We gave W.E. O'Neil a series of bids. You
17  know how they -- they'll ask you for a price, and then
18  you've got to reprice it and reprice it. It was a -- it
19  evolved until eventually there came a number that we
20  agreed to.
21     Q  Now, at the time you submitted the bid sometime
22  probably before October --
23     A  Sure.
24     Q  -- had you contacted J & D Erectors with respect

**93**

1  to them performing the actual installation work?
2      A  No.
3      Q  Did you incorporate a subcontractor price into
4  the installation work or --
5      A  No.
6      Q  How did you intend to do the work at that time?
7      A  Bid it using our own crews.
8      Q  And you intended to use glaziers and ironworkers
9  on the job?
10     A  Yes. The same guys that were going to finish up
11  Optima.
12     Q  And why did that ultimately not happen?
13     A  Because Optima wasn't finished. I was told when
14  I came to the company Optima only had four months left.
15  I'm still there.
16     Q  And it's two -- almost two years later.
17     A  Yeah.
18     Q  Or over two years. Okay.
19     MR. SCHWARTZ: I would move for entry of Employer --
20  or excuse me, Union Exhibit 14.
21     MR. SHAPIRO: Do you have any --
22     MR. CHAPMAN: No, that's -- I have no objection.
23     MR. SHAPIRO: I accept.
24     MR. SCHWARTZ: Q  Okay. Let's go back to Exhibit 4

94

1  then. At some point, your company decided not to
2  self-perform at State Street?
3    A  Yes.
4    Q  When was that decision made?
5    A  That decision was evolving also as well because
6  this was my thinking at the time. Like I —
7    Q  When you say at the time, do you mean October
8  '06 or what — when you say — what time are you
9  referring to at that time?
10   A  October when I signed the contract, when I bid
11 the job, and through into the holiday months of November
12 and December, it was my intention to do 1401 with our
13 own crew and build that crew and do 1401 just like they
14 were doing Optima.
15   Q  Okay. What changed?
16   A  Well, a couple of things. Optima wasn't getting
17 done as we had planned, it wasn't on schedule, and a lot
18 of that had to do with the materials supply, others had
19 to do with the contractor itself; so I wasn't able to
20 reduce my crew at Optima enough to bring them over to
21 1401, and I sensed that.
22   Q  Didn't you lay off some people that were
23 glaziers during the October through December '06 time
24 frame from the Optima job?

95

1    A  October of '06 to December, that we could have
2  laid off glaziers. We also hired glaziers. We laid off
3  ironworkers and hired ironworkers. There was a flow of
4  people coming in and off that job.
5    Q  So why the people that you were laying off you
6  could have stockpiled essentially and kept them until
7  the —
8    A  It depends on why they were laid off. Some guys
9  quit. You know, I hoped they'd stay, but they left.
10   Q  When is the first time you told the Union that
11 you were intending to subcontract the job at 1401 South
12 State Street, the Glaziers Union?
13   A  I didn't tell the Union that.
14   Q  Never?
15   A  No, I don't want to say never. What happened
16 was I'm going to recall that when I was beginning to
17 plan out our work and we were being asked to bid other
18 work in this town by other contractors, my concern was
19 that we would be able to man the jobs and — with the
20 project management team that I would have and with the
21 field people available to me. I thought that what I was
22 told the Optima job would be completed that we could
23 probably make some commitments to our clients and have
24 the people available coming off Optima to do that.

96

1    Optima wasn't finishing very quickly, and we were having
2  issues with getting that job done to a point where I
3  felt maybe we should slow down bidding the work, but
4  since we're obligated to do 1401 because we have a
5  contract with them, we are going to have to get this job
6  done somehow. Now, I couldn't pull the men off of
7  Optima because I would have had all kinds of issues at
8  Optima if I would have yanked them in off there and put
9  them down at 1401; so I didn't have a trained crew
10 available to me with people I knew who were safe,
11 efficient, knew how to work these windows, but I was
12 hoping I could hurry up and get Optima done and possibly
13 bring a few guys over from Optima. Optima wasn't going
14 to allow me to do that.
15   Q  But you — going back to my question which was
16 when did you tell the Union that you were not going to
17 self-perform, the Glaziers Union, that you were not
18 going to self-perform at State Street? That was my
19 question.
20   A  I didn't tell the Union I wasn't going to do
21 that. There was — somebody told —
22   Q  You told them at some point.
23   A  Well, somebody told somebody that, hey, they're
24 thinking about subcontracting work to J & D. That might

97

1  have come from somebody in my company. May be. Maybe
2  it was one of my glaziers, but there was discussions.
3  What happened was when I was being concerned about how
4  we were going to man this job, it was presented to me by
5  employees of mine that sometimes people can subcontract
6  that work out. There are companies in Chicago that will
7  install this work for us, that we wouldn't have to
8  use — steal people off Optima, that there were people
9  available from other general subcontracting companies
10 that would give us a price to do that work. I said
11 okay, maybe that's an option, but I didn't call the
12 Union and said I was going to do it, not going to do it,
13 or anything. I found out later that the Union found out
14 that I was going to do that even before I was going to
15 do that, and these guys called me in in April and said,
16 Hey, we've got to talk about this.
17   Q  All right. Well, let's start with Bates stamp
18 number 63, the first page there.
19   MR. CHAPMAN: In Union Exhibit —
20   MR. SCHWARTZ: 4. Okay? Yes.
21   Q  This is a letter addressed to Mr. Klees who it
22 really should have been addressed to you because Klees
23 was gone at that time?
24   A  Right, right.

Huron Valley Glass vs Local 27    March 20, 2008

26 (Pages 98 to 101)

98

1    Q    Did you get this letter?
2    A    I don't recall getting this letter, no.  I don't
3 know where it went when it got to 5075 Carpenter Road
4 because Vince wasn't there, and I didn't get it.
5    Q    This was their proper address for HVG at that
6 time?
7    A    Yes.
8    Q    And it's the proper zip code, et cetera?
9    A    Correct.
10    Q    But you don't recall getting this letter at that
11 time?
12    A    No.
13    Q    As of March 5, 2007, had you indicated to the
14 Union that glaziers would not be used as employees by
15 HVG on the State Street job?
16    A    No.
17    Q    Okay.  So when you got this letter or someone
18 got this letter, at this time, the Union would not have
19 necessarily known for sure that you were not going to
20 use your employees?
21    A    I don't know how they would have known.  I
22 didn't know.
23    Q    So you don't recall seeing that letter until
24 part of this litigation?

99

1    A    True.
2    Q    Okay.  Let's turn to Bates stamp 66.
3    MR. CHAPMAN:  Yeah, let me -- it's in Exhibit 4.
4    MR. SCHWARTZ:  Q    Yeah, there's pages throughout the
5 lower right-hand corner, so we'll just move along here.
6        Do you recall getting this letter which is
7 dated March 14, 2007, on Painters' District Counsel 14
8 letterhead again addressed to Mr. Klees on or around,
9 you know, a couple of days after March 14th, 2007?
10    A    I do recall seeing this.
11    Q    And at this point, you were aware of the fact
12 that the Union was putting you on notice that if -- that
13 is, the Glaziers Union --
14    A    Right.
15    Q    -- that if you subcontracted the work to a
16 nonsignatory, a non-Glazier signatory company, that you
17 would be in violation of your Union contract?
18    A    Yes.
19    Q    You understood that?
20    A    I understood what this said.
21    Q    Okay.
22    A    And then, there was this -- oh, go ahead.  Go
23 ahead.
24    Q    Okay.  Now, you're -- and you do acknowledge

100

1 receiving that letter dated on March 14th?
2    A    Correct.
3    Q    Okay.  Then, on Bates stamp 68, you responded to
4 the prior letter, correct?
5    A    Yes, that's when --
6    Q    And on March 16th, you sent a letter on Huron
7 Valley Glass Company, LLC letterhead to Mr. Thanos who
8 is a representative of the Painters Union, part of
9 the -- which the Glaziers is a part, saying that you
10 were requesting a continuance?
11    A    Right.
12    Q    And you wouldn't be able to attend, correct?
13    A    Yes.
14    Q    Okay.  Then, if you turn to Bates stamp 70,
15 Mr. Thanos, with a copy to Mr. Mabus, indicated a
16 rescheduling on -- in a March 21 letter to you,
17 indicated rescheduling of the Board of Business Agents
18 hearing?
19    A    Okay.
20    Q    Is that correct?
21    A    Correct, that I got this?
22    Q    Yes.
23    A    Yes.
24    Q    And that that's what the letter -- the purpose

101

1 of the letter was, to notify you of --
2    A    Right.
3    Q    And that the Board of Business Agents is the
4 first step of the grievance procedure under your
5 contract, you understood that?
6    A    No, but I'm not disagreeing with it.
7    Q    All right.  Then on April 4th, a letter was sent
8 to you indicating that you had not shown up for the
9 April 3rd Board of Business Agents meeting, and that the
10 Board had therefore turned the matter over to counsel
11 because of the potential violation of the Collective
12 Bargaining Agreement; is that true?
13    A    Yeah, but I don't recall getting this letter.
14    Q    You don't remember the April 4th letter --
15    A    No.
16    Q    Even though it's --
17    A    Not this one I'm looking at right now, 72.
18    Q    Is that your fax number, 734-434-2046?
19    A    Where is my business card?  I don't --
20    MR. TOOMEY:  Let the record reflect that he is --
21    A    Yes, that is our fax number, Don.
22    MR. SCHWARTZ:  Q    Okay.  Then on April 9th,
23 apparently you sent out a couple of letters reflected in
24 Bates stamp 73.  You sent a letter at least to Service

102

1  Glass Company.  What was the purpose of this letter?
2    A  To solicit pricing for them to do the
3  installation on that particular project.
4    Q  Now, let's turn to Exhibit 15 just for a moment.
5    A  Okay.
6    Q  Exhibit 15 is your company, that's HVG's
7  subcontract with J & D Erectors to perform work at the
8  1401 South State Street?
9    A  Right.
10   Q  And they, in fact, did do the installation of
11  the glass at 1401 State Street?
12   A  Yes.
13   Q  And J & D Erectors has no Union contract with
14  the Glaziers Union?
15   A  It sounds -- yes, I guess they don't.
16   Q  They have an Ironworkers contract?
17   A  Right, I know that.
18   Q  Okay.  And the contract is dated February 21st,
19  2007, correct?
20   A  That's the date on this contract, but I can't
21  attest that that's the date this contract was drawn up.
22   Q  Well, it had been drawn up before it was dated,
23  right?
24     THE REPORTER:  Pardon me, what was your question?

103

1    Q  It was drawn up before it was dated?  When
2  someone has to prepare a contract --
3    A  With all due respect, that date, the accurate
4  date of this contract could have been the 21st day of
5  March.  That could be a typo for all I know.  But the
6  21st day of February, 2007, that's an odd date to me for
7  this contract, to be honest with you.
8    Q  When did your company first solicit a bid from
9  J & D Erectors pertaining to the 1401 South State Street
10  job?
11   A  I'm not sure of the exact date.
12   Q  What month?
13   A  That wasn't made -- that wasn't solicited by me.
14   Q  Who did?
15   A  I have a gentleman who works for me named Kevin
16  Anderson who knows J & D Erectors who asked me if they
17  could ask J & D for a price, and I think that was
18  probably sometime in the winter.  You know, I would say
19  maybe January, February, March, somewhere in there.
20  When I was being concerned that we wouldn't be able to
21  man the job with the Optima crew, he said, Hey, I know
22  somebody else who can do this, can I call them, maybe
23  they'll give us a price.  I said, Sure, go ahead.
24   Q  All right.  So did your company prepare this

104

1  subcontract agreement?
2    A  Yes.
3    Q  Do you know who?
4    A  We have a clerk who would type this in based on
5  information that would be given to her, but this is a
6  standard subcontract agreement, and I bet you the clerk,
7  Nicole, probably typed this up.
8    Q  Who is -- Nicole, what's her last name?
9    A  Madry, M-A-D-R-Y.
10   Q  Is she employed by your company still?
11   A  Yes.
12   Q  And do you know who she would have received the
13  information from in order to put the information on this
14  subcontract agreement?
15   A  Either Kevin or myself.
16   Q  And you don't know -- you don't recall exactly
17  when that information was given to Nicole?
18   A  No, I don't.
19   Q  Is the price 1.253 million correct?  It's on the
20  first page.
21     MR. CHAPMAN:  Objection.  It's vague.  Correct as to
22  what?
23     MR. SCHWARTZ:  Q  Was that the agreed upon price
24  between your company and J & D?

105

1    A  Sure, I believe so.
2    Q  How many other bids did you get at that time?
3    A  None.
4    Q  And J & D Erectors on -- at Bates stamp 578
5  signed this document on April 6th of 2007, correct?
6    A  Yes.
7    Q  So you had a binding contract as of April 6,
8  2007, with J & D to do the erection at 1401 State
9  Street?
10   A  No.  They signed it April 6th.  We didn't sign
11  it yet.  We didn't sign it until April 23rd.
12   Q  But you had a deal with them?
13   A  Verbally that we would work towards giving them
14  the job provided they could do the job for us with a
15  good crew and all of that.  There was an understanding
16  that we would enter an agreement with them provided they
17  would meet certain obligations that we would eventually
18  come to agreement on.
19   Q  Well, those parameters were actually negotiated
20  sometime around February 21st because that --
21   A  No.
22   Q  -- that's the initial date of the agreement?
23   A  That's when discussions first started.  We
24  didn't finish our discussions with J & D until I was

Huron Valley Glass vs Local 27    March 20, 2008

28 (Pages 106 to 109)

106

1  certain they could do the job.
2      Q  And when was that?
3      A  Right around the time they signed this of April
4  6th.
5      Q  April 6th.  Okay.
6      MR. SCHWARTZ:  I'd move for entry of Exhibit Number
7  15.
8      MR. SHAPIRO:  Counsel.
9      MR. CHAPMAN:  No objection.
10     MR. SHAPIRO:  I accept.
11     MR. SCHWARTZ:  Q  All right.  Going back then to
12  Exhibit 4, when you --
13     MR. CHAPMAN:  Again, do you have a page?
14     MR. SCHWARTZ:  73.
15     Q  When you solicited Service Glass Company on
16  April 9th for a bid on the job, that is the 1401 State
17  Street job, you had already -- J & D had already signed
18  a contract with you for work on that job?
19     A  Right, but we hadn't signed it.
20     Q  That wasn't my question.
21     A  Okay.
22     Q  Did Service Glass submit a bid to you?
23     A  No.
24     Q  How did you get the name Service Glass?

107

1      A  It was given to me by one of our employees as
2  someone who could -- who was signatory to the Glaziers
3  Union who could give us a bid that they would possibly
4  do the job.
5      Q  Now, sometime in the March or April time frame,
6  you had a meeting with representatives of Glaziers 27
7  regarding the 1401 State Street job?
8      A  Yes.
9      Q  Do you recall when that meeting was?
10     A  Beginning of April.
11     Q  Do you recall where the meeting was?
12     A  In this room.
13     Q  Do you recall who was present?
14     A  Yes.  Mike, Mike, Mike, Kevin, and I.
15     Q  Okay.  When you say Mike, Mike, and Mike, do you
16  mean Mike Cook, Mike Mabus, and Mike O'Donnell?
17     A  Yes.
18     Q  And those are the three business agents that you
19  were aware of from the Glaziers Union?
20     A  Correct.
21     Q  And yourself and Mr. O'Donnell did you say -- or
22  no.
23     A  No.  Kevin Anderson.
24     Q  Anderson.  Okay.  So that five people were

108

1  attending the meeting?
2      A  Yes.
3      Q  How did the meeting get organized?  Who called
4  for the meeting?
5      A  Boy, either Kevin or these guys did.
6      Q  And you flew down from or came down from
7  Michigan to attend the meeting?
8      A  Yes.
9      Q  What was the purpose of the meeting?
10     A  To discuss this issue.
11     Q  And what was said in the meeting?
12     A  We heard you're subcontracting work to J & D
13  Erectors and they're not signatory to our Union and we
14  don't like that.
15     Q  Okay.  Who said that?
16     A  All three of them.
17     Q  And what was your response?
18     A  First, my response was, Okay, how do I solve
19  this by correcting this one way or another.  In other
20  words, I don't have men to put on this job from Optima,
21  I'm not done with Optima, I need to complete this work
22  for my client, I need to figure out a way of doing that.
23  They said, That's your problem; our problem is you're
24  not using glaziers when you're doing that; you said

109

1  you'd -- when you came here -- and it wasn't me, it was
2  my predecessor -- that you'd use 50/50 composite crews,
3  and now you're not doing that doing; you're giving all
4  of the work to the ironworkers.  I said, I'm not giving
5  anything to the ironworkers; I'm giving it to J & D if
6  I'm giving it at all; but I'm not opposed to
7  subcontracting this job out to somebody else; do you
8  guys have any names of any other contractors who are
9  glazing contractors that could do this instead of J & D;
10  I'll tell Kevin to solicit bids from them.
11     Q  And what did they say?
12     A  Okay.
13     Q  And what names did they give you?
14     A  They didn't give me names.  They said that
15  there's companies out there that could do that.  I said,
16  Kevin, do you know guys who are sig -- he goes, I know a
17  few guys who are signatory to the Glaziers.  I said to
18  Mike, We'll solicit them from them.  Kevin sent letters
19  out to those guys asking them to bid this job.  We
20  hadn't signed the agreement with J & D yet, and I was
21  open to considering other people besides J & D.  J & D
22  was a solution to my problem, but not the solution.
23     Q  Well, did you ever ask the Union in that meeting
24  in early April whether the Union could supply its own

Huron Valley Glass vs Local 27    March 20, 2008

29 (Pages 110 to 113)

110

1  employees, members, to -- for you to self-perform the
2  job?
3      A  My understanding was there were no men available
4  because I was trying to solicit more glaziers and
5  ironworkers for the Optima job, so I deducted that if
6  they weren't available for the Optima job, there wasn't
7  going to be guys available for me.
8      Q  But you didn't ask the question?
9      A  I don't recall asking the question one way or
10  another specifically do you have men two months from
11  now, and that's when I needed them, in May.
12      Q  Right. So you wouldn't know in April if the
13  Union would be able to have supplied men so you could
14  have self-performed?
15      A  I would assume they didn't have men because they
16  didn't have them at the time, and you didn't --
17      Q  But you're not God; you wouldn't know what
18  happened two months from then?
19      A  No, but I have to plan ahead, and I -- that's
20  what I did.
21      Q  Okay. Did you sub the work out because people
22  were getting hurt on the job at Optima?
23      A  Did I -- no. There were guys getting hurt at
24  Optima, but that wouldn't be the reason why I would

111

1  subcontract another job.
2      Q  April 21, it is Bates stamped 75, was this
3  letter from Mr. Anderson to the Glaziers sent at your
4  direction?
5      A  Well, I don't know if it was my direction, but I
6  got a copy of it. Let's see. Okay.
7      Q  So as of this time, you -- as of April 21 of
8  '07, you wouldn't have known when work was actually
9  going to begin as to whether the Glaziers would have
10  been able to supply you -- your company with employees
11  so you could have self-performed because you didn't
12  intend to self-perform for at least four to six weeks
13  after this April letter, April 21 letter?
14      A  The schedule was for us to begin in May. Around
15  March and April, I was wondering, like I always do, how
16  we are going to man our jobs. I became concerned
17  because we weren't able -- I don't even think we had
18  enough guys on Optima at the time, and Steve Lopez
19  and -- who was trying to solicit for some more
20  qualified, safe-working manpower for Optima was
21  struggling to get all of the men we needed for that job.
22  I began to be concerned that we might not be able to
23  meet our -- another obligation coming down the pike in
24  two months. That's why I was concerned about possibly

112

1  pulling men off of Optima and having our own crew
2  available to me here in Chicago, glaziers or
3  ironworkers, to do this work. That's why it was a good
4  idea, I thought, to perhaps subcontract the work out to
5  a company who already had a crew established who could
6  go down there and do this job for us.
7      Q  How much of your $5 million bid was attributable
8  to labor?
9      A  I'm going to say in my bid, about a million 2, a
10  million 3, somewhere in there was attributable to labor.
11      Q  So pretty close to the price that you got from
12  J & D?
13      A  Yes, actually it was. In fact, I think my
14  man-hours were pretty darn close when I bid the job to
15  about 10 or 11,000 man-hours that I thought it would
16  take to do the job; so that wasn't awkward to me that
17  they had bid that price.
18      Q  Now, supposedly, your -- Mr. Anderson solicited
19  bids from four companies pertaining to the 1401 job, and
20  then a few weeks later, Mr. Mabus wrote back to you that
21  only two of the companies that Mr. Anderson had
22  solicited were even Glaziers Union signatories, correct?
23  That's the next Bates stamp, 76.
24      A  Okay.

113

1      Q  Correct?
2      A  Yeah, I see that.
3      Q  Do you have the bids that were submitted by
4  either of the Union signatory companies? Were there
5  ever bids submitted?
6      A  I don't think they bid them. I don't think they
7  wanted to bid them or they didn't respond favorably to
8  that.
9      Q  Well, normally, bids are sent out to companies
10  for a job of this magnitude well in advance of -- way
11  more than four to five weeks before the job is supposed
12  to start?
13      A  Sure.
14      Q  So at the point that you were soliciting these
15  other companies for bids, their schedule was probably
16  booked up?
17      A  I imagine. I don't know -- well, go ahead.
18      Q  Okay. Turn to Bates stamp number 80. Have you
19  seen this document?
20      A  It looks familiar, yes.
21      Q  It's the notice to appear to one of these Joint
22  Arbitration Board hearings, right?
23      A  Okay. Yes.
24      Q  And then, your company asked for a couple of

Huron Valley Glass vs Local 27    March 20, 2008

30 (Pages 114 to 117)

---

114

1  continuances, and we agreed to continue it to today's
2  date?
3  A  Okay.
4  Q  Is that correct?
5  A  Yes.
6  MR. CHAPMAN: Was it an agreement?
7  MR. SCHWARTZ: What's that?
8  MR. CHAPMAN: I said was it an agreement?
9  MR. SCHWARTZ: Q  Now, if you could turn to Bates
10  stamp 92.  Actually starting with 91.
11  A  Okay.
12  Q  Yes.  Now, W & G, Inc., actually supplied the
13  wage and benefit bond to the Union Glaziers 27 effective
14  February 19th, 2008, even though W & G doesn't employ
15  any people?
16  A  I don't know if W — if W & G employs any people
17  or not.  That's where they get their paychecks from.
18  Q  Well, they didn't employ people — they don't
19  employ people in the jurisdiction of Glaziers Local 27,
20  to your knowledge, W & G, LLC?
21  A  No.  I'm assuming that's Huron Valley Glass
22  doing that.
23  Q  Right.  So W & G, LLC was providing a bond for
24  your employees, HVG's employees?

---

115

1  A  I guess, yeah.
2  Q  Well, if you look, the next page is the bond,
3  92.
4  A  All right.  Great.  This is the first time I've
5  seen it.
6  Q  Turn to page 92.
7  MR. CHAPMAN: Well, do you know, or you don't know?
8  I think that's what he's asking.  If you know, great.
9  If you don't know, great.
10  A  I don't know.
11  MR. SCHWARTZ: Q  Do you know who Joan Engelmeier
12  is?
13  A  Yes.
14  Q  Who is she?
15  A  She is a woman that works in 5075 Carpenter Road
16  who is a controller.  I know she is a controller.
17  That's her title.
18  Q  For who?
19  A  Well, this says W & G, but she is also a
20  controller for Huron Valley Glass.
21  Q  Who does she get paid by?
22  A  I don't know who is on her check.  I'm with — I
23  don't know.
24  Q  So she does work for your company as well?

---

116

1  A  Yes, but she is also a controller for the
2  drywall company that's upstairs.
3  Q  What is her duties for W — excuse me, for Huron
4  Valley?  As controller, what are her duties?
5  A  Well, she's in charge of the bookkeepers for
6  Huron Valley, like, you know, she does our year-end
7  books with accountants, she is in charge of the young
8  lady who does our receivables and payables.  They report
9  to her.
10  Q  Is that lady on the payroll of W & G or on Huron
11  Valley's payroll?  The receivables lady and the payables
12  lady, who do they get paychecks from?
13  A  The receivables lady, Huron Valley.  The
14  payables lady, Huron Valley.  I don't know who Joan gets
15  her check from.
16  Q  But in any case, the bond, the wage and benefit
17  bond was provided for Huron Valley employees by W & G as
18  you connote on Exhibit 92?
19  A  Okay.  Right.
20  Q  Turn to the next page, page number 92.  Are you
21  missing a 92 in there?
22  A  Yes.  I have 91 to 93.
23  MR. SCHWARTZ: Okay.  Do you want to — you can
24  maybe show him yours.  Do you have 92 in there?

---

117

1  MR. CHAPMAN: No.
2  MR. SCHWARTZ: Well, why don't we make copies.  I
3  don't know how it didn't get copied.
4  MR. CHAPMAN: What is it you want to show him?
5  MR. SCHWARTZ: The bond.
6  MR. CHAPMAN: Okay.  So we're missing a page.
7  MR. SCHWARTZ: Yes.  I'll just make some copies.
8  (Brief break had.)
9  MR. SCHWARTZ: Q  Does Huron Valley have some kind
10  of a management contract with W & G?
11  A  Not that I'm aware of.  I haven't seen anything.
12  Q  You never signed that?
13  A  No.
14  Q  Could you turn to Bates 96, Bates stamped 96 at
15  the bottom.  What is this document?
16  A  This appears to be an insurance certificate.
17  Q  And what is an insurance certificate?
18  A  It's a certificate that describes an insurance
19  policy.
20  Q  For what in this particular case?
21  A  I don't know.  It looks like it's Marsh, who is
22  our insurance agent, is insuring Local 27 and Huron
23  Valley Glass.
24  Q  Is this for workmen's comp?

---

Huron Valley Glass vs Local 27    March 20, 2008

118

1    A  For workmen's comp.
2    Q  So the employees on Optima and again — and
3  1401 were Huron Valley employees, but W & G provided the
4  payroll and the surety bond?
5    A  Okay.
6    Q  Is that correct?
7    A  Yes.
8    MR. SCHWARTZ:  I would move for entry of Union
9  Exhibit 4.
10    MR. SHAPIRO:  Counselor.
11    MR. CHAPMAN:  I -- it's a large exhibit.  I think
12  the only things that I would have any objection to based
13  on relevance would be the items including the surety and
14  the insurance related materials.  The corres -- so I
15  have no objection to the correspondence.  I just think
16  the other stuff is not relevant to our case here.
17    MR. SHAPIRO:  I'm going to accept all of it.
18    MR. SCHWARTZ:  Q  If we could turn to Exhibit Number
19  5.  Exhibit 5 is your letters intending to hire
20  apprentices beginning in August of 05, correct?
21    A  Okay.  Yes.
22    Q  And the employees were hired by HVG as indicated
23  on the left side?
24    A  Okay.

119

1    Q  Do you know whose signature?  It looks like a
2  Thomas something.
3    A  I think that's Tommy DiDonato.
4    Q  And his, again, position was a superintendent on
5  the Optima job?
6    A  Yes.
7    Q  And he's a glazier?
8    A  Yes.
9    Q  Did you employ glazier apprentices under the
10  name of HVG at the Optima job?
11    A  I think so.  I think we had some apprentices
12  there.
13    Q  Do you know a Don Nelson, or Nielson?
14    A  Not personally.
15    Q  Have you seen his name?
16    A  Just now, I mean.
17    Q  How about a Sean Carroll?
18    MR. CHAPMAN:  What are you looking at, Don?
19    MR. SHAPIRO:  Oh, just Bates 97, 98, and 99,
20  Exhibit 5.
21    Q  And a Don Christman?  Do you know any of those
22  names?
23    A  I know Don Christman's name.  He is an
24  apprentice.

120

1    Q  A Glaziers apprentice?
2    A  I believe so, yes.
3    MR. SCHWARTZ:  I'd move for entry of Exhibit 5.
4    MR. SHAPIRO:  Counselor.
5    MR. CHAPMAN:  No objection.
6    MR. SHAPIRO:  I accept.
7    MR. SCHWARTZ  Q  Have you seen -- let's move to
8  Exhibit 6.  Have you seen the fringe benefit report
9  forms submitted by W & G, LLC to the Glaziers Fringe
10  Benefit Funds?
11    A  Just now I have.  I don't usually look at these.
12  I don't see these.
13    Q  Who is Brenda?
14    A  Brenda is a payroll clerk.
15    Q  Employed by?
16    A  I don't know who she gets her paycheck from, but
17  she is a W & G employee, that I think I know.
18    Q  How do you know that?
19    A  Because I've been told.
20    Q  Where is she located?
21    A  5075 Carpenter Road.
22    Q  And where would she get the payroll information
23  from which these reports are prepared?
24    A  From Tommy DiDonato and the rest of the foremen

121

1  who send in their time cards each week.
2    Q  So they send them directly to a W & G employee?
3    A  Yes.
4    Q  Okay.
5    A  To Brenda.
6    Q  Do you get copies of the payroll to know to
7  monitor the hours?
8    A  I don't unless I ask for them.  If I find out
9  there is overtime, I would see them.
10    Q  Is there someone at your home office that
11  monitors the hours in addition to the clerk that just
12  prepares these forms?
13    A  Yes.  I have a general superintendent named
14  Elmo Apple who --
15    Q  Who is located where?
16    A  In our office on Carpenter Road, who reviews the
17  payroll tickets before they go to Brenda.
18    Q  Do you have like an accounting person that
19  monitors your work in progress costing to make sure that
20  you're on target budgetwise?
21    A  Yes.
22    Q  And is that this Elmo or is that somebody else?
23    A  No.  It gets -- when the payroll is processed,
24  it goes to a software program which develops job cost

Huron Valley Glass vs Local 27    March 20, 2008

32 (Pages 122 to 125)

122

1  reports that I review to see if we're on budget with our
2  labor.
3      Q  Oh, so it's something that's preprogrammed for
4  say where you should be at a certain percentage of the
5  job and then you compare that program to the actuals?
6      A  Yeah, yeah.
7      Q  I see.  And you do acknowledge that these are
8  report forms submitted by W & G, LLC for Huron Valley
9  employees on either the Optima job -- well, on the
10 Optima job?
11     A  Yes.
12     Q  Because that's the primary job that you had
13 going from October '05 through September '07?
14     A  Okay.
15     Q  Is that -- I'm asking.  It's a question.
16     A  Yes.
17     Q  Because the job you indicated that you had done
18 before or that the company had done before was probably
19 over before the Optima job started?
20     A  Yes.
21     Q  So during the period from 7/05 -- July '05
22 through September '07, the only job in the Chicago area
23 on which glaziers were employed was the Optima job?
24     A  Yes.

123

1      Q  Okay.  And you have no doubt -- or you do
2  acknowledge that these forms were prepared by a W & G
3  employee representing hours worked by glazier employees?
4      A  Correct.
5      Q  Employed by Huron Valley or --
6      A  Correct.
7      MR. SCHWARTZ:  Okay.  I'd move for entry of Union
8  Exhibit Number 6.
9      MR. SHAPIRO:  Counsel.
10     MR. CHAPMAN:  No objections.
11     MR. SHAPIRO:  I accept.
12     MR. SCHWARTZ:  Q  Can you identify -- turn to Bates
13 stamp 306, if you would.
14     MR. CHAPMAN:  What exhibit?
15     MR. SCHWARTZ:  7.
16     A  Okay.
17     Q  What is this small piece of paper that says
18 P.D. Manufacturing in the upper right-hand corner?
19     A  What's the piece of paper?
20     Q  Yeah, what is this depicting or what is this
21 document?
22     A  Well, it would be -- look like it would be part
23 of a submission drawing with the title block of the
24 manufacturer of the windows.

124

1      Q  What job was this for?
2      A  Optima.  I would -- I think Optima.
3      Q  So this would appear to indicate, again, that
4  Huron Valley Glass was the contracting party for the
5  Optima job?
6      A  Yes.
7      Q  And payroll, again, was being paid by W & G?
8      A  Correct.
9      Q  But the contract with Optima, this would be
10 reflected was -- it would be -- would have been between
11 Huron Valley Glass and Optima?
12     A  Correct.
13     MR. SCHWARTZ:  I'd move for entry of Exhibit
14 Number 7.
15     MR. SHAPIRO:  Counselor.
16     MR. CHAPMAN:  Just a relevance objection.
17     MR. SHAPIRO:  I accept.
18     MR. CHAPMAN:  Now, when you say -- I'm sorry, Don.
19 When you say 7, there's three --
20     MR. SCHWARTZ:  It's the three pages, yes.
21     MR. CHAPMAN:  Okay.  So there is a check, there is
22 a -- okay, again, relevance.
23     MR. SCHWARTZ:  Okay.
24     Q  Exhibit Number 8 -- let's go back for one second

125

1  to Bates 308 which is part of Exhibit 7, the last page.
2      A  308.
3      Q  Yes.  The page before.  So this would indicate
4  that W & G, LLC also banks at LaSalle Bank?
5      A  Sure, yeah.
6      Q  And this is the same bank that you bank at; that
7  is, HVG?
8      A  That's where I get my check, LaSalle.
9      Q  Okay.
10     MR. CHAPMAN:  There weren't more than two accounts
11 there?
12     MR. SCHWARTZ:  Q  Exhibit 8 is the documents that we
13 received pursuant to a subpoena to J & D, and you have
14 previously indicated that -- or through counsel that you
15 have no dispute with the 10,770 hours indicated that --
16 by J & D that their ironworkers worked on the 1401 State
17 Street job?
18     A  I don't dispute that.
19     Q  You would have no basis to dispute that?
20     A  No.
21     Q  You don't keep records for their hours of work?
22     A  No.
23     Q  It sounds a reasonable number to you?
24     A  Yes.

Huron Valley Glass vs Local 27     March 20, 2008

33 (Pages 126 to 129)

126

1    Q  That this is the number of hours that the
2  ironworkers worked for J & D on the 1401 State Street
3  job?
4    A  That's reasonable.
5    MR. SCHWARTZ: I'd move for entry of Employer's --
6  or excuse me, Union -- I don't know why I keep saying
7  that -- Union Exhibit 8.
8    MR. SHAPIRO: Counselor.
9    MR. CHAPMAN: No objection.
10   MR. SHAPIRO: I accept.
11   MR. SCHWARTZ: Q  Union Exhibit 9, page 346, have
12  you seen the first page, which is a Secretary of State
13  of Illinois document indicating that W & G, LLC is
14  authorized to do business in Illinois?
15   A  This is the first time I've seen that.
16   Q  So you're not familiar with that document?
17   A  No.
18   Q  If you would turn to 347, the principal office
19  of W & G, LLC as indicated by their submission to the
20  Secretary of State of Illinois is the 5075 Carpenter
21  Road in Ypsilanti, and that's the same address that
22  Huron Valley is located at?
23   A  Correct.
24   Q  And if you would turn to 349, it indicates that

127

1  Huron Valley Glass, LLC is no longer in good standing as
2  an LLC in Illinois?
3    A  Correct.
4    Q  Were you aware of that fact?
5    A  No.
6    Q  And you're aware -- if you compare 347 to 349,
7  you will note that the registered agent for Huron Valley
8  Glass, LLC and W & G, LLC in the State of Illinois is
9  CT Corporation for both of the entities? You notice
10  that, right?
11   A  That's what it says. I don't know if it's true
12  or not.
13   Q  And again, Huron Valley Glass Company, LLC is
14  noted to be at -- the principal office is at the
15  Carpenter Road in Ypsilanti?
16   A  Correct.
17   Q  Have you ever heard of W & G, Inc.?
18   A  No. I just --
19   Q  You don't know what that entity is?
20   A  To me, it's all W & G. After that, Inc., LLC, I
21  don't know.
22   Q  Okay. And you indicated before, I think, that
23  you didn't know if Mr. Stripp gets a payroll from W & G
24  or from this NCS or NEC or whatever?

128

1    A  I'm not certain.
2    Q  And if you would turn to 353, this is indicating
3  that Huron Valley Glass Company is incorporated under
4  the State of -- well, it's an incorporation document
5  from Michigan, and that it's, for whatever reason, an
6  inactive -- oh, that Huron Valley Glass, Inc., is
7  inactive. Are you familiar with that?
8    A  Familiar that they're inactive?
9    Q  Not in -- not -- Inc., not LLC. They're -- are
10  you -- were you -- did you know about an entity called
11  Huron Valley Glass Company, Inc.?
12   A  No.
13   Q  All right. So 356 we'll turn to, which is -- if
14  you would move on a couple of pages.
15   A  Okay.
16   Q  It's the Michigan Secretary of State's office
17  indicates that Huron Valley Glass Company, LLC is a
18  active corporation?
19   A  I believe that's true. That's who I work for.
20   Q  And it's a foreign corporation, I believe,
21  because it's incorporated in Indiana. Are you aware of
22  that?
23   A  No.
24   MR. SCHWARTZ: I'd move for entry of Exhibit

129

1  Number 9.
2    MR. SHAPIRO: Counsel.
3    MR. CHAPMAN: Objection based on relevance that --
4  also note that these documents are not current. None of
5  them are current. They're outdated on their face, and
6  so I would object to the -- on a relevance basis.
7    MR. SHAPIRO: I accept.
8    MR. SCHWARTZ: Q  When did Huron Valley begin
9  employing glaziers at 1401 South State?
10   A  November maybe or October. It was later in the
11  fall.
12   Q  Okay. Why? Why did you start employing people
13  there that were glaziers?
14   A  Because work needed to be done that I wanted
15  done that I wasn't sure if J & D would do it as promptly
16  as I wanted it done, so it might have been going back
17  and doing remedial work or adjusting a door or adjusting
18  a window, and we began to see the light at the end of
19  the tunnel for Optima, so I told Steve Lopez, Send some
20  glaziers down to 1401 to help me out down there and get
21  some work done.
22   Q  So you transferred people from Optima to 1401?
23   A  Yes. Actually, I think one -- a couple of them
24  might have even been new hires. I said, See if you can

Huron Valley Glass vs Local 27     March 20, 2008

34 (Pages 130 to 133)

**130**

1  call the hall and see if they've got anybody that we can
2  put down at 1401 to help us out down there.
3      Q  So the hall did have people available in
4  November to give you for the 1401 job?
5      A  I'm not sure of the November date. It might
6  have been October or it might have been December.
7      Q  Somewhere in the late fall?
8      A  Yeah. And it was up to Steve to determine
9  whether they were to go to Optima or whether they were
10  to go to 1401.
11      Q  Yes, but the Union did have people that they
12  supplied to you out of the hall?
13      A  One guy, one or two guys. That's all I needed
14  at the time.
15      Q  You don't know if more were available?
16      A  I didn't need more.
17      Q  So you don't -- the answer is you don't know if
18  there -- if there were ten available, you just got two?
19      A  The answer is I didn't ask.
20      Q  Right. Okay.
21      MR. SCHWARTZ: Could we go through the record. Did
22  you keep a track of all of the exhibits that we have
23  asked for -- moved entry of or you do not have that
24  available?

**131**

1      THE REPORTER: No, I don't have it available.
2      MR. CHAPMAN: Do you want a break for a second to
3  take inventory?
4      MR. SCHWARTZ: No. Well, I don't know. I'm not
5  going to be able to figure it out because I didn't take
6  notes. I'm just wondering if -- the only one I show
7  that we didn't ask I believe is 2, and we didn't ask 12.
8      MR. CHAPMAN: You did not ask for 2. You did not
9  ask for -- did you say 12?
10      MR. SCHWARTZ: 12, which is the out of work lists.
11      MR. CHAPMAN: Right.
12      MR. SCHWARTZ: And I think everything else except --
13      MR. CHAPMAN: 2 and 12 are -- I think they're the
14  only ones.
15      MR. SCHWARTZ: And everything else. So I guess what
16  I'd do know is, if I haven't, is ask for entry of
17  exhibits -- all exhibits other than 2 and 12.
18      MR. CHAPMAN: Let me just take a minute. You just
19  want to make sure you did the others.
20      MR. SCHWARTZ: Yes.
21      MR. CHAPMAN: I believe you asked for all of them
22  and Mr. Shapiro wrote on all of them.
23      MR. SCHWARTZ: Okay.
24      MR. CHAPMAN: And that includes the 16 and --

**132**

1      MR. SCHWARTZ: And that includes this 16 and -- 16
2  and 17. 16 is the letter of February 28th, and 17 is
3  the photo.
4      MR. SHAPIRO: Okay.
5      MR. SCHWARTZ: Oh, let me ask one more. Yeah, I'm
6  going to ask it right now.
7      Q  And I do want to just -- and I don't have extras
8  of this, but I do want to have this as part of the
9  record as well. I would like to show you what we will
10  mark as Exhibit 18. Can you identify what this is?
11      A  That's the 1401 South State job.
12      Q  Right. And that would be work similar to what
13  was performed at the Optima location?
14      A  Correct.
15      MR. SCHWARTZ: Okay. We'll make copies, and I move
16  for entry of this.
17      MR. CHAPMAN: No objection.
18      MR. SHAPIRO: I accept.
19      MR. SCHWARTZ: Okay. I believe I don't have any
20  more questions of this witness at this time.
21      MR. CHAPMAN: What I was going to ask, why don't I
22  reserve my examination of him so he can finish up his
23  case.
24      MR. SHAPIRO: I have a couple of questions.

**133**

1                    EXAMINATION
2                   by Mr. Shapiro
3      MR. SHAPIRO: Q  How much drywall work do you do in
4  Chicago?
5      A  Well, Huron Valley doesn't do any, right, but
6  they -- there was a drywall company that NCE owned that
7  did some work in Chicago. It was called Chicago Ceiling
8  and Partition. I don't know the volume.
9      Q  Are those high-rise buildings primarily or --
10      A  I don't know. I don't know. I don't -- they're
11  not here anymore, you know, doing business anymore, but
12  I know at one time --
13      Q  But they used to be?
14      A  They used to be Chicago Ceiling and Partition.
15      Q  All of the contracts that Huron Valley has for
16  work that they performed are done with Huron Valley or
17  are they done with somebody else? In other words, when
18  you take a contract to a general contractor, does it
19  have Huron Valley's name on it?
20      A  Yes.
21      Q  It has Huron Valley's name?
22      A  Only.
23      Q  When the contractor pays Huron Valley, are they
24  making it out to Huron Valley --

Huron Valley Glass vs Local 27    March 20, 2008

35 (Pages 134 to 137)

134

1    A  Yes.
2    Q  -- or are they making it out to somebody else?
3    A  Huron Valley.
4    Q  How does Valley Huron disperse the money so they
5    can pay bills, benefits?  I mean how do you funnel money
6    to other companies?
7    A  Well --
8    Q  I mean how do they get the money -- you're
9    paying benefits under another name.  How do they get the
10   money to pay it?
11   A  I don't know.  I don't know how W & -- if W & G
12   is paying that money, I don't know how W & G gets the
13   money from Huron Valley Glass.
14   Q  Or did Huron Valley keep all of the money and
15   they'd show a large profit and then the other money
16   comes from it?
17   A  If they showed a large profit, Vince would have
18   kept his job.
19   Q  So you don't know how the money changes hands?
20   A  No, I don't.
21   Q  Okay.  When you figure a job, what wage scale do
22   you use when you figure installation?
23   A  Usually -- do you mean like what dollar amount?
24   Q  I mean let's say, for instance, when you did the

135

1    Optima job or you did the job at 1400 State Street.
2    A  Right.
3    Q  How did you figure the labor rates and the
4    benefits rates and -- how did you -- how do you do that?
5    A  I take the wages plus the burden, the fringes,
6    and the general liability and workmen's compensation
7    insurance, what it would cost.  I go to our payroll
8    department and I ask them what are our labor rates
9    costing us right now, and they give me a sheet that
10   says, okay, base wages, fringes, you know, all of the
11   funds that we pay to the Union, that all adds up to a
12   certain amount of money, payroll taxes and so forth, and
13   then, there is an amount at the end that represents, you
14   know, $60 an hour or $58 dollars an hour.
15   Q  So how do you figure out which craft you're
16   going to figure -- when you figure a job, do you know
17   which craft you're going to figure -- you're going to
18   use at the time you figure the job?
19   A  Always, except Chicago, it's Glaziers, but every
20   city has a different rate.
21   Q  Okay.  So when you figured the job for Optima
22   and you figured the job for 1400 State, you figured
23   Glaziers rates?
24   A  I figured a rate.  I wasn't sure if I was going

136

1    to use Glaziers or Ironworkers because I think here, the
2    Ironworkers make a little more than the glaziers, but to
3    me, it's not enough for me when I sit down and estimate
4    to say 60 as opposed to $62.  I just use a number.
5    That -- and when I estimate -- I'm telling you how I
6    estimate.
7    Q  It stays in closed doors.  What happens in Lyons
8    stays in Lyons.
9    A  I use various formulas on my estimating, not
10   just man-hours times a certain rate.  I do a variety of
11   different things.  Square footagewise, percentage of
12   jobwise.  Sometimes I just pull numbers up and I do a
13   lot of averaging based on costs that I knew our company
14   might have spent on other jobs.  So when I bid 1401, I
15   bid an amount almost not far from what J & D quoted me
16   on.  That's why I felt comfortable that at least my bid
17   wasn't too far out in left field.  If you do the
18   arithmetic, you come up with, yeah, about 10 or 11,000
19   man-hours.  Yes, I could have signed a $62 an hour or a
20   $58 an hour rate times those many hours.  That's only
21   one way I would get to a labor number.  That's an art.
22   Q  So when you bid the job, in your mind, you
23   didn't know which craft you were going to use?
24   A  I thought I would use the same two trades that I

137

1    was using at Optima because I was going to use those
2    same guys.  They were Ironworkers and glaziers.
3    Q  When you did Optima, how far in advance that you
4    signed the contract did you decide which crews you were
5    going to have --
6    A  I didn't know because I wasn't there yet, see.
7    When I got to Optima -- when I got to this company in
8    February of '06, Optima had already started, and I went
9    out to the job site the first week I was there and I
10   said, Okay, you know, what's going on.  And they said,
11   Well, we have got 40 guys out here that are ironworkers
12   and glaziers.  I said, How is that working.  They said,
13   It's a composite crew; We have an agreement with both
14   unions.  Well, why are we doing that; that's like
15   marrying two women.  They said -- I didn't really get an
16   answer except they thought that if you -- I was told
17   that if we had agreements with both unions, we'd be
18   certain that enough men would be available to service
19   that job if we got sourced from two different -- you
20   know, that's how it was explained to me.
21   Q  Were you there when 1400 South State Street was
22   done; in other words, when a contract was done?
23   A  Yes.
24   Q  You were involved with that job?

Huron Valley Glass vs Local 27    March 20, 2008

36 (Pages 138 to 141)

138

1    A  Right. In October — yeah, that was — I was
2  there then.
3    Q  Okay. And how far before you got a contract
4  with the general contractor did you decide what metal
5  company to use?
6    A  Do you mean framing?
7    Q  I mean the windows up above?
8    A  Supply or install?
9    Q  Supply.
10    A  It was a Chinese window company, the same —
11    Q  Is that something you worked on six months
12  beforehand or is that something you got a quote on when
13  you started negotiating with the contractor?
14    A  Here is what happened on that deal. And again,
15  I'm going to tell you stuff about our company.
16    MR. CHAPMAN:  And he gets to tell you when we're
17  done.
18    A  Yeah, how you run your business.
19    Vince, the fellow who was my predecessor, began
20  pricing 1401 before I came to the company. When I came
21  to the company and took over that responsibility and he
22  came to Chicago, he continued, but I started getting
23  involved in this job called 1401 that was going to
24  happen. The same materials supplier on Optima,

139

1  P.D. Manufacturing out of Singapore, was offered to
2  W.E. O'Neil as an option to buy framing from, but they
3  weren't so certain they wanted to have Chinese on their
4  job. It was talked about. So P.D. was submitted to
5  them as, Hey, if you let us use P.D., this is how much
6  money it will cost. If you have us go with a domestic
7  supplier, it will cost this much more. So the decision
8  to use P.D. was not just Vince's or Denny Ahearn's. It
9  was an owner, W.E. O'Neil, architect, okay, let's go
10  ahead and try using these people. So a decision was
11  made, Al, at some point to go ahead and buy this
12  material from this Singapore company, P.D.
13  Manufacturing.
14    MR. SHAPIRO:  Q  Okay. When you signed the contract
15  with O'Neil, you had a schedule, construction schedule
16  from them --
17    A  Yes.
18    Q  -- that said that you were supposed to be on the
19  job in May?
20    A  Right.
21    Q  That meant that you were going to have windows
22  before then?
23    A  Well, it was tight.
24    Q  Tight, but you were going to get windows

140

1  sometime in April?
2    A  May. I mean it was like the day they show up,
3  we had to have men on the job.
4    Q  Normally, I would think you and I run the same
5  type of business. I know that when I run a business and
6  I have something in the future, I have a real good idea
7  how I'm going to do the job, how I'm going to install
8  the materials. You're telling me that when you got the
9  contract and you ordered the windows, you had no idea
10  how are you going to install them, by who, by when?
11  I mean --
12    A  Yeah, I did. We were going to do them.
13    Q  Because you were going to do them.
14    A  With Optima people that were going to be
15  finished.
16    Q  Okay. And how many people at the time were you
17  running on the job?
18    A  Pardon me?
19    Q  How many people in October, November were on
20  that job?
21    A  October, November of '06?
22    Q  '06?
23    A  25 maybe, 30.
24    Q  25, 30. And how many men did J & D have on the

141

1  job normally? 5 or 6?
2    A  Yeah. Maybe 8 at some times. It depends.
3    Q  And when February came around, how many people
4  were on the job then?
5    A  I don't recall. Probably nearly the same.
6    Q  And at the time --
7    A  The over 20 number.
8    Q  Okay. And at the time, the job was what, 90
9  percent finished, 98 percent finished?
10    A  No. Probably mid-80s maybe. I mean I would
11  like to say it was 90 percent complete, but as I say,
12  we're still out there.
13    Q  And you discovered somewhere at that time that
14  you weren't going to be able to use them, that was when?
15    A  I didn't see a way of --
16    Q  In March?
17    A  -- pulling men -- well, as I got more familiar
18  with the Optima job myself, it became obvious to me that
19  what I was hearing from my field people wasn't what I
20  was seeing, that we weren't going to be done by May of
21  '07 to be able to bring that crew over to 1401. I said,
22  Do you know what, I can see this job lasting almost till
23  Christmas of '07.
24    Q  Now you sent a contract to do the job even

Huron Valley Glass vs Local 27     March 20, 2008

37 (Pages 142 to 145)

142

1 though J & D didn't sign the contract back in the first
2 part of February?
3     A   I don't believe it was sent then. I know that's
4 the date that's on this contract, but I don't think
5 J & D had that contract in their hand in February
6 because we hadn't worked that out with them.
7     Q   My question to you is: Did J & D start looking
8 at the plans so they could figure the labor as a stop
9 gap just in case you weren't able to do it maybe back in
10 December?
11     A   No. I don't think -- they weren't approached
12 that early.
13     Q   When do you think they were approached?
14     A   Right after the holidays. I think sometime in
15 January and February when I began to get that concern.
16     Q   Now it's a pretty big job. It's a job that a
17 company normally takes more than a week or two to put
18 together. Don't you think they had a little more time
19 than you're alluding to?
20     A   No, I don't because I think a lot of it was
21 discussions about here is a job, it's 20 stories, it's
22 so many square feet, it's so many windows.
23     Q   How many square feet of --
24     A   I think 118,000. I think 118,000.

143

1     Q   So that was installed for a little more than
2 $10 a foot?
3     A   Right.
4     Q   Okay. Do you think Optima was installed for the
5 same thing doing it yourself?
6     A   No. I think by the time Optima is done, it's
7 going to be more like 15 bucks a foot.
8     Q   So --
9     A   Because here is the difference. Optima has a
10 lot of stuff on it that's not just windows. Optima had
11 guardrails, a lot of terrace doors, a lot of handrails,
12 a lot of copings, slab wraps. 1401 is just basically
13 windows.
14     Q   Vanilla job?
15     A   Yeah.
16     Q   Do you think that J & D performed the way you
17 wanted them to perform?
18     A   Yeah, they did all right. I mean --
19     Q   If that's the case, then why didn't you let them
20 do some of the adjustings to their own work, finishing
21 up what they were doing? Why would you want to bring
22 anybody else on the job if you felt comfortable with
23 them doing the work?
24     A   Because I wanted our own people, the glaziers,

144

1 who I could communicate with personally to discuss with
2 me what they were adjusting or what they weren't
3 adjusting. These windows didn't come out as -- the
4 product itself wasn't as good as I wanted it to be. You
5 know, there were gaskets coming off and things like
6 that, so I wanted guys that I knew that I could discuss
7 with to go down there and take care of that. I didn't
8 expect J & D to do that work and communicate with me as
9 well.
10     Q   Is J & D responsible for any warranty work on
11 the installation?
12     A   Yeah, it's part of their contract. I think it
13 might be a year or two-year warranty.
14     Q   But if they're subject to it, again, why would
15 you want to --
16     A   Well, if it was an installation problem, if they
17 installed something wrong, I would come back to them and
18 I'd say, You owe me that. But if it's a product thing
19 that I couldn't really, you know, assign responsibility
20 to them for installing something wrong, then I think I
21 wouldn't hit them with that. I would say, We'll take
22 care of that, because the Chinese people are out of
23 business now, so I couldn't call them up.
24     Q   That's why I guess they don't use Chinese too

145

1 much anymore.
2     A   Nah, it's tough for them.
3     Q   When you were having discussions with Local 27,
4 did you allude to the fact that you would give them the
5 storefront stores, the first to second or third story,
6 and that you would then do the above floors with J & D?
7     A   That was talked about. I was thinking about
8 that would be one way of trying to make sure everybody
9 was happy.
10     Q   Did you make that comment or did someone from
11 your company make that comment?
12     A   It's possible, yeah. I might have made it, you
13 know.
14     Q   What do you think the Union said?
15     A   What do I think the Union said?
16     Q   Well, what did they say? Did they accept it?
17     A   I think they would have been receptive to that
18 probably, yeah. I don't recall them protesting that or
19 saying no or, you know, yeah, we'll take some of it.
20     Q   Okay. The thing that I still have trouble with
21 is all of these different names.
22     A   I'm confused, too.
23     Q   If I see that -- you know, I look at all of
24 these names. I just don't understand that. I'm trying

Huron Valley Glass vs Local 27    March 20, 2008

38 (Pages 146 to 149)

146

1  to get my arms around it. Maybe you can help me.
2  You've worked there. Haven't you been concerned about
3  all of these different names --
4      A  No.
5      Q  -- and what they mean and --
6      A  No, because I know -- look it, I know the people
7  that hired me are good people, and I don't say that for
8  any other reason than that's why I'm there, and I don't
9  sense that there is any shady dealings governmentally,
10 legally, or anything else with any of this. This
11 doesn't concern me.
12     Q  Who owns the whole ball of wax? Who is the
13 principal or who has --
14     A  NCE is a holding company. I think it stands for
15 National Construction Enterprises. Okay? They own
16 Huron Valley Glass. And I understand they also own like
17 13 other companies. Now, who is they, I don't know.
18     Q  Who owns them?
19     A  I think private stockholders. I don't think
20 it's a publicly traded company.
21     Q  They are not a publicly traded company?
22     A  No. I think it's a group of gentlemen and/or
23 ladies that own stock in NCE and one of the --
24     Q  You have never been curious? You have never,

147

1  you know, had a couple of drinks at night and these guys
2  got around the table saying, Boy, you know, this is like
3  the CIA, that we've got a lot of stuff going on, what's
4  happening, who owns what?
5      A  No, no, because I've met people and I know --
6  I'm aware that those people are part of the ownership
7  group, and they're very --
8      Q  Who might those people be?
9      A  Some of the names?
10     Q  Yes.
11     A  Pino Mancina is one of the gentlemen who owns
12 NCE. I don't know how much NCE, I don't know how much
13 he owns, but I know that he was one of the gentlemen
14 that interviewed me for the job. Don Quinn is another
15 officer of that company. I'm not sure how much he owns,
16 none my business, I don't care, but he's a great guy.
17 He also talked to me when he hired me for the job, and
18 they said we'd like you to come and run the company we
19 own.
20     Q  Who else?
21     A  That's all I know actually. There may be some
22 people that I haven't met before who don't work in the
23 office or -- and they might be private stockholders just
24 like they own stock in Coca-Cola or anything else. I

148

1  don't know.
2      MR. SHAPIRO: I have no further questions right now.
3      THE WITNESS: Okay.
4      MR. SHAPIRO: What time is it?
5      MR. MABUS: It's 10 after 12.
6      MR. SHAPIRO: What do you say we take a break.
7      MR. SCHWARTZ: Okay.
8      MR. SHAPIRO: Is that okay with you, counselor?
9      MR. CHAPMAN: Yes, please.
10     MR. TOOMEY: How long do you think?
11     MR. SHAPIRO: Hour and a half?
12     MR. SCHWARTZ: No, no.
13     MR. SHAPIRO: Hour?
14     MR. SCHWARTZ: Yeah, 1 o'clock.
15     MR. CHAPMAN: I'm going to lose one of our
16 witnesses. He's got to go to law school.
17     MR. SHAPIRO: Do you want to bring someone in now?
18     MR. SCHWARTZ: Why don't you just have him testify
19 now?
20     MR. CHAPMAN: I do definitely need a break now.
21     MR. SCHWARTZ: Well, just have him testify first.
22 Well, just take him out of order.
23     MR. SHAPIRO: Yeah, we'll take him out of order.
24     MR. CHAPMAN: Let me see if I can do that. All

149

1  right? Don and I can talk during the break.
2      MR. SCHWARTZ: Yeah, we'll get back as soon as we
3  can.
4      (Brief lunch break had.)
5      (Whereupon the hearing was reconvened at 12:50
6      p.m.)
7      MR. SHAPIRO: We are now going to reconvene.
8      MR. SCHWARTZ: I think this witness has already been
9  sworn.
10     THE REPORTER: Yes.
11         MICHAEL MABUS,
12 called as a witness herein, having been first duly
13 sworn, was examined upon oral interrogatories and
14 testified as follows:
15         DIRECT EXAMINATION
16      by Mr. Schwartz
17     MR. SCHWARTZ: Q  Sir, could you state your name and
18 spell your last name for the record.
19     A  Michael Mabus, M-A-B-U-S.
20     Q  And by whom are you employed?
21     A  Painters' District Council 14.
22     Q  And what is your position?
23     A  Business representative.
24     Q  And what are your duties as business rep?

Huron Valley Glass vs Local 27    March 20, 2008

150

1    A  I negotiate collective bargaining agreements,
2  enforce those agreements, file grievances, I police the
3  geographical area, I oversee the apprenticeship program
4  and the everyday activities of the Local.
5    Q  Would you say you are employed by the District
6  Council, but your responsibilities are primarily with
7  respect to Local -- Glaziers Local 27?
8    A  Yes.
9    Q  And you are employed by the Painters' District
10  Council because the Glaziers is a constituent local of
11  that district council?
12    A  Yes.
13    Q  And were you ever a glazier?
14    A  Yes.
15    Q  For how long?
16    A  From 1977 to 1993.
17    Q  And have you been a business agent since then?
18    A  Yes.
19    Q  Were you ever a business agent actually for the
20  Glaziers? Was there a time when you weren't employed by
21  the District Council?
22    A  Yes. From '9 -- January of 2004 until 2000
23  maybe.
24    Q  2000 to 2004?

151

1    A  2000, 2001, or 2, somewhere in there. I don't
2  remember exactly when that took place. Seven years ago.
3    Q  Okay. And you participate in negotiations for
4  collective bargaining agreements?
5    A  Yes.
6    Q  And you were a negotiator for the 2003 to 2006
7  and 2006 to 2009 Glaziers Association Agreement?
8    A  Yes.
9    Q  And were you also someone involved in signing up
10  Huron Valley Glass as a contractor?
11    A  Yes.
12    Q  When did you first have contact with Huron
13  Valley Glass?
14    A  I'd say summer of 2005.
15    Q  Okay. Why don't we refer or make it so you
16  don't have to remember everything. Could you pull out
17  your exhibit list, if you could, and turn to Exhibit 3.
18      Was -- the first page of Exhibit 3, Bates
19  stamped 52, you received this letter from Mr. Klees on
20  or around August 5th or 6th of 2005?
21    A  Yes.
22    Q  Does this refresh your recollection as far as
23  when your discussions with Huron Valley began?
24    A  I had an informal meeting with Huron Valley

152

1  prior to this at the District Council.
2    Q  And who was the representative of Huron Valley
3  at that time?
4    A  I know that Tom DiDonato was the first guy that
5  I dealt with. He came in that meeting I believe with
6  another glazier out of Cleveland, Ohio, named Parker
7  Hall, and at some point, I think there was another
8  gentleman that was involved there from Huron Valley, and
9  I don't remember who that was.
10    Q  What was the purpose of your meeting at the
11  District Council?
12    A  Just to -- that was the initial meeting just to
13  sort of touch base on the project at hand.
14    Q  Which was what job?
15    A  I'm sorry, Optima, the Optima project in Skokie,
16  Illinois.
17    Q  Is that your geographic jurisdiction?
18    A  Yes.
19    Q  As far as a business agent, you cover that area?
20    A  Yes.
21    Q  And what was said at this meeting?
22    A  We discussed jurisdiction, we discussed
23  manpower, we discussed working together with the
24  ironworkers on that project. It was pretty informal,

153

1  maybe an hour long.
2    Q  Did you express any concern as to if there were
3  mixed crews, if that would be a problem for you?
4    A  No, not at all.
5    Q  And when I say mixed crews, you understand that
6  to be the glaziers and ironworkers working side by side?
7    A  Yes.
8    Q  Now, what led up to that letter, Bates stamped
9  52? Do you know what led Mr. Klees to write to you at
10  that time?
11    A  After our initial meeting, I think probably one
12  of the next things we did was send off a copy of our
13  Collective Bargaining Agreement that was already
14  negotiated with the Association, and probably it's
15  pretty normal for us to send off actually also a copy of
16  our wages and benefits.
17    Q  Okay. Could you turn to Exhibit Number 10,
18  Bates stamped 357. 10, Exhibit 10. When you said the
19  Association and Glazier contract in effect from June '03
20  through May 31, '06, is that what this Exhibit 10 is?
21    A  Yes.
22    Q  This was the standard agreement?
23    A  Yes.
24    Q  And you were a part of the negotiations that led

Huron Valley Glass vs Local 27    March 20, 2008

40 (Pages 154 to 157)

154

1   to this Agreement?
2       A  Yes.
3       MR. SCHWARTZ: I'd move for entry of Exhibit 10.
4       MR. SHAPIRO: Counsel.
5       MR. CHAPMAN: No objection to foundation. I would
6   object to relevance because it's not the contract that
7   is at issue here.
8       MR. SHAPIRO: I'm going to accept it.
9       MR. SCHWARTZ: Q  So then what concerns or what
10  issues did the company raise regarding the standard
11  contract, Exhibit 10, that is, Huron Valley? What
12  issues did they raise, referring back to Exhibit 3,
13  Bates stamped 52?
14      A  Well, obviously these specific articles.
15  Article 10, which was our geographical area, they were
16  concerned about signing with us and having that
17  contract -- be bound to that contract outside of our
18  area. I think that their main concern was stuff that
19  conflicted maybe with their plan of the glaziers working
20  together harmoniously with the ironworkers.
21      Q  Okay. And from the period August 4th of '05
22  through, let's see here, through September '05, you had
23  a series of correspondences and discussions with
24  representatives of W & G?

155

1       A  Yes.
2       Q  Did you talk to Mr. Klees directly?
3       A  Yes.
4       Q  So you knew him to be the president of Huron
5   Valley?
6       A  Yes.
7       Q  How did you know to get in touch with him?
8       A  Through Tom DiDonato.
9       Q  And he was their local representative
10  essentially?
11      A  Yes.
12      Q  And so at some point, you tendered the
13  Collective Bargaining Agreement to Huron Valley, and
14  that would be Exhibit Number 1; is that correct?
15      A  That is correct.
16      Q  Okay. Exhibit 1, now normally that document as
17  depicted in Exhibit Number 10 has the Association as the
18  contracting party. Do you know how it was determined
19  that Huron Valley Glass Company, LLC was typed in as the
20  name of the employer on page 1 of this exhibit?
21      A  It was our practice that because they were not
22  part of the Association, that when we would get somebody
23  to sign the agreement, we would not vary from the
24  Association agreement, but we would actually type that

156

1   company's name on the front page of the agreement.
2       Q  So you typed in the name -- someone from your
3   office typed in the name Huron Valley when it was
4   tendered to the company?
5       A  Yes.
6       Q  Okay. And you obviously at some point received
7   this document back from the company as a signed
8   collective bargaining agreement?
9       A  Yes.
10      Q  Did you look at Bates stamp 21 when you received
11  this document back and noticed that W & G, Inc., had
12  signed this document and not Huron Valley?
13      A  No, actually, I did not. Usually when these
14  agreements come back, they come back to the office here,
15  and then they're forwarded to the District Council. We
16  get a phone call that we got the signed agreement back,
17  and I don't usually see the thing after that.
18      Q  Had you had any discussions with someone who
19  represented themselves as an employee of W & G, Inc.,
20  prior to October of 2005?
21      A  No.
22      Q  Do you know who Mr. Stripp is?
23      A  I have no idea.
24      Q  Ever met Mr. Stripp?

157

1       A  Nope.
2       Q  Ever talked to anyone who said they were
3   employed by W & G, Inc.?
4       A  No.
5       Q  Is it your understanding -- did your office type
6   in W & G, Inc., as the signatory party on page 21?
7       A  No.
8       Q  What -- would that have been left blank for the
9   company to fill in or what -- how would you have
10  tendered it to them? In other words, how did W & G,
11  Inc., get typed in there?
12      MR. CHAPMAN: Objection, just --
13      MR. SCHWARTZ: Q  If you know.
14      MR. CHAPMAN: I would just try to make a better
15  record. To the extent that he absolutely knows what he
16  did versus what his practice might have been, just so --
17      MR. SCHWARTZ: Yeah, if he knows. Right, yes.
18      Q  If you know.
19      A  I mean can you rephrase that question?
20      Q  Yes. How --
21      A  Or if your question is: Did our office put W &
22  G, Inc., in there? No.
23      Q  So you don't know who did?
24      A  I'm assuming somebody from George Stripp's

Huron Valley Glass vs Local 27    March 20, 2008

41 (Pages 158 to 161)

158

1  office.
2  Q  Okay. But you never -- you don't know who
3  George Stripp is?
4  A  No idea.
5  MR. SCHWARTZ: All right. Well, we've already moved
6  for entry of 1, but I just want to make sure. We'll
7  move for entry of Exhibit 1.
8  Q  Is there any --
9  MR. SCHWARTZ: Any objection?
10  MR. CHAPMAN: No.
11  MR. SCHWARTZ: Q  Okay. Is there any distinction in
12  the substantive provisions of Exhibit 1 which is the
13  contract that Huron Valley Glass Company, LLC signed and
14  Exhibit 10 which was the standard Association agreement
15  in effect between 6/1/03 and 5/31/06?
16  A  No.
17  Q  And you had correspondences just to clarify
18  things, but there were no differences in the contract
19  provisions?
20  A  No. There was communications back and forth
21  between Mr. Klees and myself. I would forward stuff to
22  Mr. Toomey to take a look at. It was our stand from day
23  one that we weren't going to renegotiate the contract
24  for Huron Valley unless the contract was in place. I

159

1  was -- I wanted to ease some of his worries in
2  conversation, but we were not about to add or delete
3  anything from the Association's agreement.
4  Q  Okay. Could you turn to Exhibit 2, page 27.
5  Are you there?
6  A  Yes.
7  Q  Okay. Have you seen this document before?
8  A  Yes.
9  Q  What is this?
10  A  This is the Association agreement.
11  Q  For what period of time?
12  A  2006 to 2009, June 1st to May 31st, 2009.
13  Q  And this is the Collective Bargaining Agreement
14  currently in effect for signatory contractors?
15  A  Yes.
16  MR. SCHWARTZ: I'd move for entry of Exhibit
17  Number 2.
18  MR. CHAPMAN: Just objection to its relevance.
19  MR. SHAPIRO: I accept the paper.
20  MR. SCHWARTZ: I think I already moved for entry of
21  Exhibit 3. If I didn't, I'll do that now, which is the
22  correspondence back and forth between the parties.
23  MR. CHAPMAN: I think you did, but can I just look
24  at it real quick?

160

1  MR. SCHWARTZ: Sure.
2  MR. CHAPMAN: May I take a moment? I just want to
3  get something.
4  MR. SCHWARTZ: Sure.
5  MR. CHAPMAN: Okay. The only thing I was going to
6  say --
7  MR. SCHWARTZ: Yeah, I'm going to ask him. I'll ask
8  him that now.
9  MR. CHAPMAN: All right.
10  MR. SCHWARTZ: Q  If you compare Bates stamp 21 in
11  Exhibit 1 and Bates stamp 59 in Exhibit 3, there seemed
12  to be two different dates on which you signed these --
13  the contracts.
14  MR. CHAPMAN: Where are we at, Don?
15  MR. SCHWARTZ: Page 21, which is part of Exhibit 1,
16  the last page of Exhibit 1, and page 59 which is towards
17  the ends of Exhibit Number 3.
18  Q  It seems that on one document, Exhibit 1, you
19  signed it October 4, 2005, and on the second document
20  you signed September 2, 2005. Can you account for why
21  it appears that you signed this memorandum agreement or
22  the Collective Bargaining Agreement with W & G and Huron
23  Valley on two different dates?
24  A  No. Probably just the days that we get them

161

1  back here, I would imagine, from the Council. I mean he
2  obviously didn't -- he obviously didn't sign them at the
3  same time, either one. One of his is typed and the
4  other one is printed in there for his name.
5  Q  So there's several -- several of these documents
6  transmitted back and forth between the parties?
7  A  It appears to be, yeah. I'd have to look at
8  the --
9  Q  They would have both been the same document?
10  A  They're the same exact document, yeah.
11  Q  Now, the job that was going to take place and
12  kind of led to the consummation of these negotiations
13  was the Optima job?
14  A  Yes.
15  Q  And glaziers worked on that job?
16  A  Yes.
17  Q  How many -- what was the range of the number of
18  glaziers that worked on that job?
19  A  I think at peak, it was probably -- I think at
20  one time we might have reached 25 glaziers on that job.
21  Q  And there is still glaziers on the job?
22  A  Yes.
23  Q  And during some periods of time, did you as a
24  representative of the Union take people from other jobs

Huron Valley Glass vs Local 27    March 20, 2008

42 (Pages 162 to 165)

162

1  to man the Optima job?
2     A  I did everything possible to provide them with
3  the best manpower we could provide them with.
4     Q  What kind of things did you do?
5     A  When Tom DiDonato and I had first talked, he
6  explained to me what he wanted to do there.  He was
7  going to man the job with glaziers and ironworkers.  And
8  he said very emphatically that whichever trade performed
9  the best was going to be the one that got the most work,
10  and I passed that on to my members.  Every single guy
11  that I sent there if I took them off of the off list, if
12  he was at a job and I would call the job, a particular
13  company, and pull them out of there, I would myself give
14  them a speech of how important it was to go there and --
15  I looked forward to going there and outperforming the
16  ironworker.  I stressed that with them.  Everybody that
17  I sent there, I told them the same thing.  If they
18  couldn't cut it, I'd be the first guy to pull them out
19  of there.  I wasn't going to be embarrassed by the
20  ironworker.  I was going to prove a point that we could
21  outwork them.
22     Q  Do you have the authority to pull people from
23  another contractor to work for another contractor?
24     A  Yes.

163

1     Q  And do you do that?
2     A  Yes.
3     Q  So even if all ironworkers -- or excuse me, all
4  glaziers are employed and a company then calls you, if
5  you feel like this is a company you wanted really to
6  show something to, that you will take people from other
7  companies and give them good workers?
8     A  It is my responsibility to man jobs accordingly,
9  and if I know that I have a guy that's very proficient
10  in one aspect of the trade and he is at a different
11  company not performing that work, I'm better off taking
12  that gentleman and putting him over here and utilizing
13  this guy over there instead of having somebody on a
14  project that's not really familiar with that work.
15     Q  Did you have to take people from other jobs to
16  man the Optima job?
17     A  Periodically, I spoke with certain individuals.
18  If we'd see them at Union meetings, I would converse
19  with them and let them know that if -- if, for example,
20  if they knew that they might be getting laid off in a
21  couple of weeks anyways, I had an opportunity for them
22  to go to work somewhere looking for -- we knew what we
23  were looking for on that project, somebody familiar with
24  the unitized system.

164

1     Q  What is a unitized system?
2     A  It's basically a preglazed curtain wall.
3     Q  And what is a curtain wall?
4     A  A curtain wall is extruded metal that extends
5  past the floor line of a building, skins the outside of
6  a building.  Just like the name pretty much, a curtain
7  hanging on the outside of the building.
8     Q  And glaziers install the glass into this --
9  install this whole system and make it at the exterior of
10  the building?
11     A  On this particular job, Optima was a unitized
12  system, so it was preglazed.
13     Q  And was that similar to the job at 1401 State
14  Street?
15     A  I've never seen the job at 1401 State Street.
16  In conversations with Tom DiDonato, it was the same
17  exact system.
18     Q  And that work is covered under the Glaziers
19  contract?
20     A  Yes.
21     Q  It's something the glaziers do on a standard
22  basis?
23     A  Yes.
24     Q  Did you receive any complaints from

165

1  representatives of Huron Valley regarding the quality of
2  the glaziers' work on the job at Optima?
3     A  Nothing out of the ordinary.  There was a couple
4  of minor instances, but do you know what, when you
5  have -- when you've got 50 people on a job site for
6  three years working together with other trades and
7  performing construction work, you're going to have a
8  couple of instances, but nothing out of the norm.
9     Q  So the job was manned about 50/50 glaziers and
10  ironworkers?
11     A  I don't know what the total hours are.  Maybe
12  they could provide them.  I don't know what the total
13  hours are for a glazier versus an ironworker, but I'd
14  say that for the most part, it was held at 50/50, and I
15  think that maybe 60 percent of the job just because of
16  the fact that we were outperforming the ironworker.  A
17  lot of times, when they would start laying people off,
18  they would lay off an ironworker.  They were cutting
19  back on that ratio of 50/50 when we started to get a
20  larger percentage of the work because we were
21  outperforming them.
22     Q  You never filed a grievance because ironworkers
23  and glaziers weren't working together on the job?
24     A  No, I never did, but I went there many a times

**166**

1  in defense of Huron Valley when the ironworkers were
2  trying to bully them around about laying off too many
3  ironworkers as opposed to glaziers.
4     Q  And that job is still going on, and there are
5  still glaziers at the Optima job?
6     A  Yes.
7     Q  Now, did you learn of a job at 1401 South State
8  Street at some point in time?
9     A  Yes.
10    Q  And you learned that Huron Valley was going to
11  do the unitized system on that job as well?
12    A  Yes.
13    Q  And that's the matter in which we are here today
14  for to discuss?
15    A  Yes.
16    Q  What was the reason that the Union had a problem
17  with what happened on that job regarding the
18  installation of the unitized system?  In other words,
19  what gave rise to the grievance?
20    A  It's a violation of the current working
21  agreement because they subcontracted it to somebody that
22  is not signatory with Glaziers Local 27.
23    Q  And when did the Union first have specific
24  information from Huron Valley that the work was going to

**167**

1  be subcontracted and not self-performed?  And not a
2  rumor. I'm not talking a rumor.  I'm talking about when
3  did someone from the company say it's going to be
4  subcontracted?
5     A  Oh, from the company?
6     Q  Yes, from Huron Valley.
7     A  From the company itself would have probably been
8  that day in April that we sat down in this room and had
9  a meeting with me, Mike O'Donnell, Mike Cook, Dennis
10  Ahearn, and Kevin Anderson.
11    Q  What day was that?
12    A  I don't recall the date exactly, but it was in,
13  I believe, early spring, April 1st, first couple of
14  weeks of April.
15    Q  You had heard rumors that it was going to happen
16  before that?
17    A  Pretty substantial rumors, yes.
18    Q  Through Michael, Michael Cook?
19    A  Through Michael Cook, yes.
20    Q  Because he had heard it from J & D people?
21    A  Yes.
22    Q  I see.  You didn't have firsthand knowledge of
23  that?
24    A  No.  We communicate on a regular basis, and Mike

**168**

1  Cook called us up to tell us that he ran into J & D
2  Erectors at O'Hare Field, and they had told him that
3  they were subbing that job from Huron Valley Glass.
4     Q  What provision of the Collective Bargaining
5  Agreement is violated when a signatory company
6  subcontracts work -- the work to a nonsignatory company?
7     A  The subcontracting clause?
8     Q  Yes.
9     A  Do you want the article number?
10    Q  Yes.  I think if you would turn to Article 9,
11  that probably you might find it there.
12    A  There you go, Article 9, the subcontracting
13  clause.
14    Q  And that's the primary focus of the grievance
15  that was brought in this matter was the violation of the
16  subcontracting clause?
17    A  Yes.
18    Q  When is the first time the company communicated
19  with Huron Valley Glass, LLC and advised them if they
20  subcontracted the work to a nonsignatory company, that
21  they would be in violation of Article 9 of the contract?
22    A  At that meeting in April, that sit-down meeting
23  in here.
24    Q  Were there some earlier communications between

**169**

1  our office and the company I believe in March regarding
2  that matter?  If you'd turn to Exhibit 4, page 63.
3     A  I don't remember exactly the timeline of how all
4  of that, but I'm familiar with that letter, yes.
5     Q  And also, if you look at Exhibit 4, page 66,
6  there was a letter from the District Council to Huron
7  Valley advising them that they should appear before the
8  Board of Business Agents --
9     A  Yes.
10    Q  -- regarding this potential violation.  So
11  sometime in March, you must have had word that there was
12  subcontracting that was taking place probably through
13  innuendo or --
14    A  Like I said, Mike's running into J & D Erectors.
15  I don't recall.  It could have been January or February,
16  so --
17    Q  So you had pretty good information that --
18    A  Right.
19    Q  -- they weren't going to be self-performing?
20    A  Well, if they said they're doing it.
21    Q  Right.  And had they, being Huron Valley, had
22  they ever told the Union that they were going to
23  self-perform?
24    A  Prior to that?

Huron Valley Glass vs Local 27    March 20, 2008

44 (Pages 170 to 173)

---

170

1  Q  Yes.
2  A  No. In fact, the exact opposite.
3  Q  What did they say?
4  A  Well, in all of my conversations with Tom
5  DiDonato, and I don't know if it was the carrot in front
6  of the horse just to keep the guys working as hard as
7  they worked, but the promise since day one was that the
8  trade that performed the most was going to get the most
9  amount of work; and the way that the glaziers were
10  working on that Optima project, he was happy with the
11  work that they were doing, and because of that, his
12  conversations with me were that he was going to probably
13  utilize a crew from that Optima job and bring them
14  directly over to 1401 South State.
15  Q  And these were conversation prior to March of
16  '07?
17  A  Prior to me ever catching wind from anybody that
18  they intended to subcontract it out.
19  Q  Okay. And then, the Board of Business Agents is
20  kind of like the first step of the grievance procedure?
21  A  It is the first step, yes.
22  Q  And did Huron Valley ever appear at the Board?
23  A  No.
24  Q  And so the Board then directed the next step

---

171

1  which was the Joint Arbitration Board?
2  A  Yes.
3  Q  That being the Union directed that?
4  A  Yes.
5  Q  When you met in April with Mr. Ahearn and Tom
6  and the three of you guys, did the company at that time
7  ever offer you the opportunity to provide men on a
8  self -- so they could self-perform the 1401 State Street
9  job?
10  A  No.
11  Q  They said at that time -- what did they say
12  regarding whether they were going to self-perform or
13  subcontract?
14  A  They told us that they had made a business
15  decision, and they were subcontracting it out to J & D
16  Erectors.
17  Q  And that decision had already been made prior to
18  your meeting, this is what you were told?
19  A  Yes.
20  Q  So there was no discussion about them
21  reconsidering that and actually having you refer more
22  people to that job, to the 1401 job?
23  A  No.
24  Q  And there were a lot less people on the 1401

---

172

1  State Street job than there were at Optima?
2  A  Well, when we had conversations about the
3  manpower and -- with Dennis Ahearn and Kevin Anderson
4  about manpower and hours of labor in the job, it was
5  pretty obvious by that that it was going to be manned
6  with somewhere around a half dozen people.
7  Q  In contrast to the Optima job being manned by --
8  A  50.
9  Q  So it wasn't even anywhere near -- it wasn't
10  even in the same ballpark?
11  A  No.
12  Q  So you could easily man a job with six people or
13  half of six, three people, at any time?
14  A  With six people, yes.
15  Q  I mean half of six or the full amount?
16  A  Full amount, no problem. I didn't see a problem
17  with it at the time.
18  Q  Did you ever express to Mr. Ahearn and
19  Mr. Anderson or Mr. DiDonato that you could have
20  supplied the men if they self-performed?
21  A  I don't think that we ever had an opportunity or
22  was asked whether we could or couldn't. I think it
23  was -- I think since Kevin Anderson went to the company,
24  he had made up his mind that that's the route that they

---

173

1  were going to go, and I don't think that it was ever
2  going to be an option.
3  Q  Do you know when Mr. Anderson began working with
4  Huron Valley?
5  A  I don't remember it. I don't recall exactly. I
6  remember the conversation with Tom DiDonato when he
7  hired him, but I don't recall. I thought it was maybe
8  summer of 2006.
9  Q  Okay. Have you ever had a conversation with
10  someone from W & G, Inc., or W & G, LLC?
11  A  Nope.
12  Q  Do you know anything about that company?
13  A  Nope.
14  Q  Now, did you ever learn that your members were
15  getting paid by W & G, LLC?
16  A  At some point it came to light, and I questioned
17  Tom DiDonato, but it was a lot of confusion from our end
18  at that point because I knew that they had a company
19  called Chicago Ceiling and Partitions that was signed
20  with the Carpenters Union, and they were actually
21  performing work on that project.
22  Q  Which project?
23  A  The Optima job. Because when they were waiting
24  for the unitized system to come from China, periodically

---

174

1  there was a lull. They were on a slow boat from China,
2  and they couldn't get them there on time. And this
3  Chicago Ceiling and Partitions was utilized on that
4  project to actually enclose a good portion of that
5  building from the weather before the unitized frames got
6  there. And the first time that W & G came to light was
7  because we were checking to see if -- Huron Valley was
8  bringing in some core guys from the Glaziers Union in
9  Michigan and Cleveland. That's where Tom DiDonato was
10  from, was Cleveland. They were bringing guys in from
11  Michigan and Cleveland, and it's the responsibility to
12  pay administration dues to our District Council when
13  they're performing work in our area. I called our
14  office to pull report forms to make sure that they were
15  doing that, and our third party administrator returned
16  the phone call and said we have no contribution reports
17  from Huron Valley Glass, and now it was of great
18  concern. I mean if you've got -- you've got quite a bit
19  of money sitting there if you've got 25 people to have
20  benefits paid on them. So what we did was
21  cross-reference that. We pulled a name out that we knew
22  specifically. Let's just say Steve Lopez was working
23  for Huron Valley Glass, pulled his name up to see if
24  anyone is contributing on him, and low and behold,

175

1  that's the first time I saw the name W & G.
2     Q  And when was this?
3     A  I don't remember when we pulled those reports.
4  I would venture to say they were probably here for a
5  good year before -- before that -- I came to that
6  realization.
7     Q  So it was well after this -- all of these
8  meetings took place in February and March and April of
9  '07. Probably around that time? Around that time?
10     A  Yeah, it could be around that time. Yeah.
11     Q  I see. And the work, that was -- again, the
12  work that was being performed at 1401 was covered under
13  your Collective Bargaining Agreement, the work by the
14  J & D Erectors, the ironworkers?
15     A  Yes. From what I understand in talking to Tom
16  and Mike, it was the same exact system as Optima, and
17  that was one of the reasons that they stressed that they
18  wanted to utilize the same people from Optima because
19  they were familiar with it.
20     Q  I would like you to turn to page 382, Exhibit
21  12. Can you identify what this group exhibit is? It
22  goes from 382 to 502.
23     A  These are the records of what we keep here on a
24  day-to-day basis, what we call our off list. These are

176

1  members that are off of work and available to go to work
2  anywhere that day.
3     Q  And how do you get these names?
4     A  Either the employee, our member, or the
5  employer. If someone is working for a glass company and
6  that company is going to lay them off that day, they'll
7  call us up and say, I'm go to lay so-and-so off, put
8  their name on the off list. Sometimes they don't do
9  that. Usually the member themselves will call up and
10  ask to put their name on the off list as soon as they
11  find out that they're going to be laid off that day.
12     Q  So when J & D began doing work for the 1401
13  South State Street job in June and July of '07, there
14  were people on the off work list every day?
15     A  Yes.
16     Q  And they could have been referred to that job
17  every day?
18     A  Yes.
19     Q  And if there were people not on the list, if
20  there weren't people on the list, you could have taken
21  people from other jobs to man the job?
22     A  Just like I did with Optima, yes.
23     Q  So you would have always been able to man the
24  job with -- because there was going to be a maximum of

177

1  six people on the job if Huron Valley had determined to
2  self-perform the 1401 South State Street job?
3     A  Yes.
4     Q  And again, you were never -- that is the Union
5  was never afforded the opportunity to self -- to provide
6  those men?
7     A  No, we weren't.
8     Q  And your meeting was presented as a completed
9  decision that they were going to subcontract, that is
10  Huron Valley?
11     A  Yes.
12     Q  Do these documents in Exhibit 12 accurately
13  reflect the out of work lists from June of '07 through
14  November 30th of '07?
15     A  They're exact copies of the originals that we
16  have in the file here, yes.
17     Q  And who keeps these records?
18     A  Angela.
19     Q  And she is the bookkeeper here?
20     A  Office administrator.
21     Q  Office manager? Okay. If someone doesn't have
22  a car, does that prevent them from necessarily working?
23     A  No. That's usually just an indication to a
24  contractor that periodically somebody like Service

Huron Valley Glass vs Local 27    March 20, 2008

46 (Pages 178 to 181)

### 178

1  Glass, their business is a little bit different where
2  they service — they might have three or four different
3  stops to go to in a day, so if somebody doesn't have a
4  car, that's a problem.
5      Q  Well, let's say Mr. Wallendorf. It's indicated
6  here that he had no car, but if he is working downtown,
7  which essentially the State Street job is, he could have
8  found a ride there every day and he could have had a job
9  there for six months?
10     A  Downtown would be the perfect place for
11  Mr. Wallendorf to get to because he could take public
12  transportation there every day, yes.
13     Q  Do you know where he lives?
14     A  In Franklin Park, I believe.
15     Q  And that would be the same for Mr. Rakowski, he
16  could have been assigned to the downtown jobs?
17     A  Periodically. Periodically he's got no car.
18     Q  And when a job kind of started in late June and
19  early July, it seems like there were more people on the
20  out of work list than even later in the time period.
21     A  Typically, if a contractor was going to start a
22  job at that time of the year, I would never be concerned
23  about manpower. Actually, when Huron Valley started the
24  Optima project in October is generally when I would be a

### 179

1  little bit more concerned about it. And just based on
2  the fact that I was able to man that job at the most
3  intense time of work, I surely wasn't concerned about
4  manning a job in late May, early June when they first
5  said that job was going to start.
6      Q  And so if you manned them, those two could have
7  had a permanent job for six months essentially, and then
8  the company would — Huron Valley would have had a
9  steady workforce?
10     A  Yes.
11     Q  And what is it about the period in June and
12  May of — late May, June, and into July that's less busy
13  than October?
14     A  Generally speaking, concrete work and brick
15  works gets held up in the winter months, so a lot of the
16  concrete and brick work gets done in the summertime, and
17  everybody wants their building closed in for the harsher
18  weather in the fall and the winter, especially so the
19  finished trades can go in the time period; so our busiest
20  times is generally October, November, December.
21     Q  So when J & D started the job, it have would
22  been the easiest time for you to man the job?
23     A  I don't know about the easiest because —
24     Q  It would have been manageable?

### 180

1      A  Not a bad time at all, no.
2      MR. SCHWARTZ: I don't think I have any more
3  questions.
4      MR. TOOMEY: Yeah, you do.
5      MR. SCHWARTZ: Oh, okay. Yeah, all right.
6      MR. CHAPMAN: Do you want to go before me or — why
7  don't you go ahead.
8      MR. SCHWARTZ: Q  Were you asked to provide bidders
9  to Huron Valley for the 1401 State Street job or names
10  of contractors?
11     A  When we had our meeting in here with Dennis
12  Ahearn, Kevin Anderson, and me, Mike, and Mike, we
13  discussed a couple of different options here. If
14  they — we had told him that if they were — we let it
15  be known that J & D Erectors did not sign with us. If
16  J & D was that bent on doing the project and they were
17  that bent on utilizing them, J & D could sign an
18  agreement with us and then they're covered in the
19  Collective Bargaining Agreement of the subcontracting
20  clause. And then J & D, we even — the Association can
21  hold their ear — we even offered to signed J & D
22  Erectors to a one job agreement. We said we'd be
23  willing to do that so that then they can utilize it.
24  That's what they needed to do. We would work together

### 181

1  with them and J & D Erectors. They could subcontract
2  that job then to J & D Erectors if J & D signed with us.
3  I don't believe — if I remember correctly, Kevin
4  Anderson when he left here was going to discuss that
5  option with J & D Erectors and never got back with us.
6  As far as actually giving them, it may have came up in
7  conversation. I don't really recall whether they
8  requested us to give them contractors that they were
9  going to sub to, but this meeting was already in April.
10  According to them, that job was going to start in May.
11  Quite a few contractors if you're going to sub to them
12  wouldn't have had the leisure that J & D did to prepare
13  for this for the last six months in conversations with
14  Kevin Anderson. It's pretty difficult going into the
15  summer months to call a contractor and say, Hey, how
16  would you like to do a 20-story building starting in
17  three weeks. It didn't seem very feasible at the time.
18     Q  Does it seem any more feasible today?
19     A  For that scenario?
20     Q  Yes.
21     A  No. This is about the same time as that
22  conversation took place, and I think it would be very
23  difficult to go to somebody now and ask them to do a
24  20-story building starting next month.

Huron Valley Glass vs Local 27    March 20, 2008

182

1　　Q  When you did you learn that the subcontract
2　between Huron and J & D was dated February 21st, 2007?
3　　A  Probably three weeks ago, whenever you got that
4　information from their side.  I don't know if you
5　subpoenaed it or what.  This is the first time I knew of
6　it that it was signed previous to — probably previous
7　to our meeting.
8　　Q  A couple of months previous -- or six weeks
9　previous to your meeting?
10　　A  Well, probably pre -- you know, like you said,
11　six weeks previous to our meeting that it was already --
12　that we pretty much wasted our time in here that day.
13　　Q  Okay.
14　　　　(Discussion had off the record.)
15　　MR. SHAPIRO:  Are you done, Don?
16　　MR. SCHWARTZ:  No.  I think I have just one more
17　question.
18　　　　I'll find it.  Go ahead.  You can do it, and
19　I'll ask it on redirect.
20　　　　　　EXAMINATION
21　　　　　by Mr. Shapiro:
22　　MR. SHAPIRO:  Mr. Mabus, I have some questions.
23　　Q  When you were doing the job when Huron Valley
24　was with Optima, what was their practice as far as

183

1　securing men and women to work on the job?  Did they
2　call up and find out who was on the off list or did you
3　submit people -- how did you -- what was the process
4　with that?
5　　A  No, because they -- they were from out of town.
6　They wouldn't know anybody on that off list.  Tom
7　DiDonato and I had a direct relationship for that with
8　each other.  He would call me on my cell phone direct
9　and say, I could use another two guys starting next
10　Monday, for example.  Every single time that we manned
11　that job, it was a direct phone call from Tom DiDonato
12　to me.
13　　Q  Okay.  Now, after that job, when Huron Valley
14　got 1400 State, did that process continue on?  Did he
15　call you up and say, I have a job coming up in May, how
16　many men -- I need X amount of men, are they available?
17　　A  No.  There never was an opportunity for a
18　conversation like that.
19　　Q  So you're telling me what they did in the past
20　they did not follow through in the future?  In other
21　words, in the past when they needed men, they would call
22　you up and you would provide men for this job that they
23　were doing.  The job that they had on 1400 State, are
24　you implying that you never had the opportunity to

184

1　provide people because he never called you to ask for
2　people?
3　　A  I never had the opportunity because they
4　subcontracted it out.
5　　Q  But did they call up and say to you, I need four
6　men, or I need ten men, or I need twenty men to do this
7　job in May or June or July?  Did they ever call you up
8　and say, I need these people?
9　　A  No.
10　　Q  So they did not follow through with that
11　practice?
12　　A  No.
13　　Q  Okay.  Can you look at Section 3, item 52.
14　　A  Exhibit 3, page 52?
15　　Q  Exhibit 3, page 52.  I would like to read to you
16　Article 2, section 6.  This is a letter that was written
17　to you August 4th, 2005, by Vincent Klees who was the
18　president who had the job prior to Mr. Ahearn having it,
19　and I would assume that what one person says as
20　president follows through to the next person who is
21　president.  But this Article 2, section 6, which
22　Mr. Klees refers to is:  It is our intention to employ a
23　consistent crew of thirty to forty men once our
24　operation reaches critical mass in the Chicago area.

185

1　This being the case, we do not wish to rely on a
2　referral process.  So since Optima had 30 or 40 people
3　on the job, did you take it to be that with this item
4　that he brings out, that he really was going to use the
5　people on Optima for all future jobs?  I mean that's
6　what he says.  Did you take it to be that that's what he
7　said?
8　　A  In my conversations with Vincent Klees, it was
9　their intention to come into Chicago big time.  He let
10　us know that it was not -- Optima was only the start,
11　and he wanted to build a core crew of guys.
12　　Q  Did you believe that he built that core crew
13　with Optima?
14　　A  That was our intent.
15　　Q  I mean you had 25 people on the job, 20 people,
16　15 people?
17　　A  Including three apprentices.
18　　Q  Right.  Okay.  So that you would take as a core
19　crew?
20　　A  Right.
21　　Q  Okay.
22　　A  I mean all I would say, that not all 25 guys
23　would be considered --
24　　Q  Right.

186

A You know, the job at its peak had that --
Q But as he needed people --
A -- but realistically, I would say that you could figure on 15 to 20 of them guys being key people, and then, as that job was going to wind down, instead of laying them off, you've already, you know, made them pretty comfortable at the company, you're just going to move them to the next job.
Q But they didn't tell you -- no one from Huron Valley told you that we were going to ask for people like they did before? No one said, We're going to call you up -- they just stopped communicating with you is basically what happened as far as for more people? In other words, once you got them the people on the job, when the job was almost done or in the process of being done and they got additional work, they never contacted you to say, We're going to take these people; We're going to get more people. You didn't know what they were going to do?
A No, I didn't. At some point, I just saw them laying people off, and then occasionally, like Dennis said, once the ironworkers screwed up a bunch of stuff at 1401, then they brought -- then they hired glaziers to come in there to fix their mess; but, no. And

187

because Tom DiDonato left town, too. Tom left to go, like he said, I believe to Columbus. They had a couple of big -- I think a museum job or something in Ohio that they were going to send Tom to; so my communication then was with Steve Lopez who was our member that's been pretty much running that job since Tom DiDonato left. Not too many calls anymore for people to man anything.
MR. SHAPIRO: Okay. I have no further questions. Would you care to talk to the witness?
MR. CHAPMAN: Sure. That would be great.

CROSS EXAMINATION
by Mr. Chapman:

MR. CHAPMAN: Q Mike, as far as we have been calling them the three Mikes -- you, Mike O'Donnell, and Mike Cook -- who of the three of you is the most senior as a union official?
A Me.
Q You. All right. And that's you're saying from the late '80s, early '90s that you had actually --
A Early '90s.
Q And had you been familiar -- in preparing for this case, had came to be familiar with the nature of the lawsuits that had gone on between the Ironworkers and the Glaziers? Were you familiar with those?

188

A You've got to be more specific.
Q That is, there was -- that's fine. There was a time when I believe the Ironworkers sued the Glaziers to enforce what had been an agreement between the two of them as far as jurisdiction went.
MR. SCHWARTZ: I'll object based on relevance of that question. What does that have to do with what -- that the scope of work isn't an issue there. That everybody has admitted that the work is under both contracts.
MR. SHAPIRO: I'll let counselor continue.
MR. CHAPMAN: Q Do you remember the question?
A I don't recall really the Ironworkers suing us. I mean they -- it is possible they could have. We've sued them. They've sued us.
Q All right. Well, is it fair to say that over time, there has kind of become an agreement between the Ironworkers and the Glaziers that if there is a dual signatory, that if there is a split crew, a composite which is split, that the unions will find that arrangement to be satisfactory?
A Generally speaking, you're talking about grandfathered in contractors?
Q No. I'm -- well, let's talk about Huron Valley

189

for -- I mean because you -- Mr. Schwartz asked you a bit about your initial dealings with Mr. Klees back in August of '05. There was issues that I think he asked you about in terms of letters back and forth and the fact that Mr. Klees had actually mentioned it's our intention to sign up with both the Ironworkers and the Glaziers. Do you remember that?
A Yes.
Q All right. That's a dual signatory; is that correct?
A Yes.
Q And do you as -- is Huron Valley the only dual signatory in this District?
A No.
Q About how many dual signatories are there that you're aware of?
A A dozen.
Q Okay. And how do they compare in terms of the volume of work that they generate versus Huron Valley? Are they the same size kinds of companies, smaller, bigger?
A I would say the ones that are dual signatories are similar in size to Huron Valley. I don't know. I mean actually, I don't know because Huron Valley did --

Huron Valley Glass vs Local 27    March 20, 2008

49 (Pages 190 to 193)

190

1  they did one job in Chicago. Well, not counting — I
2  mean granted it's a, you know, a two-and-a-half year
3  job, but I don't think they compare in size to somebody
4  like Traynor Glass or Arcadia or MTH that —
5     Q  All right. So you mentioned three entities
6  right there. Traynor, Arcadia, MTH are three dual
7  signatory employers?
8        Do you remember — is that yes?
9     A  Yes.
10    Q  I'm sorry. Just so that our reporter can —
11    A  Yes.
12    Q  Are there any others that come to your head as
13 far as dual signatories?
14    A  Chicago Heights.
15    Q  Okay. Any others?
16    A  Did I say Arcadia?
17    Q  Yes.
18    MR. SHAPIRO: Alliance?
19    A  Alliance. I mean if you need me to provide you
20 with that, I can. You're asking me off the top of my
21 head.
22    MR. CHAPMAN: Q  No. I get a sense that —
23    A  Harmon.
24    Q  — you've got a pretty good memory from them,

191

1  so —
2     A  I don't remember who else.
3     Q  Do you —
4     MR. SHAPIRO: Service would be one.
5     THE WITNESS: Service is Harmon, owned by Harmon.
6     MR. CHAPMAN: Q  Okay. Of that group, do you know
7  whether or not the Glaziers has ever — have ever
8  initiated a grievance proceeding of the type that the
9  Glaziers have initiated against Huron Valley?
10    A  If they violated the subcontracting clause? If
11 they were to violate the subcontracting clause, we
12 would.
13    Q  Or just because they didn't keep an even
14 percentage of —
15    A  Nobody ever said anything about an even
16 percentage. We're talking about violating the
17 subcontracting clause.
18    Q  All right.
19    A  When the Optima job went on for two-and-a-half
20 years, I never once as a representative of this Union
21 went to that job and said anything about the ratio of
22 glaziers to ironworkers, unlike the ironworkers, who in
23 my displeasure I voiced with Tom DiDonato, who said to
24 me that whoever outperformed the other was going to get

192

1  to work; and then, when he would layoff — when his
2  intent was to lay off five ironworkers and no glaziers,
3  then the ironworker business representative would go out
4  there and put the hammer on them, and Tom would actually
5  call me up to help him get out of that jam. I've never
6  once — I told my guys flat out if they outwork you,
7  you're going home. I'm not going to go to bat for you.
8  So it's a different situation of a ratio as opposed to
9  violating the subcontracting clause.
10    Q  Okay. But I'm not asking you about that. Let's
11 just — let me be clear because I understand where it
12 may be confusing. If a contractor that is a dual
13 signatory in this town under your jurisdiction maintains
14 a composite crew or a crew composed basically equivalent
15 of glaziers and ironworkers, is that a situation that
16 the Glaziers Union finds satisfactory; that is, it is
17 not treated as a violation of any collective-bargaining
18 agreement?
19    A  Yes.
20    Q  It's okay; is that right?
21    A  I mean we police — we try and police the hours,
22 but —
23    Q  Well, assuming it's true. Assume that that's
24 the way it happens.

193

1     A  Right, right. Yes.
2     Q  All right. And that's why I was asking you a
3  little earlier, that it seems like that's kind of a, you
4  know, a Cold War resolution of a deep problem; is that
5  right? I mean I guess what I'm trying to say — and I
6  won't talk over you — is I'm just trying to understand
7  that this is the way a difficult situation has been
8  resolved among competing trades in Chicago; is that a
9  fair statement?
10    A  With contractors that have a history here of
11 being signed with both, yes.
12    Q  Okay.
13    A  But any violation like Huron Valley did of the
14 subcontracting clause, we would treat them all the same,
15 and because another one just came to my mind,
16 Christopher Glass.
17    Q  That did what?
18    A  And they're not as big a company as these
19 others, but they're a dual signatory and they're
20 somebody that we sued for subcontracting, for violating
21 the subcontracting clause. When the glaziers and
22 ironworkers are working together every single day and we
23 feel like we're getting our fair share of the work, we
24 didn't have a problem with it; but when they

Huron Valley Glass vs Local 27    March 20, 2008

50 (Pages 194 to 197)

194

1  subcontracted a job out to an ironworker contractor and
2  gave 100 percent of the work to the ironworkers, then we
3  sued them for violating the subcontracting clause.
4   Q  I understand. But if that -- forgetting a
5  subcontract for a second. If there is a crew on
6  basically a job that goes on and there is half and half
7  glaziers and ironworkers, that's the -- basically is
8  what each union is entitled to get or could it
9  reasonably expect to get in this joint signatory world;
10 is that correct?
11  A  I would say that usually, usually that would be
12 the case. In Huron Valley's I would argue that because
13 I had a conversation since day one with Vincent Klees
14 and Tom DiDonato that the trade that outperformed the
15 other trade was going to get the larger percentage of
16 the work.
17  Q  Right. Now, let's look, if we could, at -- and
18 I'll just make a reference, if I could, to the Glaziers
19 Union exhibit book, and could I ask you to take a
20 look -- you've got your book there. It's under
21 Exhibit 3, and it's page 0053, I believe.
22  A  Gotcha.
23  Q  Now, this -- you testified a little earlier
24 about this as a letter -- about one of the letters that

195

1  you and Mr. Klees exchanged in August of '05; is that
2  right?
3   A  Yes.
4   Q  All right. Now, that first paragraph there,
5  under 2. Assignments, if I could just briefly read one
6  part to you: You have stated your intent to employ
7  Glaziers and Ornamental Ironworkers. In the past, other
8  employers have utilized composite crew arrangements as a
9  solution to potential jurisdictional disputes to perform
10 all work under both agreements. Glaziers 27 would abide
11 by such a work assignment provided the crew is composed
12 of a minimum of 50 percent glaziers.
13  A  Yes.
14  Q  That's true, that's a true statement in your
15 letter, right?
16  A  That was a -- that was -- I don't recall if that
17 was in response to him being concerned about something,
18 but we wrote that.
19  Q  Okay. So when you wrote it, it was true?
20  A  Yes.
21  Q  Okay. Now, so that --
22  A  He wouldn't agree to that though, I can tell you
23 that right now.
24  Q  He wouldn't agree to that in what regard?

196

1   A  He would not agree to the minimum of 50 percent
2  glaziers because he reiterated his stand that whoever
3  performed the best was going to get the majority of the
4  work, and if the ironworkers outperformed us, they were
5  going to get more than 50 percent of the work, and if we
6  outperformed them, we were going to get more than 50
7  percent of the work; so he was not going to agree to
8  lock himself into a minimum of 50 percent of the work
9  with the glaziers.
10  Q  And that arrangement was okay with you?
11  A  That was okay with me.
12  Q  So that even though this entity would be a
13 signatory to two contracts, it was okay with you that
14 whoever did the best would get the work even though
15 they've signed a contract with both?
16  A  Yes. It was kind of a gentlemen's agreement
17 between me and Tom. It was a chance to prove -- even
18 though we have a contract, it was an opportunity for us
19 to prove that we were cheaper and better than the
20 ironworker and an opportunity to prove that the -- what
21 was going to be at the end of the rainbow was going to
22 be more work from Huron Valley Glass.
23  Q  At what point, in your mind, did that
24 arrangement end?

197

1   A  In my mind, it ended the minute they
2  subcontracted 1401 South State to an ironworker
3  contractor.
4   Q  What if though -- what if they decided in their
5  own mind that they on that particular job wanted to
6  use -- and I'm not saying they did, but hypothetically,
7  what if -- and I'm sorry to stand over you. It's just
8  my back is killing me. What if they decided for
9  whatever reason hypothetically that they liked using a
10 contractor that had ironworkers, and not that the
11 glaziers did anything wrong, but that they preferred the
12 ironworkers. Why, based on your letter and based on
13 your understanding, would that have been wrong?
14  A  I'm not sure that I understand your question.
15 If they decided to do what?
16  Q  If they decided that in that particular job --
17 let me step back. As I understood it, you said that it
18 was okay with you on behalf of the Glaziers Union that
19 you would be willing to, in essence, set your people up
20 against the ironworkers and let the best trade win, so
21 to speak, and that while that was going on, that, in
22 essence, you would not believe that there would be a
23 violation by someone like that who was a joint signatory
24 because, in essence, you were trying to develop a

198

1  relationship with Huron Valley. Am I missing -- if I'm
2  misstating, please tell me.
3     A  No.
4     Q  All right. So if I'm asking you it is okay in
5  accordance with the deal that you had kind of struck
6  they decided, okay, you know, on this particular job, we
7  want to subcontract to this entity who they found out
8  later was an ironworker's only entity, why was that
9  wrong?
10    A  Well, first of all, one is a hypothetical and
11 the other one is real. And I mean we can sit here and
12 have hypothetical situations all we want. But there is
13 no hypothetical. The real story is we outperformed the
14 ironworker and they subcontracted the job out to
15 somebody that's not signatory with us.
16    Q  All right. But wasn't it ultimately the end of
17 the deal that you had struck that it was up to them to
18 decide who performed better?
19    A  Of their own employees, but never -- never
20 anywhere that I agree that if they're -- if we're
21 outperformed by the ironworker that you can violate the
22 subcontracting clause. I don't remember ever agreeing
23 to that.
24    Q  Okay. I'm just trying to understand what the

199

1  real agreement was.
2     MR. SCHWARTZ: Oh, I think -- I'm going to object as
3  asked and answered. You have been asking him the same
4  question for 20 minutes, and he's giving you the same
5  answer.
6     MR. CHAPMAN: I don't think I've made 20 minutes.
7     MR. SCHWARTZ: All right. 15 minutes. The contract
8  is the contract, and he told you that there is a
9  difference between when a contractor is employing
10 someone versus when they subcontract. You've asked him
11 the same question twenty sometimes.
12    MR. SHAPIRO: Don, let him continue.
13    MR. CHAPMAN: Q Let me also ask you to take a look,
14 if you would, at a letter that, again, if I can focus on
15 Glaziers Union Exhibit 3, page 62, 0062. I think Don
16 asked you a little bit about it, but do you remember
17 writing this -- the original of this letter to
18 Mr. Klees?
19    A  Yes.
20    Q  Okay. If I can just ask you about a couple of
21 statements made in there: In the past, we have made
22 every effort to man the Optima project in Skokie with
23 the very best journeymen available. Let me ask you
24 that. In your mind, what is -- what makes someone or

200

1  qualifies them to be called the best journeymen? What
2  are the qualifications that you would look at to say
3  this was one of my best journeymen?
4     A  Do you know what? The wording on that might not
5  be exact. Maybe the better thing that I could have said
6  was best geared towards the work that you're performing
7  on that project.
8     Q  All right. Well, let's -- what does that mean?
9     A  Our trades are multifaceted. On the Optima job,
10 we have ten glaziers doing mirrors and shower doors.
11 That's their specialty. I couldn't take all of the
12 glaziers that -- who are erecting that unitized system
13 and put them on mirrors and shower doors and be able to
14 have them perform at speed for that contractor and vice
15 versa.
16    Q  Why is that?
17    A  Because even though they're journeymen, they
18 have something that they do all day every day. You're
19 going to be better at that.
20    Q  So better -- those that do -- just so I can
21 understand, those that do mirrors and shower doors, as
22 an example, would be better working on mirrors and
23 shower doors as opposed to working on a unitized
24 installation; is that right?

201

1     A  Right. If a guy got laid off at a mirror and
2  shower door company and that's what he has been doing
3  for ten years and he put his name on the off list, I
4  wouldn't take that guy and give him to Huron Valley
5  Glass to do a unitized curtain wall job. He wouldn't be
6  suited for that job. It's no different than any other
7  trade. There's multifacets to every trade.
8     Q  Is there any -- other than -- is there any other
9  kind of qualifica -- or specialization, if you would?
10 Mirrors or shower doors being one. Unitized doors being
11 another. Any other particular areas that you would
12 divide your membership into?
13    A  Well, I mean we've got guys that have
14 certifications for welding. I believe there was welding
15 done on that project. We have guys that are, you
16 know -- well, all of our -- all of our apprentices don't
17 graduate until they get their welding certification, but
18 that hasn't always been the case with the journeymen.
19 We're probably 60, 70 percent certified with them, and
20 if there is something that would require that on a job,
21 we would make sure that we manned that job accordingly.
22    Q  So is it fair to say that in the context of
23 Huron Valley, that you would not refer anyone to them
24 that didn't have substantial unitized door experience or

Huron Valley Glass vs Local 27     March 20, 2008

52 (Pages 202 to 205)

202

1  window experience?
2      A  Do you know what?  There was a lot of bull work
3  on that job.
4      Q  And that means --
5      A  A lot of bull work.  Very labor intensive.  They
6  were heavy unitized systems that -- of whose fault, I
7  have no idea, but there was walls up in the interior of
8  that building and drywall was up, columns were wrapped
9  before the windows were in, and we had arguments with
10  Tom DiDonato that -- about the weight of that glass in
11  the frame.  I don't recall off the top of my head what
12  they were, but if they were setting them with two guys,
13  they were breaking their backs doing it, and many times
14  we requested to do it with three guys.  It was a fight
15  with Tom.  He wanted to stick to two guys doing it.  So
16  I take that in consideration, too.  Depending on what
17  crew that were in there, you had to have somebody that
18  were kind of bulls.  You couldn't send a 5 foot 3, 120
19  pound guy there to haul the things around.  He couldn't
20  do it.  He physically couldn't do it.
21      Q  Were you familiar with the kind of work that --
22  did you become familiar with the kind of work that
23  ultimately was being done at the 1401 project?
24      A  Yes.  From what I understand he saw in

203

1  conversations with Mike Cook, it was very similar.
2      Q  As you sit here today, if, hypothetically, Huron
3  Valley would have come to you -- let's follow up with
4  what Mr. Shapiro was asking -- come to you in January
5  and said, Hey, we're going to have this job that will
6  start in May, do you have an idea of what particular
7  journeymen you would have had go to work on that job had
8  you been given the opportunity?
9      A  I might not be understanding your question.  Are
10  you talking about having the relationship that we have
11  with him right now or starting fresh where he doesn't
12  know any of my guys and I've never worked with him?
13      Q  I'm just -- and kind of what Mr. Shapiro asked
14  you is there was a certain level of -- kind of way of
15  doing business where they were asking for guys, this was
16  Tom DiDonato, so I'm going one step further.  Let's
17  assume that in January or February, Tom DiDonato or
18  someone else called you up and said, Okay, we've got
19  this job we're going to start over at 1401 South State,
20  it's going to be six guys or eight guys, whatever it
21  was.  Do you know who you would have referred to him to
22  go to -- I'm sorry? -- referred to that job?
23      A  Specific names?
24      Q  Yes.

204

1      A  No.
2      Q  Do you know anybody who was injured, any
3  particular member of Local 27 who was injured, as a
4  result of Huron Valley not contacting you or Mr. Cook or
5  Mr. O'Donnell in advance?  Who got hurt?
6      MR. TOOMEY:  What do you mean by injured?  Could you
7  clarify.  You don't mean on -- injured on the job.
8      MR. CHAPMAN:  Not physical injury.
9      Q  Who was deprived of earnings that would have
10  otherwise received it but for the failure of Huron
11  Valley to make that request for referral?  Any
12  particular employee?
13      A  Anybody specific?
14      Q  Yes, please.
15      A  I would say anybody that was on that off list at
16  any time during that period.
17      Q  Okay.  And that --
18      A  Whether they went to work that day or not
19  because they were potentially somebody that would have
20  went or could have went to Huron Valley on that project.
21      Q  All right.  And what -- and that -- if they
22  would have gone to Huron Valley and given up another
23  job, they would only have been able to get paid once,
24  right?

205

1      A  They wouldn't have given up another job.  If
2  you're asking me could I comprise a list of six people,
3  not six people all of the time, but on a day-to-day
4  basis six people that missed work that day, I could do
5  that for you.  Do you want six people for four months?
6  I'll do that for you.  It won't all be the same people,
7  but they'll be a total of six people off of work every
8  day for the duration of that project.  I could do that
9  for you.
10      Q  I'm saying are they six of the best journeymen
11  available like your letter says?
12      MR. SCHWARTZ:  Well, I'll object.  First of all,
13  there is no requirement in the contract that --
14      MR. CHAPMAN:  I know that.  I'm just reading his
15  letter.
16      MR. SCHWARTZ:  Well, let me finish my objection.
17      MR. CHAPMAN:  Go ahead.
18      MR. SCHWARTZ:  Yes.  I'd like to object to say that
19  you're trying to read something into the contract that's
20  not there.  All it says is they get a journeyman.  A
21  journeyman is a journeyman.  He has no obligation to do
22  that for the best journeyman.
23      MR. CHAPMAN:  No, I appreciate that.
24      A  Yes.

206

1    Q  Yes, you would have been able to staff with the
2    best journeymen available?
3    A  Yes.
4    Q  Which ones?
5    A  Well, like I said, you're talking about a
6    hypothetical situation.  If you would like for me to
7    comprise a list of the six every day on a day-to-day
8    basis for four months or the duration of that job, the
9    six — what term did I use?
10    MR. SCHWARTZ:  Best available.
11    A  — best available, yes.
12    MR. CHAPMAN:  Q  Okay.  So I am asking — I'm not
13    asking you to do something that you aren't going to do.
14    I'm just asking which people, which Union members, have
15    been injured as a result of the claim that Huron Valley
16    breached the agreement?
17    A  I can't give you specific names like right now,
18    but if you would like for me to comprise a list, I will
19    do that for you.
20    Q  I'm just here now, unfortunately.  That's why
21    I'm asking.
22    Okay.  Now, I'm going back, if I could, to
23    Exhibit 62 on — I'm sorry, Exhibit 3, page 62.  This
24    was the letter that you had wrote to Mr. Klees again,

207

1    and it says, if I could just go ahead, it's the next
2    sentence:  I have, to a certain extent, hand picked not
3    only the most qualified journeymen, but the apprentices
4    as well, and in most incidences giving HVG first
5    consideration over contractors that had been established
6    with our Local for many years.  What does that mean?
7    A  That means I bent over backwards for Huron
8    Valley Glass —
9    Q  And —
10    A  — to satisfy their manpower needs.
11    Q  All right.  So what does it mean to have hand
12    picked people like that?
13    A  As opposed to telling Tom, Do you know what,
14    Tom, call up the office, have them send you a copy of
15    the off list, and pick a couple of guys off it, not
16    knowing who they were or what they were capable of
17    doing.
18    Q  Okay.  So when you say you would give HVG first
19    consideration over contractors that have been
20    established with our Local, what does that mean?  Like
21    so, for example, if Mr. Shapiro was seeking people —
22    his company seems like one who had been established for
23    quite a while here, and the other gentleman here as
24    well — what would you have done better for Huron Valley

208

1    than you would have done for them?
2    MR. SHAPIRO:  Could I respond?
3    MR. CHAPMAN:  Why don't we just finish it up.
4    MR. SCHWARTZ:  You probably shouldn't.
5    MR. SHAPIRO:  It is the practice when we need people
6    to call up a month, two months, three months to say we
7    are doing a large job, we need people, and Mike
8    consistently over many years when he has the opportunity
9    to have notice will put together people that suit that
10    job.  They have done it for me.  They have done it for
11    everybody.  This is something that they do.  So if you
12    need people and you say you are putting up a curtain
13    wall or you're welding or you're — whatever you're
14    doing, you'll say, I need six people or eight people,
15    it's going to go four months or five months from now.
16    Is the job going to start always exactly at that date?
17    It may, it may not.  But I have a crew to do the jobs I
18    want to do when I don't have people today to do it
19    because I don't need them today.  This is the way we do
20    things.  You call up and you say, I need people, and
21    they get people.  I have also had them take people from
22    me when they need somebody.  They have called up and
23    said, Al, we need people for three or four days, we have
24    a contract, or we need to do something, and they have

209

1    taken the people.  I mean — and I'm sure it's happened
2    to people in this room.
3    A  There was an incident where Alumital was slow,
4    one of our glazing contractors, and I had talked to
5    Pasqual.  Huron Valley needed guys at the Optima job,
6    and I had talked to Pasqual.  Tom DiDonato had called
7    me, and I called him back and said, I've got a
8    contractor who is going to be a little slow for a while.
9    And I took the steady guys, I believe four of them, from
10    Alumital and told Tom he — he was in a period on that
11    job where he needed to get a lot of work done for — in
12    a short amount of time, maybe three weeks, and I took
13    those four guys and gave them to Tom, and I said to Tom,
14    Utilize these guys; When that contractor needs them back
15    in three weeks or four weeks, I'll call you back and let
16    you know and then you give them back to me.
17    On other occasions, I would make specific phone
18    calls to the office here and say, If anybody calls, a
19    contractor or a member, to put somebody on the off list,
20    before you put them on that off list, call me up and let
21    me know who they are and I will call Tom and tell him I
22    have somebody for him at the expense of maybe Arnie or
23    Tom Hill or Al Shapiro.
24    MR. CHAPMAN:  Q  Okay.  Now, you had mentioned Tom

Huron Valley Glass vs Local 27     March 20, 2008

54 (Pages 210 to 213)

210

1  DiDonato. He is a glazier, too?
2     A  He is a glazier out of Cleveland, Ohio.
3     Q  Okay.
4     A  Right?  I think so.
5     Q  You had mentioned earlier that when you had
6  looked at the contribution list and found there was no
7  contributions being made by Huron Valley but you
8  ultimately saw that it was by W & G --
9     A  Yes.
10     Q  -- is there any reason to believe that the
11  appropriate amount of contributions wasn't being made by
12  somebody, either Huron Valley or W & G?
13     A  I don't believe we audited them yet, so I can't
14  respond to that.
15     Q  Do you have any reason to believe that you're
16  not getting -- that the Union isn't getting what it's
17  supposed to?
18     A  I don't have reason to believe based on the fact
19  that our guys get -- they get statements from the TPA,
20  and if they noticed it, they should call me and inform
21  me.
22     Q  Okay.  Let me -- if I can show you a slightly
23  different exhibit than what Don showed you, and the only
24  difference in it, if I could, is it's on -- it's --

211

1     MR. SHAPIRO:  It's your book?
2     MR. CHAPMAN:  Yeah, the black book.
3     Q  Huron Valley Exhibit 17; it's an off list, but
4  the only -- if you can just take a quick look.  It's
5  Exhibit 17, a bit thicker than the Union Exhibit 12.
6  And I just want to ask you a few questions about it.
7  And when I say it's thicker, I think Don and I could
8  probably stipulate that the difference between the two
9  items is one begins in February --
10     A  And the other one is in June or something.
11     Q  Yeah.  The Union exhibit begins in June.  The
12  Huron Valley exhibit begins in February.  And the Huron
13  Valley exhibit goes until February 28th, 2008, while the
14  Union exhibit only goes to November 30th, '07.  And I
15  know there are a bunch of pages in the Huron Valley
16  Exhibit 17, but if you can -- this was something that
17  Don had represented it constituted the entirety of the
18  off list data during the period that's here.  Does this
19  look like he's correct in that, or do you have any
20  reason to doubt that it's not true?
21     A  No, I have no reason to doubt that it's not
22  true.
23     MR. CHAPMAN:  All right.  I would move for the
24  admission of that exhibit.

212

1     MR. SCHWARTZ:  That's fine.
2     MR. SHAPIRO:  I accept.
3     MR. CHAPMAN:  Q  Okay.  Just a couple of quick
4  questions on it.  When someone -- let's pick a date.
5  For example, February 20th, of '07.  And the reason --
6     A  You're in your book?
7     Q  Yes, please.  It's February 20th, '07.  Do you
8  know what?
9     A  They're not in order.
10     Q  I apologize.
11     A  What's the number on the bottom?
12     Q  There is not one on this because we got this a
13  little later.  But what I'm trying to understand,
14  picking out like February 21st, there is a series of
15  people on it, and it's about the sixth or eighth page
16  in.
17     A  Right there.
18     Q  Okay.  Great.  Thanks.  There is -- so I
19  understand, there is circles around some.  There is
20  writing on others.  Could you just explain what that
21  means when there is circles and writing.  I'm sure it
22  seems very obvious to you, but just so I understand.
23     A  Right.  The list would start off every day with
24  just the name or whatever is actually typed in.  If a

213

1  contractor calls and asks for a person, if -- let's just
2  say Bev Williams -- Architecture Sealants called
3  sometime during that day and hired Bev Williams for the
4  following day, I have no way of knowing whether it's one
5  day and she'll be back on the list, you know, in two
6  days.  I mean maybe if you go through it, you could
7  figure it out, but at that point, you usually don't know
8  how long, how long that it's for.
9     Q  So if there is a name of an entity next to a
10  person's name, that's something where somebody actually
11  got sent out to a particular job?
12     A  Right.
13     Q  And then, if somebody -- if there is no circle
14  or writing --
15     A  They were off.
16     Q  They stayed off that day?
17     A  Right.
18     Q  And they might appear the next day or the next
19  day?
20     A  Right.
21     Q  Okay.  Let me show you one other exhibit, if I
22  could.  In the black binder behind Exhibit 21, there is
23  a longer Excel spreadsheet, and I'm not going to ask for
24  it to be admitted at this moment, but I would like -- do

Huron Valley Glass vs Local 27    March 20, 2008

55 (Pages 214 to 217)

214

1  you see it? This one right here. Sorry. Now, if you
2  can take my word for something just for a second. That
3  is a list of every person that was on the off list one
4  way or another during the period of May '07 through
5  February 10th, '08. And I'm just asking you to briefly
6  take a look at the names of people on this list. Do you
7  know these individuals and their qualifications? And I
8  know there is a lot of them there.
9      A  I'm familiar with quite a few of them.
10     Q  So those names, do they look familiar to you?
11     A  Yes.
12     Q  All right. Let me just ask you a question about
13  a few of them to see if you know. I think that Don had
14  mentioned the name of someone named Wallendorf. And
15  this — again, asking you to take my word for it for a
16  second, Mr. Wallendorf or Ms. Wallendorf — is it Mr. or
17  Ms., do you know?
18     A  Mr.
19     Q  Mr. Wallendorf, the numbers next to his name
20  reflect the number of hours off, eight hours a day, so
21  basically, how many days off — or hours off during a
22  particular week that he wasn't — and he did not work
23  very much during the course of this period. Do you know
24  what his skill set was?

215

1      A  He's a journeyman, that's all I know.
2      Q  Did you ever refer him to a job?
3      A  Have I?
4      Q  Yeah. I'm just saying that during this period,
5  he didn't work.
6      A  He has been referred to work by us, yes.
7      Q  Is there any reason why during this entire
8  period he did not work very much at all? I mean — and
9  you take whatever I characterize, I mean just looking at
10  these numbers.
11     A  I don't know other than it's possibly because of
12  transportation, again, which wouldn't be an issue with
13  1401.
14     Q  So this is somebody you would have referred
15  to — this is a person you would have referred to Huron
16  Valley?
17     A  Possibly.
18     Q  All right. Would you have referred —
19     A  Not at Optima I wouldn't have.
20     Q  All right. And why is that?
21     A  He wouldn't have been able to get there.
22     Q  And was he someone who was involved in
23  unitized — has a specialty in unitized?
24     A  He's familiar with it.

216

1      Q  But would he be considered someone who was a
2  person that you would recommend to a contractor because
3  he was particularly good at unitized work?
4      A  No.
5      Q  Okay. Let me ask you about an individual whose
6  last name is Rakowski. Do you know that person?
7      A  Yes.
8      Q  Is that a Mr. or Ms.?
9      A  That's a Mr.
10     Q  Now, Mr. Rakowski had a substantial period
11  during May through — let's say, May through parts of
12  July and some afterward where he was not working and he
13  was on the off list. Do you know why that is?
14     A  No, I don't.
15     Q  Was he someone who you would view or judge as
16  being skilled in unitized work?
17     A  Yes.
18     Q  Okay. And did he — what employers do you
19  recall him working for during that period of time?
20     A  I don't recall.
21     Q  Did you —
22     A  If you could just keep in mind, we've got 900
23  members, and I can't remember where everybody works.
24     Q  No. I marvel at what you remember so far, so

217

1  I'm not casting any aspersions. If you remember, great.
2  If you don't, it's no problem.
3          Is he someone who is within your geographical
4  jurisdiction? Or maybe I'm misusing that phrase. I'm
5  sorry.
6      A  Yeah, you are.
7      Q  All right. But he's somebody that you would
8  know in — generically?
9      A  Yes.
10     Q  Okay. Do you know — but you don't know for
11  whom he has done work in the past; is that right?
12     A  He has worked for numerous contractors.
13     Q  All right. Now, I had mentioned earlier when we
14  talked in our kind of opening remarks that this is kind
15  of a good news situation in that virtually everybody
16  other than those two individuals was basically working
17  almost full time during the course of the period during
18  which it was alleged that Huron Valley breached it's
19  agreement. Do you look at this, and assuming the
20  numbers are correct, is this a good news situation for
21  the members of Local 27 in that the substantial majority
22  are working almost nonstop?
23     A  I don't really understand the relevancy of that,
24  but —

Huron Valley Glass vs Local 27     March 20, 2008

56 (Pages 218 to 221)

218

1    Q   Well, I'd be happy to raise it, not to have a
2    conversation. We can do that later. But here is —
3    A   And I mean quite frankly, I think it would take
4    more time than two minutes for me to look at this and
5    cross-reference the out of work list to see how — I
6    mean are you asking me is it nice to see all of these
7    zeros? Sure.
8    Q   Well, I'm just saying is that — in terms of
9    your knowledge of the history of this Local and it's
10   members during — is this period — and you don't even
11   have to look at this — just knowing what you know from
12   May of '07 through February of '08, how would you view
13   that in terms of the Union's success in making sure that
14   its members were fully and adequately employed?
15   A   I mean in my position, anytime that there is
16   anything other than a zero, I wouldn't view it as
17   something that I'd be satisfied with.
18   Q   If you were running for reelection, would you
19   look at this period of time and say we've done a pretty
20   damn good job of making sure our members are employed
21   and the membership would agree and elect you again?
22   A   I wouldn't base it on that, no. I'd be more
23   concerned about what my members would think electing me
24   if I let ironworker contractors take our work. That's

219

1    what they'd get mad about.
2    Q   I'd get that.
3    MR. AHEARN:  Off the record.
4       (Discussion had off the record.)
5    MR. CHAPMAN:  If I can just take one moment, please.
6    Q   Now, a couple of more questions. You had
7    mentioned that you had discussions with Mr. Ahearn as
8    well as Mr. Anderson here — let me first ask you: To
9    your recollection, other than Mr. Cook, was there anyone
10   else that notified you directly that they believed that
11   Huron Valley was going to subcontract the 1401 job to
12   J & D?
13   A   No.
14   Q   Did you remember anyone who was currently
15   employed at Huron Valley contacting you and saying, Hey,
16   listen, you're not going to believe what's going on
17   here, type of thing?
18   A   No, because I mean anybody that would be in —
19   in my opinion, anybody that would be in that position to
20   say that would probably be worried about the
21   ramifications of the attitude of the men on the job. It
22   would burst their bubble. They've been thinking for two
23   years that they were kicking them in the ass to get more
24   work, and it got them — I don't want to say nothing

220

1    because they got paid. They got paid every day to do
2    their job, but the promise from the company didn't hold
3    up.
4    Q   Okay.
5    A   So no, I don't think anybody was — I don't
6    think anybody would say something like that because I
7    think they know that guys go to work with a different
8    attitude the next day probably.
9    Q   When you were meeting with Mr. Ahearn and
10   Mr. Anderson and you and Mr. O'Donnell and Mr. Cook were
11   together here and there was discussion about this
12   potential subcontract with J & D, I know you said you
13   weren't asked to, but why didn't you say before you —
14   or something to this effect, before you subcontract or
15   do anything, can you let me show you a crew of people
16   that you would really like? Why didn't you do that even
17   though they didn't ask for it?
18   A   How do you know we didn't?
19   Q   Well, I just — what your testimony was
20   earlier — or maybe I misunderstood it.
21   A   My testimony is in reference to providing a
22   company to subcontract it to. I have never in any way,
23   shape, or form indicated that we didn't say we could man
24   that job. I still feel — I felt then and I feel now

221

1    that we would have had no issue manning that job had
2    Huron Valley decided to perform that work themselves.
3    Q   But I'm asking you, you were in that room and
4    you were told — or at least you were told that there
5    was a plan or a possibility there was going to be a
6    subcontract. Did you tender to them, Listen, here are
7    six people, eight people that can form a great crew on
8    that job, let us give you those guys? Did you tell them
9    anything like that?
10   A   Yes, we did.
11   Q   What particular guys did you tell them about?
12   A   I didn't give them specific names. He wouldn't
13   know them if they were sitting in this room. Why would
14   I give him or Kevin Anderson a name that means nothing
15   to them? They didn't have any concerns similar to that
16   when they sat down with us and needed 25 guys. I
17   surely — I would think — and I know that it's not the
18   same person, Mr. Klees and Tom DiDonato, but maybe if
19   Tom was in this room with us instead of Kevin Anderson,
20   I would have been able to convince them of it. But when
21   I sat down with Mr. Klees and Mr. DiDonato, I had no
22   problem convincing them that we could man that job with
23   25 people. I surely could have convinced him that we
24   could man it with six.

Huron Valley Glass vs Local 27    March 20, 2008

57 (Pages 222 to 225)

222

1    Q  But you never put in writing anywhere -- and I
2  just want to make sure -- any statement by you or any
3  one of the other business agents, Dear Kevin, Dear
4  Dennis, we can man this job?
5    A  In writing?
6    Q  Yes.
7    A  Keep in mind, the meeting that we had here
8  was -- the object of that meeting was to discuss that
9  point. When you are told point blank it's a business
10  decision, we're doing it, what do you say at that point?
11  Their mind was made up. I think Kevin Anderson's mind
12  was made up months before that. Kevin Anderson's
13  strategy of subcontracting and his relationship with
14  J & D Erectors and every company that he has been to,
15  the day that Tom DiDonato told me that they hired a
16  project manager and it was Kevin Anderson, I knew we
17  would be sitting here with these binders in a matter of
18  a year because that's Kevin Anderson's strategy; so when
19  we sat in this room and we talked to Kevin Anderson and
20  told him our issues and told him that we could man the
21  job and he said it's a business decision, pretty much do
22  what you got to do or do what we got to do, what do you
23  do at that point? Okay, it's been nice.
24    Q  All right.

223

1    A  We tried to save a relationship that we worked
2  on for two years. We didn't want it to come to this.
3    Q  And did you recommend any particular contractors
4  that you believed that Huron Valley should contact if
5  they want to subcontract the work?
6    A  You already asked me that, and I said no.
7    Q  One minute and we can move on.
8  MR. CHAPMAN: Thank you.
9           REDIRECT EXAMINATION
10            by Mr. Schwartz:
11  MR. SCHWARTZ: Just a couple of follow-up questions.
12    Q  Could you describe -- assuming that there were
13  10,700 hours that were worked by J & D's employees,
14  how -- was the Union damaged by virtue of J & D's work?
15    A  Yes.
16    Q  In what way?
17    A  Those are hours that our members would have
18  performed and should have performed.
19    Q  And if you were given several months' notice to
20  get a crew together, would you have been able to get a
21  crew together to work on the 1401 State Street job
22  beginning in May or June of this year -- or of last
23  year?
24    A  I didn't need several months. I didn't have

224

1  several months to put together a 25 man crew. I surely
2  didn't need -- if you look in the records, I had Huron
3  Valley Glass signing letters of intent for apprentices.
4  Before they even signed our collective bargaining
5  agreement, I was putting a crew together for them.
6    Q  How long would it have taken you to get some
7  people together if they didn't say we're going to do it
8  ourselves, assuming it was a six to eight man crew?
9    A  I would say based on -- listen, I don't run the
10  company, but I have worked with the tools long enough to
11  know that based on the core guys that you had at Optima,
12  what you would do is you would pull a couple of those
13  guys from that job and give them -- we would take guys
14  off of the off list. I would by hook or crook procure a
15  couple of good guys. If I needed four or if I needed
16  six, it wouldn't have been a problem. You wouldn't put
17  all six of them at 1410. You would -- the smart thing
18  to do would -- you would have been -- you would have
19  taken a couple of guys off of that job at Optima, moved
20  them to 1410 with some of those guys, and I believe if
21  you look through the off list, I also did see in that
22  time period people that were on the off list that were
23  already worked at Optima and were laid off, so they
24  would have been familiar with it. It would have been

225

1  easy to man that job.
2    Q  Could you turn to page 379, Exhibit 11.
3  MR. SHAPIRO: Whose book?
4  MR. SCHWARTZ: In our book.
5    Q  Have you got it?
6    A  Yes.
7    Q  Can you identify what the three pages in this
8  Exhibit 11 are?
9    A  That's the sheet that we put together for our
10  contractors every year of the contract to update it to
11  what the current wages and benefits are.
12    Q  Do these three sheets accurately reflect the
13  wage rates effective May 31, 2006; May 31, 2007; and
14  May 31, 2008?
15    A  Through May 31st, 2008, yes.
16    Q  That's right. Yeah, true. Right.
17    A  Yes.
18  MR. SCHWARTZ: I don't know if I asked for entry of
19  Exhibit 11 before, but I want to do that now, so -- just
20  to make sure those rates are in evidence.
21  MR. SHAPIRO: Counsel.
22  MR. CHAPMAN: I will agree --
23  MR. SHAPIRO: Agree, okay. I accept.
24  MR. SCHWARTZ: Q  Did at some point the -- in the

58  (Pages 226 to 229)

226

1  meeting in April, was the Union offered to do the
2  storefront work that they were going to -- that Huron
3  was going to self-perform that work at 1401 State?
4      A  In that meeting, we had conversations. We
5  voiced our displeasure in them by, you know, their
6  intent to violate the Collective Bargaining Agreement.
7  They threw out an offer on the table that would have
8  been a poor business decision on our end to accept what
9  appeared to be -- maybe I think we asked them what the
10  man-hours were going to be on the job, and -- somewhere
11  around 11,000, and they were throwing something at us,
12  around 2,000, and we told them that that wasn't
13  acceptable to us. It wouldn't have been acceptable to
14  anybody to relinquish 10,000 man-hours on a project. In
15  essence, we looked at it as throwing us a bone to go
16  away, and it was not acceptable to us.
17      Q  I would like you to refer to page 76, if you
18  would -- this is our book -- Exhibit 4.
19      A  Did you say 76?
20      Q  Yes. Are you at 76?
21      A  Uh-huh, yes.
22      Q  Did the company in your meeting imply or
23  indicate to you in some way that your glazier employees
24  had suffered too many work injuries or had a bad

227

1  experience at the Optima job?
2      A  When -- and I don't remember if it was Kevin or
3  Dennis, when they were explaining to us their reasons
4  for violating the agreement, they indicated some of the
5  stuff that they had issues with at the Optima project.
6  They didn't distinguish whether they were issues that
7  were they believed caused by ironworkers, glaziers,
8  either/or, but they were the reasons for doing it; and
9  it was a problem with us because we didn't know if they
10  were trying to indicate that we were responsible for it.
11  You know, when they said that there was theft on the
12  job, I think that a couple of times people broke in from
13  them from the outside and stole stuff, and -- but
14  sitting in that meeting, when you're talking to us,
15  you're saying this is the reason we're giving your work
16  away is because there was -- you know, you almost want
17  to perceive it, what, are you insinuating that our guys
18  were stealing stuff and our -- and there was a large
19  amount of injuries from our members. We were looking
20  for a clarification on what they meant by that.
21      Q  Did they ever give you a clarification?
22      A  No.
23      MR. SCHWARTZ:  Okay. That's all I want to ask you
24  right now.

228

1      MR. SHAPIRO:  We're going to take a 10 minute break.
2      (Brief break had.)
3      MR. SHAPIRO:  We're going to reconvene the meeting.
4      MR. CHAPMAN:  Thank you, Mr. Shapiro. What I would
5  like to do is just ask Aaron Purser to testify. And if
6  I might just give a brief introduction as to who he is
7  and why I'm asking him to have a chance to testify, and
8  I could just pass out his resume. What I showed you
9  were Exhibit -- was it 21? HVG 21 was this large chart,
10  and Aaron was involved -- I shouldn't say involved --
11      MR. GOODWIN:  Excuse me.
12      MR. CHAPMAN:  I'm sorry.
13      MR. GOODWIN:  Are we going to swear him in?
14      MR. CHAPMAN:  Yeah, that's a great idea.
15      MR. GOODWIN:  I don't know.
16      MR. CHAPMAN:  No, I think it's -- before he talks,
17  he should be sworn.
18      MR. SHAPIRO:  Would you please swear him in.
19          AARON PURSER,
20  called as a witness herein, having been first duly
21  sworn, was examined upon oral interrogatories and
22  testified as follows:
23      MR. SCHWARTZ:  And to be honest with you, I'd rather
24  you just ask him questions as opposed to giving an

229

1  introduction as to who he is. I mean I think that's a
2  better way of doing it.
3      MR. CHAPMAN:  That's fine.
4          DIRECT EXAMINATION
5          by Mr. Chapman:
6      MR. CHAPMAN:  Q  Aaron, were you -- just so we know,
7  you were involved in preparing what is HVG 21; is that
8  correct?
9      A  Yes.
10      Q  All right. I have passed around your resume.
11  You are currently employed by whom?
12      A  Clark Hill.
13      Q  And what is your capacity at Clark Hill?
14      A  A legal assistant.
15      Q  And how long have you been a legal assistant?
16      A  A legal assistant for over ten years.
17      Q  And when did you make the dire decision to go to
18  law school?
19      A  Three-and-a-half years ago.
20      Q  So you attend law school at night right now?
21      A  Yes.
22      Q  At Loyola?
23      A  Yes.
24      Q  I passed around your resume which is HVG 22.

230

1  Does it fairly and accurately depict your experience as
2  a paralegal since 1998 forward?
3     A  Minus my current position, yes, which I have
4  been at for a month.
5     Q  So, and you have had during the course of your
6  employment both with the Lowinger firm, at Winston &
7  Strawn, and McDonald, Bonan (phonetic) had an
8  opportunity to work with documents and to assemble
9  spreadsheets and charts; is that correct?
10    A  Yes.
11    Q  So maybe you can let the Committee know exactly
12  what I asked you to do in relation to preparing the
13  chart which is HVG 21.
14    A  Okay. Well, I initially looked at all of the
15  off lists to determine who during -- originally during
16  each month had days that they weren't assigned a job.
17    Q  So if I could show you, this is Exhibit 17; is
18  that correct?
19    A  Yes.
20    Q  Okay. Those were the full extent of the off
21  lists you looked at?
22    A  Yes.
23    Q  And what did you do?
24    A  Well, I -- not really knowing exactly what was

231

1  represented on there, if the name was there without any
2  markings, I assumed that they were always still on the
3  off list, meaning not assigned a position. If they had
4  a circle, something that had the name of a company to
5  the right, I assumed that they were then assigned to a
6  project.
7     Q  So now, this document that's Exhibit 21 is made
8  with a software program; is that right?
9     A  Yes.
10    Q  What --
11    A  Excel.
12    Q  Excel. And in addition to reviewing the off
13  list documents, did you review any other documents in
14  creating what is Exhibit 21?
15    A  Yes. There was a J & D hours list.
16    Q  Okay.
17    A  I think it's the next exhibit.
18    Q  And this would --
19    A  Yeah, it was that one there, 18.
20    Q  All right. So it was Exhibit 18. That's the --
21    A  Yes, 18, and as well as there was one I don't
22  know if it was marked.
23    Q  It was the J & D hours?
24    A  It was the J & D hours.

232

1     Q  So that would have been Union Exhibit 8 if I
2  show you here?
3     A  Yes.
4     Q  Okay. Now, this Exhibit 21 contains a series of
5  dates at the top. What do those dates represent?
6     A  The dates at the top are for each week beginning
7  with the 7th of May through the most current information
8  I had which goes through February.
9     Q  All right. And --
10    A  Of this year.
11    Q  All right. And were these the dates that you
12  had understood that work had been subcontracted by HVG?
13    A  Yes.
14    Q  In addition to that, there are a series of
15  names. You pulled those names directly off the off
16  lists?
17    A  Yes.
18    Q  And then for each week, you looked -- you
19  basically compiled the amounts of time on the off lists
20  by hours?
21    A  Yeah. Well, I mean the off list represented a
22  day, so I took that day to be eight hours, and so within
23  that week, if for say they were on the lists, meaning
24  not assigned a project all five days, I would have the

233

1  five days times eight hours for 40 hours.
2     Q  All right. So that if someone had 40 hours, for
3  example, Mr. Wallendorf in the upper left-hand corner of
4  the first page of Exhibit 21, there was 40 hours meant
5  he did not -- he was not off of the off list --
6     A  Exactly.
7     Q  -- at any point during that week?
8     A  Well, for five days.
9     Q  Okay. Now, above that, there is something
10  called J & D Hours.
11    A  Yes.
12    Q  What does that represent?
13    A  That's the total number of the hours for the
14  week that I got off the J & D hours exhibit.
15    Q  And then, there is -- so that for a particular
16  week, these were the amounts of hours that --
17    A  Worked.
18    Q  By J & D?
19    A  Yes.
20    Q  Okay. And so then, at the bottom, there is --
21  of the page there is something called Total?
22    A  Yes.
23    Q  What is that total?
24    A  That's the total number of hours that -- of all

Huron Valley Glass vs Local 27    March 20, 2008

60 (Pages 234 to 237)

234

1  of the people from the off lists for that particular
2  week. So if there were, you know, 12 guys throughout
3  that week that were on the off lists, meaning not
4  assigned a project, for each day, 8 hours, that was the
5  total number of hours for all of those people together.
6    Q   And then there is some shaded areas. Do you
7  know what those represent?
8    A   The shaded are? That would -- the shaded
9  represent where in that particular week looking at what
10 would qualify someone potentially for unemployment
11 benefits.
12   Q   Under the Illinois Unemployment Insurance Act?
13   A   Exactly.
14   Q   Now, there is -- ultimately, there are some
15 numbers on the second page, and I'm going to ask you
16 about them in a second, but they are total numbers of
17 hours; but there is an item on the first page, upper
18 left-hand corner, Max Amount Owed at 50 percent of Total
19 at 30 --
20   A   Uh-huh.
21   Q   What does that mean?
22   A   That is take the J & D hours for each week,
23 dividing it in half, and multiplying it at $35 an hour.
24   Q   And why did you do that?

235

1    A   Well, it was my understanding that the total
2  number of hours being worked were to be split and that
3  the glaziers would have been entitled to half of those
4  hours, so in taking the total hours worked, I divided it
5  in half, and then multiplied it at $35 an hour, which
6  was my understanding of what the hourly rate was.
7    Q   You did it because I had told you to, right?
8    A   Exactly.
9    Q   I don't want to play fancy about it. It's an
10 assumption that plays into this, and whether people
11 agree with it or not it's a different story, but I'll
12 take responsibility for it.
13   A   Well, that's where my understanding came from is
14 from you.
15   Q   And that's why you're going to go far in this
16 world. And then, you'll cut my head off.
17       The next one, Max Amount of 50 percent or
18 Lesser Hours at $35 per hour, what does that mean?
19   A   Okay. That is where if half of the total hours
20 worked was more than what they had -- what was available
21 in man-hours on the off lists for that week, then I
22 would use that lower amount. And I can explain.
23   Q   Why don't you go ahead and do that.
24   A   If, let's say, there were 200 hours worked,

236

1  meaning that half, 100 hours, would have been entitled
2  to the glaziers but the total number of hours that
3  somebody was on the off list for that week was only 50
4  where they couldn't have had 100 hours to give, I took
5  just the 50 hours and multiplied it by $35 an hour. If
6  the numbers met what half would have been, then I
7  just -- it would have been the same number as the line
8  above.
9    Q   So that if there weren't sufficient hours to get
10 up to the half, you used that lower number because
11 that's all people would have been able to give --
12   A   Exactly.
13   Q   -- if they would have been hired?
14   A   Exactly.
15   Q   Okay. There's one last one -- I'm sorry, the
16 second to the last one, it's called, Max Amount of 50
17 percent or Lesser Hours at 35 per. I think there may be
18 one or two missing words there.
19   A   Yeah. That's the one that if you were to
20 exclude Wallendorf --
21   Q   Okay.
22   A   -- since I found him consistently on the off
23 lists throughout the entire period, not knowing anything
24 about why he was always on there, he just definitely

237

1  skews the numbers a lot, you know, so if his reasons for
2  being on there were something that people agree it
3  wasn't, you know, where he was a qualified person
4  anyway, in that instance, I would take his hours out of
5  the equation and do the same equation as the line above.
6  So sometimes it affected the numbers, and sometimes it
7  did not at all.
8    Q   What I would like to do is, if we could, this is
9  a lot of numbers rolling around here, and -- but let's
10 come to kind of the end of the story and look at it for
11 a second.
12       There is also one other item that is -- well,
13 it originally -- it says $2,343.50 --
14   A   Yes.
15   Q   -- or point 5. What number was that?
16   A   That number comes off the -- this detail, which
17 it was my understanding represented glaziers who
18 actually have worked on the project.
19   Q   1401?
20   A   Exactly, which I got off of this list.
21   MR. SCHWARTZ:  What list? The J & D list?
22   A   No. It's --
23   MR. CHAPMAN:  No. It's Exhibit 18, HVG 18, which is
24 a list -- if I could say for the record, a list of all

Huron Valley Glass vs Local 27    March 20, 2008

61 (Pages 238 to 241)

238

1  glaziers that were working at the job, at the 1401 job,
2  during the period covered by the chart.
3      MR. SCHWARTZ: What does that have to do with
4  J & D's hours?
5      MR. CHAPMAN: It has nothing to do with J & D's
6  hours. It only shows that glaziers were actually
7  working on the job and being compensated.
8      MR. SCHWARTZ: Well, what does that have to do with
9  anything?
10     MR. CHAPMAN: Well, I don't know if you want to
11  argue about it now. I'm happy to state it, Mr. Shapiro,
12  if you'd like.
13     MR. SHAPIRO: You have the floor.
14     MR. CHAPMAN: All right. Well, what it has to do
15  with is you can't -- you can only get hours that the
16  glaziers were deprived of. Well, they would have gotten
17  at least 50 percent -- they were entitled by their own
18  agreement to at least 50 percent of the hours that were
19  available on a composite crew basis. Here, they were
20  already getting hours. The J & D doesn't reflect that
21  there is over 2,000 glazier hours on this project, and
22  so you can't count it twice. All the J & D hours do is
23  say there was J & D hours, but it -- but you -- by -- in
24  essence, by excluding the fact that glaziers were

239

1  working on this job, you are basically trying to count
2  twice. These people are already getting paid, and, in
3  fact, in some cases, more than a 50 percent share.
4      MR. SCHWARTZ: I don't understand that at all. I
5  think that, you know, when we are talking about J & D
6  and if somebody else employed people that are glaziers,
7  that has absolutely nothing to do with this case.
8      MR. CHAPMAN: Well, let me suggest this.
9      MR. SCHWARTZ: That's not double counting anything.
10  J & D is what we lost.
11     MR. SHAPIRO: I'm going to let counsel put it in the
12  record, and we'll talk about it behind closed doors.
13     MR. CHAPMAN: I think just for your edification,
14  Don, and I think you know anyway, our position is this
15  is a case about injury to particular employees. This is
16  not a Union injury case. So if there are glaziers that
17  are working, they are earning money, the Union is
18  receiving benefits, the Funds are getting benefits.
19  This is not the kind of position where this is based on
20  J & D hours because these people are working. And they
21  are working -- you know, that cannot be avoided. And
22  there was a benefit of more than $57,000 that went to --
23  I know the number is slightly different. I'll ask Aaron
24  to tell you why. That's a benefit the Glaziers

240

1  received. And if you don't -- if you just look at the
2  J & D hours, you are ignoring purposefully a benefit
3  that the Glaziers members received, and you can't count
4  these things twice. So you and I may disagree. Perhaps
5  the panel will understand what I'm talking about. And
6  if not, I'm sure they will ask, but when you get to be
7  the arbitrator, you can ask me.
8      Q   All right. So there is a difference here, and
9  tell me why that's different. Why did you have a
10  different number?
11     A   Than what's actually on there now?
12     Q   Yes.
13     A   I was informed that one of the people I would
14  have been counting before, Ufkes, is not a glazier, so I
15  had to deduct his hours, and he had -- the total then
16  came to 1600.
17     MR. SHAPIRO: What was he?
18     A   I don't know.
19     MR. SHAPIRO: Is he another craft? Is he a nonunion
20  person?
21     A   I don't know.
22     MR. CHAPMAN: I can get Denny to say that. I can
23  proffer to you that he was an ironworker.
24     MR. SHAPIRO: Okay.

241

1      MR. CHAPMAN: But he'll testify to that.
2      A   And in deducting his hours, instead of I think
3  it was 2300 hours, it goes down to 1607.
4      Q   All right. So let's -- there -- at the end of
5  the sheet, there is three sets of numbers, or more, and
6  let's skip over the 27,000 for a second. The top one is
7  184,000, the bottom is 122, and 97.
8      A   Uh-huh.
9      Q   Tell me how it was that you -- what does the
10  $184,000 figure represent.
11     A   That represents the total J & D reported hours
12  divided by 2, so in half, times 35 an hour; so in my
13  calculation, that would be the maximum entitled under
14  the total J & D hours split in half.
15     Q   So on just a strict calculation basis --
16     A   Yes, it's the top line in total divided in half
17  times $35 an hour.
18     Q   Okay. So that's the most money that HVG is
19  saying under any circumstances that the Glaziers would
20  be entitled to?
21     A   Yes.
22     Q   Now, there is a lesser number below that. It's
23  $122,000 about. What does that number represent?
24     A   That represents the -- there were -- there is

Huron Valley Glass vs Local 27    March 20, 2008

62 (Pages 242 to 245)

242

1   some weeks where there weren't enough available
2   man-hours based off of the off lists to meet that half
3   burden of the J & D hours for that week, so that
4   represents those weeks which had a lesser total, and
5   then it's the total of all of those weeks together.
6       Q   Can you pick one week that would illustrate
7   that?
8       A   Sure.  Well, the week of 12/3/07.
9       Q   Okay.
10      A   There were 378 hours reported on the J & D
11  report.  Half of that is going to be 189 hours.
12      Q   Right.
13      A   But there were only 24 hours off of the off
14  lists of available time, so without the adequate number
15  on that line off of the off lists to meet the half, I
16  used the 24 that was available, multiplied it by 35 an
17  hour, and so that's why that week instead of $6,615, it
18  went down to $840.
19      Q   Because there was only 24 hours for the Glaziers
20  to give?
21      A   Yes, and that was that week.  Some weeks, you
22  know, there is no difference at all.
23      Q   So if you took that figure across, you get to
24  122,000, that takes into account that there were weeks

243

1   where there simply just wasn't enough free hours?
2       A   Exactly.
3       Q   That the Glaziers were, let's say for lack of a
4   better word, more employed than other weeks?
5       A   Yes.
6       Q   Okay.  And so these people were actually earning
7   money.
8           All right.  Let's go to the next one, which is
9   at $97,000 figure.  How was that different?
10      A   That's using the same calculation as the one
11  before, except excluding Wallendorf, that one specific
12  employee.  Some weeks, if you would take him out, you
13  know, there were still more than enough hours off of the
14  off lists to meet the half burden, so it didn't change
15  anything.  Sometimes he was the only one or one of the
16  very few who was on the off lists during that week, so
17  it significantly lessens the available hours; so that
18  then was multiplied by 35 to get a different total in
19  that week, and that 97,000 represents all of the weeks
20  total together using that process.
21      Q   So in this calculation, the most amount of
22  damage that any -- that the glaziers as a group suffered
23  was $97,512; is that right?
24      A   Under that one, yes.

244

1       Q   Now, with the fact that there were glaziers
2   actually employed at the job while J & D was there, that
3   figure is, and we can note it, it was 56,262?
4       A   Uh-huh.
5       Q   All right.  That's the total amount of money
6   paid to glaziers?
7       A   Yes.
8       Q   So if you subtract --
9       A   Using the hour report I had and multiplying at
10  $35 an hour.
11      Q   So that of the $97,000 in damages that might
12  arguably be due, you would subtract the hours that
13  glaziers actually received; is that right?
14      A   Yes.
15      Q   So we would subtract the 56,2 from the 97,5,
16  correct?
17      A   Exactly.
18      Q   Now, there is -- which takes us into the realm
19  of about 41,000.
20          There is another figure 27,3, what is that
21  figure?
22      A   That is using the calculations on the different
23  shaded areas which represent unemployment eligibility.
24      Q   All right.  So that under Illinois law, for

245

1   those situations, that unemployment benefits would have
2   been available --
3       A   Yes.
4       Q   -- at least to these employees?
5       A   Yes.
6       Q   Whether they took them or not, we don't know?
7       A   I don't know, yes.
8       Q   But we do know that they were eligible?
9       A   Yes.
10      Q   So those damages wouldn't actually be reduced
11  even further by --
12      A   By what they would have been entitled to in that
13  number, yes.
14      Q   So the ultimate damage would be based upon the
15  deduction of the 27,3 less I think it was 41 -- well,
16  we'll get that number specifically noted.  Maybe you'll
17  do it before you go.  It's about $30,000 or $25,000,
18  right?
19      A   Yes.
20      Q   And maybe I'll ask you to make that calculation
21  as we sit here so it's clear.  Could you?
22      A   I've got a calculator on me, yeah.
23      Q   All right.  Why don't you do that.  But that
24  would then, in essence, explain how it is we have come

Huron Valley Glass vs Local 27    March 20, 2008

63 (Pages 246 to 249)

246

1  to these numbers to show the total amount of damages.
2  Even assuming that HVG breached an agreement, this is
3  the actual amount of loss that unspecified Glaziers
4  members would have suffered based upon their presence on
5  the off lists; is that right?
6      A  Yes.
7      Q  All right. Why don't I let you finish that last
8  calculation.
9      MR. HARRIS: Can you write it down so we can see it
10  in writing?
11     MR. CHAPMAN: Yes, absolutely.
12     A  I get 13,944.
13     MR. HARRIS: Where are you getting the figure from,
14  the actual hours that the glaziers were paid that were
15  on the job from?
16     A  I'm getting it from Exhibit 18.
17     MR. CHAPMAN: HVG 18.
18     A  Yeah.
19     MR. CHAPMAN: And, Mr. Harris, we can actually give
20  that number to you on your copy so you can see how we
21  came to it.
22         Okay. I would move that Exhibit 21 be
23  admitted.
24     MR. SHAPIRO: Counsel.

247

1      MR. SCHWARTZ: Well, we don't think it's relevant,
2  but we, you know — so that would be our objection.
3      MR. SHAPIRO: I accept it.
4      MR. CHAPMAN: And then, we'll make sure this number
5  is actually — because we saw an error, and we want to
6  make sure that's corrected before it went into the —
7      MR. SHAPIRO: Now, this is over and above what was
8  on Optima?
9      MR. CHAPMAN: Yeah, this has actually nothing —
10     MR. SHAPIRO: It has nothing to do with Optima
11  glaziers at all?
12     MR. CHAPMAN: I mean we're not talking — I would
13  say if I could. I can't tell you that none of the
14  people on this list worked at Optima or not. Some of
15  them might have.
16     MR. SHAPIRO: But you're not counting people at
17  State as people that worked at Optima at the same time?
18     MR. CHAPMAN: No, no. It's just the people on
19  State.
20     MR. SHAPIRO: I gotcha.
21     MR. CHAPMAN: All right. So that's admitted.
22         And maybe you can just make a note on some of
23  these laying around as to exactly how we got this
24  number, if I could ask you to.

248

1      A  Yes.
2      MR. CHAPMAN: But I think he is done testifying. Do
3  you mind if he stays in the office here just to write —
4      MR. SHAPIRO: That's fine.
5      MR. CHAPMAN: All right. Why don't you go do that.
6      A  Okay.
7      MR. TOOMEY: Hold it. We have some questions.
8      MR. CHAPMAN: I apologize. I'm sorry.
9              CROSS EXAMINATION
10             by Mr. Schwartz
11     MR. SCHWARTZ: Q  Well, now you deducted Wallendorf
12  to come up with the $97,000, right?
13     A  For that 97 line?
14     Q  Yes, you took him out.
15     Q  Right. And then you deducted him again for
16     Q  Right. And then you deducted him again for
17  unemployment so your credit is 11,000 too much because
18  11,000 in the unemployment figure is Wallendorf?
19     A  I didn't do the unemployment figures per
20  individual, but —
21     Q  Well, there's $11,490 —
22     A  — but you're right. Yeah, you're right.
23  You're right. His — they'd be —
24     Q  So that would have to be added back in the

249

1  first point?
2      A  You're right, yes.
3      Q  So — and this 2343 hours again, this is hours
4  that the glaziers have worked on the job as employees of
5  Huron Valley?
6      A  It's actually 1607.
7      Q  1600 hours is the hours that glaziers have
8  worked on that 1401 South State Street job employed by
9  Huron Valley, is that — that's what you're —
10     A  That they worked on that job, yes.
11     Q  Okay. And that's from Huron Valley's internal
12  records?
13     A  Exhibit 18 of ours, yes.
14     MR. SCHWARTZ: Okay. Those are all of the questions
15  I have. Wait a second.
16     Q  How did you know how much to put in for
17  unemployment?
18     A  Okay. Well, going in to — doing the research
19  as to how it's calculated, you look at the prior two
20  quarters of the prior two — what I had to do, not
21  knowing any information of the individuals and what they
22  have made in the past two years, was assumed that they
23  worked full time at 35 an hour, so taking that number to
24  get their salary, there is a chart that you can find

64 (Pages 250 to 253)

**250**

1  that describes what the corresponding amounts would be.
2  I did not -- it would have gone up if I knew that people
3  had children or spouses, but I assumed that they did
4  not, so I thought that was a fair way to use them being
5  employed full time not knowing whether they were or not
6  the prior two years.
7      Q  So you have no idea if any of these people did
8  get unemployment or not?
9      A  None, no idea.
10     Q  And does the 122 represent a half amount like
11  the 184 does or is the 122 a total amount?
12     A  The 122 --
13     Q  Because the 184 you said was half the hours.
14     A  That was based on half the hours, yes.
15     Q  So the 122 is also based on half the hours?
16     A  If that -- well, it depends on what it -- it
17  depends on the week. If there was a week where there
18  weren't enough glazier hours off of the off lists to
19  match what was half, I took the whole amount --
20     Q  So it's a mix?  So you -- so it's a mix of the
21  whole and the half?
22     A  It's whatever -- if the week -- if they had
23  enough to meet the half, then it was the half.
24     Q  So which weeks -- oh, so we'd have to look and

**251**

1  see. Any week where the second line is less than the
2  first, you --
3      A  It's based off of the total number of glazier
4  hours times 35.
5      Q  So any time where they're equal, then it's based
6  on half?
7      A  It's based -- exactly.
8      Q  Okay. All right. So you didn't make a
9  calculation at 100 percent at all, 100 percent J & D
10  hours?
11     A  No. I could take the top line, the 184, and
12  times it by 2.
13     Q  Right. But you couldn't do that for the second
14  line?
15     A  No.
16     Q  Right. Because you'd have to go week by week --
17     A  Because weeks vary.
18     Q  You'd have to go week by week and make that --
19     A  Exactly, exactly.
20     MR. SCHWARTZ: Okay. That's all I have.
21     MR. SHAPIRO: Any other questions? Okay.
22     MR. CHAPMAN: And, Aaron, if you could just mark on
23  everybody's the right number as it should be, and we'll
24  leave this as the exhibit, if that's okay with the

**252**

1  Committee here. Thanks.
2      (Discussion had off the record.)
3      MR. SHAPIRO: Do you want to swear in Mr. Cook.
4      MICHAEL COOK,
5  called as a witness herein, having been first duly
6  sworn, was examined upon oral interrogatories and
7  testified as follows:
8           DIRECT EXAMINATION
9           by Mr. Schwartz
10     MR. SCHWARTZ: Q  Okay. Sir, could you please state
11  your name and spell your last name?
12     A  Michael A. Cook, C-O-O-K.
13     Q  And by whom are you employed?
14     A  Painters' District Council 14, Glaziers Local
15  27.
16     Q  And what is your position?
17     A  Business representative for the Glaziers Union.
18     Q  How long have you been in that position?
19     A  A little over three years.
20     Q  Okay. And have you been involved in negotiating
21  Union contracts and administering contracts?
22     A  Yes.
23     Q  Is that two of your main duties?
24     A  Yes.

**253**

1      Q  Okay. And you're familiar with the job at
2  1401 South State Street in Chicago?
3      A  Yes.
4      Q  And is that your territory?
5      A  Yes.
6      Q  And how did you first become familiar with that
7  job?
8      A  Through talks with Huron Valley Glass early on
9  in their tenure when they signed a contract with us here
10  in Chicago.
11     Q  Okay. They had signed it in about August or
12  September of '05. When --
13     A  2005, yes.
14     Q  When were you notified of their procuring the
15  job at 1401 State Street?
16     A  Sometime in late '05, early '06.
17     Q  And who advised you from Huron Valley that they
18  had that job?
19     A  At that time, I believe it was -- do you know
20  what? Various members of our trade that we knew about
21  at the time, Mr. Ahearn made mention of the job, and Tom
22  DiDonato.
23     Q  And when did you -- what were you told as far as
24  whether Huron Valley was going to use its employees or

254

1  subcontract the work when you were first advised of the
2  job?
3     A  It was my understanding that the employees on
4  the job would be in accordance as it was at Optima,
5  which was another job, where it would be half glaziers
6  and half ironworkers.
7     Q  So it was going to be self-performed by Huron
8  Valley?
9     A  Yes.
10    Q  Were you ever advised of the existence of a
11 company called W & G, LLC?
12    A  No.
13    Q  When you met with these people, they all advised
14 you that they were representing Huron Valley Glass, LLC?
15    A  Yes.
16    Q  And did you ever learn that there was a
17 possibility that Huron Valley was going to subcontract
18 unitized glazing work at 1401 South State Street?
19    A  Are you asking was I aware that they were going
20 to do that?
21    Q  Yes.  When did you first gain knowledge that
22 would have given you that indication?
23    A  In or around January of 2006, January or
24 February.

255

1     Q  2006 or 7?
2     A  2007, I'm sorry.  I was on a job at O'Hare
3  Airport, and I had run into an ironworker that I know
4  that I had worked with in the past by the name of Nick
5  Rossi from J & D Erectors, and just within casual
6  conversation talking with Mr. Rossi asking him how the
7  job situation was, you know, for him, he had made me
8  aware that he was signing or in the process of signing a
9  contract with Huron Valley Glass to perform the work at
10 1401 South State Street.
11    Q  When he — he was going to sign a contract on
12 behalf of who?
13    A  I guess on Huron Valley to perform —
14    Q  He their representative on the job?
15    A  Yes. — to perform the work at 1401 South
16 State.
17    Q  So meaning he was going to have to sign a
18 contract as an employee or on behalf of Huron Valley
19 with the owner or the general —
20    A  No.  As the company owner.  He is the owner of a
21 company called J & D Erectors.
22    Q  Oh, okay.  So J & D, he told you that J & D was
23 in the process of negotiating a contract with Huron
24 Valley to do the unitized work at 1401 State Street?

256

1     A  Yes.
2     Q  And this was in January of '07?
3     A  Yeah, January or February of '07.
4     Q  And what did you do upon getting that
5  information?
6     A  Pretty much immediately, of course, contacted,
7  you know, our other representatives here, Mike Mabus and
8  Mike O'Donnell, made them aware of what I had found.  At
9  that point, I continued — or I contacted Huron Valley
10 and spoke to Mr. Kevin Anderson who had, in fact, told
11 me that, yeah, they were looking at subcontracting the
12 project out to J & D Erectors.
13    Q  And when did this conversation with Mr. Anderson
14 take place?
15    A  In February.
16    Q  Was it in person or over the telephone?
17    A  The first time I believe it was over the
18 telephone.
19    Q  And when he told you that they were looking at
20 subcontracting the job, what was your response?
21    A  I said that could be an issue.  Obviously, if
22 our people, the Glaziers Local 27, are not employed on
23 that job as they had been on past jobs, that it could be
24 a violation of our subcontracting language.

257

1     Q  And what's the gentleman's name you were
2  speaking to?  Kevin Anderson?
3     A  Kevin Anderson, yes.
4     Q  And when you said it would be a violation of
5  subcontracting if they subcontracted to a nonsignatory,
6  what was his response?
7     A  Really none.  He just said, Well, you know,
8  it's — we have to — then you have to do what you have
9  to do.  And I said, What do you mean by that.  And he
10 said, Well, we had some problems on a job at the Optima,
11 and it's somewhat of a business decision to mitigate
12 what they felt their damage is, and it was in their best
13 interest to sub the job out to J & D Erectors.
14    Q  And this conversation was in January or February
15 of '07?
16    A  Yes.
17    Q  Did he tell you — well, then when was the next
18 conversation with anybody from Huron Valley?
19    A  I believe at that time, we had proceeded with
20 filing a grievance against Huron Valley to appear —
21 basically to appear in front of our Board of Business
22 Agents downtown, which is our standard procedure
23 whenever there is a grievance.  At that time, they were
24 notified to appear sometime in March.

Huron Valley Glass vs Local 27    March 20, 2008

66 (Pages 258 to 261)

258

1    Q  They being Huron Valley?
2    A  Huron Valley, and they did not appear at that
3  time in March. They were requested a second time to
4  appear, and again, they did not appear the second time.
5  The referral at that time was to be put in front of you
6  guys, in front of our attorneys.
7    Q  At the Joint Board like it is today?
8    A  Correct.
9    Q  And that we convened this hearing a number of
10  months later?
11    A  Right.
12    Q  Did you have any conversations with Kevin
13  Anderson or anyone else from Huron Valley after March of
14  '07?
15    A  We did. We were able to get ahold of Kevin and
16  Mr. Ahearn and tried to schedule a meeting to determine
17  what we were going to do about the State Street job, at
18  which point, Mr. Anderson and Mr. Ahearn agreed and we
19  had met here at our office in Lyons.
20    Q  Do you recall when that was?
21    A  Sometime in -- I believe it was in April.
22    Q  And who was present for the Union?
23    A  It was myself, Mike Mabus, Mike O'Donnell,
24  Mr. Ahearn, and Mr. Anderson.

259

1    Q  Did Mike O'Donnell have much to do with this
2  job?
3    A  No.
4    Q  As a matter of fact, neither of the jobs that
5  Huron has done in this area have been within his
6  jurisdiction?
7    A  No. That is correct.
8    Q  Did anyone tell you that -- in your meeting in
9  early April that Huron and J & D had entered into a
10  contract date dated February 21 which was signed by
11  J & D as of April 6th?
12    A  At that time, it was just mentioned that J & D
13  was going to perform the work, but it wasn't a definite.
14  We didn't know for sure at that time that J & D was
15  assigned to that work.
16    Q  Do you recall if the meeting was before or after
17  April 6th of 2007 or right around that time?
18    A  I don't recall. I don't recall.
19    Q  In the meeting, did -- what was said by the
20  representatives of Huron Valley regarding whether they
21  were going to subcontract? Was it a done deal or was
22  there still --
23    A  No. At that meeting at that time, it didn't
24  sound like it. They made reference to trying to find

260

1  contractors to sub it out to. They had asked us for a
2  list of contractors, of potential contractors, to sub it
3  out to at that time. We had provided them with a
4  couple. They had already had a list on their own, and
5  the list that they had showed us on this particular
6  letter, two -- there were four contractors -- two of the
7  four contractors weren't even signatory with Local 27 at
8  the time.
9    Q  Is it normal for a subcontractor to agree to do
10  work on a contract in excess of a million dollars and
11  only 30 days notice?
12    A  No.
13    Q  What's the normal time, the lapse in time,
14  between signing a contract and actually doing the work?
15    A  Jobs of that magnitude, high-rise construction,
16  take literally months, I mean I would say six months
17  greater or even a year at times, to procure that work.
18  They -- it just takes a lot of time to put things in
19  order, materials, manpower, equipment, especially in
20  Chicago.
21    Q  Were you involved in supplying manpower to the
22  Optima job at all?
23    A  Not really, no.
24    Q  Do you supply manpower -- are you contacted by

261

1  companies to supply manpower on a routine basis as part
2  of your job?
3    A  Yes.
4    Q  And would you have had any problem -- and
5  assuming that J & D had about six people, six to seven
6  people on its job at 1401 State Street, would you have
7  been able to supply manpower of that magnitude to that
8  job --
9    A  Absolutely.
10    Q  -- during the period of -- let me finish.
11  -- during the period of June of '07 through February of
12  '08?
13    A  Absolutely.
14    Q  Did the -- in the meeting, did they -- in April,
15  did Huron ever offer you the opportunity of saying, We
16  will self-perform if you can tell us that you will get
17  the manpower?
18    A  No.
19    Q  So they were pretty determined on subcontracting
20  at that meeting?
21    A  Yes.
22    Q  That decision had been made?
23    A  Yes.
24    Q  But they didn't tell you that they had already

**262**

1  signed or were in the process of signing a contract with
2  J & D?
3      A  Huron Valley did not, no.
4      Q  When is the first time you learned of the date
5  of the subcontract between J & D and Huron Valley?
6      A  It was very recent actually.  I don't know the
7  exact date.  It was sometime in the last 60 days.
8      Q  Regarding the out of work list, is your out of
9  work list a referral hall or exclusive hall?
10     A  It's a referral hall.
11     Q  And what's the difference between an exclusive
12  hiring hall and a referral hall, to your knowledge?
13     A  A referral hall, just — I mean we have
14  membership available, and we can refer them to jobs.
15  Exclusive would be to provide employment to members —
16  for members to contractors unconditionally, I would say.
17     Q  And could — if, for instance, Huron Valley had
18  self-performed the 1401 State Street job and they had
19  five guys and they needed seven, could they go off on
20  the street and get two people for a day?
21     A  On the street as far as —
22     Q  Just bring people in from Cleveland, bring
23  people in from Ohio, bring from Michigan if they wanted
24  to for a short period of time?  I mean —

**263**

1      A  If they were members of another glaziers local,
2  they could.
3      Q  So they have the right to hire their own people
4  and not necessarily go through you to obtain manpower on
5  a job?
6      A  Yes.
7      Q  And, in fact, on the Optima job, are you
8  familiar with the fact that some of the glaziers that
9  were there were not from the Chicago area?
10     A  Yes.
11     Q  Have you ever driven by that Optima job?
12     A  Yes, I've been there.
13     Q  And you have obviously — you have driven by the
14  State Street job?
15     A  Multiple times.
16     Q  Is there any difference in the nature of the
17  work that was being performed by either the mixed crew
18  at the Optima or the ironworkers by J & D at the State
19  Street job?
20     A  To what I have seen, it was the exact same
21  system.
22     Q  What would you describe it as?
23     A  A unitized preglazed curtain wall.
24     Q  And is that something that's covered under the

**264**

1  Glaziers contract?
2      A  Yes, it is.
3      Q  Do Glaziers do that as a routine part of their
4  work jurisdiction?
5      A  Yes, they do.
6      MR. SCHWARTZ:  I don't think I have anything else.
7      MR. SHAPIRO:  Counsel, do you have any questions?
8      MR. CHAPMAN:  Just a few.
9              CROSS EXAMINATION
10             by Mr. Chapman:
11     MR. CHAPMAN:  Q  Mike, you had mentioned that you
12  had spoke to Mr. Rossi from J & D —
13     A  J & D Erectors.
14     Q  — out at the airport one day?  And he had
15  mentioned that there would be — there was a deal
16  potentially with HVG; is that right?
17     A  Uh-huh.
18     Q  Let me ask you this:  In your experience, has
19  J & D done subcontract work with other signatories of
20  collective bargaining agreements with Local 27?
21     A  No.  No.  They're an ironwork — no.
22     Q  It had been my understanding that actually they
23  had done — J & D has done work with Harmon as one and a
24  number of other dual signatories; but are you aware

**265**

1  after that?
2      A  Maybe in the past, I would say a long time ago.
3  Not since I have been a business agent.
4      MR. SHAPIRO:  Do you know when it was?
5      MR. CHAPMAN:  Do I?
6      MR. SHAPIRO:  Yes.
7      MR. CHAPMAN:  No, I don't know exactly.  But I
8  haven't been sworn in either.
9      Q  So that would be the same with — I'm sorry.
10  Let me take a moment.
11     Now, during the course of the meeting that you
12  had mentioned you attended in March — April of '07 with
13  Messrs. Ahearn and Anderson, as well as Mr. Mabus and
14  Mr. O'Donnell, at that point in time, were there
15  particular glaziers that worked with you that you
16  believe you could have referred to work on the 1401 job?
17     A  Yes.
18     Q  Okay.  Who were they?
19     A  Do you mean names?
20     Q  Yes.
21     A  I couldn't give you names.  I'd have to go off
22  the list from that day, and it could be any one of our
23  actual 600 and some members.
24     Q  What particular members do you believe suffered

Huron Valley Glass vs Local 27    March 20, 2008

68 (Pages 266 to 269)

266

1  damages as a result of Huron Valley subcontracting the
2  work to J & D?
3      A  All of them.
4      Q  Okay.  In equal amounts?
5      A  Yes.
6      Q  What would be the total amount?
7      A  Of members or --
8      Q  So that every single member of the Local would
9  have been damaged?
10      A  In my opinion, sure.
11      Q  All right.  Well, let's talk about numbers,
12  sheer out-of-pocket cash money losses.  Do you have any
13  idea of what particular members lost money as a result
14  of this?
15      A  No.
16      MR. CHAPMAN:  If I might just take one moment.
17          Okay.  Thank you.
18          REDIRECT EXAMINATION
19          by Mr. Schwartz
20      MR. SCHWARTZ:  Q  Have you seen paychecks from
21  employees of Huron Valley?
22      A  I have seen a paycheck from a company called
23  W & G.
24      Q  When did you see a paycheck?

267

1      A  Actually about a month ago.
2      Q  And this person was employed on which job?
3      A  Actually on both, Optima and State Street, 1401
4  State Street.
5      Q  Had you ever had dealings with W & G?
6      A  No.
7      Q  Did you know what W & G is or was?
8      A  No idea.
9      Q  Every time you have met with someone on behalf
10  of Huron Valley, it has been expressed to you that they
11  were representing Huron Valley?
12      A  Yes.
13      Q  And are you aware of the fact that the W & G
14  paychecks that you -- or the paycheck you saw, did it
15  reflect the current wage rate in effect between the
16  Glaziers and the Association?
17      A  Yes.
18      Q  And that the W & G, LLC's fringe benefit rates
19  on their report forms reflect the current rates, not the
20  rates in effect a year or two ago?  They're adhering to
21  their current contract, contractual rate?
22      A  To the best of my knowledge, yes, but I have not
23  checked.
24      MR. SCHWARTZ:  Okay.  All right.  I think that's

268

1  all.
2      MR. SHAPIRO:  Mr. Cook, I have a couple of
3  questions.
4          EXAMINATION
5          by Mr. Shapiro:
6      MR. SHAPIRO:  Q  The work that J & D did was just
7  the unitized system or was it other work?
8      A  Or was it what?
9      Q  Other work on the building?
10      A  There was curtain wall work on the lower floors,
11  first and second floor, that J & D performed.  It was
12  curtain wall erection and glazing.
13      Q  Now, what work did Local 27 glaziers do on that
14  job?  What type of work?
15      A  Do you mean -- oh, as of current, what they have
16  been doing?
17      Q  On 1401.
18      A  They have actually been doing some remedial
19  work, repairing some of the window frames.  To what
20  extent, I really don't know.  I guess there was hopper
21  vents, there was some issues with hopper vents.  Oh,
22  operating windows, caulking, things of that nature.
23      Q  Did they do the actual installation of the
24  windows or did they do the actual installation of the

269

1  curtain wall or did they do the actual glazing of the
2  curtain wall?
3      A  To the best of my knowledge, the glaziers
4  haven't touched any of the actual installation of
5  anything on that job to date.
6      Q  So in your estimation, all they are doing is
7  cleanup work?
8      A  Yes.
9      Q  Are you aware of how many people have worked on
10  that job for Local 27 and for how long?
11      A  Yes.  Since about November of 2007 to date,
12  there has been two to three men on that job.
13      Q  Consistently?
14      A  Yes.
15      MR. SHAPIRO:  I have no further questions.
16          FURTHER REDIRECT EXAMINATION
17          by Mr. Schwartz:
18      MR. SCHWARTZ:  Q  And those are two or three men
19  employed by Huron Valley?
20      A  Employed by Huron Valley, that is correct.
21      Q  When you have been on the job, do you have any
22  estimate on an ongoing basis approximately how many
23  J & D people were on the job on a daily basis?
24      A  Of the times I had spot-checked there over the

270

1  course of last year, there was six to eight employees,
2  J & D employees, on that job.
3      Q  And all performing work that would be covered
4  under your contract, the Glaziers contract?
5      A  Yes.
6      MR. SHAPIRO: I have another question.
7           FURTHER EXAMINATION
8              by Mr. Shapiro:
9      MR. SHAPIRO: Q  Mr. Cook, how did Huron Valley
10  procure the workforce on that job?
11      A  Which workforce? The J & D workforce?
12      Q  No. The Local 27 glaziers on that. Did they
13  call you up and ask you for men? Did they call the
14  Union here and ask for men? Did they --
15      A  Most of the time, I would get personal phone
16  calls from some of the Huron Valley supervisors that are
17  employed by them as to if we had people that we could
18  send them. As a matter of fact, probably 90 percent of
19  the time came from phone calls.
20      Q  And how many instances were you not able to give
21  them the manpower they needed?
22      A  There was never an instance.
23      Q  Never?
24      A  To give them guys from our Local?

271

1      Q  Correct.
2      A  No. No. We were able to give them guys pretty
3  much whenever they wanted. Sometimes it takes a day or
4  two, but --
5      Q  Okay. But you were able to fill their request?
6      A  Right.
7      MR. SHAPIRO: I have no further questions.
8      We will have closing statements --
9      MR. SCHWARTZ: He has a right to call his witness
10  again, if he so chooses.
11      MR. SHAPIRO: I'm sorry.
12      MR. CHAPMAN: That's okay. Yes, I just have a few
13  questions. I think we're done with Mike though.
14      MR. SHAPIRO: Okay.
15      MR. SCHWARTZ: You're excused. Thanks, Mike.
16           DENNIS AHEARN,
17  recalled as a witness herein, having been previous duly
18  sworn, was examined upon oral interrogatories and
19  testified as follows:
20           DIRECT EXAMINATION
21              by Mr. Chapman:
22      MR. CHAPMAN: Q  Denny, I just want to follow-up on
23  a couple of things that have been brought up. I think
24  Don got out a lot of stuff that I was going to ask you

272

1  anyway.
2      You know, there has been a lot of discussion
3  about meetings in which Mr. Anderson was involved or
4  letters that Mr. Anderson wrote. Are you aware of
5  those?
6      A  I'm aware of -- over time, I'm aware of what
7  happened. I wasn't at the time aware of all of the
8  conversations that were taking place amongst all of the
9  parties, either him or DiDonato.
10      Q  Was it your direction as president of the
11  company at any point to Mr. Anderson or Mr. DiDonato
12  that alternatives involving the Glaziers Union at the
13  1401 project shouldn't be considered?
14      A  No. The people who work for me understand my
15  commitment to self-performing work. It's just a
16  philosophy I've always had where I'm at to prefer to
17  self-perform over subcontracting. All of the people who
18  work for me know that's my preference, and Tommy
19  DiDonato knows that and Kevin Anderson knows that. They
20  also know that I used to be a glazier, and they also
21  know that I don't consider Chicago an ironworker town or
22  a glazier town. It's just a town where people want to
23  hire us to install windows for them. That's what they
24  understand, and that's my direction for the company, is

273

1  to -- the preference on all of these jobs would -- were,
2  number one, Option A, self-perform with the labor
3  agreements we have. In every city except for Chicago,
4  it's 100 percent glaziers. But before I got to this
5  company, we signed agreements with two, ironworkers and
6  glaziers, and that's what we're living with today.
7      Q  Okay. There has also been a number questions
8  both directed at you and just now by Don at Mike Cook
9  about the lead time that it would have taken to make a
10  decision to subcontract or not or to obtain labor
11  available for the 1401 project. Have you heard those
12  questions?
13      A  Sure.
14      Q  All right. And I think Mr. Cook just mentioned
15  that it would take months to be able to get a group of
16  people together to handle a 20-story building of the
17  type that 1401 is. Did you hear him say that?
18      A  Yes.
19      Q  Now, how important to you was it that you
20  believed that there was going to be the Optima crew
21  available to move over to 1401 in terms of your making a
22  decision as far as getting your labor group together for
23  that project?
24      A  Okay. I'll answer as the -- you know, as direct

274

1 as I can with this. You have heard the name Tommy
2 DiDonato. He has been -- he was the guy who ran Optima
3 for us as a glazier. Tommy is from Cleveland. Mike
4 Cook is right, and Mike, that he is from Cleveland.
5 Tommy has issues healthwise, like I do. It was
6 important for Tom, in my mind, not to live in Chicago
7 when he lived in -- or work in Chicago when he lived in
8 Cleveland, and I told him that as the time went on. I
9 said, You know, I've got to get you home; you need to go
10 home, eat home-cooked meals, run work in Ohio; we'll
11 find other people in Chicago to run the Chicago work;
12 thanks for doing this job, but, Tommy, this is not long
13 term for you. I don't know how Tommy felt about that
14 deep down, but he said, Okay, Denny, you know, wherever
15 I got to go. I said, Your next job will be closer to
16 your house, so we need to start training people here in
17 Chicago to be what you are now here. So for Tommy to
18 understand that his role in 1401 was going to be
19 anything other than finishing Optima was not right. He
20 was not in a position to be the guy who was going to run
21 1401. He did tell me about a couple of young men that
22 were working under him that could kind of take over that
23 kind of responsibility. One of them is Steve Lopez who
24 has taken over for Tommy at Optima. Steve is a glazier,

275

1 and I thought, oh, Steve Lopez would be a good guy to go
2 over to 1401 when Tommy goes back to Ohio. So it's not
3 just crews. It's experienced leaders who can layout,
4 who can install windows that they're familiar with. Not
5 all of the glaziers know how to do that, not all of the
6 ironworkers know how to do that, but Steve Lopez does,
7 and a few of the guys over there do. So my purpose in
8 servicing that job correctly was to promise O'Neil that
9 I would put men on that job who could skillfully do that
10 kind of work.
11       Mention has been made about how heavy some of
12 these windows are. Yeah, they are, and not every
13 glazier can lift that kind, not every ironworker can,
14 but Steve Lopez can, and a few of those guys can. So
15 those were the guys I knew who were experienced enough.
16 .     It has also been mentioned that the jobs were
17 the same. They weren't. On Optima, there is handrails,
18 guardrails, slab wraps, curtain walls, storefronts,
19 entrances, terrace doors, copings. On 1401, there is
20 just windows and storefront and that's it. So it does
21 take a different skill set for people on Optima as there
22 would be for people who were installing windows.
23       Mike Mabus had mentioned before there was grunt
24 work, a lot of grunt work at Optima. Not as much grunt

276

1 work at 1401. So a different build on a guy would be
2 required differently.
3       But the key is the supervision, and that's what
4 I was looking at. If Tommy DiDonato goes back to Ohio
5 and works in Ohio and runs our work there because that's
6 where he lives and that's where he needs to be and I've
7 got one guy, Steve Lopez, who can run my crews for me
8 and that guy is needed at Optima, who is my other Steve
9 Lopez to go down there? If some guy says Wallendorf, I
10 don't know that he's got the skill set Lopez does to run
11 a crew. I can't just put guys on there without
12 leadership. So it's one thing for these guys to say
13 they can service me men. I could say who is going to be
14 the layout guy, who is going to be the coordinator? I
15 have to promise my client that I'm going to have
16 leadership down there. If I don't have leadership and I
17 put bodies who are on an off sheet, I don't think I'm
18 serving us in that job very well. And Lopez was the guy
19 I had in mind. I just couldn't pull him off Optima. He
20 is still down at Optima and will be until May when I
21 could put him on a another job that I'm going to do.
22       That was my commitment in my mind to our
23 company and to the Union. Whether it was Tommy DiDonato
24 what he had in his mind or Kevin Anderson had; they

277

1 don't run the company. I have got that responsibility.
2 I'm the one sitting here today.
3       That's a long answer to a short question, but
4 that's the deal.
5       Q  No. I appreciate it. One of the other things
6 that has been raised is that -- and I think by
7 Mr. Schwartz, is that it seemed as if things with J & D
8 were a foregone conclusion as of February 21st of 2007.
9 Was that the case, that you had already made your mind
10 up to use J & D?
11       A  No. It was my mind made up that I had to have a
12 solution. What happened was Kevin Anderson had told me,
13 I know of a company who does this, they've done it in
14 the past for other companies. And I said to Kevin, You
15 know how I feel about subcontracting work because I
16 didn't think we had enough control over someone else's
17 people to make sure. I said, These guys better have the
18 same attention -- they don't watch out for our money
19 like we do. Kevin says, Well, they've done it before,
20 they've done it for other companies; at least we can get
21 a price from them and that can be Option B if we -- if
22 you are concerned that we can't get guys like Steve
23 Lopez and those kind of guys to do 1401. I said, Okay,
24 go ahead and get a price from them; do you know those

278

1  guys. He goes, Yeah, I know them; I've worked with them
2  in the past; They've done other jobs like this for other
3  people. And he mentioned, I think they've done work for
4  Traynor and Harmon and all of them. I said, Okay, let's
5  see. So he says, I'll introduce you to them. So one
6  day I did meet with J & D to discuss with them if they'd
7  be interested in doing this, could they do this; what
8  kind of manpower commitments have they made to other
9  customers if we give them this job; do they have a good
10  safety record; if I needed them to bond the job, how is
11  their insurance, is there an insurance carrier. Those
12  were the questions I asked them to see if that was a
13  viable option. When I got done with that meeting, I
14  thought, yeah, I guess they could. They have done this
15  in the past. They seemed to have qualified people.
16  This man seemed sincere. I guess if I were to go ahead
17  and hire them, they would do okay for me. That's a
18  viable option for me.
19  Q  Okay.
20  A  I did not ask him at that meeting do you hire
21  glaziers or do you hire ironworkers. I was more
22  concerned with whether his company could perform the
23  work in a timely manner, in a safe manner so I wouldn't
24  be embarrassed with O'Neil.

279

1  Q  Okay. Let me just ask. I just want to look
2  through our exhibits real quickly and see if there's
3  anything that I wanted to ask you any questions about
4  that we would seek to have admitted that hasn't already
5  been admitted, so if I may take a moment.
6       Let me just ask you about Huron Valley 18,
7  which Aaron referred to earlier, which was this JC
8  detail.
9  A  Sure.
10  Q  Is that a record that's customarily kept by
11  Huron Valley?
12  A  If — yeah, it's available. We can pull that
13  up. If I were to go to my clerks and say, Printout all
14  of the men that worked for me on a particular job, they
15  would do things with the computer and print that out.
16  Q  So this is a business record of Huron Valley?
17  A  Yes, sir.
18  Q  And it's kept in the ordinary course of its
19  business?
20  A  Right.
21  Q  By people who know the information that's put
22  into it, right?
23  A  Correct.
24  MR. CHAPMAN: All right. I'd move that be admitted.

280

1  MR. SCHWARTZ: No objection.
2  MR. SHAPIRO: I accept.
3  MR. CHAPMAN: And then, Exhibit 19 was a letter that
4  I had written to Don Schwartz requesting documents and
5  information, and I would move that that be admitted.
6  MR. SCHWARTZ: Well, why is that relevant?
7  MR. CHAPMAN: I think it's just based upon the
8  documents that were produced versus what was requested.
9  I want to just make sure it's clear that -- what was
10  requested.
11  MR. SHAPIRO: I accept.
12  MR. CHAPMAN: Okay. I think that's it.
13  MR. SCHWARTZ: I have a couple of questions.
14  MR. SHAPIRO: Well, you go first.
15  MR. SCHWARTZ: Okay.
16       CROSS EXAMINATION
17       by Mr. Schwartz:
18  MR. SCHWARTZ: Q  Do you know Mike Garneau,
19  G-A-R-N-E-A-U?
20  A  That name sounds familiar.
21  Q  He is the gentleman that did the layout as a
22  glazier on the Optima job for you guys.
23  A  That's probably where I heard his name from.
24  Q  And he had been laid off prior to the beginning

281

1  of the 1401 State Street job, correct?
2  A  I don't know. Maybe you're right. I mean I'm
3  not denying that.
4  Q  So if he was available, the Union could have
5  supplied you Mr. Garneau and --
6  A  I don't know the conditions, if he was laid off,
7  why he was laid off. Some guys quit. They get laid
8  off, but they quit. They don't want to work anymore for
9  us.
10  Q  Maybe, and -- but he could also go back to work
11  and decide he changed his mind, then he could have gone
12  back to work, and if the Union referred him to your job,
13  he would have been qualified to the layoff that you're
14  discussing?
15  A  Making an assumption, yeah, that he was a
16  layoff -- a layoff guy, right.
17  Q  Now, did you give J & D the bid that you had
18  already submitted to O'Neil when you requested that
19  J & D submit a bid to you?
20  A  Did I give them a bid?
21  Q  Yes. Did you give them the bid that you had
22  submitted to O'Neil and ask can you meet this price, in
23  other words?
24  A  No.

282

1   Q  Did they submit a bid to you in writing, J & D?

2   A  Do you know what? I would assume they did. I

3 would not have received that personally. Kevin Anderson

4 probably would have received that and —

5   Q  Do you know when the bid was received?

6   A  No, but I think it was the beginning, January or

7 February or so, of '07.

8   Q  Okay. Now, you mentioned that you want to move

9 Mr. Lopez to another job beginning in May; is that

10 correct?

11   A  That's the plan. I think we'll be done with

12 Optima by then.

13   Q  Okay. Well, you do realize that you're not

14 going to be able to move him to another job because he's

15 not going to be working for you because you're trying to

16 go nonunion effective May 31?

17   A  Who's going to go nonunion?

18   Q  You're going nonunion versus the Glaziers

19 effective May 31 is what you've —

20   A  We're a union contractor. As far as I'm

21 concerned, we will always be a union contractor. If we

22 terminate the agreement with the Glaziers effective

23 May 31st, we'll still be union.

24   Q  But Mr. Lopez as a glazier isn't going to be

283

1 working for you?

2   A  Not if he's still a glazier, and I imagine he

3 will be, he would not working for me then if, if that

4 termination goes into effect.

5   Q  Well, you sent the letter.

6   A  I sent a letter announcing that it was our

7 intent to terminate that agreement. It's not May 31st

8 yet. My door is always open for Mike Cook and Mike

9 Mabus to give me a call.

10   Q  Okay. When did you begin — when was your

11 meeting with — can you tell us who you met with with

12 J & D the first time you met with the representative of

13 J & D?

14   A  Phil Saineghi.

15   Q  And do you recall when that meeting was?

16   A  No, but it was cold outside. I can tell you it

17 was in the winter. I can remember where I met him, but

18 I don't know exactly the date.

19   Q  But it is — I mean your contract that we saw

20 before is dated February 21 with him. I don't know if

21 it was signed that day, but that's the date on the

22 contract.

23   A  I know it wasn't signed that day, and I can tell

24 you that is the date that's truly on that subcontract

284

1 agreement, but I don't know if the person typing on

2 there meant to put February 21st, March 21st, or

3 February 2nd. That I can tell you. But I know it's

4 February 21st on there.

5   Q  You probably had conversations with J & D prior

6 to that time?

7   A  I think it was around that time actually. I

8 think it was — I think it was the January, February of

9 '07 time when I met with them.

10   Q  And they were supposed to begin work in May?

11   A  According to the schedules that we had, we had

12 all targeted that May was going to be the date.

13   Q  So they had about three or four months lead time

14 to prepare, assuming that they were — had the job given

15 to them around February? They would have had three

16 months or so to prepare?

17   A  Yeah. If I would have committed to them in

18 February, they would have had three months. If I didn't

19 commit to them till April, they would have only had

20 about another month, but they said they could handle it either

21 way because I had told them I'm not deciding anything

22 right now. I'm interviewing you.

23   Q  You didn't testify to that this morning that you

24 had told them that you were interviewing them. That's

285

1 the first time you ever said —

2   A  You didn't ask that question. I'm telling you

3 now I was interviewing them. When I met with Phil

4 Saineghi, it was — I questioned him about his ability

5 to do the job, his willingness to do the job, whether

6 he'd be wanting to do the job, and if I did give him the

7 job, would he be able to do it. I had not made a

8 commitment to him at the meeting.

9   Q  Right. But you don't send contracts to people

10 you're just interviewing. You send contracts to people

11 that you intend to hire, and that contract is dated

12 February 21. It's not signed February 21, but it's

13 dated February 21.

14   A  Right. Correct. It was signed in April.

15   Q  Right. So they could reasonably have expected

16 to start planning for May work in February?

17   A  Sure. Right.

18   Q  So the people that you were supposedly

19 soliciting bids for in the middle of April would have

20 only had 30 days notice as opposed to 90 to 120 days

21 notice that J & D had?

22   A  I didn't give those other people enough time. I

23 solicited the glaziers after meeting with these fellows

24 and them saying that I — that — and requested that I

Huron Valley Glass vs Local 27    March 20, 2008

73 (Pages 286 to 289)

286

1 possibly do that. I said, I'll go to other people
2 besides J & D, give me the names of some glaziers. And
3 Kevin Anderson had said, I know of some glaziers; I'll
4 send — I said, Sure. So I hadn't committed to J & D.
5    Q  But you know that 30 to 45 days notice for a
6 million dollar job is really not adequate notice for a
7 company to begin preparations to do work?
8    A  No, I don't know that. No, that's not — that's
9 an opinion. Mike Cook has that opinion. I'll tell you
10 what, if I came to someone who wanted to do work for me
11 and they — some guys could make that work, yeah.
12 They'd say, Do you know what, I'll get it together —
13    Q  That's not normal though. I mean certainly —
14    A  I don't know what normal is.
15    Q  — O'Neil didn't come to you in October of 2006
16 and say, We want you to start this job in January of
17 2007.
18    A  No.
19    Q  They said, You're going to start the job in May
20 of 2007. So you had like eight months to prepare —
21    A  But labor has nothing to do with that. Material
22 delivery does. You can put together a crew in a month
23 or six weeks' time laborwise. You can't get Chinese
24 material here in six weeks' time.

287

1    Q  Okay.
2    A  Labor — putting together a labor crew of six or
3 seven guys is not as difficult as buying Chinese
4 windows.
5    Q  Okay.
6    A  It doesn't take as long.
7    MR. SCHWARTZ:  Okay.  I don't think I have any
8 further questions.
9    MR. SHAPIRO:  Denny, I have a question.
10         FURTHER EXAMINATION
11         by Mr. Shapiro:
12    MR. SHAPIRO:  Q  How many states do you do work in?
13    A  Right now, Ohio, Chicago, a couple of —
14    MR. SCHWARTZ:  That would be Illinois. That would
15 be Illinois because it's a state.
16    A  Yeah, Illinois. Well, because — we're bidding
17 some other work actually in Indiana, and we're actually
18 looking at some jobs possibly in the Washington, D.C.
19 area, but —
20    MR. SHAPIRO:  Q  So you do work all over the
21 country?
22    A  This region. Let's say region.
23    Q  Five states, six states?
24    A  Not that many. Four, I'll say.

288

1    Q  Four states?
2    A  Yeah.
3    Q  And you never send anybody from your company to
4 be on the job? You do all of these jobs with manpower
5 from that city?
6    A  No. We have sent Michigan people to Chicago
7 here to work on 1401 and glaziers that maybe who might
8 be slow where we're at because Michigan is really slow
9 right now.
10    Q  But you have your own people that you trust that
11 you send out to a job to supervise or work on the job?
12 You don't depend totally on manpower from wherever
13 you're doing the work?
14    A  My preference is to have guys work where they
15 live.
16    Q  I know that.
17    A  But I have sent people from Michigan to Illinois
18 to supervise. Tommy DiDonato came from Ohio to
19 Illinois, so, yes, I have done that.
20    Q  But as past practice, this is what you do just
21 to have the good interest of your company at heart to be
22 on the job to see everything is going okay?
23    A  Okay. Let me answer it that way. Past
24 practice, I have been here two years. When I first came

289

1 here, the only guy that was not working where he lived
2 was Tommy DiDonato. Everybody else works where they
3 live, but I — that's the way I prefer, but Tommy is
4 from Ohio, right.
5    Q  Now, you said in the past, that W & G and Huron
6 Valley don't exist, or they have nothing to do with each
7 other, right?
8    MR. CHAPMAN:  I don't think that's what he said.
9    A  No, I didn't.
10    MR. SHAPIRO:  Q  What did you say?
11    A  I said I don't know really. W & G seems to be
12 the payroll company for the field people that work for
13 Huron Valley, like a payroll company.
14    Q  See, the thing I don't understand on your
15 Exhibit 18 and you have Huron Valley here, and you have
16 W & G here, and it's prepared by your company, I just
17 want to make sure that these aren't tied together. You
18 have alluded to the fact that one doesn't have anything
19 to do with the other, and yet, I'm questioning why you
20 have something from W & G on the same page that you have
21 on Huron Valley. I don't understand how this can be if
22 they have nothing to do with each other.
23    A  Well, they do have something to do with each
24 other. The Huron Valley Glass Company hires workers

Huron Valley Glass vs Local 27    March 20, 2008

74 (Pages 290 to 293)

290

1  that work for them that receive a payroll check from a
2  company called W & G. I don't know why they set it up
3  that way. So I think W & G does a lot of accounting
4  functions payrollwise, not any otherwise. They don't
5  buy materials. They don't do anything else other than
6  issue payroll checks to the employees of Huron Valley
7  Glass. And by the way, they also do it for the drywall
8  companies, but I don't know why. So there is a
9  relationship, but I'm— that's all I know.
10  Q  Okay. I'm just trying to understand this.
11  A  Yeah, I am, too. I don't—
12  Q  That's all I'm trying to do.
13  A  I don't know what that is.
14  MR. SHAPIRO:  Any further questions?
15  MR. O'DONNELL: I have a question, Al.
16        EXAMINATION
17       by Mr. O'Donnell:
18  MR. O'DONNELL: Q  Denny, earlier you said that the
19  glaziers that went over to 1401 were doing work that
20  were because of manufacturer's defects, correct?
21  A  I would classify it that way.
22  Q  Wedge rubber falling out—
23  A  Wedge rubber falling out of windows, the doors
24  were kind of junky.

291

1  Q  Not work that J & D had done?
2  A  J & D installed the windows. All right? And I
3  had found out that you know how when you cut the gaskets
4  they shrink. When the Chinese made the windows, they
5  didn't make them -- the gaskets a little longer. They
6  apparently cut them the exact length. So when the
7  gaskets were shrinking a little bit, there was air gaps,
8  so I needed those gaskets replaced and cut the correct
9  length, so I said let the glaziers -- I called up Steve
10  Lopez. I said, Send some glaziers over there and fix
11  those gaskets because one of the Chinese people, they
12  didn't cut their gaskets long enough.
13  Q  So that 1600 hours that the glaziers worked
14  would not be deducted from the 50 percent of the hours
15  that J & D had done, correct?
16  A  Huh?
17  Q  The 1600 hours that were deducted on this chart,
18  which is a little confusing to begin with, is work over
19  and above the 10,000 hours, correct?
20  A  Yes.
21  Q  It wasn't a part of J & D's?
22  A  Well, if -- I could have had J & D do the
23  gasket.
24  Q  But then J & D would have had another —

292

1  A  But that would have been added on top of those
2  hours. So if you were to look at all of the hours that
3  were worked on the job, it's 10,777, plus the glaziers
4  hours, plus I've still got glaziers on there and they
5  probably will be for another month besides just gaskets.
6  They're doing other things besides gaskets.
7  Q  So all of the subtractions on the chart aren't
8  really subtractions from this figure up here of 10,000
9  hours. The 1600 hours was subtracted from the
10  50 percent of the 10,000 hours. The 1600 hours should
11  have been added on to the 10,000 because it was work
12  over and above what J & D did, correct?
13  A  I'll answer your question, but I can't comment
14  on that chart. I mean if you want to add or subtract
15  something, be my guest, but —
16  Q  Okay. I'm just trying to clarify the chart.
17  It's a little foggy with me and —
18  MR. GOODWIN: Me, too.
19  A  Okay. I understand the chart, but —
20  MR. CHAPMAN: It's a hard chart. I acknowledge
21  that.
22       FURTHER CROSS EXAMINATION
23       by Mr. Schwartz:
24  MR. SCHWARTZ: Well, the chart is really -- now I'll

293

1  ask you, is really apples and oranges regarding the 1600
2  hours. It's got nothing to do with J & D hours, that
3  1600 hours?
4  A  No. It's got to do with glaziers —
5  Q  Right.
6  A  -- who have work on 1401 —
7  Q  For you?
8  A  -- and it's for 1,607 hours for Huron Valley
9  Glass working on that job.
10  Q  Right. And 10,770 hours is what J & D's
11  ironworkers worked on the job?
12  A  Correct.
13  Q  And they're cumulative to get the total number
14  of work -- of unitized work and remedial work —
15  A  Correct.
16  Q  -- on the job?
17  A  But the glaziers aren't done. J & D is just
18  about done. You know, the building is enclosed. But
19  I'm probably going to have glaziers there -- because
20  they're caulking. They're caulking in the areas and
21  adjusting doors and they're going to hang a few doors
22  and they're going to be there for another month.
23  MR. SHAPIRO: Has J & D been paid everything in
24  their contract yet?

294

1    A  No. Neither have we.
2    MR. HARRIS: Are you going to backcharge them for
3    the work that -- the glaziers work that is going on
4    right now?
5    A  If I can determine -- I want to be honest with
6    them and fair with them.  If J & D messed up, I want to
7    backcharge them, but if it's a window problem like these
8    gaskets being cut long or something, I'm not going to
9    blame them for that, so I think I've just got to eat
10   that, you know.
11   MR. HARRIS: You paid 100 percent on the material
12   already?
13   A  Yeah, ahead of time.
14   MR. SCHWARTZ: Who -- let me ask another question.
15   Q  Who decides -- the money that you get, Huron
16   Valley gets, from O'Neil, who decides that it's going to
17   stay in the Huron Valley bank account and who decides
18   that it's going to get forwarded on to the  W & G bank
19   account?
20   A  I think what happens, Huron Valley collects all
21   of the money from O'Neil, right, and then Huron Valley
22   reimburses W & G for the payroll checks that it wrote to
23   the employees.
24   Q  So ultimately the payroll is really coming

295

1    from --
2    A  It would be like if I was paying ADP or somebody
3    to do my payroll.
4    THE REPORTER: I'm sorry. Could you finish your
5    question.
6    Q  So ultimately Huron Valley is really paying the
7    payroll?
8    A  Yes.
9    Q  It's coming out of your budget?
10   A  Yes.
11   MR. SCHWARTZ: Okay.
12   MR. SHAPIRO: Any other questions?
13   We will have closing statements.
14   MR. SCHWARTZ: Well, I -- we'll probably stand on
15   your our brief. I don't know that --
16   MR. CHAPMAN: What are you talking about? He's
17   sitting here and he's been waiting all day.
18   (Discussion had off the record.)
19   MR. TOOMEY: What I want to say is Michael Cook said
20   it right. When the question was posed to him, he said
21   that every single member would be injured by virtue of
22   the subcontracting breach. And it has also been
23   computed and Mr. Purser doesn't really disagree with
24   this figure of $396,936.50. Even the employer's figures

296

1    support that, but they have reduced that figure by
2    50 percent, and then reduced that some more and some
3    more, but Mr. Purser did simply what he was told. And
4    as you saw, the numbers simply don't add up. They are
5    taking deductions for unemployment that he doesn't know
6    whether it was received. He is taking deductions for
7    hours that were over and above what was performed by
8    J & D because the employer gave remedial work to the
9    glaziers to correct. And we have -- while we have just
10   have been discussing that, whether it's J & D's error or
11   that of the manufacturer is really of no import. That
12   wasn't part of the subcontract that was let.
13   Now, at the outset, I said in the opening
14   statement that we will establish that a contract breach
15   of the subcontracting clause occurred. And I think that
16   is all but admitted here by the employer. While he says
17   it was for this reason or that reason or some other, the
18   bottom line is the work was subcontracted to a
19   nonsignator Glazier employer in violation of Article 9,
20   section 2. Once we get past that threshold then, the
21   only issue is -- to determine is damages.
22   And there is no right to assume that people
23   were -- should have been entitled to unemployment, nor
24   is there an issue that -- about the 50 percent for which

297

1    Contractor makes a large argument. Had he performed it
2    with his own forces, that would have been one thing, but
3    he made it clear that the decision was not to do that,
4    but it was to subcontract the work. Your subcontracting
5    clause is unique in that it makes in Section 1 special
6    provisions for subcontracting, and that if you have a
7    historic practice of subcontracting work to another
8    employer who has an agreement with the Ironworkers, you
9    may do so, but if you have no historic practice, and
10   clearly they have no practice at all, they have done
11   essentially one job in this area and they did it with
12   their own forces, they're not in a position to take
13   advantage of that. There is no automatic 50 percent
14   pass through, which is essentially what they're arguing.
15   The contract controls the situation, and we're really
16   asking for a strict instruction of that agreement.
17   The next issue is -- and certainly the Union
18   gave adequate notice of the problem to the employer.
19   They said, Here is what the problem is, here is what
20   your potential damages would be for a breach. All of
21   that, the legal authority for that, was set out on
22   March 5th. And nothing changed. Nothing was directed.
23   They went ahead and they performed the job.
24   In my -- in our brief in support of the

Huron Valley Glass vs Local 27    March 20, 2008

76 (Pages 298 to 301)

298

1  argument, you will see at pages 6 and 7 all of the
2  authority is laid out.
3        I want to address for a second in the opening
4  statement, we said you're going to hear a shell game.
5  It happens to be a game of corporate shells. Huron
6  Valley says we don't even know who this W & G, LLC is.
7  They're in the same building, they do all our payroll,
8  the comptroller is the same, they bank at the same
9  corporation -- both with the LaSalle Bank. They also,
10 if you look at the exhibits, have the same corporate
11 registered agent in the State of Illinois. The man is
12 the president of the company. Doesn't know who owns it.
13 Doesn't know who the shareholders are. He just works
14 there. But here is all I know, the Seventh Circuit --
15 W & G, LLC is bound to our contract just as if they had
16 signed it. The Seventh Circuit says a signature at the
17 bottom of a bargaining agreement is unnecessary. And
18 that's based on a 2004 case called Banner Restorations
19 at pages 8 and 9 wherein they say you can adopt a
20 contract through a course of conduct. The course of
21 conduct here is they pay their current wage rates, they
22 make use of the Union referral hall, W & G, Inc., has a
23 bond at the current amount of the present Association
24 agreement, therefore, it has, through a course of

299

1  conduct, adopted the Association agreement through it's
2  May 31, 2009, expiration date.
3        One of the issues raised at the outset here is
4  the Joint Committee's jurisdiction over all of the
5  entities, and the first exhibit that Mr. Schwartz marked
6  and handed out this morning was a letter on
7  February 28th advising counsel that all parties were
8  intended to be bound by this, and he could come in to
9  this proceeding and argue whatever he wanted on behalf
10 of any one of those entities; so it was before the
11 record was ever opened. In fact, almost a month before
12 we ever sat down here, that issue was out on the table
13 and before all parties.
14       The -- one last thing I want to say is when we
15 get to this issue -- and if you look at -- that's
16 frequently a matter that's looked at by the court. At
17 page 9 of my brief, there is a variety from other trades
18 of decisions for a lot of them involving large sums of
19 money about people claiming, hey, it's not me, it's him.
20 But again, that's really just a sideshow to the real
21 issue, and that is, was the contract breached and what
22 is the appropriate measure of damages.
23       Now, we have asked for pay in lieu of work, and
24 the case law is repleat that the formula used is hours

300

1  lost measured by the hourly rate. And the employer in
2  his calculations seriously doesn't argue with that,
3  except he says you should reduce it by half -- I think
4  we've addressed that -- and he also has an interesting
5  argument, but not very compelling, about you couldn't
6  have provided me with the manpower, so, yes, I breached
7  your contract, but you're not really damaged. And our
8  brief contains a variety of cases that reach an opposite
9  conclusion, and the reason for that is -- Mike Cook got
10 it right -- not just every member of the Union is
11 damaged, but the Union itself is damaged in -- out on
12 the street, in the marketplace, and their own reputation
13 among their members about their ability to enforce the
14 contract.
15       And the very last thing that we attached to
16 our own brief was a labor arbitration award decided in
17 November, November 25th of 2007, so we're right up to
18 date, and it's a pay in lieu of work case of remarkable
19 parallels to the proceeding here. It was a nonunion
20 contractor who received a subcontract; and in the award,
21 the employer was directed to provide the union with
22 records showing the hours worked by nonunion employees.
23 Here it was installing drywall. The parties will then
24 determine the amount of damages to which the union is

301

1  entitled by using those hours, which we saw as an
2  exhibit of J & D's, with the applicable union wage
3  package and that sum will become part of this award.
4  And we're going to ask for this additional relief, too,
5  that the Arbitrator will retain jurisdiction for the
6  purpose of resolving any disputes that may arise out of
7  the interpretation or application of this award. This
8  is what is frequently done by arbitrators. This
9  happened to be a federal mediation and conciliation
10 arbitrator. I don't want to belabor the point. It's
11 part of the brief.
12       And the other thing that we would ask you to do
13 is assert jurisdiction over I believe the word that was
14 used by the company witness was an umbrella of
15 companies. And that umbrella includes Huron Valley
16 Glass, LLC, the actual signator to the contractor,
17 W & G, Inc., George Stripp, Individually -- because it's
18 a defunct corporation, he could personally liable --
19 and W & G, LLC.
20       Oh, and finally, that you have the right under
21 the contract to determine if the breach of contract was
22 willful. We think that adequate evidence has been set
23 forth today showing that the actual dates of contracts
24 give a clear indication of what was really going on

302

1  here, and the Union gave notice, told them here is what
2  we're going to do next. The Union's belief is it's a
3  willful violation. That determination is up to the
4  Joint Committee, and the contract requires if you make a
5  finding of willfulness, that you can assess an
6  additional percentage of any award that you may render.
7  Thank you.
8      MR. SHAPIRO: Counsel.
9      MR. CHAPMAN: You know, I have a couple of thoughts,
10  and like Mr. Toomey, there is a lot of stuff in the
11  briefs, but a couple of things hit me is it — one of
12  the things, just to get it out of the way, the best —
13  again, we kind of clutter up the proceeding with this
14  W & G thing. The best evidence that we have right now,
15  the only evidence that you have before you, is that
16  W & G acted as a payroll service for Huron Valley.
17  That's all that is. That's what you see. No one is
18  saying that it had been prejudiced by the existence of
19  W & G's signature. No one has been hurt by it.
20  Monies — his latest testimony that was elicited by
21  Mr. Schwartz himself was that these monies were moved
22  for the purpose of paying salaries through a payroll
23  service which is not unlike ADP or Paychexs or anything
24  else, and that the mere fact — and the Illinois law

303

1  cases are very clear on this — the mere fact that an
2  organization is used amongst related companies does not
3  provide a ground for piercing the corporate veil, which
4  is what's being asked to be done here, which is the
5  thing that is going to pollute this proceeding
6  unfortunately if it goes ahead. They've got a party
7  here that's doing the work, the people in this room know
8  Huron Valley, they know the entity, and that people
9  don't even know W & G is all the more reason why it
10  shouldn't even be here. The fact is the entity that is
11  responsible or it's taking responsibility in this
12  proceeding is doing it. There is no injustice being
13  shown, no prejudice being shown, all of the things that
14  are required for this, and I think even Mr. Toomey and
15  Mr. Schwartz would acknowledge it, that to pierce the
16  corporate veil or to tab some single employer, there has
17  to be an injustice, and there's really — the W & G
18  issue, respectfully, it's a red herring and it continues
19  to be trotted out.
20      But the real point here is there's two things
21  the Union had to show. The Union had to show that, A,
22  there was a breach of this agreement by Huron Valley,
23  and secondly, that there are particular people that were
24  damaged.

304

1      Now, I understand the testimony is — we've got
2  kind of a draw when it's all said and done. Mr. Mabus
3  and Mr. Cook have noted that, in essence, they went to a
4  meeting, decisions were already made. Denny has said
5  they went to the meeting and they asked for help. The
6  bottom line is we could argue all night about who should
7  have done what when. All right? And on reflection, I
8  am sure that everybody would have done it differently
9  knowing today what they know. But bottom line, we're at
10  a different spot now.
11      The Union had obligations to provide labor.
12  The particular clause in question under Section — I'm
13  sorry, under Section 6 really speaks to that in the
14  agreement as far as what the obligations would be. It
15  says it, and we know that the Union's obligation is to
16  provide labor, to provide competent labor. The real
17  trouble here is — also, what I think is a
18  misunderstanding, Huron Valley has never asserted that
19  there was not labor available to do the work at 1401,
20  and I want to be real clear about that. It's true that
21  Huron Valley made a decision to subcontract that work.
22  So be it. We know that there are glaziers out there.
23  That if Mike Mabus or Mike Cook or Mike O'Donnell had
24  said, I want this person, that person, or the other to

305

1  leave their job and come over to 1401, they could have
2  done it. We don't argue that. But now we get to the
3  real thrust of it, which is, okay, let's assume for the
4  sake of argument that there was a breach. Now, we get
5  to the problem that the cases are really addressing,
6  which is, okay, who is injured and who is entitled to be
7  paid for it.
8      Now, one thing, I know what Mike Cook said is
9  that our reputation — John mentioned it, too — that
10  we've — you know, be it a political issue, a
11  reputational issue, but this isn't a case about pain and
12  suffering. It's the — a breach of contract remedy is
13  what do you — what does it take to put people in the
14  position where they would have been had the breach not
15  occurred. You know, get me to where I was if you had
16  done what you were supposed to do. And what you had —
17  if you had done what you were supposed to do, there
18  would have been composite crews. All right?
19      But the case — I want to focus one second in
20  our brief. You will read it. It's a lot of legal
21  stuff, a lot of legal mumbo jumbo except for this. It
22  says — and this is a case of the NLRB — For each
23  employee where a backpay award is claimed — and backpay
24  and payment in lieu are the same thing — the Union has

306

1  to show that the individual gross pay calculation is
2  reasonable. All right? The -- it must be done on a per
3  employee basis. Let's assume you go ahead and say,
4  Listen, let's order $100,000. Who gets it? Who gets
5  that money? What particular employee was harmed? And
6  we kept asking the question: Who got hurt? And each of
7  their witnesses said: I don't know. But how can you
8  say that somebody has been harmed by a breach of
9  contract without saying who it was. This isn't the
10 Union's money. The Union wasn't deprived of a job. The
11 Union acts here in a representative capacity to get
12 money for -- that's their aggrievance. It's a grievance
13 procedure. Somebody has been hurt, and the person
14 aggrieved is a particular employee or a particular set
15 of employees. And what our chart was really trying to
16 show was that there's a bunch of people who were
17 working, so you can't get paid twice, but that's exactly
18 what happens here.
19     Now, you may say, okay, wait a minute, there
20 was a wrong. But it gets to the -- the fundamental
21 issue is that, yeah, there can be wrong sometimes, but
22 the good news is if no one has been injured by virtue of
23 the wrong -- I'm going to give -- I'm just assuming,
24 okay, fine, there's a wrong. I don't agree. But if

307

1  that's the case, you don't just throw money out because
2  there is a wrong. You have to throw out money because
3  there is an injury and that money will actually be used
4  to help somebody who was injured. Not one person's name
5  is mentioned. Not one employee. So this isn't about
6  pain and suffering in an auto accident case where you
7  kind of just say, Well, listen, we'll throw $300,000 at
8  it because someone was hurt. This is a contract case,
9  and that's what the things in our brief talk about.
10     Again, I appreciate that it's late and
11 everything, but I guess what struck me -- and I'll be
12 done with it -- is it really comes down to who got hurt,
13 if there was a wrong, and to me, there was no clear
14 evidence that there has been a breach. Obviously, the
15 subcontract occurred. Whether the Union provided the
16 labor or it could have provided the labor is a question
17 that remains unanswered. Whether it was their
18 obligation to tender people and show that there were
19 people available, it never did. But forgetting even all
20 of that, there is not the name of a single employee who
21 was injured here, and absent that proof, the Union's
22 request for money in any amount must be denied.
23     MR. SCHWARTZ: Let me just say a couple of things in
24 rebuttal.

308

1      I mean I -- what counsel indicated is that it's
2  a breach of contract case. Well, this Collective
3  Bargaining Agreement is not between the Union and Mr. Wallenberg and
4  Huron Valley. It's between the Union and Huron Valley.
5  It's a Union grievance, and it's not an individual
6  grievance, and it's regarding the subcontracting clause
7  of the contract for which an individual worker really
8  has no standing to assert a claim in the most part; so I
9  fundamentally disagree with the basic premise that what
10 we have here is an individual claim. This is not an
11 individual claim. It's a group claim. The Union
12 itself was damaged in the amount of 10,770 hours. There
13 was no right to set off for the 50/50 rule because this
14 is a subcontracting claim and not a claim for a breach
15 of mutual agreement that Mr. Mabus alluded to regarding
16 essentially a Cold War resolution which is that the
17 parties will agree if you perform the work yourself and
18 you're a dual signator, that you can use 50/50. That's
19 not what the subcontracting clause says. It's not an
20 individual case. The Labor Board is probably a backpay
21 for some individual discriminatee who was fired.
22     Mr. Toomey stated in our closing that in a case
23 where you've got a contract claim where the Union is a
24 grievant -- and the Union is the grievant here, not an

309

1  individual -- that the Union is entitled to the remedy,
2  and how the Union distributes the money is its
3  prerogative.
4      In addition, obviously the out of work lists,
5  they excluded the man that was damaged the most, which
6  is Mr. Wallenberg, the guy who is there, who was there
7  on there every day because he doesn't have a car but
8  could easily take public transportation downtown. They
9  discounted him. They cut out 5,000 hours for his money
10 because they say, Well, he shouldn't be included because
11 he didn't work. Well, he didn't work because he didn't
12 have a car, but he could always get downtown. So
13 there's one person right there that's the largest number
14 of hours that they seemed to discount, and pooh-pooh
15 when he is the one that's most fundamentally damaged.
16 So I think everything that counsel has stated is really
17 upside-down and incorrect.
18     In addition, the Funds, which is in another
19 forum, have also been damaged, and if you accept this
20 argument here and it was made positive before the Court,
21 then the Funds would have no basis for asserting a claim
22 for fringe benefits here.
23     So I think I have -- we fundamentally disagree
24 with the fact -- as well as Union dues, but -- so we

## 310

1 just fundamentally agree with looking at this case as an
2 individual grievance as opposed to a Union grievance, it
3 was -- that what he kept repeating is that this is a
4 breach of contract, this is a breach of contract, and
5 the contract is not with individual members in the
6 company. It's with the Union.
7 The Union has been aggrieved in a discreet and
8 concrete number of hours. All of the wages and dues are
9 owed as a breach of contract remedy, and all you're
10 going to do is to encourage people to breach the
11 contract and then say after the fact. Well, the Union
12 has got full employment, so we can do whatever we want.
13 That's just fundamentally a violation of any precept
14 that would say that an arbitrator is supposed to
15 enforce a contract. You cannot subcontract in violation
16 of the contract with impunity and say. Because most of
17 the people are working, therefore, we don't owe you any
18 money for this fundamental breach of contract. It's
19 illogical. It makes no sense. It makes as little sense
20 as if it does excluding Mr. Wallersberg because he didn't
21 have a car. In fact, that makes even less sense.
22 So we don't think that there is a selorf for
23 anything, and under the Glassmeasters case, which many of
24 you are familiar with, the Court awarded full damages

## 311

1 for a breach in that case, and we think that a full
2 breach -- it should be award here.
3 MR. CHAPMAN: Is that a benefits case?
4 MR. SCHWARTZ: That was a benefit case.
5 MR. CHAPMAN: So what does it have to do with this?
6 MR. SCHWARTZ: It's the same principle. It's a
7 breach of contract.
8 MR. CHAPMAN: I don't think it -- I disagree.
9 MR. SHAPIRO: If you would like to --
10 MR. CHAPMAN: Yeah, I mean, you know, it's --
11 MR. SCHWARTZ: We can talk all day.
12 MR. CHAPMAN: Right. You know, people who are
13 harmed by a breach should be entitled to get a recovery.
14 People shouldn't get a double recovery. If they worked
15 and the Union got money, they can't work more than the
16 hours they have to be able to provide. If you go and
17 say, Well, listen, you were working all of those
18 hours -- and Wallerford -- I don't know remember what
19 his last name is -- is a guy that wouldn't even be
20 someone who would be qualified to go on this job. Even
21 Mike was -- had difficulty saying how this guy would be
22 working on a utilized job, and they couldn't get him out
23 to any other jobs for over a year. I don't know how you
24 could include a guy like that. I don't even know him.

## 312

1 I don't want to insult him. I just look at the numbers.
2 I don't know who he is. But do you know what? Just
3 because -- you could say that's isn't punishment, and our
4 brief shows it. These cases aren't about punishing
5 somebody because they breached a contract even if you
6 say they did. It's about rewarding -- in essence,
7 reimbursing people who suffered a loss. The Union acts
8 here in a representative capacity. If didn't get paid
9 the hours. It didn't lose the hours. It's the people
10 that worked that either did or didn't. Those are the
11 people who are the measure here. And there hasn't been
12 one lick of evidence that shows what particular people
13 were injured separate and apart from the bad feeling.
14 There is a lot of bad feeling here, but this is a
15 dollars case to regress an injury that people either
16 suffered or they didn't, and there has been no proof
17 that any of them did.
18 MR. SHAPIRO: Okay. The Board will meet and file at
19 a later date a written brief with our findings.
20 The Board will meet and file a written brief or
21 report of our findings.
22 MR. CHAPMAN: Thank you all for you time.
23 MR. SCHWARTZ: Thank you very much.
24 MR. SHAPIRO: We are going to meet now, and -- but

## 313

1 we will file at a later date a written brief.
2 (Whereupon the hearing was concluded at 4:35
3 p.m.)

Huron Valley Glass vs Local 27    March 20, 2008

80 (Page 314)

314

```
 1   STATE OF ILLINOIS )
                       )
 2   COUNTY OF COOK )
 3       MICHELLE M. CETKOVIC, being first duly sworn,
 4   deposes and says that she is a Certified Shorthand
 5   Reporter in Cook County, Illinois, and reporting
 6   proceedings in the courts in said County.
 7       That she reported in shorthand and thereafter
 8   transcribed the foregoing proceedings;
 9       That the within and foregoing transcript is
10   true, accurate and complete and contains all the
11   evidence which was received and the proceedings had upon
12   the within cause before the Association of Glazing
13   Contractors and Glaziers Local 27 Joint Arbitration
14   Committee.
15
16
17   _____
18       MICHELLE M. CETKOVIC, C.S.R.
         Notary Public
19       311 South Wacker Drive
         Suite 300
20       Chicago, Illinois  60606
         Phone: 312-386-2000
21
22
23
24
```

Off-List Calculation Sheet
for employees of Glaziers Union Local 27 (5/07-2/08)

08CV4166
JUDGE GUZMAN
MAGISTRATE JUDGE SCHENKIER

| J&D Hours | 10/15/07-10/21/07 | 10/22/07-10/28/07 | 10/29/07-11/4/07 | 11/5/07-11/11/07 | 11/12/07-11/18/07 | 11/19/07-11/25/07 | 11/26/07-12/2/07 | 12/3/07-12/9/07 | 12/10/07-12/16/07 | 12/17/07-12/23/07 | 12/24/07-12/30/07 | 12/31/07-1/6/08 | 1/7/08-1/13/08 | 1/14/08-1/20/08 | 1/21/08-1/27/08 | 1/28/08-2/3/08 | 2/4/08-2/10/08 | # of Weeks Unem. Ben. (Assuming Single/No Dependents) | Estimated Weekly Benefit Amount | TOTAL J&D Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J&D Hours | 323 | 288 | 262 | 166 | 296 | 199 | 348 | 378 | 338.5 | 264 | 192 | 54 | 144 | 279 | 251 | 121 | 136 | | | 10525 |
| Wallendorf | 32 | 40 | 24 | 40 | 40 | 24 | 16 | 0 | 0 | 32 | 24 | 24 | 40 | 40 | 40 | 40 | 40 | 31 | 11,439.00 | |
| Feltes | 0 | 0 | 24 | 8 | 0 | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | | 0 | 0.00 | |
| McCrea | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | |
| Tyrcha | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | |
| Mackey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | |
| Sullivan | 0 | 0 | 16 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 32 | | 1 | 369.00 | |
| Hill | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 369.00 | |
| Sterk | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 16 | 0 | 16 | 8 | 8 | 0 | 16 | 16 | 0 | 0.00 | |
| Gaidelis | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | |
| Sadek | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | |
| Gillen | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 24 | 0 | 0 | 8 | 40 | 8 | 1 | 369.00 | |
| Halsey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | |
| Calvert | 0 | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | |
| Wargin | 0 | 0 | 0 | 0 | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | |
| Bilina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | |
| Rakowski | 8 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 24 | 8 | 0 | 16 | 0 | 16 | | 11 | 4,059.00 | |
| Green | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | |
| Cadwallader | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | |
| Kimble | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | |
| Carroll | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 369.00 | |
| Vulgamott | 0 | 0 | 0 | 16 | 0 | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | |
| Cahill | 0 | 0 | 16 | 0 | 0 | 0 | 8 | 8 | 0 | 0 | 0 | 0 | 8 | 8 | 0 | 0 | 0 | 1 | 369.00 | |
| Lopez | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 1 | 369.00 | |
| Coleman | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1,107.00 | |
| Peterson | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 369.00 | |
| Appelhans | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 2,214.00 | |
| Johnson | 0 | 0 | 8 | 0 | 0 | 16 | 0 | 0 | 0 | 8 | 8 | 16 | 8 | 16 | 0 | 8 | 0 | 4 | 1,476.00 | |
| Jordan | 0 | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1,107.00 | |
| Dabrowski | 40 | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 1,476.00 | |
| Smolik | 0 | 8 | 24 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 8 | 0 | 16 | 8 | 8 | 1 | 369.00 | |
| Burns | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | |
| Stogsdill | 8 | 24 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 369.00 | |
| Rucker | 0 | 0 | 16 | 24 | 8 | 0 | 0 | 0 | 24 | 40 | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 738.00 | |
| Kalata | 0 | 0 | 16 | 0 | 0 | 0 | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 369.00 | |
| Dotts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | |
| TOTAL | 96 | 96 | 168 | 120 | 64 | 40 | 40 | 24 | 40 | 126 | 72 | 120 | 72 | 64 | 128 | 128 | 120 | 73 | 27,306.00 | |
| Max Amount Owed at 50% of Total & $35 per hour | $5,653 | $5,040 | $4,585 | $2,905 | $5,180 | $3,483 | $6,090 | $6,615 | $5,924 | $4,620 | $3,360 | $945 | $2,520 | $4,883 | $4,393 | $2,118 | $2,380 | | $184,193 | |
| Max Amount of 50% OR Lesser Hours at $35 per hour | $3,360 | $3,360 | $4,585 | $2,905 | $2,240 | $1,400 | $1,400 | $840 | $1,400 | $4,410 | $2,520 | $945 | $2,520 | $2,240 | $4,393 | $2,118 | $2,380 | | $122,310 | |
| Max Amount of 50% OR Lesser Hours at $35 per | $2,240 | $1,960 | $4,585 | $2,800 | $840 | $560 | $840 | $840 | $1,400 | $3,290 | $1,680 | $945 | $1,120 | $840 | $3,080 | $2,118 | $2,380 | | $97,512 | |
| Glaziers Hours Used / Paid at $35 per hour | | | | | | | | | | | | | | | | | | 2343.5 | 82,022.50 | |

Off-List Calculation Sheet
for employees of Glaziers Union Local 27 (5/07-2/08)

| | 5/7/07-5/13/07 | 5/1407-5/20/07 | 5/2107-5/27/07 | 5/28/07-6/3/07 | 6/4/07-6/10/07 | 6/11/07-6/17/07 | 6/18/07-6/24/07 | 6/25/07-7/1/07 | 7/2/07-7/8/07 | 7/9/07-7/15/07 | 7/16/07-7/22/07 | 7/23/07-7/29/07 | 7/30/07-8/5/07 | 8/6/07-8/12/07 | 8/13/07-19/07 | 8/20/07-8/26/07 | 8/27/07-9/2/07 | 9/3/07-9/9/07 | 9/10/07-9/16/07 | 9/17/07-9/23/07 | 9/24/07-9/30/07 | 10/1/07-10/7/07 | 10/8/07-10/14/07 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J&D Hours | 98 | 154 | 96 | 119 | 236 | 248 | 232 | 251 | 264 | 276 | 316 | 228 | 392 | 416.5 | 266 | 359 | 328 | 322.5 | 401 | 377 | 308 | 445.5 | 352 |
| Wallendorf | 40 | 40 | 40 | 32 | 24 | 40 | 40 | 32 | 32 | 40 | 32 | 40 | 40 | 32 | 32 | 32 | 40 | 24 | 32 | 40 | 32 | 40 | 40 |
| Feltes | 40 | 16 | 0 | 0 | 8 | 0 | 0 | 16 | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 40 | 0 | 0 | 0 |
| McCrea | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tyrcha | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mackey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 |
| Sullivan | 16 | 8 | 24 | 0 | 8 | 0 | 0 | 0 | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 8 | 8 | 0 | 0 | 0 | 0 |
| Hill | 40 | 24 | 0 | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sterk | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 16 | 16 | 24 |
| Gaidelis | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sadek | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 0 | 8 | 0 | 0 | 0 |
| Gillen | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 |
| Halsey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Calvert | 8 | 16 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 16 | 0 | 0 |
| Wargin | 16 | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bilina | 8 | 24 | 0 | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rakowski | 40 | 40 | 40 | 32 | 40 | 40 | 40 | 32 | 32 | 32 | 16 | 24 | 8 | 0 | 0 | 16 | 0 | 0 | 24 | 32 | 0 | 8 | 24 |
| Green | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cadwallader | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kimble | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Carroll | 8 | 32 | 24 | 24 | 0 | 0 | 8 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 16 | 8 | 0 |
| Vulgamott | 0 | 8 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cahill | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 0 |
| Lopez | 32 | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 40 | 0 |
| Coleman | 24 | 0 | 32 | 32 | 8 | 24 | 16 | 24 | 8 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Peterson | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Appelhans | 40 | 16 | 0 | 0 | 24 | 32 | 16 | 16 | 16 | 24 | 8 | 40 | 16 | 0 | 0 | 0 | 8 | 0 | 8 | 32 | 0 | 8 | 0 |
| Johnson | 32 | 40 | 40 | 24 | 8 | 0 | 0 | 16 | 24 | 16 | 8 | 8 | 32 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 16 | 0 | 0 |
| Jordan | 32 | 16 | 32 | 24 | 0 | 8 | 16 | 24 | 32 | 8 | 0 | 8 | 16 | 0 | 0 | 0 | 0 | 0 | 16 | 16 | 8 | 16 | 8 |
| Dabrowski | 24 | 16 | 0 | 0 | 16 | 0 | 8 | 8 | 32 | 40 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 32 |
| Smolik | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 8 | 16 | 16 | 8 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 16 | 40 | 0 | 16 | 16 |
| Burns | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Stogsdill | 40 | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 24 | 0 | 8 |
| Rucker | 0 | 0 | 0 | 0 | 0 | 16 | 8 | 8 | 16 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 40 | 8 | 0 |
| Kalata | 16 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 0 | 32 | 0 | 0 | 0 |
| Dotts | 8 | 0 | 0 | 16 | 8 | 0 | 0 | 0 | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| TOTAL | 480 | 360 | 280 | 272 | 168 | 160 | 160 | 184 | 280 | 200 | 96 | 160 | 128 | 32 | 40 | 80 | 48 | 32 | 176 | 400 | 56 | 128 | 160 |
| Max Amount Owed at 50% of Total & $35 per hour | $1,715 | $2,695 | $1,680 | $2,083 | $4,130 | $4,340 | $4,060 | $4,393 | $4,620 | $4,830 | $5,530 | $3,990 | $6,860 | $7,289 | $4,655 | $6,283 | $5,740 | $5,644 | $7,018 | $6,598 | $5,390 | $7,796 | $6,160 |
| Max Amount of 50% OR Lesser Hours at $35 per hour | $1,715 | $2,695 | $1,680 | $2,083 | $4,130 | $4,340 | $4,060 | $4,393 | $4,620 | $4,830 | $3,360 | $3,990 | $4,480 | $1,120 | $1,400 | $2,800 | $1,680 | $1,120 | $6,160 | $6,598 | $1,960 | $4,480 | $5,600 |
| Max Amount of 50% OR Lesser Hours at $35 per | $1,715 | $2,695 | $1,680 | $2,083 | $4,130 | $4,200 | $4,060 | $4,393 | $4,620 | $4,830 | $2,240 | $3,990 | $3,080 | $0 | $280 | $1,680 | $280 | $280 | $5,040 | $6,598 | $840 | $3,080 | $4,200 |
| Glaziers Hours Used / Paid at $35 per hour | | | | | | | | | | | | | | | | | | | | | | | |

ASSOCIATION OF GLAZING CONTRACTORS AND
PAINTERS DISTRICT COUNCIL NO. 14
AND ITS AFFILIATE
GLAZIERS ARCHITECTURAL METAL
AND GLASS WORKERS UNION NO. 27
JOINT COMMITTEE

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | 08CV4166 |
| | ) | JUDGE GUZMAN |
| HURON VALLEY GLASS COMPANY, | ) | MAGISTRATE JUDGE SCHENKIER |
| LLC, | ) | |
| | ) | TC |
| and | ) | |
| | ) | |
| GLAZIERS ARCHITECTURAL METAL | ) | |
| and GLASSWORKERS LOCAL 27 | ) | |

## POST-HEARING BRIEF OF HURON VALLEY GLASS COMPANY, LLC

**I.    SUMMARY OF POSITION OF HURON VALLEY GLASS COMPANY, LLC**

The Joint Committee should deny the request of Glaziers Architectural Metal and

Glassworkers Local 27 (the "Union") for money damages and any other relief the Union seeks

against Huron Valley Glass Company, LLC ("HVG") because:

1. the Union failed to provide HVG with any referrals of Union members or other subcontractors employing Union members to perform the work at the 1401 S. State Street Project (the "1401 Project") in breach of the Union's obligations under the July 22, 2005 Articles of Agreement (the "July CBA");

2. the Union has failed to provide the required specific basis to award any damages to compensate any individual Union member for any damages that a particular member allegedly suffered; and

3. under any circumstances, no individual Union member was injured or damaged by any HVG conduct in connection with the 1401 Project.

**II.    HVG DID NOT BREACH THE TERMS OF THE AGREEMENT**

**A.  The Union Failed to Perform Its Own Obligations to Provide HVG With
Competent Glaziers to Hire for the 1401 Project**

1

The only agreement that the Union alleges that HVG breached in connection with the 1401 Project is the July CBA (HVG Exhibit 1). In order for the Union to establish that HVG breached the July CBA in not hiring members of the Union on the 1401 Project, the Union was required to have shown that it: (1) fulfilled its responsibility of the to assist the Employer in obtaining competent Glaziers; and (2) advised HVG before it began work of which glaziers were available and who were certified welders, have completed safety courses and are certified to and will work from swing stages and scaffolds. See July CBA, Section 6 (Exhibit 1). Additionally, the Union must show that HVG did not, in fact, hire any Union members for the 1401 Project. The evidence shows that the Union has failed to satisfy any of these requirements.

### 1. The Union Knew Of the Existence of the 1401 Project More Than Two Months Before It Began, But Instead of Referring Members or Sub-Contractors, It Prematurely Asserted Grievances

The Union believed on or before March 7, 2007 that HVG had planned to be begin work "in a few months" as the window subcontractor at the 1401 Project. See March 7, 2007 Letter from John J. Toomey (Glaziers Union outside counsel) to Vincent Klees (the former HVG President) (HVG Exhibit 7) as well as the expected testimony of Glaziers Union Business Representative Michael Mabus. At or before the time it directed Toomey to send Klees the March 7, 2007 Letter, the Union believed that HVG was going to subcontract the labor on the Project "exclusively to an Ironworker subcontractor excluding Glaziers 27 members from employment on that site." (HVG Exhibit 7) as well as the expected testimony of Glaziers Union Business Representative Michael Mabus.

Even though it believed that HVG was going to be performing work on the 1401 Project, the Union failed to perform its obligations under Section 6 of the July CBA. The expected testimony of HVG's president—Dennis Ahearn—as well as testimony of the Union's business agents shows that the Union never assisted HVG in obtaining competent Glaziers for the 1401

2

Project. The Union never advised HVG of which Glaziers were available and who were certified welders, have completed safety courses and are certified to and will work from swing stages and scaffolds. And the Union had ample time to do so. HVG did not begin doing work at the 1401 Project any earlier than May 7, 2007, and did not even sign a subcontract with J&D Erectors, Inc. ("J&D") until April 23, 2007. See HVG-J&D Contract (HVG Exhibit 16). No document exists showing that the Union tendered a single Union member to HVG for the 1401 Project during the two month period it was aware of the upcoming 1401 Project.

Instead, even before that it could legitimately claim that HVG had somehow breached the July CBA, the Union sent HVG notices of grievances and demands that HVG employ unspecified Union members. See, March 7, 2007 Letter from John J. Toomey to Vincent V. Klees; March 14, 2007 Notice of Grievance and Of Hearing Before the Board of Business Agents, March 21, 2007 Notice of Grievance and Of Hearing Before the Board of Business Agents, and April 4, 2007 Letter from Gerald Thanos to Dennis Ahearn (Exhibit7 through 11, respectively).

Ultimately, the Union's Business Agents and HVG's Ahearn and ___ met together on April __, 2007. The Union still had no members to refer to HVG for the 1401 Project which had not yet started. However, the Union's Business Agents suggested that HVG subcontract the labor for the 1401 Project to another contractor who employed Union members based upon Section 6 of the July CBA that provided:

> If an Employer is unable to obtain sufficient employees in any classification through the Glaziers Local 27 referral procedure within 48 hours excluding Saturday, Sunday and holidays from the time the request is made it [employer] may subcontract the work for that job to a Union contractor without regard to any other provision of this Agreement

permitted it to do.  However, the Union Business Agents did not suggest any particular labor contractor where HVG could find any such Union members who were not already engaged in other work.  Nonetheless, HVG solicited bids from labor subcontractors it believed employed Union Glaziers, including .  See, April 9, 2007 Letters from Dan Lindsey to Prime Architectural, Service Glass, and Desiree, Inc. (HVG Exhibits 12).  None of those potential subcontractors responded to the HVG's requests for bids and HVG notified the Union of this fact.  See, April 21, 2007 Letter from Kevin Anderson to Michael O'Donnell (HVG Exhibit 13).  In response, the Union offered no members available for work and no companies having Union member employees with which HVG could contract for labor.  Instead, it merely threatened to file this payment-in-lieu action.  See May 2, 2007 Letter from Michael Mabus to  Kevin Anderson (HVG Exhibit 14).  With no Glaziers to hire and while still using Glaziers as part of its composite crews at the Optima project with the Union's blessing, HVG was left with little choice but to sign the J&D Contract which it did on April 23, 2007.

As the 1401 Project continued, HVG was able to hire a number of Glaziers, many of whom were part of its crews at the Optima project and who are still working at the 1401 Project even when no Iron Workers are part of crews at that project.  See, March 19, 2008 HVG-Glazier Employee JC Detail (HVG Exhibit 18).

What did HVG do wrong?  Nothing.  The Union did not refer any members to HVG for employment and did not refer HVG any providers of Union members.  Having failed to follow the provisions of Section 6 of the July CBA, the Union cannot now claim that HVG should be punished because HVG chose to do work.

## III.    HVG'S OBLIGATION AS A JOINT LIMITED TO HIRING EQUAL NUMBER OF GLAZIERS AND IRON WORKERS

4

Throughout the course of HVG's relationship with the Union, as well as the Union's relationship with other dual signatories, the Union has agreed that a contractor could satisfy its obligations by maintaining the same number of Glazier Union and Iron Workers' Union members on projects without fear of reprisal. See, August 25, 2005 Mabus-Klees Letter (HVG Exhibit5). Indeed, the Union never contested that very arrangement with the 1401 Project.

As the Supreme Court held in *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581-82, 4 L. Ed. 2d 1409, 80 S. Ct. 1347 (1960), arbitrators are free to consult "the industrial common law" including "the practices of the industry and shop" in interpreting a collective bargaining agreement. *See, United Food & Commer. Workers Union, Local No. 7 v. King Soopers, Inc.*, 52 F.Supp.2d 1215 (D. Colo. 1999)(*aff'd* by 10th Cir. 2000). An arbitrator may properly incorporate the past practices of the parties or the common law of the shop into the written collective bargaining agreement where that document is silent or ambiguous on the matter. *See, Jackson Purchase Rurual Electric Coop. Assoc. v. Local Union 816 IBEW*, 646 F.2d 264 (6th Cir. 1981), citing *Detroit Coil Co. v. Int'l Assoc. of Machinists & Aerospace Workers, Lodge No. 82*, 594 F.2d 575, 579 (6th Cir. 1979).

As such, its own conduct, as well as the well known custom and practice in the construction industry shows that the Union neither expected, nor was entitled to any greater participation in projects involving joint signatories such as HVG. Any review of damages that the Union's members allegedly sustained must be based upon a 50%, rather than 100% level of participation on the 1401 Project.

## IV.    THE UNION HAS NOT PROVEN THAT ANY OF ITS MEMBERS SUFFERED ANY INJURY OR DAMAGE

Even assuming that HVG somehow breached the Agreement, Union not entitled to simply multiply 100% of the Iron Workers' hours on the 1401 Project by regular and hourly

5

overtime rates as its damages. Such an award has no relationships to the damages that any union member suffered and is also wrongfully punitive.

### A. Nature and Scope of the Payment-In-Lieu Remedy for HVG's Alleged Breach of the July CBA

The objective in compliance proceedings is to restore, to the extent feasible, the status quo, by restructuring the circumstances that would have existed had there been no improper conduct. *See, Consolidated Delivery & Logistics and Teamsters Local No. 481,* 2007 NLRB Lexis 374 (NLRB 2007). The purpose of back pay is remedial, and not to punish. *Id.,* citing *Republic Steel Corporation v. NLRB,* 311 U.S. 7, 12, (1940).

The Union must establish the amount of backpay due an employee who was not hired in violation of the provisions of the July CBA. *See, NLRB v. Ferguson Electric,* 242 F.3d 426 (2nd Cir. 2001). A back pay award must be sufficiently tailored to remedy only the actual consequences of an unfair labor practice, and should not address purely speculative damage. *Id.,* at 431. Remedies that award employees more than they would have received but for the violations are punitive, and thus improper. *Aguinaga, et al. v. United Food & Commercial Workers Int'l Union,* 854 F.Supp. 757, 761 (D. Kan. 1994).

The Union has burden of proof to provide affirmative evidence that a union worker, if hired by the employer pursuant to the collective bargaining agreement, would have worked for the employer during the entire backpay period claimed. *Contractor Services, Inc. v. IBEW Local 347,* 2007 NLRB Lexis 393 (2007). Neither should backpay unjustly enrich the employee by placing him in a better position than he would have enjoyed if the discrimination had not occurred. *Id.,* at 13. Indeed, in an analogous situation to that which the Union presents here, it has been found to be improper to rely only upon a union's Union's presentation and audit

numbers, without tailoring damages on an individualized basis, which would be improper. *See,*

*Consolidated Delivery & Logistics and Teamsters Local No. 481, supra.*

### B. THE UNION CANNOT MEET ITS BURDEN OF PROOF AS TO ENTITLEMENT FOR BACKPAY ON ITS MEMBERS' BEHALF

The Union cannot meet its burden of proof in this case to reach the damage award that it

seeks because the Union cannot show how each employee was injured by HVG. Likewise, in

addition to the fact that it cannot show injuries, it cannot establish particularized damages which

would support its total claim, and thus the calculation as offered by the Union must be reduced in

accordance with the actual proofs on a "per employee" basis. Specifically, for each employee

where a backpay award is claimed, the Union has to show that the individual gross pay

calculation is reasonable. *Contractor Services, Inc. v. IBEW Local 347,* 2007 NLRB Lexis 393

(2007). Additionally, in order to qualify for backpay, an employee must make reasonable efforts

to secure interim employment. *See, Cheney Construction , Inc. and United Brotherhood of*

*Carpenters and Joiners of America,* 2007 NLRB Lexis 105 (NLRB 2007). However, if a

worker's interim earnings exceed the Union's backpay determinations, then he will not be

awarded backpay and the Union cannot claim damages for that employee. *Id.*

As will be established in this case, the Union has done nothing more than multiply a

perceived total of hours worked (by members of the Ironworkers Union) as against the prevailing

wage rate in order to come up with a total claim of damage. However, insofar as it has failed to

take into account and present this Board with individualized evidence on a per-employee basis

which could sustain the Union's claim, insofar as the evidence clearly shows that the employees

have not been damaged to nearly the extent that is claimed by the Union, this Board should find

that the numbers presented by the Union are nowhere near correct and it should likewise refuse

to implement any award under the Union's scheme.

7

## C. THE DAMAGES CLAIMED ARE NOT INDIVIDUALIZED TO EACH UNION MEMBER CLAIMING DAMAGE

Instead of accepting the Union's claims as true, this Board should consider the evidence on a per-employee basis, because that is the *only* method upon which to predicate a backpay award in a case such as this. As is required under the federal law which governs labor relations and which is promulgated by the NLRB, it is the union's burden to prove that the backpay amounts are reasonable and not arbitrary. *See, Contractor Services, Inc. and International Brotherhood of Electrical Workers, AFL-CIO,* 2007 NLRB Lexis 393 (NLRB 2007).

In upholding its duty to consider individualized proofs of damage in this case as it must, this Board can easily see that the Union audit calculation based its numbers only upon the number of hours worked by J&D Erectors workers, without taking into account the fact that most of the Glaziers workers were not damaged. This is so because the Union "off-lists" clearly show that the majority of Union workers were not, in fact, off work. As was stated above, the objective in compliance proceedings is to restore, to the extent feasible, the status quo by restructuring the circumstances *that would have existed had there been no wrongful conduct by the employer. See, Consolidated Delivery & Logistics, Inc. and Teamsters Local Union No 481, AJW International Brotherhood of Teamsters,* 2007 NLRB Lexis 374 (NLRB 2007). Also, the unavailability of workers is a recognized defense in order to mitigate back pay liability. *AMCAR Div. ACF Indus., Inc. v. NLRB,* 592 F.2d 422, 432 (8th Cir. 1979).

In this case, as can be established by HVG, out of the 35 workers who were listed as "out of work" and whose names appear on the off-lists provided to HVG by the Union and upon whose claims the Union is at present prosecuting, for the same time period covered by the J&D Erectors hours, 29 of 35 workers were, in fact, working at least eighty percent of the time and were not actually damaged at all in relation to the J&D hours. Thus, when calculating damages

8

claimed by the Union, this Board must take into account the actual days which cannot be included in the Union's numbers because the employee was actually working on some other job site and not on the "off-list". Consequently, insofar as the Union's audit fails in its entirety to show actual damages suffered by individual workers upon which any sort of claim could be based, in fact, it cannot be relied upon at all for an accurate showing of damage. Accordingly the audit findings presented by the Union should be disregarded.

### B. THE MAJORITY OF LOCAL 27 GLAZIERS WERE NOT DAMAGED AND SUFFERED NO INJURY

The crux of the Union's claim seems to be that for the 1401 Project, there were thirty-five (35) Glazier's members who were entitled to have been called by HVG, and that HVG's failure and refusal to call upon those workers must result in a damage award. In its audit findings, the Union claims backpay based upon hours worked by one of HVG's subcontractors, J&D Erectors. However, because most of these workers whose names appear on the Union's "off-lists" were not damaged because they found other jobs for the majority of the weeks in question, the Union's calculations are unreliable and cannot be utilized to fashion an appropriate remedy.

In Illinois, in order for an employer such as HVG to succeed in establishing an affirmative defense to a claim of backpay, he must establish the defense by a preponderance of the evidence. *Heinrich Motors Inc. and Int'l Union, United Auto, Aerospace and Agricultural Implement Workers of America,* 166 NLRB 783, 7 (NLRB 1967). Additionally, an employee's willful loss of earnings (such as from self-employment, refusal to work or to travel for a position) is an affirmative defense to backpay liability. *Parts Depot, Inc. v. NLRB,* 2008 U.S. App. Lexis 236 (2008).    Employees claiming entitlement to backpay and benefits are required to make reasonable efforts to mitigate damages, and once backpay and benefits are awarded, the burden shifts to the employer to show that the claimant did not exercise reasonable

diligence in mitigating his damages through showing that (1) there were suitable positions which the claimants could have discovered for which they were qualified; and (2) that the claimants failed to use reasonable diligence in seeking such positions. *Aguinaga, et al. v. United Food & Commercial Workers Int'l Union*, 854 F.Supp. 757, 769 (D. Kan. 1994). Here, because most of the 35 Glaziers found interim work and were not otherwise damaged by HVG's failure to hire them for the 1401 S. State project, the hours that are claimed for these workers must be offset by their hours worked elsewhere.

### 1.    INTERIM EARNINGS PROVE THAT THE EMPLOYEES WERE NOT DAMAGED MUST BE EXCEPTED FROM ANY BACKPAY AWARD

The Union's audit claim improperly includes hours for union members who were not injured and not damaged, because they were working and being paid by employers other than HVG. In Illinois, it is well-settled that interim earnings are offset against a backpay award so that the backpay award compensates only actual damages and to avoid making an employee who has found other work more than whole. *Heinrich Motors Inc. and Int'l Union, United Auto, Aerospace and Agricultural Implement Workers of America*, 166 NLRB 783, 7 (NLRB 1967). Backpay is generally only reduced by interim employment income that was in fact received by an employee. *NLRB v. Midwestern Personnel Services*, 508 F.3d 418, 424 (7th Cir. 2007). However, the rule requiring deduction of interim earnings applies only to earnings during the hours when the employee would have been employed by the employer. *Consolidated Delivery & Logistics, Inc. and Teamsters Local No 481*, 2007 NLRB Lexis 374 (NLRB 2007).

Interim earnings should be apportioned and credit should be given to the employer only for such portion thereof as can be found to have resulted from the non-employment by the employer. *Heinrich Motors, Inc. and Int'l Union United Automobile, Aerospace and Agricultural Implement Workers of America*, 166 NLRB 783, 788 (NLRB 1967). Setoffs for

10

interim earnings are to be calculated on an quarterly basis and interim earnings in one calendar quarter should have no effect on backpay liability for any other quarter. *Aguinaga, supra,* at 771, citing *NLRB v. Seven-Up Bottling Co. of Miami,* 344 U.S. 344 (1953).

### 2.    UNEMPLOYMENT COMPENSATION BENEFITS MUST BE EXCEPTED FROM BACKPAY AWARDS

The Union's audit claim improperly includes hours for union members who mitigated their damages by likely filing claims with the State of Illinois Department of Employment Security (IDES) for unemployment benefits. As has been held by the Second Circuit Court of Appeals, even though unemployment benefits are often considered a "collateral source" of income and not typically deducted from backpay awards, the decision of whether or not an award should be offset by the amount of unemployment compensation actually given to an employee is a discretionary determination to be made by the court. *See, Cole v. Uni-Marts, Inc.,* 88 F.Supp.2d 67, 76 (W.D. N.Y. 1999), citing *Dailey v. Societe Generale,* 108 F.3d 451, 460-61 (2nd Cir. 1997). In *Dailey v. Societe Generale,* although a discrimination case, the Second Circuit closely examined labor cases which have considered the issue, and has refused to require an automatic deduction of unemployment from a backpay award, instead finding that inclusion of such benefits confers an undue benefit upon a worker and in essence, provides him with much more than he would have received in the absence of any unlawful conduct on the part of the employer. *Id.* Applying the reasoning that because the leading case on the issue, *NLRB v. Gullet Gin,* affirmed the NLRB's refusal to deduct as an exercise of discretion, the Second Circuit opined that this same discretion should apply in the district court context as well. 340 U.S. 361 (1951). *See also, Sims v. Mme Paulette Dry Cleaners,* 638 F.Supp. 224 (S.D. N.Y. 1986); *McDaniel Ford, Inc. v. NLRB,* 2001 U.S. App. Lexis 14195 (2nd Cir. 2001).

11

As a result, in this case, the Board should follow the Second Circuit and find that inclusion of such unemployment compensation in a backpay award, where it is applicable to a particular Glazier's Union employee, would ultimately sanction providing that person with double recovery for his lost employment (i.e. allowing him to receive unemployment benefits and receive a later backpay award, thus making him more than whole), which is improper. Applying this to the matter before this Board, it in upholding its duty to restore these workers to the same income they might have realized if they had been employed on the project at 1401 S. State Street, this Board should authorize a deduction for any unemployment benefits that were claimed by the Glazier's workers, so as not to confer more of a benefit than they would otherwise be entitled to.

Based upon the contents of HVG Exhibit 21, it is clear that the Union cannot recover any generalized form of damages under any circumstances. That is, at best the Union could only recover the equivalent of 50% of the J&D Iron Workers' hours and then in only that amount that where there were Union members who could have legitimately worked on the 1401 Project. At best, that amount is no more than $122,310 and even less in an amount of $97,512 if the Wallendorf hours are excluded based upon that member's ongoing and repeated failure to work on any Union project. However, either of those amounts must be reduced by the amount of actual Union member hours during the May 2007 through February 2008 period. Union members had put in 2,343.5 hours at the 1401 Project generating wages in the amount of $82,022.50. A further deduction for IDES benefits that each Union member either did receive or should have received would reduce any award by an additional $27,306.00. As a result, it is clear that the Union members suffered no injury or damages in connection with the 1401 Project.

## VI.    CONCLUSION

12

For all of the reasons submitted in this brief, as well as the testimony submitted in the hearing, the Committee should deny the Union's request for relief in total.

HURON VALLEY GLASS COMPANY

By: _Richard H. Chapman_

One of Its Attorneys For

Richard H. Chapman, Esq.

CLARK HILL PLC

150 North Michigan Avenue, Suite 2400

Chicago, IL 60601

5570456.1 28059/120606

Association of Glazing Contractors and
Painters District Council No. 14 and Its Affiliate
Glaziers Architectural Metal and Glass Workers Union No. 27
Joint Arbitration Committee

In the Matter of:                                )
                                                 )
Huron Valley Glass, LLC,      .                  )
W & G, Inc.                                      )
George Stripp, Individually and                  )
W & G, LLC.                                      )
                                                 )
Employer/Respondents,                            )
                                                 )
        and                                      )
                                                 )
Glaziers Architectural Metal and                 )
Glassworkers Local 27                            )
                Grievant              . )

## UNION'S BRIEF IN SUPPORT OF ARGUMENT

NOW COMES the Grievant, GLAZIERS LOCAL 27, through its attorney,

DONALD SCHWARTZ, ARNOLD AND KADJAN, and files the Union's Brief in

support of the grievance.

## STATEMENT OF FACTS

The Glaziers Local 27 Collective Bargaining Agreement signed by Employer

October 4, 2005 (Exhibit 1) contains 9(a) recognition and at Article 9 a subcontracting

clause:

> Section 2.      Employers shall not contract any work covered
> by this Agreement to be done at the site of the construction, alteration,
> painting, or repair of a building, structure, or other work to any person,
> firm, or company who does not have an existing labor Agreement with
> Glaziers Local 27.

October 23, 2006 Huron Valley Glass, LLC was awarded the $5,595,000 glazing

contract for labor and material at the project known as Reebie Lofts Apartments, 1401 S.

State Street, Chicago, Illinois.  W. E. O'Neil was the prime contractor (Exhibit 14).

1

Huron Valley in turn subcontracted all of the labor for the installation of glass to J & D Erectors, Inc. in a $1,253,000 subcontract dated February 21, 2007. That included store front glass on Floors 1 and 2 and installation of preglazed windows on Floors 3 through 22 (Exhibit 15). This is all covered work under Article 7 of the Glaziers contract, Scope of Work. J & D Erectors is not a signator to a Glaziers 27 agreement. J & D did not commence installation work until May, 2007. Huron Valley gave the Glaziers Union work away February 21, 2007, the day it let the contract.

Huron Valley breached the Glaziers subcontracting provision February 21, 2007, the day it let the labor subcontract to a non-signator in breach of the union only subcontracting clause.

Huron was promptly advised of that breach and given an opportunity to cure. In February, 2007, the Union did not know that a contract was in place, but it was rumored Huron Valley was considering subcontracting the work at the site exclusively to an ironworker subcontractor.

On March 5, 2007, less than two weeks after the subcontract date, Local 27 notified Huron Valley that such action would violate the Glaziers Local 27 subcontracting clause citing extensive appropriate legal authority on that point (Exhibit 4).

The letter also advised that damages for that contract breach would be sought and asked that their lawyers call - nothing occurred. The letter stated that absent resolution, Local 27 would proceed with a grievance. The measure of contract damage would be in an amount of money to place the Union in the position it would have been, but for the breach, pay in lieu of work. This is the standard remedy given by arbitrators.

2

This pre-job commencement "heads-up" letter was sent to give Huron Valley Glass, LLC an opportunity to correct the situation and to mitigate any potential damages for the clear contract breach of Article 9.

When no response came, Huron Valley was sent on March 14, 2007 a Notice to Appear before the Board of Business Agents as required in Article 18. They sought two continuances March 14, 2007 and April 4, 2007, and never appeared.

Huron Valley never let on it had already awarded a subcontract with another trade. It went through a charade saying on April 29, 2007 (Exhibit 4) it sought bids from two Glaziers 27 contractors. It claimed four, but only two have Glazier contracts. Huron never let on the contract was already signed. It proceeded with J & D who completed the work as they always intended. These so called "glazier bids" were a sham as the job had been let two months earlier.

The measure of damages for the subcontracting breach is pay in lieu of work. It is simply the total hours worked by the subcontractor's employees in covered work on the project, multiplied by the Glazier wage rates as per the contract (Exhibit 11). The hours are accurate, they were provided by J & D Erectors who routinely had six men on the project (Exhibit 8). It is computed at straight time for all hours. Fringe benefits are not included as they are not sought before this tribunal. An audit by Wolf & Company based on J & D Erectors job data computed 10,770.2 hours for a total of $396,936.50 in damages for lost wages (Exhibit 13).

3

Article 18 of the Glaziers contract, the Joint Trade Board provisions further permits the Committee to attach to any monetary award an additional 25% for a willful breach. The award should include this amount given the contract date of February 21, 2007, Employer's lack of candor about the letting the agreement and the March 5, 2007 notice and legal authority provided to the Employer at the outset. That totals $99,234 for a grand total award of $496,170.

These facts are simple, straight forward and undisputed. The Committee has jurisdiction over all entities who are jointly and severally bound to the agreement, whatever the name.

Huron Valley Glass, LLC, is not presently in good standing in Illinois. W & G, Inc. is a defunct Michigan corporation where W & G, LLC and Huron Valley are also located. George Stripp, Individually who signed the labor contract and W & G, LLC. all are operating from the same address.

All pre-contract negotiation and correspondence was conducted with Huron Valley Glass, LLC., 5075 Carpenter Road, Ypsilanti, Michigan where W & G, LLC is also located. The bargaining agreement was sent to Huron Valley who is named as the employer, and they returned it, signed by W & G, Inc. and George Stripp. Huron Valley without notice to the Union had altered the signature page changing the name on the signature to a different company, but not the front page of the contract.

Huron abided by the terms and conditions of the contract and paid the rates and benefits required thereunder through yet a third entity, W & G, LLC. Jurisdiction should be extended to all entities individually, corporately and otherwise.

4

When the Company wanted apprentices, they were requested by Huron Valley Glass, LLC but paid under W & G, LLC who is headquartered at the same address, 5075 Carpenter Road, Ypsilanti, Michigan. The Committee can find that they are in fact the same company, alter-egos of one another, and that Huron Valley Glass, LLC., the defunct W & G, Inc. and George Stripp, Individually and W & G, LLC are all bound, jointly and severally to the current Association agreement through May 31, 2009 as the Huron Valley companies have adopted through their course of conduct, the current wages, benefit level and payments, bonding and referral procedures of the current Association agreement, just as if they had signed it rather than the 2006 rates rolling over from year to year.

The collective bargaining agreement was breached February 21, 2007, the day the subcontract was let. There were plenty of glaziers out of work at that time. Had they been promised months of steady work in August, September, October and thereafter, they have been available. A proper damage award for a knowing breach of contract will encourage a good faith effort to abide by the contract in the future.

Moreover, had a Local 27 subcontractor been sought in February, 2007, there would be no issue as the manpower would have been adequately planned and scheduled in advance.

The affected class of glaziers suffered an economic loss of work and the Union suffered as it reflects adversely on them in the marketplace and injures their standing among members regarding its ability to enforce the contract. The Union is entitled to protection from this type of injury and loss of face and prestige among its membership and in the marketplace. If one employer is allowed to breach the contract, all will seek to breach the agreement in the same fashion.

Frequently arbitration awards are made to the Union who is permitted to distribute the funds to persons on the out of work list in their discretion and to deduct from those sums the amounts the Union would have received in dues which they were deprived of by the Employer's actions.

Employers' mitigation claims should be disregarded as it took no steps to cure the subcontracting breach and so is entitled to no reduction in damages for the breach and so damages in the amount of:

$396,936.50  for pay in lieu based on actual hours x Glaziers scale
$99,234.00  25% liquidated damages for willful violation Article 18
$496,170.50

are due jointly and severally from Huron Valley Glass, LLC, W & G, Inc., and George Stripp, Individually and W & G, LLC the defunct corporation.

## HURON CONTRACT BREACH

Pursuant to Section 1 of the Glaziers Agreement, Local 27 has been granted Section 9(a) recognition as the <u>exclusive</u> bargaining representative of all persons who are performing bargaining unit work as described under Article 7 <u>Classification of Work</u>.

By subcontracting out covered work to a non-signatory to the Glaziers 27 agreement, <u>Huron</u> breached the collective bargaining agreement.

In <u>Glassmasters</u>, 2003 U.S. Dist. Lexis, 30 EBC 2119 (N.D. Ill. 2003) aff'd 99 Fed. App. 740, 33 EBC 1568 (7th Cir. 2004) followed <u>Plasterers 67 Pension Fund v. Niles Group</u>, 2007 U.S. Dist. Lexis 18001 (S.D. Mich. 2007), the Seventh Circuit Court of Appeals determined an employer was liable under both agreements it signed to make

6

fringe benefits even if it resulted in a double payment holding:

> The Fund's claim is based on the terms of the CBA, not
> on principles of labor law. If the CBA provides that
> contributions to the Fund are to be made for glazing work . . .

> Gibson cannot avoid his obligations by assigning that
> work to nonunion members or, as here, members of a
> different union.

The Seventh Circuit addressed this issue also in <u>Glassmasters</u>:

> The time to avoid paying double here was before the
> work was done by getting an agreement or a pre-work
> resolution of the dispute. After the work was done was
> too late. In short, the Gibson-glaziers' union agreement
> requires contributions to the Fund for all hours of
> work covered by the CBA without regard to union
> membership. Accordingly, the judgment of the
> district court must be AFFIRMED.

This has resulted in a filing of a <u>Glassmasters</u> suit against Huron for benefits and a grievance for pay in lieu of work under the collective bargaining agreement before the Joint Committee which seeks pay measured by all hours worked by the other trade or non-union personnel for the work that is glaziers work under Article 7, but was transferred from them to another trade (Ironworkers Local 63) or group of employers. The Ironworkers Union in other parts of the country often bring such grievance claim actions. <u>Ironworkers District Council</u> (Hoffman Construction) 293 NLRB No. 60, 130 LRRM 1495 (1989) and <u>Active Glass Corp. v. Ironworkers</u>, 875 F. Supp. 245, 149 LRRM 2491 (S.D. N.Y. 1995).

## <u>ARBITRATORS AUTHORITY OVER PARTIES</u>

Employer has engaged in a shell game of sorts regarding the identity of the party bound to the agreement dated October 4, 2005.

<div align="center">7</div>

The preamble of the collective bargaining agreement names Huron Valley Glass LLC. The parties under Article 1 are the Association and [any other employer who is not a member of the Association, but is otherwise bound by this Agreement] being sometimes hereinafter referred to as "Employer". It is thus an adoption of the Association contract. The signator is W & G, Inc., a defunct Michigan corporation, signed by George Stripp. Under Illinois law, the individual may be held personally liable. 805 ILCS 5/8-65 for carrying on the business after dissolution.

Huron Valley Glass LLC is not presently in good standing in Illinois. The group will be referred to herein as "Huron, et al."

W & G, LLC who is not signed to the contract, operates from the same address, 5075 Carpenter, Ypsilanti, Michigan and shares the same registered agent as Huron Valley Glass, LLC. W & G, LLC made use of the Union hiring hall, checked off dues and paid benefit contributions under the terms of the June 1, 2006 to May 31, 2009 Association agreement. This is conduct manifesting an intention to be bound by the terms of the contract. Robins v. Lynch, 836 F.2d 330 (7th Cir. 1988).

The Seventh Circuit in Bricklayers Local 21 Fund v. Banner Restoration, 385 F.3d 761 (7th Cir. 2004), 175 LRRM 2633 in collecting cases on the subject held:

> "A signature at the bottom of the collective bargaining
> agreement is unnecessary".

Thus W & G, LLC is bound through its course of conduct. W & G, Inc. a defunct corporation. Under Illinois law 805 ILCS 5/8-65 places personal liability on George Stripp for debts and liabilities of the company incurred in carrying on its business after dissolution. Huron Valley Glass, LLC is not currently in good standing in Illinois which would impose that same liability on its shareholders, but at all times that entity held itself out as bound to the contract.

## JOINT COMMITTEES JURISDICTION OVER ALL THE ENTITIES

The Joint committee may assert jurisdiction over the entire Huron Group of Huron Valley, LLC, the non existent W & G, Inc. and George Stripp, Individually (the contract signor) and W & G, LLC.

This issue frequently arises in joint board cases. Illinois District Council No. 1 of Bricklayers v. Christopher, 2006 U.S. Dist. Lexis Lab. 261 (N.D. Ill. 2006) Chief Judge Holderman affirmed a $419,408.70 award in a case of astounding parallels. The Union notified all parties by letter it considered them sufficiently interrelated as to make them all bound and liable for the obligations created by the contract and a hearing would take place before the Joint Board to resolve the issue.

Employer responded it was a dissolved corporation and no longer a legal entity. Another said it was not signatory so it was not appearing. The union wrote back as done at bar, that the claim is against all of the individuals and businesses and each of them is liable under the contract signed by Christopher Enterprises and the union intended to go forward with the claims against the individuals and businesses and they could make whatever argument they choose.

Similarly <u>Sullivan v. Brunsky d/b/a Banner Plumbing Service</u>, 1996 U.S. App. Lexis 9719 (7th Cir. 1996) affirmed a personal judgment for $219,752. Brunsky claimed he was not personally liable and that another corporation was liable . He lost the argument.

<u>UFCW Local 588 v. Morgan's Holiday Market</u>, 1999 U.S. App. Lexis 30194 (N.D. Cal. 1999) holding a predecessor's collective bargaining agreement will bind a subsequent employer who expressly assumes or adopts the collective bargaining agreement and that alter ego disputes are properly arbitrated.

Accordingly, the Joint Committee should hear all disputes regarding the contract of all parties and related entities under the theories of incorporation by reference, assumption, agency, veil piercing/alter-ego and estoppel. <u>Thompson v. American Arbitration Assn.</u>, 64 F.3d 773, 776 (2nd Cir. 1995).

In <u>Active Glass</u>, Ironworkers brought an arbitration to recover money based on Employer's failure to hire Ironworkers members in violation of contract. Active argued the money was already paid to the Glaziers and Carpenter Unions. The court ordered Active to arbitrate bi-partite with the Ironworkers (i.e. just those two parties). It denied multiparty (tripartite) arbitration to include Glaziers. The Seventh Circuit similarly held in <u>Miron v. Operating Engineers 139</u>, 44 F.3d 558, 148 LRRM 2199 (7th Cir. 1995) Thus, Ironworkers employ the same arbitral means as Glaziers are utilizing to police and enforce their contract.

# DOUBLE BREASTING IN THE CONSTRUCTION INDUSTRY

1.  Single Employer Test
    <u>Radio Technicians Union Local 1264 v. Broadcast Services</u>
    380 U.S. 255 Standards

    *1.  Inter-relation of operations
     2.  Common Management
    *3.  Centralized Control of Labor Relations
     4.  Common Ownership

    *Factors weighed most heavily.

All four factors may be required if there is an absence of an arms length

relationship.

II.  The Above Standards are Proven by Evidence of:

    a)  Sharing space, personnel records, accountants,
        clerical staff, etc.;

    b)  Shared supervisory personnel among companies,
        or interchange of key management people;

    c)  Same decision maker at both enterprises is central
        control of labor relations;

    d)  Transfer of equipment and employees between companies;

    e)  Common business, purpose and customers; and

    f)  Informal loan arrangements and co-mingling of issues.

III.  <u>Single Bargaining Unit Test = Community of Interest</u>

To enforce against one Employer the other contract, it must be demonstrated  both

form an appropriate single bargaining unit.

    A similarity in:            Skills
                                Duties
                                Working Conditions
                                Work at Same site
                                Geographic Location
                                Interchange

11

will include if constitute a true craft, a homogenous group of skilled journeymen in trades

that have been given separate representation.

## PAY IN LIEU GRIEVANCE CLAIM
## ENDORSED BY THE NLRB

The filing of a grievance does not create a "jurisdictional dispute" to invoke the

jurisdiction of the NLRB. United Steel Workers Local 14693 and Skibeck PLC, 346

NLRB No. 46, (8/27/05) the NLRB stated as footnote 3:

> "The Board has held that it will not use its authority to rescue
> those who have made such conflicting promises. See McKenzie
> Engineering Co., 333 NLRB 905, 907 (2001 ) enf. denied on
> other grounds 303 F.3d 902 (8th Cir. 2002). Also NLRB v.
> Howard Immel, 102 F.3d 948, 953 (7th Cir. 1996) 'no legal
> authority supports the proposition that [one party's] actions
> in entering into two conflicting bargaining agreements alters
> the rights of [another] party'."

which is the same holding as Glassmasters.

Therein Skiback had a contract with the Operating Engineers and the

Steelworkers. He used operators over steelworkers and the NLRB required him to make

whole the steelworkers benefit fund and his employees for all losses, plus interest

suffered as a result of Skiback's action.

Hoeber v. Roofers Local 30, 138 LRRM 2083 determined that

> "no merit is found in the mere possibility that a Section
> 301 court action may ultimately require the contractor to
> pay twice for work makes it inherently unlawfully coercive
> since contractor may be required to pay twice because of
> its unfortunate decision to enter into two conflicting agreements".

The court declined to set aside the suit to enforce the arbitration award granting double

payment.

If an employer assigns work in violation of a jurisdictional clause in a collective bargaining agreement, the union may lawfully pursue its contractual remedy through arbitration, if available, otherwise by suit in Federal Court. Developing Labor Law, Chapter 24, Page 1817). The use of contractual and judicial means, as opposed to economic pressure, to enforce work assignment claims under a collective bargaining agreement does not violate Section 8(b)(4)(D). There must be a threat of job action, usually a strike. See e.g. Miron Constr. Co. v. Operating Eng'rs Local 139, 44 F.3d 558, 148 LRRM 2199 (7th Cir. 1995); Roofers Local 30 (Gundle Lining Constr. Corp.), 307 NLRB 1429, 141 LRRM 1047 (1992), enforced, 1 F.3d 1419, 144 LRRM 2040 (3rd Cir. 1993); Longshoremen (ILWU) Local 7 (Georgia-Pacific corp., Bellingham Div.), 291 NLRB 89, 92-93, 130 LRRM 1033 (1988) aff'd 892 F.2d 130, 133 LRRM 2326 (D.C. Cir. 1989); Sheet Metal Workers Local 49 (Los Alamos Contractors), 206 NLRB 473, 84 LRRM 1333 (1973).

## PAY IN LIEU CLAIMS

The NLRB has consistently recognized since 1988 that the mere filing of an arguably meritorious grievance does not constitute "coercion" within the meaning of 8(b)(4(ii)(D). Longshoremen ILWA Local 7 (Georgia Pacific), 291 NLRB 89 (1988) aff'd 892 F.2d 130 (D.C. Cir. 1989) and followed in Teamsters Local No. 222 (Geneva Rock Products) 322 NLRB 810, 154 LRRM 1259 (1996) finding that a pending grievance is not a basis for a 10(k) proceeding and quashed the notice of hearing. Thus there is no jurisdictional impediment to proceeding on the Glaziers pay in lieu claim. There is no NLRB jurisdiction here. No charge has been filed. There have been no picketing, work stoppages or threat of same to force a reassignment of the work.

Similarly in <u>Active Glass</u> no merit was found in the contention of both the Employer and Carpenters that the grievance filed by the Ironworkers, or the letters of intention to do so, constitute a threat within the meaning of Section 8(b)(4)(D). <u>Operating Engineers Local 3</u> (Levinson-Richmond Terminal) 299 NLRB 449 (1990) cited in <u>Ornamental Ironworkers 401</u> (William Watts) 317 NLRB 671 Footnote 3, 150 LRRM 1339 (1995); <u>McKenzie Engineering</u>, 333 NLRB 905, 170 LRRM 1470 (2001) awarding pay in lieu of work.

In <u>UFCW 540</u> (Pilgrims Pride), 334 NLRB No. 114 (2001) the Board explained <u>Longshoremen Local 7</u>, 291 NLRB 89 enf 895 F.2d 1130 (D.C. Cir. 1989) decision dealing with pay in lieu claims. The Board noted that national labor policy encourages resort to grievance arbitration procedure as the preferred method of resolving labor-management disputes. Consistently with these principles the Board holds that submission to grievance arbitration of an arguably meritorious claim is not 8(b)(4) conduct upon which a jurisdictional dispute may be predicated.

<u>Elkouri</u> How Arbitration Works 5th Ed. P. 757 the seminal treatise on labor arbitration recognizes:

> Job security is an inherent element of the labor contract, a part of its very being. If wages is the heart to the labor agreement, job security may be considered its soul. Those eligible to share in the degree of job security the contract affords are those to whom the contract applies.
>
> The transfer of work customarily performed by employees in the bargaining unit must therefore be regarded as an attack on the job security of the employees whom the agreement covers and therefore on one of the contract's basis purposes.

14

Where an arbitrator is called upon to remedy the improper assignment of bargaining unit work to outsiders a frequently utilized remedy is a monetary award of damages to the union, a cease and desist order from improper assignment, mandates to the employer to assign work to bargaining unit employers (P. 762), orders to return improperly contracted work to the bargaining unit.  Another arbitration hornbook is Remedies in Arbitration Hill & Sincroppi 2nd Ed. P. 344 opines:

> A common monetary remedy is to award an
> amount equal to lost earnings or the amount
> paid to employers.

Hill & Sincroppi at Chapter 15, P. 385 Work Assignments notes further that a monetary remedy is appropriate where an affected class suffers an economic loss of work and an award for compensatory damages by the loss of wages must be granted.

They find that unless management is subject to a monetary penalty for a knowing breach of the agreement relating to the assignment of work it will be free to ignore those provisions whenever all employees in the disfavored class are working.  Conversely, a damage award for a knowing contract breach will encourage a good faith effort to abide by the contract.

Hill states further an unremedied knowing mis-assignment of work reflects adversely on the Union and injures its standing among employees.  Arguably the Union is entitled to protection against this type of injuries to its reputation as well as the monetary injury incurred in policing the contract through grievance and arbitration even if it cannot show a loss of wage to any individual employees.

Arbitrator Louis Imundo awarded IBEW Local 15 $495,000 on October 18, 2006 for mis-assignment of unit work (therein to management) rather than unit personnel in a matter he concluded as a deterrent to enforce mis-assignment and removal of work from the unit..

Huron's situation is similar to <u>McKenzie Engineering Co.</u>, 333 NLRB No. 115, 170 LRRM 1440 at 443 (2001) citing <u>NLRB v. Howard Immel</u>, 102 F.3d 948, 158 LRRM 2026 (1996):

> No legal authority supports the proposition that an employer's action in entering into two conflicting bargaining agreements alter the rights of a party to a 9(a) agreement. Indeed the only authority that Immel cites recognizes that by entering into conflicting bargaining agreements an employer may have to pay two unions for work that only one performed. <u>Hutter Construction v. IUOE</u> 862 F.2d 641, 645 N. 16, 129 LRRM 3034 (7th Cir. 1988). This reasoning suggests that an employer cannot escape its obligations under the collective bargaining agreement by claiming that those obligations conflict with its obligations under another agreement".

The Board further found at 170 LRRM 1444 "there was in fact no jurisdictional dispute at least in the sense it was contemplated in the Act . . Moreover the Respondent's conflicting contractual obligations arose only because it took the initiative to create such a conflict by seeking out and signing the addendum with the Operating Engineers which was no more than a very thinly disguised attempted by the Respondent to avoid its collective bargaining contract with the (Carpenters) Union".

## PAY IN LIEU - BACK PAY

The computation by an arbitrator of back pay amounts due will be sustained if the amounts found due are based upon "principles of equity and good conscience". <u>Pelletier v. Sinclair Transportation</u>, 250 A.2d 834, 70 LRRM 306 (N.H. Sup. Ct. 1989).

16

## APPROPRIATENESS OF BACKPAY AWARD TO THE UNION

The Union's back pay request is a simply pay in lieu of work claim brought over the misassignment of work. Elkouri How Arbitration Works, Arbitrable Remedies for Improper Assignment of Bargaining Unit Work to Outsiders determined at Page 763 that

It is common to grant a monetary award of damages to unit employees who lost work:

> "Where the arbitrator is called upon to remedy the improper assignment of bargaining unit work to outsiders, a frequently utilized remedy is a monetary award of damages to unit employees for lost work. In some cases the arbitrator has ordered the employer to cease and desist from the improper assignment, or has ordered the employer to assign the work to employees in the bargaining unit. Of course, the circumstances of the particular case may justify yet other remedies, possible to be used in conjunction with one or more of the foregoing remedies".

Thus the remedy ordered herein comports with the national trend advanced by Elkouri as applied when work is assigned outside the unit, sometimes to subcontractors, other times to supervisors.

It is thus appropriate to prohibit the assignment, order restitution of the work, combined with a monetary award to unit members to make restitution for lost earnings. MSB Mfg. Co. 92 LA 841 (Bankston, 1989) or award damages to the union where it was impossible to identify the individual workers who were displaced by the improper assignment. Brutoco Engineering Construction, 92 LA 33 (Ross, 1988) as cited in Elkouri, P. 757 awarded damages as representative of members. C. Iber & Sons, 69 LA 697, 705 (Gibson, 1977) ordered the money paid to the union as the representative of the employees who had been displaced from work. In Cardinal Printing Co. 60 LA 1208, 1215 (Dworkin, 1973) a publisher was ordered to pay to the union damages resulting

from non bargaining unit employees.  The union·was the appropriate party to receive damages for the ultimate use and benefit of its members.

The Seventh Circuit Court of Appeals has endorsed pay in lieu of work claims in IUOE Local 139 v. Hutter Construction, 862 F.2d 641, 129 LRRM 3034 (7th Cir. 1988) and reaffirmed in Miron Construction, Inc. v. IUOE Local 139, 44 F.3d 558, 148 LRRM 2199 (7th Cir. 1995) finding such awards valid and enforceable remedies in work assignment disputes.

The claim for back pay based on actual hours worked at contract rates, to be paid to the Union and the Fund is a recognized and reliable remedy.  It is restitution to the Union and a deterrent to Management to engage in like behavior in the future.

## MONETARY AWARD TO UNION
## IS APPROPRIATE

This was the same issue posed in Allied Plant Maintenance, 88 LA 963 (Banks, 1987) in an issue of work assignment (jurisdiction).  The arbitrator concluded that adoption of management's view would undoubtedly visit a forfeiture upon the union in that its members would be deprived of the right not to do the work.

The Union sought as a remedy that the Employer be enjoined from further issuance of like work assignments and for money "equal to the wages that would have been drawn as wages.".

18

<u>Mallanckrodt Chemical</u>, 68-2 Arb. ¶8511 (Goldberg, 1968) analyzed the problem

as follows:

> The arguments in favor of an award of damages despite the
> union's failure to show monetary loss to any employee are
> three-fold. Initially, it can be argued that unless management
> is subject to a monetary penalty for a knowing breach of the
> agreement relating to assignment of work, it will be free to
> ignore those provisions whenever all employees in the
> disfavored classification are working a full forty hour week.
> Conversely, a damage award for a knowing breach of contract
> will encourage a good faith effort to abide by the contract. .

Arbitrator Goldberg also stressed the status of the union as representative of

the individual employees:

> [T]he vice of an unremedied misassignment of work, at the very
> least a knowing misassignment, is that it reflects adversely on
> the union and injures the union's standing among the employees.
> "What good is the union if the company can ignore the union
> contract whenever it wishes and the union can't do anything about
> it?" a typical employee might ask. Arguably the union is entitled
> to protection against this type of injury to its reputation, as well as
> to the monetary injury incurred by it in policing the agreement
> through the grievance and arbitration procedure, even if it cannot
> show a loss of wages to any individual employee.

The potential adverse monetary consequences were also noted:

> Finally, the argument can be made (wholly without regard to
> whether the misassignment of work was knowing or not) that
> where the work is wrongfully assigned to employees in one
> classification, an award of damages measured by the amount of
> wages that might have been earned had the work been properly
> assigned is justified on the theory that even though the union
> cannot show a loss of earnings by an employee in the disfavored
> classification, such a loss might well have occurred. The employer,
> if forced to assign the work within the proper classification, might
> have had the work done on an overtime basis. Alternatively, the
> employer's action in assigning the disputed work to another
> classification, rather than to an employee in the proper classification
> might mean that at some indefinite date in the future, an employee in
> the disfavored classification will be laid off sooner than he would
> otherwise have been. It is extraordinarily difficult for the union to
> prove either of these facts since the former rests on a speculation

19

as to how management would have reacted in a hypothetical situation and the latter on speculation as to whether or not the future holds any prospect of layoffs or short work weeks for employees in the disfavored classification. Yet the difficulty of proof does not wholly negate the possibility that there either was or will be a loss of work for these employees (Remedies in Arbitration, Hill & Sincroppi, BNA Books, 1981, P. 131).

In a case of astounding parallels, this was again applied in Wehr Constructors, Inc., 124 LA 995 (Oberdank 11/25/07) where the contractor employed a non-signatory subcontractor in violation of the collective bargaining agreement is required to provide the union with records showing the hours worked by non-union employees at the site. The amount of damage the union is entitled was calculated by using those hours and the applicable union wage (and fringe benefit package) and that sum will become part of this award. The arbitrator retained jurisdiction for the purpose of resolving any dispute that arose out of the interpretation or application of the award.

The arbitrator contrary to employer's belief, found money damages appropriate in matters involving breaches of subcontracting clauses and are not considered harsh or draconian. After all the employer voluntarily put itself in the position. Having made it choice cannot expect to simply walk award form the other without paying a price for the consequences of its folly. The union certainly lost the change to refer men (therein carpenters) to the project and is entitled to recover for the lost opportunity.

According to Arbitrator C. Allen Foster, In Celanese Fibers Co., 72 LA 271 (1979):

> " . . . arbitrators agree that when misassigned work is performed on overtime or employees are on layoff at the time the work is done, the affected class suffers an economic loss of work, and an award for compensatory damages by the loss of wages must be granted".

In light of the rationale of Arbitrators Goldberg and Foster, and in view of the following findings, the union's request for damages were awarded in Allied Plant Maintenance.

### COMMITTEE MAY RETAIN JURISDICTION

Fairweather Practice and Procedure in Labor Arbitration P. 361:

> Moreover an arbitrator may retain jurisdiction either expressly in his award or by agreement of the parties in case the parties cannot agree on some matter specified in the award. For example, the amount of back pay. Western Airlines, 74 LA 923, 924 (Richman, 1980) retained jurisdiction in the award.

Page 385

Indeed courts have uniformly held that the functus officio doctrine is not applicable to incomplete awards citing Garment Workers Local 246 v. Evans Mfg. Co., 318 F.2d 58, 53 LRRM 2455 (3d Cir. 1986) arbitrators issuance of a preliminary award and retention of jurisdiction to resolve issue of damages is proper.

In Wehr Constructors, Inc., 124 LA 995 (Oberdunk 11/25/07) above, the arbitrator expressly retained jurisdiction for the purpose of resolving any dispute that may arise out of the interpretation and application of the award. Such language is common in arbitral decisions.

<u>Hill & Sincroppi Remedies in Arbitration</u> at Page 186, <u>Option to Remand Back</u>

<u>Pay Issue</u> notes:

> Once it is determined that a back pay award is appropriate, an arbitrator may remand the task of computation to the parties. Such a remedy is usually, but not always accompanied by retention of jurisdiction by the arbitrator in the event there is a subsequent dispute over the amount. The computation of back pay is regarded as a "peripheral aspect of a case" for which it is appropriate for an arbitrator to retain jurisdiction for the sake of procedural economy.

WHEREFORE, Glaziers Local 27 will pray at the conclusion of its case for an award of damages for the subcontracting breach of $396,936.50 plus 25% in liquidated damages for a willful violation using the <u>Wedi Constructors</u> formula for calculation.

GLAZIERS LOCAL 27

By:    _David Schwartz_____

One of Its Attorneys

DONALD D. SCHWARTZ
ARNOLD AND KADJAN
19 W. Jackson Boulevard
Suite 300
Chicago, Illinois 60603
(312) 236-0415



## Labor and Employment Law Library

urce:  Arbitration Decisions > Labor Arbitration Decisions > Wehr Constructors, 124 LA 995 (Arb. 2007).

<div align="center">

**124 LA 995**

**Wehr Constructors**

**Decision of Arbitrator**

FMCS Case No. 07/55608

November 25, 2007

</div>

In re WEHR CONSTRUCTORS, INC. [Danville, Ky.] and INDIANA/KENTUCKY REGIONAL COUNCIL OF CARPENTERS

### Arbitrator(s)

Arbitrator: Lawrence M. Oberdank, selected by parties through procedures of the Federal Mediation and Conciliation Service

## Headnotes

### ARBITRABILITY

**[1] Traveling contractor** ▶94.141 ▶24.101 ▶24.751

Dispute over meaning of employer's letter that it intended to modify collective-bargaining agreement on number of contractors is arbitrable, where agreement defines grievance as including "all disputes of every type and aracter between the parties hereto arising from this Agreement."

### CONSTRUCTION INDUSTRY

**[2] Association contract** ▶25.10 ▶24.751 ▶24.101

Employer's letter to union intended to modify collective-bargaining agreement of number of contractors did not repeal agreement, where letter was presented after negotiations ended and agreement came into being; letter was at best invitation to reopen negotiations to which union was not obligated to reply.

**[3] Estoppel** ▶24.78

Union is not estopped from attempting to enforce collective-bargaining agreement requiring traveling contractor to use union firms for work, where employer never produced alleged agreement with union stating that it could use nonunion subcontractors.

### SUBCONTRACTING

**[4] Past practice** ▶117.382

Union did not waive right to enforce traveling contractor provision of collective-bargaining agreement, even though it had not grieved contractors' earlier uses of nonunion subcontractors, where there was no evidence of union's motive in not grieving; it may not have known that contractor was using nonunion subcontractors.

**[5] Association contract** ▶25.10 ▶117.389

Fact that commercial agreements with nonunion subcontractors may have preceded collective-bargaining agreement that required use of union subcontractors does not invalidate labor agreement's effect, where union is asking for damages and not rescission of commercial agreements.

### CONSTRUCTION INDUSTRY

**[6] More favorable conditions** ▶25.10 ▶117.389 ▶24.757

Traveling contractor is required to abide by provision of collective-bargaining agreement that requires it use union subcontractors, even though agreement also provides that it is entitled to adopt more favorable provisions if union executes agreement with another employer with more employer-favorable provisions, where more favorable conditions apply to terms within confines of agreement with union.

## SUBCONTRACTING

**[7] Damages ►117.395**

Traveling contractor that used nonunion subcontractor in violation of collective-bargaining agreement is required to pay monetary damages to craftsmen who may have lost work due to infraction, since monetary damages are appropriate in matters involving breach of subcontracting clauses.

### Attorneys

Appearances: For the employer—James U. Smith III, attorney. For the union—Paul Berkowitz and Joe Pawlick, attorneys.

## Opinion Text

## DAMAGES

## Opinion By:

OBERDANK, Arbitrator.

### Statement of the Facts

Wehr Constructors, Inc., herein the "Employer", is a general contractor and project manager engaged in the construction industry in Kentucky. It has collective bargaining agreements with several labor organizations that represent skilled tradesmen and is party to such an understanding with the Indiana/

**Page 996**

Kentucky Regional Council of Carpenters, herein the "Union", which is an intermediate body that was created when the Carpenters District Councils in both states were merged.

The employer's bargaining history with the union's predecessor goes back to 1960, although there was a break in the relationship between 1989 and 1999. At that time, it executed the labor agreement governing work in Allen, Barren, Breckinridge, Bullitt, Butler, Carroll, Edmonson, Gallatin, Grayson, Hardin, Hart, Henry, Jefferson, Larue, Logan, Marion, Meade, Metcalfe, Monroe, Nelson, Oldham, Shelby, Simpson, Spencer, Trimble, Warren and Washington Counties, herein the "Louisville Contract", and remained a signatory to its successors, thereafter. Article 1.1(d) of the contract in effect between June 1, 2003 and May 31, 2006 contained language concerning other agreements and provided:

> Employers signatory to this Agreement hereby agree that when they perform work within the boundaries of the State of Kentucky, but outside the geographical jurisdiction of this Agreement as described herein, that the Employer will become signatory to and be bound by the terms and conditions of the Kentucky State District Council of Carpenters Collective Bargaining Agreement applicable to the geographical area where the cork is to be performed. [1]

---

[1] The language remained essentially the same in the labor agreement that took effect on June 1, 2006. The only changes being that the "Indiana/Kentucky Regional Council of Carpenters" was substituted for the "Kentucky State District Council of Carpenters" and the phrase, "within the State of Kentucky" was inserted after the words, "geographical area" because the contractors objected to the provision being extended into Indiana.

---

In January 2006, the employer was seeking the general contract for construction of an Ambulatory Surgery Center in Danville, Kentucky. A portion of the work entailed the installation of drywall so, in keeping with its customary practice, it solicited bids from a list of approved subcontractors in the area, both union and nonunion. Nineteen firms interested in submitting proposals attended a pre-bid meeting conducted by the employer on February 2, 2006 but none were union. On February 8th, reminders were sent to companies that failed to attend the meeting and, eventually, one union contractor, Danville Acoustics, bid the job. Its proposal was higher than those received from three nonunion firms and, after rejecting the lowest offer when the company proved unable to satisfy the bid requirements, the employer awarded the contract to another nonunion firm.

On March 22, 2006, the employer, as project manager, solicited proposals from union and nonunion firms interested in securing the drywall contract at the Frankfort Regional Medical Center. It employed the same procedure used to

obtain bids on the Danville project but, again, only one union contractor, Catron Interiors, made an offer. Its bid was significantly higher than the nonunion competition so the employer awarded the job to a nonunion concern.

Neither project was regulated by the Louisville labor agreement, however, because they were located in the geographic area overseen by Carpenters Local Union Number 1650 in Lexington, Kentucky and governed by the terms and working conditions in its contract, herein the "Lexington Contract". Article V of that accord restricted an employer's ability to subcontract and provided:

> All work falling under the jurisdiction of the Union which has been mutually negotiated shall be assigned to or subcontracted to a contractor having an agreement with the Union. [2]

---

[2] The identical language is found in Article V of the present collective bargaining agreement which has been in force since June 1, 2006 and will not expire until May 31, 2009.

---

The employer has never become a signatory to this understanding even though twenty percent of its business is conducted within its territorial jurisdiction.

The union and contractors negotiated new agreements in 2006, however, and, on June 23rd, the employer signed the understanding that supplanted its Louisville contract. At the same time, it sought to add a caveat which provided:

> That all contracts awarded to Wehr Constructors, Inc. prior to June 1, 2006 are exempt from grievances and are not bound to the terms and conditions of the agreement with the exception of the current wages and fringe contributions stated there-in. Said wages will be retroactive from June 1, 2006.

Daniel Hogle received the proposal but did not agree to it on behalf of the union and Executive Secretary-Treasurer, David C. Tharp, subsequently reminded the employer that the new contract was consummated on June 9, 2006. He also advised it that the union had no interest in reopening negotiations or changing the bargain.

On December 7, 2006, the union formalized a grievance protesting the employer's breach

Page 997

the Lexington Contract by subcontracting the installation of drywall at the Danville, Kentucky Ambulatory Surgery Center and Frankfort Regional Medical Center to nonunion contractors. All attempts at settlement failed and the matter was presented to the Joint Arbitration Committee pursuant to Article XIX of the Lexington Contract. That body deadlocked on February 23, 2007 and the dispute was advanced to final and binding arbitration.

## Opinion

The employer argues, in part, that it had a right to propose additional terms to the jointly-negotiated contract and that, once it had, the union was not at liberty to reject the caveat while, at the same time, binding it to the underlying agreement. To hold otherwise would require the Arbitrator to exceed his authority and invalidate an essential element of the accord. Disputes over what the contract is, moreover, are for the courts to resolve, not the Arbitrator. Nor may the union prevail even if the Arbitrator decides that the terms proposed in the June 23, 2006 letter were rejected, as the union argues, because, in that event, there could not be a meeting of the minds regarding the particulars of the bargain and, therefore, no agreement compelling the employer to abide by the traveling contractor language. Should the Arbitrator believe otherwise, principles of estoppel and waiver still preclude enforcement of the provision here because a letter of understanding and fifteen year practice exempt the employer from its application. A different result would violate all principles of contract interpretation by improperly giving retroactive effect to the 2006 labor agreement. Besides, the most favored nations clause in the Lexington Contract permits the employer to let work to nonunion firms without regard for the subcontracting language. The union is simply not entitled to the remedy it seeks and, in the absence of a solution, the grievance is moot. The Arbitrator should so hold and deny it.

The union, on the other hand, calls attention to the fact that both the 2003-2006 and 2006-2009 Louisville Contracts required a traveling contractor to execute and abide by the terms of the labor agreement prevailing in the territory where the work was performed. The employer was bound by the first and is a signatory to its successor. There is no uncertainty about its being a traveling contractor while employed on the Danville Ambulatory Surgical Center and Frankfort Regional Medical Center or about work on those projects being governed by the Lexington Contract and it was, therefore, obliged to execute that understanding and abide by its terms when subcontracting the installation of drywall. Yet, it did neither and let the work to nonunion firms even though union contractors bid the jobs. The violation of the subcontracting clause in the Lexington Contract is clear and the union is entitled to damages based on hours lost by bargaining unit employees. The Arbitrator should so hold and sustain the grievance.

[ 1 ] The employer insists its letter of June 23, 2006 is a restrictive endorsement of the Louisville Contract which

became part of the understanding and argues that any dispute concerning its validity is, therefore, for the court to decide but its reliance on substantive arbitrability is misplaced, in my judgment. Whenever that concept is raised as a defense, the only question before the court is whether the litigant resisting arbitration did, in fact, agree to resolve the dispute in that forum. If contractual language lends itself to an interpretation suggesting it did, the reluctant party will be told to arbitrate. However, courts also uphold an Arbitrator's right to decide the issue if the grievance procedure is liberal enough to encompass it. Here, Article XIX, Section 1 of the Lexington Contract defines the term, grievance, as including "all disputes of every type and character between the parties hereto arising from this Agreement". [3] This definition is, without a doubt, broad enough to include any argument concerning the legitimacy of the restraints being urged by the employer, in my view, and presents no obstacle to an arbitral resolution of the matter.

---

[3] The complaint, in this case, involves interpretation of the Lexington Contract and was processed pursuant to its grievance procedure.

---

[ 2 ] Rejection of the modifications, moreover, did not repeal the Louisville Contract or excuse the employer's failure to abide by its terms. It was among the contractors who engaged in coordinated bargaining with the union in 2006 and reached an agreement with it on June 9th. Negotiations ended at that time and the present Louisville Contract came into being. The revisions now being urged by the employer were never part of the joint discussions but were raised for the first time on June 23, 2006 when the contract was presented for signature. They represent, at best, an invitation to reopen negotiations for the purpose of changing the bargain and the union, therefore, was under no obligation to accede to the employer's

Page 998

wishes. Its refusal to do so had no affect on the underlying collective bargaining agreement or the employer's duty to honor it and, if truth be told, the union could have filed charges with the National Labor Relations Board accusing the employer of bargaining in bad faith had it refused to sign the understanding. [4] For that reason, the exemption for all contracts let before June 1, 2006 sought by the employer never came to pass and is not part of the Louisville Contract, in my judgment. [5]

---

[4] Tharp's letter refusing the employer's overture was sent by certified mail but, unfortunately, there is no date on the receipt. This omission is not significant, however, because the employer does not question its authenticity or deny receiving it.

[5] Nor is a different result required if, as the employer suggests, rejection of its proposals did, indeed, rescind the Louisville Contract because, when confronted with the notion of being nonunion, it quickly ratified the accord.

---

[ 3 ] Nor do I believe the union is estopped from enforcing its contractual rights, as the employer contends. Equitable Estoppel requires proof that the aggrieved party relied on the misrepresentations of another in good faith; that is was reasonable for it to do so under the circumstances; that, as a result, it sustained damages which would not have occurred but for the perfidy of the other person and that it would, therefore, be unjust for the miscreant to reap the rewards of his wrongdoing. The employer says it relied on a written agreement that allowed it to use nonunion subcontractors on its projects but the accord was never produced or put into evidence. No testimony was offered as to when the bargain was struck; the substance of talks leading to the understanding; the circumstances under which it was reached; whether union negotiators had authority to bind all local unions in the State of Kentucky and to do so in perpetuity; what project conditions triggered its application and whether the parties intended it to replace conflicting language in existing and future labor agreements. Nothing suggests that union agents subsequently misrepresented the terms of this obscure arrangement and that the employer relied on their duplicity to its detriment. The long and short of it is that there is simply no reason to believe the employer was duped and, therefore, no reason to apply the doctrine of Estoppel.

[ 4 ] Claims that the union intentionally waived its right to enforce the traveling contractor provisions of its Louisville Contract and the Subcontractor clause in the Lexington Contract are baseless, in my opinion and draw no support from the record. The employer does solicit bids from union subcontractors in the geographic areas where its projects are located and, when necessary, contacts them more than once to learn if they have an interest in the job but it also seeks bids from nonunion firms at the same time. It awards work to nonunion employers when their bids are lower than their union competitors and has admittedly been doing so for fifteen years. The union has never grieved the practice according to the employer and, therefore, has waived its right to do so now. A binding custom or past practice is not established by the mere passage of time alone, however, and this is especially true if they are being asserted for the purpose of changing contractual language that is clear and unequivocal. In that case, the party seeking to take advantage of the waiver must come forward with compelling evidence showing its counterpart was not only aware of the custom but that it understood the practice was going to amend explicit contractual language and approved of it doing so by specifically agreeing to the change or acquiescing in its application over time. Without evidence of actual knowledge and consent, the passage of time only proves the employer continually ignored its

contractual responsibilities and invites speculation about the reasons for union silence. Maybe, it failed to grieve because it didn't object to the use of nonunion subcontractors or perhaps it didn't know the employer was using them and, then again, it may have neglected to police its jurisdiction while the employer was in its territory. In any event, ɣ employer did not come forward with evidence of the union's motive and, in not doing so, failed prove it waived the ...ght to enforce the labor agreements.

[ 5 ] The employer, in addition, notes that the agreements at Danville Ambulatory Surgical Center and Frankfort Regional Medical Center preceded the Louisville and Lexington Contracts and argues, therefore, that retroactive application of the labor agreements is improper because it would invalidate those understandings but this contention treats the commercial accords and labor contracts as one and misconstrues the impact that each has on the other, in my judgment. The labor agreements are distinctive and do not annul or change the commercial understandings, in any way. The employer is not obliged to cancel or change its bargain with the nonunion firms and, indeed, is free to honor its commitments by finishing both projects with their employees. Nor does the union ask that it be compelled

**Page 999**

to revoke those understandings and replace the nonunion subcontractors. Instead, it seeks money damages as compensation for the breach of the subcontracting language in the Lexington Contract and, while this presents the employer with a dilemma since it could end up paying for the same work twice, it is a problem every business must face if it voluntarily assumes incompatible obligations. The solution does not lie in expungement of the union's legal right to redress, however but in the avoidance of similar problems in the future.

Besides, this is not a case where the employer, having a legitimate right to do so, entered into an arrangement with a nonunion firm and then discovered its labor agreement imposed new obligations on it that might adversely affect its existing commercial contracts. Here, the employer was bound by the Louisville Contract in effect between, June 1, 2003 and May 31, 2006. Article 1.1(d) of that understanding required it to sign and abide by the appropriate carpenter contract whenever it traveled outside Louisville's jurisdiction and that included the Lexington Contract governing the Danville Ambulatory Surgery Center and Frankfort Regional Medical Center. Article V of that agreement left no room for doubt and required the employer to subcontract work to union companies only. It was not at liberty, therefore, to solicit or accept offers from nonunion contractors, no matter what its practice had been. Yet, it did not sign the Lexington Contract or abide by its terms at the Danville Ambulatory Surgery Center or Frankfort Regional Medical Center. The duty to use union labor did not originate with the current Louisville and Lexington Contracts as the employer implies and, for that reason, it may not complain because it finds itself in a predicament of its own ıking.

[ 6 ] The employer may not evade accountability by relying on Article XXIV of the current Lexington Contract which, in pertinent part, provides;

> In the event the Union executes an agreement with another Employer containing provisions that are more favorable to such other Employer than those that have been agreed upon herein, then said Employer shall be entitled to adopt such more favorable provisions in lieu of the less favorable provisions contained in this Agreement. [6]

---

[6] The same language appeared in the Lexington Contract that was in effect between June 1, 2003 and May 31, 2006.

This language is not a license to shop around for more favorable conditions, as the employer seems to imply but is designed to guarantee economic stability in the Lexington area by providing contractors with a level playing field and ensuring tradesmen enjoy the same wages, fringe benefits and working conditions. It makes no difference if Article 7.3 of the current Louisville Contract permits employers to solicit bids from nonunion drywall contractors because that proviso does not extend beyond the territorial confines of the agreement and Article XXIV of the Lexington Contract does not supply a vehicle for it to do so. Nor may the employer hire nonunion firms just because they benefit from lower labor costs and more lenient work practices. The more favorable conditions mentioned in Article XXIV allude to terms that are part of a collective bargaining agreement negotiated by the union and, if they are not, the employer is not entitled to adopt them. Indeed, the entire bargaining relationship would be destroyed if contractors could simply lower wages and adjust working conditions whenever they found a nonunion company with a better deal.

Furthermore, the Lexington Contract furnishes relief to employers having trouble competing with nonunion contractors by allowing them to negotiate project agreements and in Article XXVIII, provides:

> The Indiana/Kentucky Regional Council of Carpenters agrees, when Employers signatory to the Collective Bargaining Agreement are bidding work in the geographical jurisdiction covered by the agreement feel that their competitive position with other Employers not signatory to this agreement is lessened on a particular project due to conditions and requirements in the existing Collective Bargaining Agreement, to meet with such

signatory Employer or Employers in an effort to amend the agreement for the particular job or project only. The purpose of any amendment to the agreement is to make the signatory Employer or Employers who are bidding the aforesaid work more competitive with Employers who are not signatory to the agreement. The amendment includes, but is not limited to adjustment in wages and working conditions. The Union shall give written notice to all other such Employers within forty-eight (48) hours of agreeing to a project agreement. Time shall be of the essence in negotiating any such project agreement.

The employer did not take advantage of the avenue open to it and contact the union to learn if it was amenable to negotiating a project agreement for the installation of drywall on the Danville Ambulatory Surgery Center or Frankfort Regional Medical Center

**Page 1000**

and but merely charged ahead on the assumption that Article 7.3 of the Louisville Contract protected its utilization of nonunion subcontractors. [7] Endorsing its belief regarding the supremacy of Article 7.3 makes Article XXVIII superfluous.

---

[7] At first, the employer sent copies of all bids received on both projects to the union office in Louisville, Kentucky but stopped doing so after local agents said they didn't need the information. I am sure this is probably true but it does not raise a presumption of union acquiescence in the employer's dealings with nonunion contractors. It is just as reasonable to suppose the local was not interested because the projects were not in its territorial jurisdiction.

---

Neither Article 1.1(c) of the Louisville Contract nor Article V of the Lexington Contract need ancillary evidence to reveal their true intent. Both are unambiguous and the obligations they impose are undeniable. Article 1.1(c) requires the employer to do two things when it travels outside the Louisville jurisdiction; sign the contract prevailing in the area and abide by its terms. Article V is just as explicit and compels the employer to subcontract to employers having an agreement with the Union. The language of both provisions can have no other meaning and leaves no room for the exercise of discretion. Their import is obvious and they must be enforced as written. The employer clearly violated them when it employed nonunion firms to install drywall at the Danville Ambulatory Surgery Center and Frankfort Regional Medical Center and must respond in damages.

' ] Contrary to the employer's belief, money damages are appropriate in matters involving breaches of subcontracting clauses and are not considered harsh or draconian. After all, the employer voluntarily put itself in the position of having to choose which of its conflicting obligations to honor and, once having made the choice, cannot, in all sincerity, expect to simply walk away from the other without paying a price for the consequences of its folly. In this case, union craftsmen employed by two contractors who bid on the installation of drywall at the Danville Ambulatory Surgery Center and Frankfort Regional Medical Center may or may not have lost work because the jobs were awarded to a nonunion subcontractor but the union certainly lost the chance to refer carpenters to the projects and is entitled to recover for the lost opportunity, in my judgment.

## AWARD

The grievance is sustained and the employer is directed to provide the union with records showing the hours worked by nonunion employees when installing drywall at the Danville Ambulatory Surgery Center and Frankfort Regional Medical Center within thirty days. The parties will then determine the amount of damages to which the union is entitled by using those hours and the applicable union wage and fringe benefit package and that sum will become part of this award. The Arbitrator will retain jurisdiction for the purpose of resolving any dispute that may arise out of the interpretation or application of this award.

– End of Case –

---

Contact customer relations at: customercare@bna.com or 1-800-372-1033

ISSN 1527-7356
pyright © 2008, The Bureau of National Affairs, Inc. Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Association of Glazing Contractors and
Painters District Council No. 14 and Its Affiliate
Glaziers Architectural Metal and Glass Workers Union No. 27
Joint Arbitration Committee

In the Matter of:                          )
                                           )
Huron Valley Glass, LLC,                   )
W & G, Inc.                                )
George Stripp, Individually and            )
W & G, LLC.                                )
                                           )
               Respondents,                )
                                           )
          and                              )
                                           )
Glaziers Architectural Metal and           )
Glassworkers Local 27                      )

### UNION'S PROPOSED
### DECISION AND AWARD

This matter coming to be heard before the Association of Glazing Contractors and

Glaziers Local 27 Joint Arbitration Committee pursuant to Article 18 of the collective

bargaining agreement, each side appearing and having given evidence and argument, it is

the majority decision of the Committee that:

A.     It has jurisdiction over the parties and the subject matter and is authorized

under the contract to grant an appropriate remedy.  Jurisdiction over all parties is

discussed further herein.

B.     As set forth in this Decision, reference to Glaziers Architectural Metal and

Glass Workers Union Local No. 27 Chicago and Vicinity of the International Union of

Painters and Allied Trades AFL-CIO shall be referred to as the "Glaziers Local 27" or

"Union".

1

1.    Huron Valley Glass, LLC is named in the preamble of the collective bargaining agreement pursuant to Article 1. The parties are the Association of Glazing Contractors and any other employer who is not a member of the Association, but is otherwise bound to the Agreement.

2.    The pre-contract correspondence was with Huron Valley Glass, LLC at its address in 5075 Carpenter, Ypsilanti, Michigan and the contract was sent to them for signature.

3.    The contract is signed by W. & G, Inc. by George Stripp. No corporate capacity is indicated by him and dated October 4, 2005. The contract was forwarded to the Union by Huron Valley Glass, LLC.

4.    W & G, Inc. is a defunct Michigan corporation and has never been licensed to do business in Illinois. Mr. Stripp is individually liable under the Illinois Business Corporation Act, 805 ILCS 5/8.65.

5.    W & G Glass, LLC conducts business at the same address 5075 Carpenter, Ypsilanti, Michigan as Huron Valley Glass, LLC. All notices of this proceeding were sent to that address. Each has the same Illinois registered agent.

6.    At no time did Huron Valley Glass, LLC object to receipt of the Board of Business Agents or Joint Committee notices or indicate it was not the proper party to the proceeding or was not bound to the collective bargaining agreement.

7.     Neither Huron Valley Glass, W & G, Inc., George Stripp and/or W & G, LLC served written notice of termination of their Association bargaining agreement during the window period contained in Article 25 of not less than sixty (60) days nor more than ninety (90) written notice by registered or certified mail prior to the expiration date of May 31, 2006.

8.     The Union and the Association of Glazing Contractors served notice, met and bargained and reached a successor agreement for the period June 1, 2006 through May 31, 2009 covering wages, hours and working conditions.

9.     Huron Valley Glass, LLC, W & G, Inc., W & G, LLC and George Stripp, Individually (hereinafter referred to as "Huron Valley, et al.") ratified and adopted the terms and conditions of the newly negotiated Association agreement by using the Union referral procedures, Article 2, Section 6, checking off dues, under Article 2, Section 4, abiding by the hours Article 3, Section 1, Wages Article 5 and submitted and paid fringe benefits at rates as required under the June 1, 2006 – May 31, 2009 Association agreement and obtaining a bond at the rates required by the current Association agreement under Article 20, <u>Bonding</u> Section 6(b) on behalf of some of its employees who performed bargaining unit work.

10.     Huron Valley Glass, LLC, W & G, Inc., W & G, LLC and George Stripp, Individually hereinafter "Huron, et al." are bound to the Association Agreement through May 31, 2009 by failing to send timely notice of termination in 2006 and by adopting the contract through a continued course of conduct and paying all proper and appropriate rates thereunder to date.

3

11.    Article 9, <u>Subcontracting</u> Section 2 of the Huron, et al. Agreement contains a union signatory subcontracting clause which provides:

> "Employers <u>shall not contract</u> any work covered by this Agreement to be done at the site of the construction alteration, painting or repair of a building structure or other work to be done and person, firm or company who does not have an existing labor agreement with Glaziers Local 27."

12.    Huron, et al. undertook a contract dated October 23, 2006 on 1401 S. State Street, Chicago, Illinois known as the Reebie Lofts for $5,595,000. Huron subcontracted the work February 21, 2007 to J & D Erectors, a non-Local 27 signator to perform work covered under Article 7 <u>Scope of Work</u>. The contract was breached as of the date of signing with J & D Erectors. The work of pre-glazed window installation and store front glass did not commence until August, 2007.

13.    On March 5, 2007, prior to the commencement of the project, the Union provided Huron at its 5075 Carpenter, Ypsilanti, Michigan address legal authority to the effect that violation of the subcontracting clause could result in a pay in lieu of work claim and contained legal citations to that effect citing <u>Hutter Construction Co. v. IOUE 139</u>, 862 F.2d 641 (7th Cir. 1988) and <u>Miron Construction v. IOUE Local 139</u>, 44 F.3d 588 (7th Cir. 1994) and sought a resolution to mitigate potential damages. Huron's attorney did not contact the Union or its counsel.

14.    Notice to Huron to appear before the Board of Business Agents was served March 14, 2007 at the 5075 Carpenter, Ypsilanti, Michigan address for a March 20, 2007 appearance. Huron responded March 16, 2007 seeking a continuance. The matter was continued to April 3, 2007. No one appeared.

15. Huron Valley did not alter its plans or disclose to the Union it had already subcontracted the work to a non-Glaziers 27 signator, J & D Erectors.

16. Glaziers 27 responded May 2, 2007 to the April 21, 2007 Huron Valley letter again stating it gave prior notice and reserved all contract rights to seek pay in lieu of work for the subcontracting breach.

17. Huron Valley replied to the letter May 14, 2007 that it was proceeding with the project. There was no mention that it had no contract with Glaziers 27 or that any other entity was performing the work.

18. The 1401 S. State Street project commenced and was performed entirely by persons who were not members of Glaziers 27 nor was their employer signator to a Glaziers 27 agreement. Huron Valley, et al. wrote to the Glaziers April 21, 2007 that it was subcontracting the work to a non-signator.

19. The 1401 S. State Street project was performed by J & D Erectors, Inc. who does not have a bargaining agreement with Glaziers Local 27. They installed store window glass on Floors 1 and 2 and pre-glazed windows on Floors 3-24. All such work is covered under Article 7 Scope of Work of the Glaziers Local 27 contract.

20. The total hours worked by J & D Erectors non-glaziers on the South State Street project performing covered work was 10,777.20 for the period May 7, 2007 through February 8, 2008. This assumes all hours were performed at straight time rates and excludes overtime or premium time that may have been paid.

21.    No notice to terminate the contract was sent by any of the Huron Valley family, Huron Valley Glass, LLC W & G, Inc., W & G, LLC and George Stripp, Individually. The Association bargained a June 1, 2006 to May 31, 2009 agreement. W & G, LLC followed all the terms and conditions of the new Association contract and paid the required wage and benefit rates required by the new Agreement.

22.    Bound by prior course of conduct, Huron, et al. now maintains that no one is bound to the October 4, 2005 collective bargaining agreement. It is well settled that an employer can bind himself to a collective bargaining agreement by a course of conduct. Robbins v. Lynch, 836 F.2d 330 (7th Cir. 1988) where employer made contributions and paid contributions at prescribed rates and submitted monthly reports.

## AWARD

23.    The grievance is hereby sustained. The remedy for the breach of the subcontracting clause is an amount of damages that would make the Union whole.

24.    Huron et al., jointly and severally is directed to comply with the subcontracting provisions, Article 9, of the agreement for its duration i.e. May 31, 2009 and all other terms and conditions of the collective bargaining agreement through May 31, 2009.

25.    As such contract breaches serve to erode the Union's purpose, prestige and influence in the workplace, it is the Committee's opinion that a monetary award is warranted. It is hereby granted and computed as follows:

26.   Huron, et al. is ordered to make whole Glaziers 27 whose members should have performed the work at the 1401 S. State Street project for losses suffered as a result of their failure to comply with the Glaziers 27 agreement.  Damages in the amount of $393,936.50 shall be paid to Glaziers Local 27 to be distributed to its membership.

27.   The Committee finds that it has jurisdiction over all the parties, Huron Valley Glass, LLC, W & G, Inc., George Stripp, Individually and W & G, LLC (hereinafter Huron Companies) and constitute a single employer or alter egos of one another and the Committee has jurisdiction to address all issues before it.

28.   The Huron Companies are bound by a course of conduct to the Association agreement through the May 31, 2009 expiration.

29.   As outlined in Paragraph 26 above, Huron Valley, LLC, W & G, Inc., W & G, LLC and George Stripp, Individually are hereby ordered to pay the Union within 48 hours from receipt of the Opinion and Award the amount of $396,936.50 determined to be due under the age audit to the union to make them whole for lost work opportunities measured by the actual hours worked by other employees who are members of trades other than Glaziers 27 of 10,770.2 hours multiplied by the Glaziers hourly rate of pay of $35.00 per hour as a make whole remedy and as a deterrent to further contract breaches by the Huron Companies.

30.   The Union is entitled to deduct from the Award monies for its treasury, the equivalent of working dues, based on those hours shown in the audit for such amounts.

31.   Pursuant to Article 18, Section 1, it is determined that the violation of the contract was willful and that a 25% liquidated damage award rendered hereunder to be paid to the grieving party.

7

32.    Accordingly, Huron Valley Glass, LLC, W & G, Inc., W & G, LLC and George Stripp, Individually, jointly, severally, individually and personally are ordered to pay within 48 hours of receipt of the Award plus this Award, 25% which equals $99,234 as liquidated damages for a total award against them of $496,170.50.

33.    The Union shall in its sole discretion be responsible for determining how the proceeds due under the Decision and Award are to be distributed to its membership.

34.    The Joint Arbitration Committee shall retain jurisdiction over the matter to assure the Award is implemented and as the breach may be ongoing, shall retain jurisdiction for the life of the contract until May 31, 2009 to hear any other grievances arising from this or other matters.

35.    The Huron Companies are hereby enjoined from further breach of the subcontracting provisions of Article 9 or violating the scope of work provisions of Article 7.

Dated:                                    Joint Arbitration Committee

_____            _____

                                   _____

                                   _____

                                   _____

                                   _____

association of glazing contractors

Post Office Box 1446 • Elk Grove Village, Illinois 60009
(847) 593-2980

Association of Glazing Contractors and
Painters District Council No. 14 and Its Affiliate
Glaziers Architectural Metal and Glass Workers Union No. 27
Joint Arbitration Committee

In the Matter of:                          )
                                           )
Huron Valley Glass, LLC,                   )
W & G, Inc.                                )
George Stripp, Individually and            )
W & G, LLC.                                )
                                           )
            Respondents,                   )
                                           )
      and                                  )
                                           )
Glaziers Architectural Metal and           )
Glassworkers Local 27                      )

## DECISION AND AWARD

This matter proceeded to arbitration before the  Association of Glazing

Contractors and Glaziers Local 27 Joint Arbitration Committee (Committee) per Article

18 of the collective bargaining agreement (CBA) between Glaziers Local 27 (Union) and

Huron Valley Glass, LLC (Huron) on March 20, 2008.  Each side was represented by

counsel.  Evidence was presented and  arguments were made.  Trial briefs were also

submitted by each side.


It is the majority decision of the Committee that:

A.      It has jurisdiction over the parties and the subject matter and is authorized

under the contract to grant an appropriate remedy.  Jurisdiction over all parties was

discussed.

"To Promote the Welfare, Image, Principles of Highest Level for the Industry"

B.    The Union filing the grievance is The Glaziers Architectural Metal and Glass Workers Union Local No. 27 Chicago and Vicinity of the International Union of Painters and Allied Trades AFL-CIO (Union).

C.    Huron Valley is named as the employer in the preamble of the 2005 CBA with the Union in Article 1. Huron through its attorney agreed at the hearing to the jurisdiction of this Committee for the purposes of this arbitration meaning that it acknowledges to be bound to the Union agreement in effect for all periods at issue.

D.    The pre-contract correspondence between the parties was between Huron and the Union at the company address in 5075 Carpenter, Ypsilanti, Michigan and the contract was sent there for signature.

E.    The CBA was signed on the last page under the name W & G, Inc. by George Stripp. No corporate capacity was indicated by him and he dated his signature on October 4, 2005. The contract was forwarded to the Union by Huron.

F.    W & G, Inc (Inc.) is a defunct Michigan corporation and has never been licensed to do business in Illinois. The evidence established that Inc was dissolved prior to the date Mr. George Stripp (Stripp) signed the CBA on behalf of Inc. The committee finds that Inc. as well as Huron is bound to the CBA as the entity that alleges to have signed the CBA.

G.    The committee agrees with the Union argument that under Illinois law Stripp is individually liable for any amounts owed by Huron and Inc. under the CBA. The Illinois Business Corporation Act, 805 ILCS 5/8.65 imposes liability on the individual who signs a contract and carries on business of a dissolved corporation. Stripp

2

falls under this category based on his signing the CBA on behalf of a dissolved corporation.

H.    The committed finds that W & G, LLC (LLC ) conducts business at the same address 5075 Carpenter, Ypsilanti, Michigan as Huron. All notices of this proceeding were sent to that address. Each has the same Illinois registered agent.

I.    Dennis Ahearn (Ahearn) testified on behalf of Huron. He stated that although he is president of Huron and Huron and LLC share office space he does not know who works for LLC or the business that this entity is engaged in. He did state that the controller for Huron is the same as the controller for LLC. He also stated that all contracts to perform work are obtained in the name of Huron but that wages are paid to field employees in the name of LLC. He personally gets a check from Huron. The Union entered into evidence the monthly fringe benefit report forms submitted for Huron employees. Ahearn stated that he did not know why the reports were submitted under the LLC name. He stated that the employees on the monthly Union reports worked on Huron Jobs and were supervised by Huron personnel. Ahearn stated that LLC is a payroll company for Huron employees.

J    The committee finds that LLC is the single employer or alter ego of Huron based on the facts presented at the hearing. The Union adequately established the relationship between LLC and Huron so that the committee finds that LLC is bound to Huron's CBA with the Union.

K.    The Committee finds that none of the respondent companies gave notice to terminate the CBA prior to the work being performed at issue in the grievance.

3

L       Although not essential to the Committee's findings in this matter the Committee believes that the conduct of Huron and LLC indicates that the companies remain bound to the Association bargaining agreement in effect from June 1, 2006 – May 31, 2009. The Union and the Association of Glazing Contractors served notice, met and bargained and reached a successor agreement for the period June 1, 2006 through May 31, 2009 covering wages, hours and working conditions. Huron and LLC ratified and adopted the terms and conditions of the 2006 CBA by using the Union referral procedures, Article 2, Section 6, checking off dues, under Article 2, Section 4, abiding by the hours Article 3, Section 1, Wages Article 5 and submitted and paid fringe benefits at rates as required under 2006 CBA. LLC also obtained a bond at the rates required by the current CBA under Article 20, Bonding Section 6(b) on behalf of some of its employees who performed bargaining unit work.

M.      The Union filed the grievance at issue herein under Article 9, Subcontracting Section 2 of the CBA. That provision contains a union signatory subcontracting clause which provides:

> "Employers shall not contract any work covered by this Agreement to be done at the site of the construction alteration, painting or repair of a building structure or other work to be done and person, firm or company who does not have an existing labor agreement with Glaziers Local 27."

N.      The Union grieved based on a job awarded to Huron, etc. in a contract dated October 23, 2006 for 1401 S. State Street, Chicago, Illinois known as the Reebie Lofts for $5,595,000. Huron claimed at the hearing that is did not subcontract the job to J & D until the end of April 2007. The committee disagrees and finds that Huron subcontracted the work February 21, 2007 to J & D Erectors, a non-Local 27 signator to

perform work covered under Article 7 <u>Scope of Work</u>. This is based on the date indicated on the first page of the subcontract agreement. The Union alleged that the CBA was breached as of the date of signing of the subcontract with J & D Erectors.

The work of pre-glazed window installation and store front glass called for in the subcontract agreement did not commence until August, 2007. The parties agree that the work performed at the Reebie job is covered under the Glaziers Union CBA work jurisdiction. The parties agree that J & D was only signatory to an Ironworkers CBA and J & D has no CBA with the Glaziers Union.

O.    On March 5, 2007, prior to the commencement of the project, the Union provided Huron at its 5075 Carpenter, Ypsilanti, Michigan address legal authority to the effect that violation of the subcontracting clause could result in a pay in lieu of work claim and contained legal citations to that effect citing <u>Hutter Construction Co. v. IOUE 139</u>, 862 F.2d 641 (7th Cir. 1988) and <u>Miron Construction v. IOUE Local 139</u>, 44 F.3d 588 (7th Cir. 1994) and sought a resolution to mitigate potential damages. Huron's attorney did not contact the Union or its counsel.

P.    The Union filed it's original grievance by sending Notice to Huron to appear before the Board of Business Agents as required under the first step of the union agreement on March 14, 2007 at the 5075 Carpenter, Ypsilanti, Michigan address for a March 20, 2007 appearance. Huron responded March 16, 2007 seeking a continuance. The matter was continued to April 3, 2007. No one appeared. The company(s) have not questioned the procedural validity of the grievance and do not challenge the jurisdiction of this committee on this basis.

Q.    In February and March 2007 the companies did not disclose to the Union

it had already subcontracted the work to a non-Glaziers 27 signator, J & D Erectors. The

Committee does not find the companies argument regarding when it subcontracted the

work to J & D to be credible. The company claims that it met with Union representatives

in April 2007 in an effort to resolve the grievance. The company claims that at that time

it asked the Union for names of companies who are Local 27 signators in an effort to

resolve the dispute. The Company claims that it subcontracted to J & D because no

Local 27 signator would bid on the job. The committee finds that the date on the

subcontract, February 2007 and the signature date by J & D in early April 2007 make it

unbelievable that Huron truly intended to find a Local 27 signator to do the work. We

find that the company intended merely to cover it's tracks and that it had already

consummated a deal with J & D before seeking bids from Glazier signator contractors.

R.    Huron Valley, et al. wrote to the Glaziers April 21, 2007 that it was

subcontracting the work to a non-signator. The 1401 S. State Street project was

performed by J & D Erectors, Inc ironworker employees. J & D has no Glazier CBA.

The employees installed store window glass on Floors 1 and 2 and pre-glazed windows

on Floors 3-24. All such work is covered under Article 7 <u>Scope of Work</u> of the Glaziers

Local 27 contract.

S.    The committee finds that the Company(s) violated the CBA by

subcontracting work within the scope of work of the Glaziers CBA to a non-signator

contractor. The contractual subcontracting provision is clear in prohibiting the conduct

engaged in in this situation. Huron and the related entities were put on notice on several

occasions that the proposed subcontracting violated their CBA. The employer made a

6

business decision to subcontract in violation of the CBA. We do not find any defense raised by the employer to this alleged violation to have any merit.

T.    The committee accepts the parties stipulation that the total hours worked by J & D Erectors ironworkers on the South State Street project performing work covered under the Glaziers CBA with Huron/LLC work was 10,777.20 for the period May 7, 2007 through February 8, 2008. This assumes all hours were performed at straight time rates and excludes overtime or premium time that may have been paid.

U.    The company(s) raised several defenses at the hearing. First, the company claims that if a violation is found only one-half of the hours found to be due should be awarded based on an understanding between the Glaziers and Ironworkers Unions that dual signator contractors are allowed to split the crews. Second, the company claims that back pay, if any should be limited because the Union has not demonstrated that there was an adequate number of out of work glaziers that Huron could have hired on it's payroll during the period of time J & D employed ironworkers on the job. Third, the company claims that the back pay remedy must be calculated on an individualized worker by worker basis and not as damages to the Union as a whole. Fourth, the company claims interim earnings of out of work employees must reduce the back pay award. Fifth, the company claims that unemployment compensation must reduce a back pay award.

V.    The Union claims that the grievance should be deemed a "pay in lieu of work" grievance which the Union may bring as an institution and that based on prior arbitration awards we may make a back pay award based on all hours worked by J & D

7

ironworker employees regardless whether there were available out of work glaziers to perform the work

W.    The Committee has carefully reviewed the arguments of both parties. The Committee holds that the Union's argument is more persuasive than the companys'. The committee is persuaded by the logic employed by Arbitrator Goldberg in the Mallankrodt decision cited in the Union's brief. We find that if we were to not award a complete pay in lieu remedy we would encourage this and other contractors to violate the subcontracting clause. Damages are proper when the Union as a whole has lost work. The Union has also been damaged in it's standing which argues in favor a full compensation for loss of work due to the violation of the subcontracting clause of the CBA.

X.    We do not accept the company's argument that individualized damages are the only proper remedy. The grievance was brought by the Union on behalf of the entire bargaining unit. Further, the violation occurred at the time of subcontracting. The Union was deprived of the right to find bargaining unit members to work on the job when the job commenced some months after the subcontract was let. It is too speculative to accept the company argument that the Union could not have filled the positions needed on the job in June when the violation occurred months before the job was to commence. We do not accept the argument that bargaining unit members and the unit as a whole were not injured based on the violation of the CBA. Nor do we find it proper to deduct unemployment or interim earnings earned by employees on the out of work list from an award to the Union as a whole.

8

## AWARD

1.    · The grievance is hereby sustained.  The remedy for the breach of the subcontracting clause is an amount of damages that would make the Union whole.

2      Huron,  LLc,  Stripp and Inc. jointly and severally are directed to comply with the subcontracting provisions, Article 9, of the agreement.

3.    The Committee's opinion is  that a monetary award is warranted.  It is hereby granted and computed as follows:

a.      Huron, et al. are ordered to make whole Glaziers 27 whose members should have performed the work at the 1401 S. State Street project for losses suffered as a result of their failure to comply with the Glaziers 27 agreement.  Damages in the amount of $393,936.50 shall be paid to Glaziers Local 27 to be distributed to its membership. This award is based on the audit prepared the Richard Wolf and Co as the audit was entered into evidence at the hearing

b.      The Committee finds that it has jurisdiction over all the parties, Huron Valley Glass, LLC, W & G, Inc., George Stripp, Individually and W & G, LLC (hereinafter Huron Companies) and constitute a single employer or alter egos of one another and the Committee has jurisdiction to address all issues before it.

c.      As outlined above, Huron Valley, LLC, W & G, Inc., W & G, LLC and George Stripp, Individually are hereby ordered to pay the Union within seven days from receipt of the Opinion and Award the amount of $396,936.50 determined to be due under the wage audit to the Union to make them whole for lost work opportunities measured by the actual hours worked by other employees who are members of trades other than Glaziers 27 of 10,770.2 hours multiplied by the Glaziers hourly wage rate of pay of $35.00 per hour as a make whole remedy and as a deterrent to further contract breaches by the Huron Companies.

d.      Pursuant to Article 18, Section 1, it is determined that the violation of the contract was willful and that a 25% liquidated damage award rendered hereunder to be paid to the grieving party.

e.      Accordingly, Huron Valley Glass, LLC, W & G, Inc., W & G, LLC and George Stripp, Individually, jointly, severally, individually and personally are ordered to

10

pay within seven days of receipt of the Award plus this Award, 25% which equals

$99,234 as liquidated damages for a total award against them of $496,170.50.

     f.     The Union shall in its sole discretion be responsible for determining how

the proceeds due under the Decision and Award are to be distributed to its membership.

     g.     The Joint Arbitration Committee shall retain jurisdiction over the matter to

assure the Award is implemented.

     h.     The Huron Companies are hereby enjoined from further breach of the

subcontracting provisions of Article 9 or violating the scope of work provisions of Article

Dated:                     Joint Arbitration Committee

_April 23, 2008_

11